## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRUE RELIGION APPAREL, INC., *et al.*,[1] | : | Case No. 17-11460 |
| | : | |
| Debtors. | : | (Joint Administration Requested) |

## DECLARATION OF DALIBOR SNYDER, CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY PLEADINGS

I, Dalibor Snyder, declare and state as follows:

1.      I am the Chief Financial Officer for True Religion Apparel, Inc. ("TRI") and each of its affiliates (collectively, the "Debtors") that have filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Cases"). The Debtors and their non-debtor foreign affiliates (the "Non-Debtor Affiliates") are referred to herein collectively as "True Religion" or the "Company."

2.      These Cases represent the culmination of the Debtors' efforts to achieve a mechanism for the successful restructuring of the Debtors' business for the benefit of the Debtors' stakeholders through the Plan (defined below). To minimize the adverse effects of filing Chapter 11 while at the same time moving the Debtors' restructuring efforts forward smoothly, therefore maximizing value for the benefit of stakeholders, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day

---

[1]     The Debtors, together with the last four digits of each Debtor's tax identification number, are: True Religion Apparel, Inc. (2633), TRLG Intermediate Holdings, LLC (3150), Guru Denim Inc. (1785), True Religion Sales, LLC (3441), and TRLGGC Services, LLC (8453). The location of the Debtors' headquarters and service address is: 1888 Rosecrans Avenue, Manhattan Beach, CA 90266.

Pleadings").[2]  I submit this Declaration in support of the Chapter 11 Petitions and the First Day

Pleadings.  I am familiar with the contents of each First Day Pleading (including the exhibits and

other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry,

believe the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to

operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve

value and maximize the likelihood of the successful restructuring of their business; and (c) best

serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought

in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these

chapter 11 cases.

3.      Except as otherwise indicated, all statements set forth in this Declaration are

based upon: (a) my personal knowledge; (b) information supplied to me by other members of the

Debtors' management or the Debtors' professionals that I believe in good faith to be reliable;

(c) my review of relevant documents; or (d) my opinion based upon my experience and

knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could

and would testify competently to the facts set forth in this Declaration.  The Debtors have

authorized me to submit this Declaration.

4.      I have served as the Chief Financial Officer of TRI since August 2016, and prior

to that, I served in various roles at TRI's business planning division beginning in December 2013

through November 2015.  From November 2015 through August 2016, I served as the Chief

Financial Officer of Sugarfina, Inc.  In my various capacities at TRI, I have become familiar with

the Debtors' businesses, operations and financial affairs.  As part of my duties as CFO in these

Cases, I will be overseeing and advising the Debtors on their day-to-day operations, budgets,

---

[2]   Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to
them in the relevant First Day Pleading.

cash flows, financial analysis and overall restructuring and reorganization efforts.  I hold my

B.A. and M.B.A. degrees from Harvard University and Harvard Business School, respectively.

5.       This Declaration is divided into five parts:  (i) an overview of the Company; (ii) a

summary of the Debtors' capitalization and primary prepetition indebtedness; (iii) the

circumstances leading to the commencement of these Cases and the Debtors' internal

restructuring initiatives; (iv) background and summary of the Restructuring Support Agreement

(defined below) and objections in chapter 11; and (v) relevant facts in support of the First Day

Pleadings.

## EXECUTIVE SUMMARY

6.       Founded in Los Angeles, California in 2002, the Company designs, markets, sells,

and distributes premium fashion apparel, centered on its core denim products using the brand

name "True Religion Brand Jeans."  True Religion is a brand that is globally recognized for

innovative, trendsetting denim jeans and apparel.  The Company's products are distributed

through wholesale and retail channels on six continents and through their websites at

www.truereligion.com and www.last-stitch.com.  On a global basis, as of the Petition Date, the

Company had approximately 140 True Religion and Last Stitch retail stores and over 1,900

employees.  For the fiscal year ended January 28, 2017, the Company reported total assets of

$243.3 million against $534.7 million of liabilities on a consolidated basis.  For the twelve

months ended January 28, 2017, the Company generated $369.5 million of net revenue and

posted a net operating loss of $78.5 million.

7.       Like several other national retailers such as Quicksilver, Pacific Sunwear,

American Apparel, Aéropostale, and BCBG, to name a few, the Company has been adversely

affected by a macro consumer shift away from brick-and-mortar to online retail channels, among

3

other factors, resulting in recent losses.  In addition, the premium denim market segment of the

fashion industry in which the Company operates has been in decline over the last several years,

compounding the negative impact on the Company's sales.  As a result, over the past several

years, as discussed more fully herein, the Company has aggressively cut costs and taken other

internal restructuring measures, including three reductions in force and several closures of

underperforming stores, and explored many alternatives to loosen existing liquidity.  Given the

size of the Company's debt, as part of its restructuring efforts, the Company considered more

significant restructuring options, including approaching its existing secured lenders with the hope

of negotiating a consensual restructuring.  These negotiations were extensive, arms-length,

spanning many months, and successfully culminated with the parties' execution of the

Restructuring Support Agreement attached hereto as Exhibit A (the "Restructuring Support

Agreement"), supported by 86.4% in amount of holders of First Lien Claims and 60.5% in

amount of Second Lien Term Claims (the "Ad Hoc Group") and TRLG Holdings, LLC  (the

"Equity Parent"), that forms the outline for the plan of reorganization (the "Plan") concurrently

filed herewith.

8.      If confirmed, the Plan will result in a 72% deleveraging of the Debtors' balance

sheet from approximately $493 million of funded debt as of the Petition Date to approximately

$139.5 million upon emergence.  The Plan proposes that over $386 million of First Lien Claims

shall be converted into new equity of the Reorganized Debtors and new first lien term loans as

more specifically set forth in the Plan.  Citizens Bank, N.A. has agreed to provide a $60 million

revolving debtor-in-possession credit facility to finance the Debtors through this process as well

as a commitment to provide exit financing.  With committed financing in place, the Debtors will

operate during the chapter 11 cases in the ordinary course of business and be in a position to

move quickly and expeditiously to Plan confirmation. The Debtors will also utilize the benefits of chapter 11 case to continue to critically evaluate their lease portfolio, close or consolidate underperforming store locations, and renegotiate lease terms to the extent possible.

9.      These cases were filed with the intention of confirming and implementing the Plan, allowing the Debtors to right-size their balance sheet while providing fair recoveries to all stakeholders. Unlike many retailers that are unable to reorganize, the Debtors have a viable path forward with the support of the Ad Hoc Group, their trade vendors, and a loyal customer base. The Company is pleased to be able to present for Court approval the Plan that will allow the Debtors to emerge with a healthy balance sheet, allow it to compete in the marketplace, continue to serve as an ongoing customer for its vendors, an ongoing tenant for dozens of leased locations, and save hundreds of domestic jobs in the process.

## I.      COMPANY OVERVIEW

### A.      Historical Overview

10.      Founded by Jeff Lubell in 2002, the Company was at the forefront of the premium denim movement, turning jeans from a commodity into a fashion statement. The Company designs and retails trendsetting jeans with the iconic and trademarked horseshoe symbol. The True Religion brand offers a wide range of apparel including jeans, pants, women and knit tops, and outerwear made from denim, fleece, jersey, and other fabrics. The Company is known for its unique fits, washes, and styling details.

11.      The Company's denim products are manufactured in the United States and internationally, depending on the product. True Religion jeans are designed in house by the Company's dedicated team of designers. The Company's products are distributed through wholesale and retail channels in all 50 states across the country, the District of Columbia, and six different continents as described in more detail below.

5

12.    The Company leases its corporate headquarters, distribution facilities, and all of its retail stores. The Company's headquarters are located in Manhattan Beach, California. The Company has one distribution center in Fontana, California, as well as one showroom in the United States to display its apparel to buyers.

**B.    The Debtors' Business Operations**

13.    True Religion operates in four segments: (i) Direct to Consumer; (ii) Americas Wholesale; (iii) International; and (iv) Core Services. Each segment is discussed below.

### 1.    Direct to Consumer

14.    As of the Petition Date, the Company sells directly to consumers (DTC) in the United States and Canada through 128 retail stores, of which 73 are True Religion full-price retail stores, 53 are True Religion outlet stores, and 2 are Last Stitch retail stores. The U.S. retail stores are located in 33 states across the country. The average full-price store is typically 1,700 square feet and showcases the full range of True Religion branded merchandise. The outlet stores are typically 2,500 square feet. The Company also retails its products on the internet through www.truereligion.com and www.last-stitch.com. The Company's retail business competes in the highly competitive fashion industry.

15.    For the fiscal year ended January 28, 2017, the Company's DTC business generated net sales totaling $273 million, accounting for approximately 73.9% of the Company's total net sales.

### 2.    Americas Wholesale

16.    As of the Petition Date, in addition to the True Religion-branded retail stores, True Religion products are sold at nearly 500 locations not operated by the Company across United States, Canada, Mexico, and South America. The Company has several valuable relationships with leading nationwide premium department stores, specialty retailers and

boutiques, and off-price retailers through which its products are sold, including Nordstrom, Bloomingdales, Saks Fifth Avenue, Off 5th, and Nordstrom Rack, e-commerce sites, and others.

17.    For the fiscal year ended January 28, 2017, the Company's Americas Wholesale business generated net sales totaling approximately $54 million, accounting for approximately 14.6% of the Company's total net sales.

### 3.    International

18.    Sales of the Debtors' products are made internationally through a variety of distribution channels including Company-owned stores and distributor-owned stores.  As of the Petition Date, the International division consists of (i) 11 international stores outside North America, of which 6 are True Religion full-price retail stores and 5 are True Religion international outlet stores, and (ii) wholesale operations.  In 2010, the Company also formed a joint venture with UNIFA Premium GmbH (60% owned by True Religion and 40% owned by UNIFA) that distributes True Religion apparel in select European countries and operates certain of the True Religion Stores located in Germany and the Netherlands.  The Company sells directly to wholesale customers or has wholesale distribution agreements in various other countries and continents, including in Africa, Australia, Europe, the Middle East, and Asia.

19.    For the fiscal year ended January 28, 2017, the Company's International business generated net sales totaling approximately $40.8 million, accounting for approximately 11.1% of the Company's total net sales.

### 4.    Core Services (Licensing Business)

20.    The Core Services unit records all of the Company's corporate operations, including design, production, marketing, credit, customer services, information technology, accounting, executive, legal, and human services departments.

DOCS_LA:305756.6 85199/001

21.     In addition, the Company selectively licenses to third parties the right to use its various trademarks in connection with the manufacture and sale of designated products.  The licenses typically have three-year terms and the Debtors may grant the licensee conditional renewal options.  For the fiscal year ended January 28, 2017, the Company recognized $1.7 million in royalty revenue.

### 5.     Intellectual Property Portfolio

22.     The Company has invested heavily in developing and maintaining a large portfolio of copyright, patent, and trademark registrations in the United States and internationally.  The Company owns registrations in the United States and certain foreign countries of the "True Religion" "True Religion Brand Jeans", "True Jeans," and the horseshoe trademark, among others.  As of the Petition Date, the Company's intellectual property portfolio consists of 7 copyrights, 15 patents, and over 390 registered trademarks worldwide.

### 6.     Employees

23.     As of the Petition Date, the Debtors employed approximately 1,705 employees, of which 621 are employed full-time and 1,084 are employed part-time.  The Debtors are not party to any collective bargaining agreement and none of the employees are unionized.  On a collective basis, with their non-debtor global affiliates, the Company employs over 1,900 individuals worldwide.

### C.     The Debtors' Corporate Organizational Structure

24.     The Debtors are five privately held, affiliated companies.  TRLG Intermediate Holdings, LLC ("Holdings"), the direct or indirect parent of each of the Debtors, is a Delaware limited liability company, and is a non-operating holding company.  True Religion Apparel, Inc. ("TRI"), a Delaware corporation, owns 100% of the interests of Guru Denim, Inc., a California

DOCS_LA:305756.6 85199/001

corporation. Guru Denim, Inc., in turn, owns 100% of the interests of True Religion Sales, LLC, a Delaware limited liability company, as well as 100% of the ownership interests in certain non-debtor foreign affiliates of the Debtors. (Certain of the Debtors' foreign subsidiaries or affiliates, in turn, own other foreign affiliates). True Religion Sales, LLC, which is the main operating company for the U.S. operations, owns 100% of the equity of TRLGGC Services, LLC, a Virginia limited liability company, which holds and manages the Debtors' gift card liability. A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached as Exhibit B.

25.     Prior to July 2013, shares of the Company were publicly listed. On July 30, 2013, the Company completed a going-private transaction with affiliates of TowerBrook Capital Partners L.P. ("TowerBrook Capital"). As of the Petition Date, Holdings is 100% owned by Equity Parent, which in turn is majority owned by TI III TRLG Holdings, LLC ("TI Holdings"), an affiliate of TowerBrook Capital. TI Holdings, in turn, is owned by three TowerBrook Capital affiliates who are collectively referred to herein, with TI Holdings and Equity Parent, as "TowerBrook". Also, as of the Petition Date, minority interests in Equity Parent are held by Thomas O'Neill, one of the Debtors' current directors, who holds a 0.05% interest on a fully diluted basis, and by other individuals who are officers or employees of the Debtors who hold vested and unvested interests in Equity Parent.

26.     The Debtors understand that, prior to February 2016, TI Holdings or its affiliates purchased a portion of the Prepetition First Lien Obligations (defined below) and, as of June 27, 2017, TI Holdings, holds approximately 5.9% thereof.

DOCS_LA:305756.6 85199/001

## II.    DEBTORS' CAPITALIZATION AND PRIMARY PRE-PETITION INDEBTEDNESS

27.    The Debtors are obligated under an asset-based, secured credit facility and have issued or guaranteed over $483 million in principal obligations.  These obligations, and the priorities of liens between and among the Debtors' prepetition secured lenders, are discussed below.

### A.    Prepetition ABL Debt

28.    *Prepetition ABL Credit Agreement.*  The Prepetition ABL Lenders (as defined below) extended a $60,000,000 first priority senior secured asset-based revolving credit facility (the "Prepetition ABL Facility"), including a $25,000,000 sub-facility for Letters of Credit (as defined in the Prepetition ABL Credit Agreement (as defined below)), pursuant to that certain ABL Credit Agreement, dated as of July 30, 2013 (as amended, restated, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement," and together with the Prepetition ABL Security Agreement (as defined below) and the other Credit Documents (as defined in the Prepetition ABL Credit Agreement), the "Prepetition ABL Credit Documents"), among TRI, as borrower, Deutsche Bank AG New York Branch, as administrative and collateral agent (the "Prepetition ABL Agent"), and the lenders party thereto from time to time (the "Prepetition ABL Lenders," and, together with the Prepetition ABL Agent and the other Secured Creditors (as defined in the Prepetition ABL Credit Documents), the "Prepetition ABL Secured Parties").  As of the Petition Date, the Debtors party to the Prepetition ABL Credit Documents are indebted to the Prepetition ABL Secured Parties pursuant to the Prepetition ABL Credit Documents in the aggregate outstanding principal amount of $12,000,000 and Existing L/Cs in an aggregate face amount of $5,051,858 plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses and all other Obligations (as defined in the Prepetition ABL Credit

Agreement) owing under or in connection with the Prepetition ABL Credit Documents (including, without limitation, any obligations under the Existing L/Cs (as defined above), collectively, the "Prepetition ABL Obligations").

29.     *Prepetition ABL Collateral.*  In connection with the Prepetition ABL Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition ABL Security Agreement"), by and between the Debtors, as grantors, and the Prepetition ABL Agent, as collateral agent for the Prepetition ABL Lenders and the other Prepetition ABL Secured Parties.  Pursuant to the Prepetition ABL Security Agreement and the other Prepetition ABL Credit Documents, the Prepetition ABL Obligations are secured by valid, binding, perfected and enforceable (x) first priority liens on, and security interests in, the ABL Facility Priority Collateral (as defined in the Intercreditor Agreement (as defined below)) (the "Prepetition ABL Collateral First Liens") that are senior to the Prepetition ABL Collateral Second Liens and the Prepetition ABL Collateral Third Liens (each as defined below) and (y) third priority liens on, and security interests in, the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) that are junior and subordinate to the Prepetition Term Collateral First Liens and the Prepetition Term Collateral Second Liens (each as defined below) (the "Prepetition Term Collateral Third Liens" and, together with the Prepetition ABL Collateral First Liens, the "Prepetition ABL Secured Party Liens"), in each case, subject to certain exclusions as set forth in the Prepetition ABL Credit Documents.

30.     *Prepetition ABL Guarantee.*  Pursuant to the Prepetition ABL Credit Documents, each of the Guarantors (as defined in the Prepetition ABL Credit Agreement) has delivered to the

Prepetition ABL Agent an unconditional joint and several guaranty of the Prepetition ABL Obligations, which guaranty is secured by the Prepetition ABL Secured Party Liens.

**B.**    **Prepetition First Lien Term Debt**

31.    *First Lien Credit Agreement.*  The First Lien Lenders (as defined below) extended a $400,000,000 first priority, senior secured term loan facility of which $386,000,000 in aggregate principal amount remains outstanding (the "First Lien Facility") pursuant to that certain First Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, or otherwise modified from time to time, the "First Lien Credit Agreement," and together with the First Lien Security Agreement (defined below) and the other Credit Documents (as defined in the First Lien Credit Agreement), the "First Lien Credit Documents"), among TRI, as borrower, Delaware Trust Company (as successor to Deutsche Bank AG New York Branch), as administrative and collateral agent (the "First Lien Agent"), and the lenders party thereto from time to time (the "First Lien Lenders," and, together with the First Lien Agent and the other Secured Creditors (as defined in the First Lien Credit Documents), the "Prepetition First Lien Secured Parties").  As of the Petition Date, the Debtors party to the First Lien Credit Documents are indebted to the Prepetition First Lien Secured Parties pursuant to the First Lien Credit Documents in respect of loans in the aggregate outstanding principal amount of $386,000,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses and all other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Documents (collectively, the "Prepetition First Lien Obligations").

32.    *First Lien Collateral.*  In connection with the First Lien Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time,

12

the "First Lien Security Agreement"), by and between the Debtors, as grantors, and the First Lien

Agent, as collateral agent for the First Lien Lenders and the other Prepetition First Lien Secured

Parties. Pursuant to the First Lien Security Agreement and the other First Lien Credit

Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected and

enforceable (x) first priority liens on, and security interests in, the Term Loan Priority Collateral

(the "Prepetition Term Collateral First Liens") that are senior to the Prepetition Term Collateral

Second Liens and the Prepetition Term Collateral Third Liens and (y) second priority liens on,

and security interests in, the ABL Facility Priority Collateral that are junior and subordinate to

the Prepetition ABL Collateral First Liens and senior to the Prepetition ABL Collateral Third

Liens (the "Prepetition ABL Collateral Second Liens" and, together with the Prepetition Term

Collateral First Liens, the "Prepetition First Lien Secured Party Liens"), in each case, subject to

certain exclusions as set forth in the First Lien Credit Documents.

33.    *Prepetition First Lien Guarantee.* Pursuant to the First Lien Credit Documents,

each of the Guarantors (as defined in the First Lien Credit Agreement) has delivered to the First

Lien Agent an unconditional joint and several guaranty of the Prepetition First Lien Obligations,

which guaranty is secured by the Prepetition First Lien Secured Party Liens.

**C.     Prepetition Second Lien Term Debt**

34.    *Second Lien Facility.* The Second Lien Lenders (as defined below) extended a

$85,000,000 second priority senior secured term loan facility (the "Second Lien Facility")

pursuant to that certain Second Lien Credit Agreement, dated as of July 30, 2013 (as amended,

restated, or otherwise modified from time to time, the "Second Lien Credit Agreement," and

together with the Second Lien Security Agreement (as defined below) and the other Credit

Documents (as defined in the Second Lien Credit Agreement), the "Second Lien Credit

Documents"), among TRI, as borrower, Wilmington Trust, National Association (as successor to

Deutsche Bank AG New York Branch), as administrative and collateral agent(the "Second Lien Agent"), and the lenders party thereto from time to time (the "Second Lien Lenders," and, together with the Second Lien Agent and the other Secured Creditors (as defined in the Second Lien Credit Documents), the "Prepetition Second Lien Secured Parties"). As of the Petition Date, the Debtors are indebted to the Prepetition Second Lien Secured Parties pursuant to the Second Lien Credit Documents in respect of loans in the aggregate outstanding principal amount of $85,000,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses and all other Obligations (as defined in the Second Lien Credit Agreement) owing under or in connection with the Second Lien Credit Documents (collectively, the "Prepetition Second Lien Obligations" and together with the Prepetition ABL Obligations and the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").

35.      *Second Lien Collateral.* In connection with the Second Lien Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "Second Lien Security Agreement"), by and between the Debtors, as grantors, and the Second Lien Agent, as collateral agent for the Second Lien Lenders and the other Prepetition Second Lien Secured Parties. Pursuant to the Second Lien Security Agreement and the other Second Lien Credit Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable (x) second priority liens on, and security interests in, the Term Loan Priority Collateral (the "Prepetition Term Collateral Second Liens") that are junior and subordinate to the Prepetition Term Collateral First Liens and senior to the Prepetition Term Collateral Third Liens, and (y) third priority liens on, and security interests in, the ABL Facility Priority Collateral that are junior and subordinate to the Prepetition ABL Collateral First Liens

and the Prepetition ABL Collateral Second Liens (the "Prepetition ABL Collateral Third Liens" and, together with the Prepetition Term Collateral Second Liens, the "Prepetition Second Lien Secured Party Liens" and, together with the Prepetition ABL Secured Party Liens and the Prepetition First Lien Secured Party Liens, the "Prepetition Liens"), in each case, subject to certain exclusions as set forth in the Second Lien Credit Documents.

36.    *Prepetition Second Lien Guarantee.*  Pursuant to the Second Lien Credit Documents, each of the Guarantors (as defined in the Second Lien Credit Agreement) has delivered to the Second Lien Agent an unconditional joint and several guaranty of the Prepetition Second Lien Obligations, which guaranty is secured by the Prepetition Second Lien Secured Party Liens.

**D.    Intercreditor Agreement**

37.    The Prepetition Agents (i.e., the Prepetition ABL Agent, the First Lien Agent, and the Second Lien Agent) are parties to that certain Intercreditor Agreement, dated as of July 30, 2013 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement").  The Intercreditor Agreement, among other things, provides for the relative priority of the respective prepetition liens and security interests of the Prepetition Agents in and to the ABL Facility Priority Collateral and the Term Loan Priority Collateral (collectively, the "Prepetition Collateral"), pursuant to the terms set forth therein.

**E.    Other Prepetition Obligations**

38.    As of July 3, 2017, the Debtors had an estimated $8.6 million of outstanding accounts payable owing to vendors, service providers, and landlords.

DOCS_LA:305756.6 85199/001

### III.   CAUSES OF BANKRUPTCY AND INTERNAL RESTRUCTURING INITIATIVES

#### A.   Events Leading to Chapter 11

39.   From 2007 through 2012, the Debtors' business nearly tripled in size with net revenue at $490 million and EBITDA at $92 million in 2013.  Beginning in 2013, the Debtors began experiencing declining sales caused by the general trend of consumers away from traditional retail to online shopping.  The continuing fundamental shift in consumer behavior away from brick-and-mortar and mall shopping toward online retailing has decreased traffic and negatively impacted sales in the Company's physical locations as well as the wholesale accounts to which the Company sells.  The volume of retailers either going out of business, over-inventoried or closing a significant number of physical locations has created a highly competitive promotional environment wherein the Company must utilize significant promotional efforts to be competitive and attract its fair share of consumer traffic and drive sales.

40.   At the same time, changing consumer preferences in the specialty retail segment, and in particular, premium denim, have compounded the broader retail industry-wide challenges. Denim entered a down cycle in 2013, caused in part by the growth of the "athleisure" trend. Competition has also increased from emerging and established fast fashion and low-priced apparel retailers, which has compressed pricing and put pressure on the Company's gross margin rates.  In addition, the rapid rise and high profitability of the premium denim segment before 2013, led in part by True Religion, attracted new companies and brands with focused style segmentation/specialization between clean and embellished product, further fragmenting the premium denim consumer base, particularly in the women's category.  This increase in available consumer choice and volume of premium denim purveyors eroded overall True Religion market share in the premium denim segment.

41.     In addition to broader industry shifts, the Company's financial performance was further adversely impacted by new product designs launched by the Company that failed to resonate with the consumer and investments in brand repositioning through new store concepts that performed below expectations.

**B.      Internal Restructuring Initiatives**

42.     In response to declining performance, the Company has made several concerted internal restructuring efforts.  First, the Company changed senior leadership in 2015 hiring a new Chief Executive Officer, Chief Marketing Officer and Vice President of Sourcing.  In order to reduce costs, the Company also accelerated the shift to offshore manufacturing.  Moreover, the Company has undertaken a targeted and tenacious reduction in SG&A costs in areas such as reductions in force, modifying retail incentive plans, consolidating delivery, negotiating with vendors, and reducing travel, expense and sample spending, among other cost-cutting efforts.

43.     Such measures showed promise as early results indicated that the business was stabilizing and the decline between current year and prior year EBITDA was shrinking. However, in early 2016, the Company saw further deterioration in customer traffic, top line business, gross margins and EBITDA.  As a result, the Company addressed the decline in performance through a variety of additional initiatives, including but not limited to:

  a.  Evaluating and reducing the store fleet, including closing 20 unprofitable retail stores in 2016;

  b.  Focusing the product range to enhance brand perception and reinforce product messaging;

  c.  Redirecting resources in support of digital commerce to drive increased sales in this growth channel, enhance customer intelligence, and significantly add customers to the Company's data base;

17

    d.   Increasing brand awareness through social media campaigns;

    e.   Streamlining the timeline between design and go-to-market;

    f.   Implementing a targeted reduction-in-force at corporate headquarters by approximately 25% to better align headcount with the Company's go-forward strategy and reduce complexity and hierarchy; and

    g.   Hiring a new Chief Financial Officer in August 2016.

44.    The Debtors have undertaken a critical and extensive evaluation of their lease portfolio, including engaging various real estate professional firms from time to time to assist them in their efforts. As a result, the Debtors have been engaged in landlord discussions either for re-negotiation of terms or a consensual termination of various leases and expect that these discussions will continue post-petition. In recent years, the Debtors have closed 30 underperforming locations worldwide and anticipate closing additional locations in 2017.

45.    Although all these internal efforts have helped the bottom line, the Company could not change its trajectory quickly enough given the broader industry headwinds, looming debt maturity date, and high occupancy costs (even after taking into account the reduced store footprint). While the Company possessed ample liquidity, it realized its long-term prospects would be greatly enhanced by reducing outstanding debt. In March 2016, the Company retained a financial advisory firm, MAEVA Group, LLC ("MAEVA"), to assist and advise the Company in business strategy, financial forecasting, and devising and assessing potential restructuring proposals and any potential restructuring transaction.

DOCS_LA:305756.6 85199/001

## IV.    THE RESTRUCTURING SUPPORT AGREEMENT AND OBJECTIVES IN CHAPTER 11

### A.    Creditor Negotiations and Entry into the Restructuring Support Agreement

46.    The Company and TowerBrook realized that without a balance sheet restructuring, there would be limited ability for growth going forward.  In order to address the Company's over-levered balance sheet and proactively address its 2019 and 2020 debt maturities under the Prepetition First Lien Loan Agreement and Prepetition Second Lien Loan Agreement, the Company, with the participation of TowerBrook, and with the advice and support of MAEVA, reached out to its secured lenders.  The Company and TowerBrook began discussions with certain First Lien Lenders and Second Lien Lenders in September 2016.  Since November 2016, the Company and TowerBrook have been in active negotiations with the Ad Hoc Group through their lead counsel (Akin Gump Strauss Hauer & Feld LLP) and their financial advisor (Moelis & Company, LLP) (collectively, the "Holder Parties' Professionals"), over the terms of a potential restructuring.

47.    The Debtors (with MAEVA), TowerBrook and the Holder Parties (as defined in the Restructuring Support Agreement) attended several in-person meetings and exchanged several comprehensive restructuring proposals to right size the Debtors' balance sheet and enable the Debtors to be well-positioned going forward from an operational perspective.

48.    In addition, in the months leading up to the commencement of these Chapter 11 Cases, the Company executed multiple forbearance agreements and limited waivers with the Prepetition ABL Lenders, the First Lien Lenders and the Second Lien Lenders, providing the Company with interim covenant relief as the parties worked towards a consensual restructuring.

49.    The negotiations between the Company, TowerBrook, and the Ad Hoc Group culminated into the entry of the Restructuring Support Agreement between the Company, Equity

Parent, and the Holder Parties.  The Restructuring Support Agreement outlines the terms of a plan of reorganization that will allow the Company to quickly emerge from Chapter 11 with a balance sheet that has 72% less funded debt from the Petition Date and other reduction in liabilities while simultaneously providing the Company an opportunity to execute on its operational restructuring strategies outlined above.  With a significantly deleveraged balance sheet and support from the Holder Parties, the Company will be positioned for long-term growth and be in a position to continue to implement and execute its turnaround plan.  Substantially all holders of the Debtors' Prepetition First Lien Claims have signed the Restructuring Support Agreement, even though the Plan contemplates distributions to junior creditors and to equityholders, subject to the terms of the Plan.

50.    In connection with the Restructuring Support Agreement, the Debtors also obtained the Holder Parties' support of the Debtors' use of cash collateral and the Debtors' proposed DIP Facility, as further described below.

51.    The Restructuring Support Agreement obligates the Debtors to, among other things, take all necessary action reasonably required to propose and seek confirmation of the Plan.  Under both the Restructuring Support Agreement and the DIP Facility, the Debtors agreed to certain milestones designed to ensure that the Debtors move expeditiously towards conformation of the Plan.  Specifically, the DIP Facility milestones include:

| | |
|---|---|
| Interim DIP Order Approval | No later than 5 business days following the Petition Date |
| Motion to Extend 365(d)(4) Deadline Filed | No later than 10 days after the Petition Date |
| Motion to Extend 365(d)(4) Deadline Approved | No later than 35 days after the Petition Date |
| Final DIP Order Approval | No later than 40 days following the Petition Date |
| Disclosure Statement Approval | No later than 65 days following the Petition Date |

20

| Plan Confirmation of Acceptable Plan | No later than 100 days following the Petition Date |
|---|---|
| Plan Consummation | The earlier of (i) 120 days following the Petition Date or (ii) October 30, 2017 |

**B.    Objectives in Chapter 11**

52.    Consistent with the Restructuring Support Agreement, on July 5, 2017, the Debtors commenced these voluntary Chapter 11 Cases. The Company has a clearly defined vision and go-forward plan to drive strategic and financial growth. The go-forward plan focuses on: (i) global e-commerce expansion; (ii) targeted efforts to acquire new customers and to increase brand awareness; (iii) increasing distributor relationships on a global basis and increasing brand licensing globally; (iv) expanding pop-up outlet stores; and (v) expanding the Last Stitch retail stores concept.

53.    The pop-up outlets have been profitable for the Debtors, require significantly less outlay of capital than traditional outlet stores to open, and are based on short-term leases (18 months or less) with little downside for the Company. The pop-up outlets enable the Debtors to also reinforce their brand in targeted locations near their key customer base without the capital outlay of opening a traditional outlet store. During the course of these cases, the Debtors intend to open three to four additional pop-up outlets consistent with their past practices and their go-forward business plan. In addition, the Debtors have had success with converting certain of their True Religion locations to "Last Stitch" branded locations. During the course of these cases, the Debtors intend to open two additional Last Stitch locations consistent with their past practices.

54.    Early results of the Company's initiatives have shown promise. Nevertheless, the Company's maturing capital structure and high store occupancy costs, require restructuring before the Company can complete its turnaround and growth strategy. Through the Plan

DOCS_LA:305756.6 85199/001

contemplated by the Restructuring Support Agreement and the Ad Hoc Group's commitments thereunder, the Debtors intend to emerge from bankruptcy quickly, with a drastically reduced debt load.

55.    Moreover, the Debtors believe that the Plan, by enabling the Debtors to emerge quickly as a going concern, is in the best interest of their estates and will permit the Debtors to avoid liquidation through a successful rehabilitation of the Company and its business.

## V.    FIRST DAY PLEADINGS

56.    To enable the Debtors to minimize the adverse effects of these cases, the Debtors are requesting various types of relief in their First Day Pleadings.  Generally, the First Day Pleadings are designed to meet the Debtors' goals of (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and support of their customers, employees, vendors, suppliers, and service providers during the Debtors' reorganization process, and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

57.    I have reviewed each of the First Day Pleadings and believe the facts set forth therein are true and correct.  I believe that the relief sought in each of the First Day Pleadings is narrowly tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to achieve a successful reorganization.  Furthermore, I believe that with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to the Debtors' reorganization and granting the relief within the first twenty-one days of the chapter 11 cases is necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers, vendors, and creditors.

58.    The Debtors have an immediate need to continue the orderly operation of their business by securing goods and paying employees in the normal course of business. The Debtors' continued operations will enable them to preserve the going concern value of their estates and main vendor and customer confidence.

## A.    Administrative and Procedural Motions

59.    The Debtors will present several purely administrative or procedural First Day Pleadings: (a) a motion to jointly administer the Debtors' bankruptcy cases, (b) a motion to file a consolidated list of creditors, and (c) an application to employ Prime Clerk LLC ("Prime Clerk") as claims and noticing agent under 28 U.S.C. § 156.

## B.    Debtors' Motion to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Consolidated Matrix Motion")

60.    As in many large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the names and addresses of their respective creditors on a debtor-specific basis. The Debtors have prepared a consolidated creditor matrix that may receive certain notices during these cases. Requiring the Debtors to segregate and convert their records to provide five separate Debtor-specific creditor matrices would be unnecessarily burdensome and would result in duplicate filings.

61.    Similarly, the Debtors have proposed certain notice procedures that are designed to (a) provide service of most documents only to those parties in interest on a "Master Service List," with any party in interest eligible to be put on the Master Service List upon request, and (b) with several exceptions, provide electronic service of documents whenever possible to reduce costs and to speed up the service process. The Debtors believe that these procedures are fair, will provide adequate service to all relevant parties of all pleadings and documents, and will save

23

significant amounts in administrative costs that would otherwise detract from potential recoveries in these cases.

**C.      Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Commissions, Incentive Payments, Employee Benefits, and Other Compensation and Pay Temporary and Contract Workers; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ("Employee Wage & Benefits Motion")**

62.      The Debtors and their affiliates employ approximately 1,705 people, of which 621 are employed full-time and 1,084 are employed part-time.  The continued and uninterrupted support of the Debtors' employees is essential to the success of the Debtors' business. Maintaining the goodwill of the Debtors' employees and ensuring the uninterrupted availability of their services will protect the going concern value of the estates and maximize the value ultimately available to creditors by assisting the Debtors in maintaining the necessary "business as usual" atmosphere and preserving the Debtors' relationships with customers and vendors. Interruptions in payment of prepetition employee-related obligations, including wages, health and other benefits, and reimbursement of business expenses, will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

63.      To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, employee-related obligations, including: (a) employee wages, salaries, commissions, incentive payments, vacation and holiday pay, and other accrued compensation, (b) prepetition business expenses, (c) prepetition contributions to, and benefits under, employees' benefit plans (medical, dental, vision), (d) remittances to various third party employee-benefit providers on

behalf of employees, and all Prepetition Employee Obligations as defined in the Employee Wage & Benefits Motions, including:

| Wages or Benefits | Total |
|---|---|
| Gross Wages | $1,400,000 |
| Ceridian administrative fees (payroll processing) | $50,000 |
| Reimbursable Expenses | $175,000 |
| Third Party Labor Provider Costs | $475,000 |
| Prepetition Commissions | $285,000 |
| Incentive Program Payments | $875,000 |
| Closing Store Manager Payments | $25,000 |
| CBIZ Health Plan administrative fees | $20,000 |
| Medical Plan premium amounts | $330,000 |
| Dental Plan premium amounts | $35,000 |
| Vision Plan premium amounts | Included in Medical Premium Cap |
| COBRA Administrative fees | $3,000 |
| Flexible Spending Account fees | $7,500 |
| Health Savings Account fees | $5,000 |
| Basic Life Insurance Plan, AD&D and Employee Disability Plan | $25,000 |
| 401(k) Plan Audit Fees | $25,000 |
| Miscellaneous Benefits Fees | $10,000 |
| BWC Workers' Compensation Payments (Ohio) | $10,000 |
| Washington Agency Workers' Compensation Payments | $12,000 |

**D.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs in the Ordinary Course of Business ("Customer Programs Motion")**

64.    Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' reorganization efforts. In addition, the Debtors must maintain positive customer

relationships and their reputation for reliability to ensure that their customers continue to purchase the Debtors' products during the pendency of these chapter 11 cases.

65.     Specifically, the Customer Programs generally relate to the Debtors' programs in which they offer gift cards (of which an estimated $1,000,000 remains outstanding as of the Petition Date), refunds and exchanges, merchant credits and discounts, and coupons to retail customers.   The Debtors also provide Customer Programs to wholesale customers with respect to returns, wholesale discounts, cooperative advertisement, markdown allowance and other Customer Programs summarized in the Customer Programs Motion.   The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to meet competitive market pressures, and to ensure customer satisfaction, in order to retain current customers, attract new ones, and, ultimately, enhance revenue and profitability for the benefit of all the Debtors' stakeholders.

66.     The Debtors utilize several credit card companies and Paypal to process customer sales less any chargebacks, returns, and any processing fees charged.   Maintaining use of the credit cards is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods.

67.     The Debtors operate in a very competitive sector, and much of the success and viability of the Debtors' businesses are dependent upon brand loyalty, the Debtors' reputation and confidence of their customers.   Continued customer support is essential to the success of the Debtors' businesses and the preservation of the value of their estates.   The failure to honor the Customer Obligations in the ordinary course and without interruption would almost certainly cause the Debtors to suffer an irreparable loss of customer support and confidence, and those

customers might in the future make their purchases elsewhere as a result. The loss of customers would, without a doubt, detrimentally affect the Debtors' business and the recoveries to creditors.

**E.    Debtors' Motion for Entry of an Order Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and Granting Related Relief ("Critical Vendor Motion")**

68.    The Debtors' business relies on their access to and relationship with a network of vendors and suppliers. The Debtors' ability to generate income is dependent on sales of premium fashion apparel which is dependent, in large part, on customer traffic and satisfaction. If the quality and volume of the Debtors' merchandise decreases, sales will decrease as well. Any disruption in the Debtors' supply of merchandise would have a far-reaching economic and operational impact on their business.

69.    The vast majority of the Debtors' merchandise is provided by a broad network of vendors that, for the most part, conduct business with the Debtors on an invoice by invoice or purchase order by purchase order basis, and not pursuant to long-term contracts. The Debtors also rely on key service providers. These vendors typically supply their customers with services ("Non-product Vendors") and products ("Product Vendors") on trade terms based on their experience with and perceived risk of conducting business with such customers.

70.    It is essential to the success of the Debtors' restructuring effort that they be able to maintain the supply of merchandise to their retail stores and via direct sales to their customers and that they are able to continue to rely on service providers to operate their business. Failure to continue sourcing and managing inventory and sales through their existing network of vendors and service providers on commercially reasonable terms could have catastrophic consequences for the Debtors.

DOCS_LA:305756.6 85199/001

71.    The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source or primary provider of services or products; (ii) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured. As a result of their critical review and evaluation, the Debtors have identified a narrow subset of vendors as Critical Vendors.

72.    The Critical Vendors do not operate under formal contracts with the Debtors. Instead, the Critical Vendors rely on prompt and full payment. Absent assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods or services to the Debtors. The Debtors believe that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtors' business. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

73.    As of the Petition Date, the Debtors are current on payments to certain of the Critical Vendors but will owe amounts that have accrued immediately prior to the Petition Date for which they have not yet been invoiced or payment is not yet due and which do not fall within the relief requested in the Administrative Expense Motion (defined below). The Debtors anticipate the total amount of Critical Vendor Claims will be approximately $4,000,000.00 (the "Critical Vendor Cap").

74.    Given the importance of the goods or services provided by the Critical Vendors, I believe it is imperative that the Debtors be granted, on an emergency basis, the flexibility and

authority to satisfy the prepetition claims of the Critical Vendors up to the Critical Vendor Cap, as any disruption in the Debtors' ability to adequately stock their retail stores and provide merchandise directly to their customers would cause immediate and irreparable damage to the Debtors' business.

**F.     Motion Pursuant to Sections 105(a), 507(a)(8), And 541(d) of the Bankruptcy Code for an Order Authorizing the Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees ("Tax Motion")**

75.     The Debtors, in the ordinary course of their business, incur various tax liabilities, including, among other things, sales and use taxes, franchise taxes, business licenses, permits, and other fees, as well as other taxes, fees and governmental obligations (the "Prepetition Taxes"). The Debtors have reviewed their books and records and believe that, as of the Petition Date, accrued but unpaid prepetition liabilities incurred in the ordinary course of business total approximately $1,663,000 in unremitted Sales and Use Taxes, $200,000 in unremitted Franchise Taxes, and $40,000 of various taxes and fees for business licenses, annual reports, various permits, and other similar types of taxes and fees. The Debtors also utilize a third-party tax processing company to process and remit sales and use taxes, Avalara, Inc., who may be owed $10,000 in fees as of the Petition Date.

76.     The Debtors seek entry of an order authorizing them to pay the Prepetition Taxes. The Debtors have ample business justification to pay the Prepetition Taxes because it is my understanding that (a) many, if not all, of the Prepetition Taxes would be priority claims under the Bankruptcy Code that likely would be paid in full under a chapter 11 plan, (b) certain of the Prepetition Taxes may not constitute property of the Debtors' estates, (c) the Debtors are required to pay the Prepetition Taxes to maintain their good standing in the jurisdictions in which they do business, (d) failure to pay certain Prepetition Taxes could give rise to liens on certain of the Debtors' property, and (e) the Debtors' directors and officers could face personal liability if

29

certain Prepetition Taxes are not paid. Therefore, to prevent immediate and irreparable harm that would result from such disruptions and distractions, the Debtors seek authority to pay these claims on a first day basis up to a maximum amount of $1,925,000 in the aggregate.

**G.** **Debtors' Motion for Order (I) Authorizing Payment of Section 503(b)(9) Claims and (II) Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods Ordered Prepetition ("Administrative Expense Motion")**

77.    _Payment of 503(b)(9) Claims._ The Debtors received numerous goods in the ordinary course business during the twenty-day period immediately preceding the Petition Date. The Debtors believe that certain of the vendors and suppliers who delivered goods to the Debtors during the twenty-day period prior to the Petition Date but have not received payment for such goods (the "503(b)(9) Claimants") likely will either (a) refuse to continue to fill new purchase orders with the Debtors while these claims remain unpaid and/or (b) seek the allowance and payment of those claims (the "503(b)(9) Claims") through individual motions to this Court. The 503(b)(9) Claimants, Debtors and other parties in interest will likely divert resources in these cases toward either negotiating for continued services from these 503(b)(9) Claimants or drafting, filing, prosecuting and defending individual motions and related responses regarding the payment of 503(b)(9) Claims.

78.    In order to maintain their relationship with their vendors and to minimize any potential consequences of delaying payment of the 503(b)(9) Claims, the Debtors request an order authorizing, but not directing, them to pay the 503(b)(9) Claims immediately to the extent the Debtors determine that it is necessary to ensure the uninterrupted supply of materials to the Debtors to the extent set forth in the Administrative Expense Motion. The Debtors estimate that the amount owing to 503(b)(9) Claimants for goods delivered in the twenty days prior to the Petition Date is approximately $6,000,000.00.

79.    <u>Payment of Prepetition Purchase Orders</u>.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "<u>Outstanding Orders</u>") with a number of suppliers (collectively, the "<u>Suppliers</u>") for ordinary course goods that are in various stages of production and had not yet been delivered as of the Petition Date and which the Debtors believe are important to the Debtors' ongoing business operations.  Accordingly, the Debtors seek entry of an order confirming administrative expense priority status and authorizing payment of the Debtors' undisputed obligations for the postpetition delivery of goods that were ordered prepetition and that the Debtors have not canceled, declined, returned, or contested, subject to the terms of (i) any agreement for such payment entered into by the Debtors and any Supplier and (ii) any postpetition financing approved by the Court.  The Debtors further request entry of an order confirming that the Debtors shall have the right to (i) cancel a purchase order (including any Outstanding Order), (ii) decline the acceptance of goods, (iii) return any defective, nonconforming, or unacceptable good, or (iv) contest the amount of any invoice or claims, or liens related thereto, on any grounds.

80.    The Debtors believe that the requested relief in the Administrative Expense Motion is necessary to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of goods from their Suppliers and vendors.  Any disruption in the flow of the Debtors' inventory will materially harm the value of these estates.

**H.    Motion of Debtors for Interim and Final Orders (A) Approving the Debtors' Proposed  Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (D) Granting Related Relief ("<u>Utilities Motion</u>")**

81.    The Debtors utilize various utility services provided by numerous utility companies (collectively, the "<u>Utility Companies</u>").  Because the Utility Companies provide essential services to the Debtors and their retail operations, any significant interruption in utility

services would be highly problematic. In fact, the temporary or permanent discontinuation of utilities services at any of the Debtors' locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' restructuring efforts. On average, the Debtors pay approximately $232,000.00 each month for third party Utility Services and approximately $2,275 per month for a third-party processor of utility bills, RadiusPoint. The Debtors believe that, as of the Petition Date, they owe RadiusPoint approximately $5,000.00 for administrative fees.

82.    The Debtors will propose procedures to protect the rights of Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately two weeks of the Debtors' aggregate utility expenses. The Debtors submit that the deposit (which will be in the amount of $116,000), in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business and their existing security deposits constitutes sufficient adequate assurance of future payment to the Utility Companies.

I.    **Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(A) and 363 Authorizing Debtors to Pay Prepetition Claims of Shippers and Customs Representatives and Granting Related Relief ("Shippers Motion")**

83.    The Debtors' business depends on the daily process of importing and shipping their merchandise to stock their retail stores, fulfill wholesale customer orders and to make direct sales to E-commerce consumers via their on-line website. The merchandise is received into the Debtors' Fontana, California distribution center (the "Distribution Center") and then shipped to various locations. The smooth and efficient flow of the Debtors' merchandise to and from the Debtors is highly dependent on the services provided by custom brokers, freight forwarders, and common carriers.

84.    The Debtors engage the services of freight forwarders (the "Freight Forwarders") that contract for, coordinate, and ensure the transportation of the merchandise to and from the

32

Distribution Center.   Merchandise shipped internationally is subject to custom import duties upon arrival in the United States.  The Debtors rely on customs brokers (the "Customs Representatives") to obtain possession of this merchandise as it arrives in the United States from abroad and to expeditiously process the release of the merchandise so it can be delivered to the Distribution Center.

85.    After the merchandise is brought to the Distribution Center by the Freight Forwarders, the Debtors then engage the services of certain common carriers (the "Common Carriers"), to expedite shipment of merchandise from the Distribution Center to their ultimate destination.

86.    The estimated retail value of the merchandise being transported and/or processed as of the Petition Date by the Shippers and Customs Representatives substantially outweighs the outstanding shipping and customs charges.  The Debtors' ability to pay the Shippers and Customs Representatives that are involved in the daily transportation of the merchandise is critically important to the Debtors' business operations.

87.    The Debtors owe the Shippers and Customs Representatives approximately $845,000.00 for prepetition shipping, custom duties, and similar charges.  In the event that such charges remain unpaid, I am informed that the Shippers and Customs Representatives may argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are paid and their liens satisfied.

88.    Even absent a valid lien, the Shippers and Customs Representatives' mere possession (and retention) of the Debtors' merchandise could severely disrupt the Debtors' operations and restructuring efforts.

33

89.     If the Debtors' business operations are to continue, and the Debtors are to efficiently administer their estates, the Debtors must be able to maintain their distribution network in which the payment as requested under the Shippers Motion comprises a vital link.

J.      **Motion of Debtors for Order under Sections 105, 345, 363, 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Continued Performance of Intercompany Transactions; (IV) Limited Waiver of Section 345(B) Deposit and Investment Requirements and (V) Granting Related Relief ("Cash Management Motion")**

90.     In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving seven bank accounts, including approximately 122 subaccounts for the Debtors' domestic stores (collectively, the "Bank Accounts"). The Cash Management System provides a well-established mechanism for the collection, management, and disbursement of funds used in the Debtors' business.

91.     The Debtors' ability to continue their Cash Management System and to continue to engage in the Foreign Subsidiary Intercompany Transactions (as defined in the Cash Management Motion) in the ordinary course of their business is essential to their operations. Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines (the "UST Guidelines"). The Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds.

92.     In light of the substantial size and complexity of the Debtors' operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates. Altering the Cash Management System could

disrupt payments to employees and key vendors.  Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures and in accordance with the DIP Motion (as defined below).

93.     The Debtors will also seek authority to implement ordinary course changes to their Cash Management System that the Debtors determine are beneficial to their business, <u>provided</u> that such changes shall only be made to the extent permitted under the DIP Facility (as defined below) or as otherwise ordered by the Court.  In addition, the Debtors will seek authority to make certain changes to their Cash Management System as required by any order approving the Debtors' entry into the DIP Facility.

94.     In addition, in the ordinary course of their business, the Debtors engage in Intercompany Transactions as more fully set forth in the Cash Management Motion.  The Cash Management System and other processes allow the Debtors to track all obligations owing between related entities.  The Debtors seek the authority to continue their Intercompany Transactions in the ordinary course of business as further set forth in the Cash Management Motion.

**K.      Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(A), 362 and 365 Enforcing and Restating Automatic Stay and Bankruptcy Termination Provisions of Bankruptcy Code ("Automatic Stay Motion")**

95.     Given the global reach of the Debtors' businesses, the Debtors transact with vendors and suppliers of goods and services located outside the United States.  These foreign creditors and counterparties are not likely to be familiar with the Bankruptcy Code, particularly with respect to the various protections it affords to chapter 11 debtors, including the automatic stay.  As such, the Debtors believe that there is risk that certain foreign creditors and counterparties will not adhere to, or respect, the automatic stay or the orders of a court in the

35

United States.  Any such act by a foreign creditor or counterparty in contravention of the

Bankruptcy Code could disrupt the Debtors' ability to operate their businesses.

96.    Accordingly, to aid in the administration of the Debtors' bankruptcy cases and

avoid disruptions to the Debtors' businesses, the Debtors will seek entry of an order confirming

the application of the automatic stay provisions of section 362 of the Bankruptcy Code, the anti-

termination and anti-modification provisions of section 365 of the Bankruptcy Code, and the

anti-discrimination provisions of section 525 of the Bankruptcy Code.

97.    The Debtors believe that, absent an order enforcing the automatic stay protections

of Bankruptcy Code section 362 and the bankruptcy termination provisions of Bankruptcy Code

section 365, parties may take precipitous action against the Debtors or the property of the estates.

The Debtors believe that the existence of such an order, which the Debtors will be able to

transmit to affected parties, will maximize the protections afforded by sections 362, 365 and 525

of the Bankruptcy Code.

**L.    Motion of Debtors for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of Equity interests ("NOL Motion")**

98.    The Debtors estimate that through their 12-month fiscal year ended January 28,

2017, they have generated domestic NOLs totaling approximately $107.6 million ($26.7 million

of federal NOLs prior to any carryback and $80.9 million of state NOLs).  In addition, the

Debtors may have net unrealized built-in losses ("NUBILs"), alternative minimum tax credit

carryforwards (the "AMT Credits"), and foreign tax credits as well (the "Foreign Tax Credits",

and together with NOLs, NUBILs, and AMT Credits, the "Tax Attributes").  To preserve these

valuable Tax Attributes, the Debtors will seek to establish notice and objection procedures

regarding certain transfers of beneficial interests in equity securities in the Debtors.

36

99.    These Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases.  The Tax Attributes are of significant value to the Debtors and their estates because the Debtors can carry forward certain Tax Attributes to offset their future taxable income for up to 20 years (or approximately 10 years in the case of Foreign Tax Credits), thereby reducing the Debtors' future aggregate tax obligations. Importantly, such Tax Attributes may be utilized by the Debtors to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will potentially inure to the benefit of all of the Debtors' stakeholders.

100.    The relief sought will enable the Debtors to closely monitor certain transfers of equity securities and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their Tax Attributes.

**M.    Motion of Debtors Pursuant to Sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 2002 1(B), 4001 2, 9013 1(M) for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (vi) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "DIP Motion")**

101.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing them to enter into a new $60 million senior, secured debtor-in-possession financing facility (the "DIP Facility") with Citizens Bank, N.A. (the "DIP Lender") on the terms set forth in the DIP Agreement (as defined in the DIP Motion).  Approximately $12 million of the proceeds of the DIP Facility would be used to pay-off the existing Prepetition ABL Obligations , plus another $5 million to back-up or replace existing letters of credit. The DIP Facility will consensually prime the obligations of each of the Debtors' existing term loan lenders as to the ABL Priority Collateral, and will provide needed financing during the Debtors' cases pending

37

consummation of the Debtors' chapter 11 plan and the exit financing contemplated thereby, which Citizens also has committed to provide pursuant to that certain Exit Facility Commitment Letter Agreement dated July 4, 2017 (the "Exit Facility Commitment Letter"), agreed upon by Citizens and TRI.

102.    Prior to the Petition Date, the Debtors were informed that their existing Prepetition ABL Lenders would not extend credit to the Debtors on a postpetition basis beyond the existing maximum borrowing availability.  The Debtors therefore conducted a thorough marketing process in order to identify alternative sources of capital, as detailed in the Declaration of Harry Wilson of MAEVA Group, LLC in Support of the DIP Motion, I believe that the marketing process that was conducted included a number of potential lenders and was appropriate in light of the Debtors' capital structure, financing needs, and timing concerns.

103.    Ultimately, the DIP Lender presented the Debtors with the most economically advantageous alternative for a new debtor-in-possession asset-based lending arrangement.  The proceeds of the DIP Facility will allow the Debtors to repay the existing Prepetition ABL Obligations and to have access to additional liquidity that is necessary for the Debtors to maintain going concern value.

104.    Immediate access to incremental liquidity through the DIP Facility is critical to preserving the value of the Debtors' estates.  The Debtors are an operating retail business with hundreds of employees, vendors, and customers that depend on the Debtors' continuing performance of their ongoing business obligations.  The Debtors have an urgent and immediate need to obtain financing and for authority to use Cash Collateral subject to the terms of the DIP Motion in order to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with employees, vendors, and customers; (c)

pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d)
support the Debtors' working capital, general corporate and overall operational needs.  The
foregoing expenditures are critically necessary to preserve and maintain the going concern value
of the Debtors' business and, ultimately, help ensure a successful reorganization under the
Debtors' proposed pre-negotiated plan.  Without access to funding under the DIP Facility and
use of Cash Collateral, the Debtors would be forced to cease operations and liquidate their assets
and would be unable to restructure their business as a going concern

105.    The terms of the DIP Agreement were negotiated at arms' length and in good
faith between the Debtors and the DIP Agent over several weeks.  The outcome of such
negotiations is the DIP Agreement and the Exit Facility Commitment Letter with Citizens,
resulting in an agreement that is designed to permit the Debtors to maximize the value of their
assets through the pre-negotiated plan confirmation process.

106.    I further believe that, subject to the approval of this Court, each of the Debtors is
qualified and authorized to enter into the DIP Agreement.  Specifically, each Loan Party (as
defined in the DIP Agreement) is a corporation or limited liability company validly existing and
in good standing under the laws of the State of Delaware, California or Virginia, as applicable.
Each Loan Party has the corporate (or limited liability company) power and authority to enter
into and perform the DIP Documents to which it is a party, has taken all necessary corporate (or
limited liability company) action to authorize the execution, delivery and performance of such
DIP Documents and has duly executed and delivered such DIP Documents.  Further, the
execution and delivery by each Loan Party of the DIP Documents to which they are parties do
not, and the performance by the Loan Parties of their respective obligations thereunder will not,
(i) result in a violation of the Certificate of Incorporation or Bylaws or other organizational

39

document of such Loan Party (as such terms are defined in the DIP Agreement) or (ii) result in a violation of any order of the Court.

107.    The DIP Facility presents these estates with the best economic terms available that will allow the Debtors to repay the existing Prepetition ABL Obligations, while providing adequate liquidity to maintain operations in the ordinary course and satisfy ongoing administrative expenses associated with these cases.  Additionally, the DIP Facility will position the Debtors to maximize value by not only providing the Debtors with the liquidity that they need to implement the Restructuring Support Agreement through the Plan, but also to emerge from chapter 11 as a going concern with committed exit financing in place.  The stability provided by the DIP Facility will help to minimize disruption to the Debtors' business during their restructuring process and provide confidence to the Debtors' vendors and employees that the Debtors will be able to operate successfully post-emergence.

108.    For these reasons, I believe that the Debtors' sound business judgment clearly supports approval of the DIP Facility in order to allow the Debtors to gain access to needed financing and thereby maximize value for all constituents.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the DIP Motion.

**N.    Motion of Debtors for Entry of an Order Authorizing the Debtors to (I) Assume Exit Facility Commitment Letter, (II) Pay and Reimburse Related Fees and Expenses, and (III) Indemnify The Parties Thereto (the "Exit Facility Commitment Motion")**

109.    The Debtors believe that the Plan provides the best restructuring alternative available to these estates.  The Plan contemplates implementing a new senior secured exit financing facility in order to repay the proposed DIP Facility, also to be provided by Citizens Bank, N.A., and to provide additional working capital liquidity to the reorganized Debtors on a post-emergence basis.  The proposed exit facility with Citizens satisfies this requirement.

40

110.    Consistent with the Plan and following an extensive marketing effort, the Debtors and Citizens negotiated the terms of the Exit Facility Commitment Letter and agreed upon such commitment prior to the commencement of these bankruptcy cases. The Debtors believe that the financing contemplated under the Exit Facility Commitment Letter is advantageous to the Debtors given the low interest rate that will be charged and the amount of liquidity (up to $60 million) that will be made available to the reorganized Debtors, subject to the borrowing base and other conditions set forth in the Exit Facility Commitment Letter. By entering into the Exit Facility Commitment Letter, the Debtors are providing all stakeholders, customers, vendors, contract counterparties, and other interested parties with evidence that the Plan is not only feasible, but also will be consummated within the milestones set forth in the DIP Facility.

111.    The Debtors now seek to assume the Exit Facility Commitment Letter in order to ensure that the funding contemplated thereunder will be available to the Debtors following confirmation of the Plan, and to allow the Debtors to proceed promptly to consummate the Plan in accordance with the milestones in the DIP Facility. By assuming the Exit Facility Commitment Letter, the Debtors will be agreeing to three basic obligations: (a) to reimburse Citizens for its reasonable fees and expenses in connection with its due diligence and preparation of definitive documents with respect to the contemplated exit facility, (b) to indemnify Citizens as to any damages or losses that Citizens or its affiliated persons may incur as a result of, or in connection with, the exit facility, and (c) to negotiate exclusively with Citizens as to the exit facility, but subject to a "fiduciary out" on the basis of reasonable advice of legal counsel for the Debtors.

112.    The terms of the Exit Facility Commitment Letter are the product of extensive arm's length negotiations among the Debtors and Citizens, as well as their respective counsel and financial advisors.

113.    The Debtors believe that the terms and conditions set forth in the Exit Facility Commitment Letter are well within the range of "market" fees, protections and other terms typically received by parties entering into similar agreements and reflect an exercise of their sound business judgment.  I therefore urge the Court to approve the Exit Facility Commitment Motion.

DOCS_LA:305756.6 85199/001

## **CONCLUSION**

For all of the reasons set forth herein and in the First Day Pleadings, I respectfully

request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: July 5, 2017
At: Los Angeles, California

Dalibor Snyder
Chief Financial Officer