# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRUE RELIGION APPAREL, INC., *et al.*,[1] | Case No. 17-11460 (___) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR
## DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE COURT.**

### IMPORTANT DATES

- Date by which Ballots must be received: [_____], 2017 at 5:00 p.m. (EST)

- Plan Confirmation Objection Deadline: [_____], 2017 at 4:00 p.m. (EST)

- Hearing on Confirmation of the Plan: [_____], 2017 at [____].m. (EST)

Dated: July 5, 2017

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Robert B. Orgel (CA Bar No. 101875)
David M. Bertenthal (CA Bar No. 167624)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:   ljones@pszjlaw.com
          rpachulski@pszjlaw.com
          rorgel@pszjlaw.com
          dbertenthal@pszjlaw.com
          joneill@pszjlaw.com

Proposed Counsel for the Debtors and Debtors in Possession

---

[1]The Debtors, together with the last four digits of each Debtor's tax identification number, are: True Religion Apparel, Inc. (2633), TRLG Intermediate Holdings, LLC (3150), Guru Denim Inc. (1785), True Religion Sales, LLC (3441), and TRLGGC Services, LLC (8453). The location of the Debtors' headquarters and service address is: 1888 Rosecrans Avenue, Manhattan Beach, CA 90266.

**ARTICLE I.** EXECUTIVE SUMMARY ...................................................... 1
 A. INTRODUCTION ......................................................................... 1
 B. RULES OF INTERPRETATION ................................................. 1
 C. PLAN SUPPORT FROM CONSENTING CREDITORS,
   SHAREHOLDERS ......................................................................... 2
 D. PURPOSE AND EFFECT OF THE PLAN ................................. 3
   1. Plan of Reorganization Under Chapter 11 of the
     Bankruptcy Code ............................................................... 3
   2. Financial Restructurings in Connection with the Plan ...... 3
   3. Plan Overview .................................................................... 4
 E. VOTING PROCEDURES AND SOLICITATION MATERIALS .... 10
   1. Who May Vote on the Plan .............................................. 10
   2. Voting Record Date .......................................................... 10
   3. Voting Agent ..................................................................... 11
   4. Solicitation Package, Ballots and Notices ....................... 11
   5. Voting Procedures ............................................................. 12
   6. Exemption from Securities Act Registration Requirements .... 12
   7. Filing of the Plan Supplement ......................................... 13
 F. CONFIRMATION OF THE PLAN ............................................ 13
   1. Confirmation Hearing ...................................................... 13
   2. Deadline for Objecting to Confirmation of the Plan ....... 13
   3. Notice Parties ................................................................... 13
   4. Effect of Confirmation of the Plan .................................. 14
 G. CONSUMMATION OF THE PLAN .......................................... 14
 H. RISK FACTORS ........................................................................ 15
**ARTICLE II.** GENERAL BACKGROUND TO THE CHAPTER 11 CASES ..... 15
 A. THE DEBTORS' ORGANIZATIONAL STRUCTURE .......... 15
 B. OVERVIEW OF THE DEBTORS' BUSINESS ...................... 15
   1. The Debtors' Business Operations ................................... 16
   2. Intellectual Property Portfolio ......................................... 17
   3. Employees ......................................................................... 17
   4. Intercompany Transactions ............................................... 17
 C. DEBTORS' PREPETITION CAPITAL STRUCTURE ........... 18
   1. Prepetition Revolver ........................................................ 18
   2. Prepetition First Lien Claims .......................................... 18
   3. Prepetition Second Lien Claims ...................................... 19
   4. Intercreditor Agreement ................................................... 19
   5. Other Prepetition Obligations .......................................... 19
**ARTICLE III.** CHAPTER 11 CASES ............................................................ 20
 A. EVENTS LEADING TO COMMENCEMENT OF THE
   CHAPTER 11 CASES ............................................................... 20
   1. Negative Shifts in Broader Retail Environment .............. 20
   2. Internal Operational Restructuring Initiatives ................. 20
   3. Creditor Negotiations and Entry into Restructuring Support
     Agreement ......................................................................... 21
 B. DEBTOR IN POSSESSION FINANCING ............................... 23
 C. FIRST AND SECOND DAY RELIEF ..................................... 24

|   |   |   |   |
|---|---|---|---|
| | 1. | Procedural Motions | 25 |
| | 2. | Stabilizing Operations | 25 |
| | 3. | Retention of Chapter 11 Advisors | 26 |
| D. | | OTHER MATERIAL EVENTS IN THE CHAPTER 11 CASES | 26 |
| | 1. | Claims Bar Date | 26 |
| | 2. | Executory Contract and Unexpired Lease Rejection Procedures Motion | 26 |
| | 3. | Appointment of the Creditors' Committee | 27 |
| | 4. | Meeting of Creditors | 27 |
| **ARTICLE IV.** | | SUMMARY OF THE PLAN | 27 |
| A. | | ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS | 27 |
| | 1. | Administrative Expense Claims | 27 |
| | 2. | Professional Fee Claims | 28 |
| | 3. | DIP Facility Claims | 28 |
| | 4. | Priority Tax Claims | 28 |
| B. | | CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS | 29 |
| | 1. | Summary | 29 |
| | 2. | Elimination of Vacant Classes | 29 |
| | 3. | Voting; Presumptions; Solicitation in Good Faith | 30 |
| | 4. | Cramdown | 30 |
| C. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | 30 |
| | 1. | Class 1 – Non-Tax Priority Claims | 30 |
| | 2. | Class 2 – Miscellaneous Secured Claims | 31 |
| | 3. | Class 3 – Prepetition First Lien Claims | 32 |
| | 4. | Class 4 – Continuing Operations Claims | 32 |
| | 5. | Class 5 – General Unsecured Claims | 33 |
| | 6. | Class 6 – Equity Interests in Holdings | 34 |
| | 7. | Class 7 – Intercompany Interests | 34 |
| D. | | SPECIAL PROVISION GOVERNING CLAIMS RELATED TO ASSUMED EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND UNIMPAIRED CLAIMS | 35 |
| E. | | ACCEPTANCE OR REJECTION OF THE PLAN | 35 |
| | 1. | Presumed Acceptance of Plan | 35 |
| | 2. | Voting Classes | 35 |
| | 3. | Acceptance by Impaired Classes of Claims and Equity Interests | 35 |
| | 4. | Cramdown; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 35 |
| | 5. | Continuing Susceptibility to Claim Objection; Solicitation in Good Faith | 36 |
| F. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 36 |
| | 1. | General Settlement of Claims | 36 |
| | 2. | Corporate Existence | 36 |
| | 3. | Vesting of Assets in the Reorganized Debtors | 37 |
| | 4. | New ABL Facility | 37 |

|      | 5.  | Reorganized First Lien Term Loan Facility | 38 |
|      | 6.  | Authorized Financing | 38 |
|      | 7.  | Management Incentive Plan | 38 |
|      | 8.  | Issuance of Reorganized First Lien Term Loans, New Common Shares, New Warrants and Related Documentation | 38 |
|      | 9.  | Substantive Consolidation for Plan Purposes | 39 |
|      | 10. | Release of Liens, Claims and Equity Interests | 40 |
|      | 11. | Amended Organizational Documents | 40 |
|      | 12. | Directors and Officers of Reorganized Holdings | 41 |
|      | 13. | Corporate Action | 41 |
|      | 14. | Cancellation of Notes, Certificates and Instruments | 42 |
|      | 15. | Cancellation of Existing Instruments Governing Security Interests | 43 |
|      | 16. | Intercompany Claims; Intercompany Interests; Corporate Reorganization | 43 |
|      | 17. | Restructuring Transactions | 44 |
|      | 18. | Restructuring Expenses | 44 |
|      | 19. | Agent Fee Claims | 44 |
| G.   |     | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 44 |
|      | 1.  | Assumption and Rejection of Executory Contracts and Unexpired Leases | 44 |
|      | 2.  | Assignment of Executory Contracts or Unexpired Leases | 45 |
|      | 3.  | Rejection of Executory Contracts or Unexpired Leases | 45 |
|      | 4.  | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 46 |
|      | 5.  | Objections to Assumption, Assignment or Cure of Executory Contracts or Unexpired Leases | 46 |
|      | 6.  | Assumption of Existing Senior Leadership Employment Agreements/Incentive Compensation | 47 |
|      | 7.  | Director and Officer Insurance Policies | 47 |
|      | 8.  | Indemnification Provisions | 47 |
|      | 9.  | Compensation and Benefit Programs | 47 |
|      | 10. | Workers' Compensation Benefits | 48 |
|      | 11. | Insurance Policies | 48 |
| H.   |     | PROVISIONS GOVERNING DISTRIBUTIONS | 48 |
|      | 1.  | Distributions for Claims Allowed as of the Effective Date | 48 |
|      | 2.  | Distributions on Account of Claims Allowed After the Effective Date | 48 |
|      | 3.  | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 50 |
|      | 4.  | Compliance with Tax Requirements/Allocations | 52 |
|      | 5.  | Timing and Calculation of Amounts to Be Distributed | 53 |
|      | 6.  | Setoffs | 53 |
|      | 7.  | Surrender of Canceled Instruments or Securities | 53 |
|      | 8.  | Lost, Stolen, Mutilated or Destroyed Securities | 53 |
| I.   |     | PROCEDURES REGARDING DISPUTED CLAIMS AND |  |

|  |  | EQUITY INTERESTS | 54 |
|  | 1. | Rights of Reorganized Debtors with Respect to Allowance of Claims and Equity Interests | 54 |
|  | 2. | No Distributions to Holders of Disputed Claims or Equity Interests Pending Resolution of the Dispute | 54 |
|  | 3. | Resolving Disputed Claims and Equity Interests | 54 |
|  | 4. | Distributions after Allowance of Disputed Claims or Equity Interests | 55 |
| J. |  | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 55 |
|  | 1. | Conditions Precedent to Confirmation | 55 |
|  | 2. | Waiver of Conditions | 57 |
|  | 3. | Notice of Effective Date | 57 |
|  | 4. | Effect of Non-Occurrence of Conditions to Consummation | 57 |
| K. |  | EFFECT OF CONFIRMATION; AND RELEASE, INJUNCTION AND RELATED PROVISIONS | 57 |
|  | 1. | General | 57 |
|  | 2. | Compromise and Settlement | 58 |
|  | 3. | Mutual Release by the Debtors and Released Parties | 59 |
|  | 4. | Releases by Holders of Claims and Interests | 60 |
|  | 5. | Exculpation | 60 |
|  | 6. | Injunctions | 61 |
|  | 7. | Protection against Discriminatory Treatment | 62 |
|  | 8. | Reimbursement or Contribution | 62 |
|  | 9. | Recoupment | 62 |
|  | 10. | Preservation of Rights of Action | 62 |
| L. |  | BINDING NATURE OF PLAN | 63 |
| M. |  | MODIFICATION OR REVOCATION OF THE PLAN | 63 |
|  | 1. | Modification of Plan | 63 |
|  | 2. | Revocation of Plan | 63 |
| **ARTICLE V.** | | **PLAN CONFIRMATION** | 64 |
| A. |  | CONFIRMATION HEARING AND OBJECTIONS | 64 |
| B. |  | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 64 |
|  | 1. | Best Interests of Creditors Test / Liquidation Analysis | 66 |
|  | 2. | Feasibility | 67 |
|  | 3. | Valuation | 68 |
|  | 4. | Acceptance by Impaired Classes | 68 |
|  | 5. | Confirmation Without Acceptance by Impaired Classes | 69 |
| C. |  | CONSUMMATION OF THE PLAN | 71 |
| **ARTICLE VI.** | | **RISK FACTORS** | 71 |
| A. |  | RISKS RELATING TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 71 |
|  | 1. | Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests | 71 |
|  | 2. | The Debtors May Object to the Amount or Classification of a Claim or Equity Interest | 71 |
|  | 3. | The Debtors May Fail to Satisfy the Vote Requirement | 71 |

| | 4. | The Debtors May Not Be Able to Secure Confirmation of the Plan | 72 |
| | 5. | Non-Consensual Confirmation of the Plan May Be Necessary | 72 |
| | 6. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved | 73 |
| | 7. | The Restructuring Support Agreement May Terminate. | 73 |
| | 8. | Risks of Not Obtaining the Funding Under the New ABL Facility | 73 |
| | 9. | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 73 |
| B. | | RISKS RELATING TO THE CHAPTER 11 PROCESS | 74 |
| | 1. | The Debtors' Exclusivity Period May Terminate | 74 |
| | 2. | Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business | 74 |
| | 3. | The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code | 74 |
| C. | | RISKS RELATING TO RECOVERIES UNDER THE PLAN | 74 |
| | 1. | The Recovery to Holders of Allowed Claims Can Not Be Stated With Absolute Certainty | 74 |
| | 2. | The Value of New Common Shares Can Not Be Stated With Absolute Certainty | 75 |
| | 3. | Holders of Equity Securities in Reorganized Holdings May Not Be Able to Recover in Future Cases of Bankruptcy, Liquidation or Reorganization | 75 |
| | 4. | The Reorganized First Lien Term Loans, New Common Shares and New Warrants Will Be Illiquid | 75 |
| | 5. | There Is Not an Established Market for Equity Securities in Reorganized Holdings, and Holders of New Common Shares Will Be Subject to Restrictions on Resale and Transfer, Including Under the Amended Organizational Documents, Which Could Make Such Interests Illiquid | 76 |
| D. | | RISK FACTORS RELATING TO THE DEBTORS' BUSINESS, INDUSTRY AND MARKET FACTORS | 77 |
| | 1. | Continued Risk Upon Confirmation and Consummation | 77 |
| | 2. | The Company's Industry Is Highly Competitive, Which May Force the Company to Lower Its Prices and May Have an Adverse Effect on Its Operating Results | 77 |
| | 3. | The Company Operates in International Markets, Which Expose It to a Number of Risks | 77 |
| | 4. | The Company May Face Risks Associated with Current or Future Litigation and Claims | 78 |
| | 5. | The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations | 78 |
| | 6. | The Debtors May Fail in Their Lease Rationalization Efforts | 78 |
| | 7. | Large Holders of the Prepetition First Lien Claims May Control Reorganized Holdings | 79 |

8.    Tax Implications of the Plan ..................................................... 79

E.    RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING
STATEMENTS ...................................................................................... 79

1.    The Financial Information Contained Herein Is Based on
the Debtors' Books and Records and, Unless Otherwise
Stated, No Audit Was Performed ............................................. 79

2.    Financial Projections and Other Forward-Looking
Statements Are Not Assured, Are Subject to Inherent
Uncertainty Due to the Numerous Assumptions Upon
Which They Are Based and, as a Result, Actual Results
May Vary ................................................................................. 79

F.    DISCLOSURE STATEMENT DISCLAIMER ...................................... 80

1.    The Information Contained Herein Is for Soliciting Votes
Only .......................................................................................... 80

2.    This Disclosure Statement Was Not Approved by the
Securities and Exchange Commission ..................................... 80

3.    The Debtors Relied on Certain Exemptions From
Registration Under the Securities Act ..................................... 80

4.    This Disclosure Statement Contains Forward-Looking
Statements ................................................................................ 81

5.    No Legal or Tax Advice Is Provided to You by This
Disclosure Statement ............................................................... 81

6.    No Admissions Are Made by This Disclosure Statement ....... 81

7.    No Reliance Should Be Placed on Any Failure to Identify
Litigation Claims or Projected Objections .............................. 81

8.    Nothing Herein Constitutes a Waiver of Any Right to
Object to Claims or Equity Interests or Recover Transfers
and Assets ................................................................................ 82

9.    The Information Used Herein Was Provided by the Debtors
and Was Relied Upon by the Debtors' Advisors ..................... 82

10.    The Potential Exists for Inaccuracies and the Debtors Have
No Duty to Update .................................................................... 82

11.    No Representations Made Outside the Disclosure Statement
Are Authorized ........................................................................ 82

**ARTICLE VII.** ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ...................................................... 82

A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY
CODE .................................................................................................... 82

B.    FILING OF AN ALTERNATIVE PLAN OF
REORGANIZATION ............................................................................ 83

**ARTICLE VIII.** ISSUANCE AND RESALE OF REORGANIZED FIRST LIEN
TERM LOANS, NEW COMMON SHARES, AND NEW WARRANTS
UNDER THE PLAN ............................................................................... 83

A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF
THE SECURITIES ACT AND BLUE SKY LAWS ............................... 83

1.    Section 1145(a) of the Bankruptcy Code (Offer and
Issuance of Reorganized First Lien Term Loans, Exchange
Common Shares and New Warrants) ....................................... 83

2.     Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, and Rule 701 Under the Securities Act (Offer and Issuance of New Common Shares and Other Equity Securities Under Management Incentive Plan)....................84

B.     RESALES OF REORGANIZED FIRST LIEN TERM LOANS, NEW COMMON SHARES, AND NEW WARRANTS ...........................85

     1.     Resales of the Exchange Securities .................................85

     2.     Resales of the MIP Securities........................................86

**ARTICLE IX.** SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................................87

A.     GENERAL............................................................................87

B.     U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS ...........................................................................88

     1.     Cancellation of Debt Income .........................................88

     2.     Potential Limitations on NOL Carryforwards .................89

     3.     Alternative Minimum Tax .............................................92

C.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN...................................................................................93

     1.     Treatment of a Debt Instrument as a Security .................93

     2.     Consequences to Holders of Allowed Prepetition First Lien Claims...................................................................94

     3.     Consequences to Holders of Allowed General Unsecured Claims...................................................................96

     4.     Equity Interests .............................................................98

     5.     New Warrants ...............................................................99

     6.     Accrued But Untaxed Interest .......................................99

     7.     Market Discount ...........................................................99

     8.     Limitation on Use of Capital Losses ...........................100

     9.     Net Investment Income Tax.........................................100

     10.    Information Reporting and Backup Withholding .........100

D.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS UNDER THE PLAN .........................................101

     1.     Gain Recognition ........................................................101

     2.     Interest .......................................................................102

     3.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Shares or the New Warrants...................................................102

     4.     FATCA ......................................................................104

E.     GENERAL DISCLAIMER ......................................................104

**ARTICLE X.** RECOMMENDATION..........................................................105

## IMPORTANT INFORMATION FOR YOU TO READ

THE DEADLINE TO VOTE ON THE PLAN IS [_____], 2017, AT 4:00 P.M. EASTERN TIME.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

This Disclosure Statement provides information regarding the Debtors' Plan, which the Debtors seek to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise noted, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to go effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including Article VI hereof entitled "Risk Factors") and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan. Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Equity Interests for purposes of soliciting votes to accept or reject the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article VI.

The Debtors urge each Holder of a Claim or Equity Interest entitled to vote to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan, attached hereto and/or incorporated by reference herein. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their

entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.

The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. The Debtors have prepared this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Bankruptcy Rule 3017 and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained in this Disclosure Statement or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. PSZ&J HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

This Disclosure Statement does not constitute, and should not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, the terms of the Plan and the restructuring transactions contemplated by the Plan will bind the Debtors, any Person acquiring property under the Plan, all Holders of Claims and Equity Interests

(including those Holders of Claims and Equity Interests that do not submit Ballots to accept or reject the Plan or that are not entitled to vote on the Plan), and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Debtors are relying on the exemptions from the Securities Act and equivalent state law registration requirements provided by section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and Rule 701 promulgated under the Securities Act, and similar provisions of Blue Sky Laws to exempt the offer and issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Laws.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. You are referred to Article VI of this Disclosure Statement for a discussion of certain of such risks and uncertainties. The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' Voting Agent by (a) calling the Debtors' restructuring hotline at (844) 224-1136; (b) emailing truereligionballots@primeclerk.com; (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/truereligion; and/or (d) writing to the Voting Agent at: True

Religion Voting Agent, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.

## <u>EXHIBITS</u>

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Restructuring Support Agreement (with exhibits other than the Plan)

EXHIBIT C – Organizational Chart of the Debtors

EXHIBIT D – Liquidation Analysis

EXHIBIT E – Financial Projections

EXHIBIT F – Valuation Analysis

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN.

---

# ARTICLE I.
## EXECUTIVE SUMMARY

## A.    INTRODUCTION

True Religion Apparel, Inc., a Delaware corporation, together with its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "Debtors", and collectively with their non-debtor Affiliates, the "Company"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July 5, 2017 (the "Petition Date"). The Debtors' Chapter 11 Cases are jointly administered under lead case name True Religion Apparel, Inc. and lead case number 17-[_____].

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. Accordingly, the Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. _], dated [_____], 2017 (as amended, supplemented, or modified from time to time in accordance with its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

On [__], 2017, the Bankruptcy Court entered an order [Docket No. [__] (the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures, and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan, and (d) scheduling the Confirmation Hearing.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable [_____] at [____] a.m. prevailing Eastern Time on [_____], 2017 at the Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom [__], Wilmington, Delaware 19801.

Additional information with respect to confirmation of the Plan is provided in Article V of this Disclosure Statement. This Disclosure Statement includes information about, without limitation, (i) the Debtors' business, prepetition operations, financial history, and events leading up to these Chapter 11 Cases, (ii) the significant events that occurred thus far in these Chapter 11 Cases, (iii) the anticipated recoveries of Creditors under the Plan, (iv) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (v) the Plan confirmation process, (vi) certain risk factors to be considered before voting on the Plan, and (vi) discussions relating to certain securities registration and tax consequences of the Plan. The descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors relate to the Plan filed with the Bankruptcy Court.

## B.    RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other

agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## C.  PLAN SUPPORT FROM CONSENTING CREDITORS, SHAREHOLDERS

Prior to the Petition Date, the Debtors engaged in extensive, good-faith negotiations with an ad hoc group of certain Prepetition First Lien Lenders and Prepetition Second Lien Lenders and with their equity sponsors, including TowerBrook and the Equity Parent, to develop a comprehensive financing, restructuring, and recapitalization plan to be implemented through these Chapter 11 Cases.  That agreement was memorialized in the Restructuring Support Agreement, attached hereto as **Exhibit B**, executed by parties that collectively hold directly or indirectly on behalf of their managed funds and accounts approximately 86.4% of the Debtors' Prepetition First Lien Claims and 60.5% of the Debtors' Prepetition Second Lien Claims (such parties to the Restructuring Support Agreement from time to time, the "Consenting Creditors"), and by TRLG Holdings, LLC, the parent company of Holdings (the "Equity Parent").

The Plan reflects the agreement reached among the Debtors, Equity Parent, and the Consenting Creditors to reorganize the Debtors as a going-concern business and outlines a consensual deleveraging transaction that will leave the Debtors with a significantly improved capital structure. The Debtors, Equity Parent, and Consenting Creditors believe that the financial restructurings, the operational restructuring (through, among other things, focused lease rejections) and the other transactions reflected in the Plan will position the Reorganized Debtors well to succeed post emergence from bankruptcy. With a sustainable capital structure aligned with the Debtors' revised business plan and adequate operating liquidity, the Reorganized Debtors will be positioned to compete more effectively in the evolving retail industry.  The Debtors, Equity Parent, and the Consenting Creditors determined that, notwithstanding that the Debtors did not face imminent debt maturities, it was a better option for the Debtors to file for chapter 11 with an agreement on a Plan that provides the possibility of recoveries to all of the Debtors' stakeholders and allows the Debtors to undertake the necessary financial and operational restructurings now, rather than delay the chapter 11 filing and risk further deterioration to the Debtors' business, which would result in less value for all of the Debtors' stakeholders.  Substantially all holders of the Debtors' Prepetition First Lien Claims have signed the Restructuring Support Agreement, even though the Plan contemplates distributions to other creditors and to equityholders, subject to the terms of the Plan.

**THE DEBTORS, CONSENTING CREDITORS, AND CONSENTING EQUITY SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERY FOR ALL STAKEHOLDERS. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## D.     PURPOSE AND EFFECT OF THE PLAN

### 1.     Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, confirmation of the Plan means that the Reorganized Debtors will continue to operate their business going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

### 2.     Financial Restructurings in Connection with the Plan

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $483 million, and related interest and accruals, consisting primarily of approximately (a) $12 million in principal amount outstanding under their Prepetition Revolver; (b) $386 million in principal amount outstanding under their Prepetition First Lien Loan Agreement; and (c) $85 million in principal amount outstanding under their Prepetition Second Lien Loan Agreement. Additionally, as of July 3, 2017, the Debtors had an estimated $8.6 million of outstanding accounts payable, and also owe additional amounts, on an unsecured basis, to vendors, customers, service providers, and landlords.

If the Plan is confirmed, the Debtors will emerge from these Chapter 11 Cases with approximately 72% less funded debt. The Debtors' pro forma exit capital structure will consist of (a) a New ABL Facility, to be provided by the same lenders that have agreed to provide postpetition, senior secured debtor-in-possession financing to the Debtors during the Chapter 11 Cases, (b) up to $114.5 million in aggregate principal amount of Reorganized First Lien Term Loans (less the amount of any Class 5 Swapped Debt, if applicable), as set forth below, and (c) new Equity Securities in Reorganized Holdings:

| Prepetition and Post-Emergence Capital Structure | | |
|---|---|---|
| ($ millions) | Prepetition* | Post-Emergence* |
| **Prepetition Funded Debt** | | |
| Prepetition Revolver | $12.00 | |
| Prepetition First Lien Term Loan | $392 | |
| Prepetition Second Lien Term Loan | $89.1 | |
| | | |
| **Post-Emergence Funded Debt** | | |
| New ABL Facility | | $25.00 |
| Reorganized First Lien Term Loan Facility | | $114.5[2] |
| | | |
| **Total Funded Debt** | **$493.1** | **$139.5** |

* Dollar amounts are in millions.

---

[2]This amount is subject to decrease by the amount of the Class 5 Swapped Debt.

3.    **Plan Overview**

Under the Plan, certain Claims are not classified and are entitled under the Bankruptcy Code (and the Plan) to a full recovery (*i.e.*, Administrative Expense Claims, including DIP Facility Claims and Professional Fee Claims, and Priority Tax Claims).  For all other Claims against, and all Equity Interests in, the Debtors, the Plan designates Classes of Claims and Classes of Equity Interests and provides treatments that take into account the differing nature and priority under the Bankruptcy Code of the various classified Claims and Equity Interests.  In accordance with section 1122 of the Bankruptcy Code, the Plan provides for seven (7) Classes of Claims against and/or Equity Interests in the Debtors.

The following chart briefly summarizes the classification and treatment of classified Claims and Equity Interests under the Plan.[3]  Amounts listed below are estimated.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW BASED UPON, AMONG OTHER THINGS, THE TOTAL AMOUNT OF ALLOWED CLAIMS IN A PARTICULAR CLASS.**

---

[3]This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

## ESTIMATED RECOVERIES AND OTHER MATTERS

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount[4] | Impairment | Entitled to Vote | Estimated Percentage Recovery[5] |
|-------|---------------------------|----------------------------------------|------------|------------------|-----------------------------------|
| 1 | Non-Tax Priority Claims | $1 -2 million[6] | No | No | 100% |
| 2 | Miscellaneous Secured Claims | $< 1 million | No | No | 100% |
| 3 | Prepetition First Lien Claims | $392 million | Yes | Yes | 37.2% to 38.2%[7] |
| 4 | Continuing Operations Claims | $3 to 5 million | No | No | 100% |
| 5 | General Unsecured Claims | $104.7 million[8] | Yes | Yes | 4.9% to 7.5%[9] |
| 6 | Equity Interests in Holdings | N/A | Yes | Yes | N/A[10] |

---

[4]Except as indicated, all Estimated Prepetition Claim Amounts are projected estimates only, estimated as of the Effective Date (after, *inter alia*, reduction for payments or the honoring of Claims pursuant to the First Day Motions or Second Day Motions), and actual amounts may be materially greater or less than those set forth herein.

[5] All percentage recoveries indicated for Impaired Classes are estimates only based upon the proposed treatment of such Claims and Equity Interests in the respective Classes, as more fully set forth below and in the Plan. Actual percentage recoveries for such Classes may be materially greater or less than those set forth herein as a result of, among other things, the total amount of Allowed Claims in a particular Class.

[6]Most or all of the Non-Tax Priority Claims represent wage-related claims or benefits. A portion thereof may be paid or honored in the ordinary course, with the consent of the Required Consenting Creditors, prior to confirmation of the Plan pursuant to the First Day Motions.

[7]The indicated, estimated percentage recovery derives from estimated recovery values for the consideration for Class 3 of (i) $110 million in aggregate principal amount of the Reorganized First Lien Term Loans, and (ii)(x) the number of Exchange Common Shares equal to 90.0% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option), if each of Class 3, Class 5 and Class 6 vote to accept the Plan or (y) the number of Exchange Common Shares equal to 94.5% of the Exchange Common Shares, if either of Class 5 or Class 6 votes to reject the Plan. Equity values are supported by the Company valuation set forth in ARTICLE V.B.3.

[8]Class 5 debt is estimated at $104.6 million and includes, *inter alia*, the Prepetition Second Lien Claims and claims arising from the rejection of any real property leases.

[9]The indicated, estimated percentage recovery derives from estimated recovery values for the consideration for Class 5 of (i) $2.5 million in aggregate principal amount of the Reorganized First Lien Term Loans, (ii) the number of Exchange Common Shares equal to 5.5% of the Exchange Common Shares, (iii) Class A Warrants and (iv) only to the extent Class 5 votes to accept the Plan, (x) $1.0 million in Cash and (y) an additional $2 million in aggregate principal amount of Reorganized First Lien Term Loans. For illustrative purposes only, the high end of the indicated, estimated percentage recovery assumes that no Holder of Class 5 Claims elects the Class 5 Cash Out Option. Equity values are supported by the Company valuation set forth in ARTICLE V.B.3.

[10] The Plan provides that if certain conditions are met, Equity Interests in Holdings may receive up to 4.5% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Cash out Option, if applicable), Class B Warrants, and Class C Warrants.

| | ESTIMATED RECOVERIES AND OTHER MATTERS | | | | |
|---|---|---|---|---|---|
| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount[4] | Impairment | Entitled to Vote | Estimated Percentage Recovery[5] |
| 7 | Intercompany Interests | N/A | No | No | 100% |

| Class | Nature of Claim or Interest | Plan Treatment |
|-------|-----------------------------|----------------|
| 1 | Non-Tax Priority Claims | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 1 Claim: (i) Cash equal to the amount of such Allowed Class 1 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (x) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, (y) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim or (z) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 1 Claim; or (ii) at the election of the Debtors, in consultation with the Required Consenting Creditors, such other less favorable treatment as to which the Holder of such Allowed Class 1 Claim and the Debtors or Reorganized Debtors, as applicable, agree in writing. |
| 2 | Miscellaneous Secured Claims | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 2 Claim:  (i) Cash equal to the amount of such Allowed Class 2 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (x) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (y) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim; or (ii) at the election of the Debtors, with the consent of the Required Consenting Creditors or Reorganized Debtors, as applicable, either: (x) Reinstatement (with the Holder, as applicable, retaining the Liens securing its Allowed Miscellaneous Secured Claim as of the Effective Date until full and final payment thereof); (y) return of the Collateral securing such Allowed Class 2 Claim by the Initial Distribution Date; or (z) such other less favorable treatment as to which the Holder of such Allowed Class 2 Claim and the Debtors or Reorganized Debtors, as applicable, will have agreed upon in writing. |
| 3 | Prepetition First Lien Claims | On the Effective Date each Holder of an Allowed Prepetition First Lien Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Prepetition First Lien Claim, its Pro Rata share of: (i) Reorganized First Lien Term Loans in the aggregate principal amount of $110 million under the Reorganized First Lien Term Loan Facility; and (ii)(x) if each of Class 3, Class 5 and Class 6 vote to accept the Plan, the number of Exchange Common Shares equal to 90.0% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option) or (y) if either of Class 5 or Class 6 votes to reject the Plan, the number of Exchange Common Shares equal to 94.5% of the Exchange Common Shares.  To the extent any Holder of an Allowed General Unsecured Claim exercises the Class 5 Equity Cash Out Option, the percentage of New Common Shares received by Holders of Allowed Class 3 and Class 6 Claims will automatically adjust on a Pro Rata basis to reflect such exercise without the need to issue any additional New Common Shares. |
| 4 | Continuing Operations Claims | Each Holder of Allowed Continuing Operations Claims will receive in full satisfaction, settlement, discharge and release of, and partially in exchange for, its Allowed Continuing Operations Claim:  (i) Cash or such other consideration due under the applicable Allowed Class 4 Claim equal to the amount of such Allowed Class 4 Claim payable on the later of, or, in each case, as soon as reasonably practicable thereafter, (x) the Initial Distribution Date if such Class 4 Claim is an Allowed Class 4 Claim on the Effective Date, (y) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, or (z) the date such treatment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 4 Claim; (ii) Reinstatement or such other treatment rendering such Claim Unimpaired; or (iii) such other less favorable treatment as to which the Debtors, with the consent of the Required Consenting Creditors (which consent may be obtained by the Debtors by providing reasonable negative notice of their determinations or the principles they will apply in making them), or Reorganized Debtors and the Holder of such Allowed Class 4 Claim will have agreed upon in |

| Class | Nature of Claim or Interest | Plan Treatment |
|-------|----------------------------|----------------|
| | | writing. |
| 5 | General Unsecured Claims | By the later of (x) fourteen (14) days after the Rejection Claim Bar Date and (y) the date from or after the Effective Date on which such General Unsecured Claim first is an Allowed General Unsecured Claim, or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the Class 5 Default Consideration, consisting of: (i) Reorganized First Lien Term Loans in the aggregate principal amount of $2.5 million under the Reorganized First Lien Term Loan Facility; (ii) the number of Exchange Common Shares equal to 5.5% of the maximum number of Exchange Common Shares distributable under the Plan; and (iii) Class A Warrants. |
| | | In addition and only if Class 5 votes to accept the Plan, by the later of (x) fourteen (14) days after the Rejection Claim Bar Date and (y) the date from or after the Effective Date on which such General Unsecured Claim first is an Allowed General Unsecured Claim, or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim also will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the Class 5 Consensual Plan Consideration, consisting of: (i) $1.0 million in Cash; (ii) additional Reorganized First Lien Term Loans in the aggregate principal amount of $2.0 million under the Reorganized First Lien Term Loan Facility; provided, however, if any Holder of an Allowed General Unsecured Claim is a Class 5 Electing Holder, such Holder will receive the Class 5 Warrants for Debt Treatment with respect to its Class 5 Swapped Debt; and (iii) the Class 5 Equity Cash Out Option, which, as more fully set forth in the Plan definition thereof, is an option permitting each Holder of an Allowed General Unsecured Claim to elect to receive, in lieu of the Exchange Common Shares afforded it as part of the Class 5 Default Consideration, a share of $1,050,000 in Cash. |
| 6 | Equity Interests in Holdings | On the Effective Date, and solely to the extent that each of Class 3, Class 5 and Class 6 vote to accept the Plan, each Holder of an Equity Interest in Holdings will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Equity Interest in Holdings, its Pro Rata share of: (i) the number of Exchange Common Shares equal to 4.5% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option) (to the extent any Holder of an Allowed General Unsecured Claim exercises the Class 5 Equity Cash Out Option, the percentage of New Common Shares received by Holders of Allowed Class 3 and Class 6 Claims will automatically adjust on a Pro Rata basis to reflect such exercise without the need to issue any additional New Common Shares); (ii) Class B Warrants; and (iii) Class C Warrants. |
| | | If any of Class 3, Class 5 or Class 6 votes to reject the Plan, Holders of Equity Interests in Holdings shall receive no recovery, and (x) the above-referenced 4.5% of the Exchange Common Shares, shall be distributed Pro Rata to the Holders of Class 3 Prepetition First Lien Claims, as set forth in the Plan and (y) the Class B Warrants and Class C Warrants shall not be issued. |
| 7 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for purposes of the Subsidiary Structure Maintenance. |

Below are explanations regarding certain concepts referenced in the above Plan treatment summary:

1. **Certain Plan Distributions Conditioned Upon Class Acceptance**. Certain Plan Distributions are conditioned upon the outcome of how certain Classes vote to accept or reject the Plan.

    a. **General Unsecured Claim Holder's Right to Greater Recovery and Option to Elect Cash Instead of Equity if Class 5 Votes to Accept the Plan.** If Class 5 votes to accept the Plan, Holders of Allowed General Unsecured Claims shall be entitled to receive their Pro Rata share of a Plan Distribution greater than if Class 5 votes to reject the Plan. Specifically, in addition to what they would otherwise receive under the Plan (the Class 5 Default Consideration), Holders of Allowed General Unsecured Claims will also be entitled to receive the Class 5 Consensual Plan Consideration, consisting of their Pro Rata share of (a) $1.0 million in Cash, (b) an additional aggregate principal amount of $2.0 million in Reorganized First Lien Term Loans (subject to each Holder's right, instead, to elect the Class 5 Warrants for Debt Treatment), and (c) the Class 5 Equity Cash Out Option.

    The Class 5 Equity Cash Out Option entitles each Holder of an Allowed General Unsecured Claim to elect to receive Cash in lieu of Exchange Common Shares equal to such Holder's Pro Rata share of $[1.012 million] (as measured, for the avoidance of doubt, based on such Holder's Allowed General Unsecured Claim as a percentage of all Allowed General Unsecured Claims, and not as a percentage of all Allowed General Unsecured Claims of Holders who elect the Class 5 Equity Cash Out Option). Cash to be paid to such Holder for electing the Class 5 Cash Out Option is in addition to the Cash such Holder already would have a right to receive as part of the Class 5 Consensual Plan Consideration if Class 5 votes to accept the Plan (*i.e.,* its Pro Rata share of the additional aggregate $1.0 million of Cash).

    b. **Distribution to Holders of Equity Interests**. In addition, if Class 3, Class 5 and Class 6 vote to accept the Plan, Holders of Equity Interests in Holdings shall be entitled to receive their Pro Rata share of (a) the number of Exchange Common Shares equal to 4.5% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option), (b) the Class B Warrants, and (c) the Class C Warrants.

    In that circumstance as well (*i.e.*, if Class 6 receives a Plan Distribution because Class 3, Class 5 and Class 6 vote to accept the Plan), then Holders of Prepetition First Lien Claims shall not be entitled to receive 4.5% of the Exchange Common Shares that otherwise would have gone to such Holders of Prepetition First Lien Claims in Class 3.

    To the extent any Holder of an Allowed General Unsecured Claim exercises the Class 5 Equity Cash Out Option, the percentage of New Common Shares received by Holders of Allowed Class 3 and Class 6 Claims will automatically adjust on a Pro Rata basis to reflect such exercise without the need to issue any additional New Common Shares.

2. **Class 5 Warrants for Debt Treatment**. If Class 5 votes to accept the Plan, each Holder of an Allowed General Unsecured Claim may elect to receive Class D Warrants in lieu of receiving their Pro Rata share of the additional $2.0 million of Reorganized First Lien Term Loans that such Holder would otherwise receive on account of its Allowed General Unsecured Claim (such Holder being referred to as a "Class 5 Electing Holder"). For waiving its right to receive its Pro Rata share of such additional $2.0 million of Reorganized

First Lien Term Loans if Class 5 votes to accept the Plan (referred to in the Plan as the "Class 5 Swapped Debt"), a Class 5 Electing Holder will receive, instead, Class D Warrants to purchase 1.0% of the fully-diluted New Common Shares for each $200,000 of Class 5 Swapped Debt of the fully-diluted New Common Shares at an initial exercise price per share struck at a $330 million equity valuation for Reorganized Holdings. Pursuant to the terms of the Restructuring Support Agreement, and as part of the agreements set forth in the Plan, each Holder of an Allowed Prepetition First Lien Claim, that (a) is a Holder of an Allowed Prepetition Second Lien Claim and (b) is party to the Restructuring Support Agreement, has agreed to elect the Class 5 Warrants for Debt Treatment with respect to one hundred percent (100%) of its portion of the aggregate principal amount of the additional $2.0 million of Reorganized First Lien Term Loans that would otherwise be distributed to such Holder in respect of its Allowed General Unsecured Claim if Class 5 votes to accept the Plan. Such election will result in a reduction in the principal amount of the Reorganized First Lien Term Loan Facility without regard to the impact of any other such elections by Holders of Allowed General Unsecured Claims. For the avoidance of doubt, a Class 5 Electing Holder is not waiving its right to any other distributions due to it in respect of any Allowed General Unsecured Claim (including its Pro Rata share of the $2.5 million of Reorganized First Lien Term Loans available to Holders of Allowed General Unsecured Claims regardless of whether Class 5 votes to accept or reject the Plan), any Allowed Prepetition First Lien Claim or any other Claim it may hold.

## E.  VOTING PROCEDURES AND SOLICITATION MATERIALS

### 1.  Who May Vote on the Plan

Each Holder of an Allowed Claim as of the applicable voting record date in Classes 3, 5, and 6 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims or Equity Interests in Classes 3, 5, and 6 shall be counted in determining whether acceptances have been received sufficient in number and amount to confirm the Plan. An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Classes 1, 2, 4, and 7 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended or modified in accordance with the terms therein and, in any event, the Debtors, subject to any consent that may be required in the Plan or under the Restructuring Support Agreement, reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### 2.  Voting Record Date

The Bankruptcy Court has approved the close of business on [_____], 2017, as the voting record date (the "Voting Record Date"). The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

### 3. Voting Agent

The Debtors have retained Prime Clerk LLC (the "**Voting Agent**") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Plan. Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at https://cases.primeclerk.com/truereligion; (b) calling the Voting Agent at 844-224-1136 (toll free); or (c) emailing truereligionballots@primeclerk.com. The Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

### 4. Solicitation Package, Ballots and Notices

Voting Classes. The following materials constitute the solicitation package with respect to the Plan enclosed herewith (the "Solicitation Package"):

- a solicitation cover letter from the Company addressed to the voting creditor;

- the appropriate form of Ballot and instructions for completing the Ballot;

- the voting instructions and solicitation procedures approved by the Bankruptcy Court (the "Voting Procedures");

- this Disclosure Statement with all exhibits;

- the Plan (as an exhibit hereto);

- a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice");

- a copy of the Disclosure Statement Order; and

- such other materials as the Bankruptcy Court may direct.

Only Holders of Prepetition First Lien Claims (Class 3), General Unsecured Claims (Class 5), and Equity Interests in Holdings (Class 6) are entitled to vote to accept or reject the Plan.

Notices of Non-Voting Status. As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan. As a result, such parties will not receive Solicitation Packages but, instead, will receive the Confirmation Hearing Notice that explains, among other things, (i) that Classes 1, 2, 4, 7 are Unimpaired under the Plan, and therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) instructions for such Holders of Claims and Equity Interests on how they may obtain a copy of the Plan and this Disclosure Statement, (iii) the deadline by which to object to confirmation of the Plan, and (iv) the Confirmation Hearing date and time.

Contract and Lease Counterparties. Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Plan. Such parties nevertheless will receive the Confirmation Hearing Notice.

## 5. Voting Procedures

To be counted as a vote to accept or reject the Plan, such Holder's properly completed and executed Ballot must be received by the Voting Agent by **4:00 p.m. (prevailing Eastern Time) on[___ _____], 2017 (the "Voting Deadline")** and in accordance with the voting instructions attached to each Ballot. The Voting Agent will process and tabulate received Ballots and will File a voting report as soon as practicable on or after the Voting Deadline but prior to the Confirmation Hearing. Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

**THE INFORMATION CONTAINED IN THIS ARTICLE I.E.5 IS INTENDED FOR SUMMARY PURPOSES ONLY. HOLDERS OF CLAIMS IN THE VOTING CLASSES SHOULD REVIEW CAREFULLY IN FULL AND FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING VOTING PROCEDURES.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT FAILS TO CLEARLY INDICATE AN ACCEPTANCE OR REJECTION, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS THE COMPANY IN ITS DISCRETION DECIDES OTHERWISE.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

> PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS IS URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN TITLED, "RISK FACTORS."

## 6. Exemption from Securities Act Registration Requirements

The Company intends to rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer and issuance of Reorganized First Lien Term Loans, Exchange Common Shares, and New Warrants under the Plan, including New Common Shares issuable after the Effective Date upon the exercise of the New Warrants.

The Company intends to rely on section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer and the issuance of New Common Shares, New Warrants and other Equity Securities to officers and other key employees of the Company pursuant to the Management Incentive Plan.

### 7. Filing of the Plan Supplement

The Debtors will file the Plan Supplement no later than five (5) Business Days before the Confirmation Hearing. Parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/truereligion; (ii) calling the Voting Agent at 844-224-1136 (toll free); or (iii) emailing truereligionballots@primeclerk.com

## F. CONFIRMATION OF THE PLAN

### 1. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to such confirmation.

**The Bankruptcy Court has scheduled a Confirmation Hearing to be held on [          ], 2017 at [     ].m. (prevailing Eastern time)**. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan or any Exhibit, Plan Schedule or Plan Document may be amended or modified, if necessary, in accordance with the terms therein, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest, in all cases, however, subject to any consent that may be required in the Plan or the Restructuring Support Agreement.

### 2. Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has scheduled the Confirmation Objection Deadline for [          ], 2017 at [     ].m. (prevailing Eastern time)**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by no later than the Confirmation Objection Deadline by the Notice Parties.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE. INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

### 3. Notice Parties

All notices, requests, objections, or demands shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows (collectively, the "**Notice Parties**"):

    (a)   <u>The Debtors</u>, 1888 Rosecrans Avenue, Manhattan Beach, CA 90266 (Attn: Chief

Executive Officer);

(b)    Counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899-8705 (Courier 19801) (Attn:  Laura Davis Jones, Richard M.  Pachulski, Robert Orgel, David Bertenthal);

(d)    Counsel to TowerBrook, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn:  Joshua Feltman);

(e)    Counsel to the Consenting Creditors, Akin Gump Strauss Hauer Feld, LLP, One Bryant Park, New York, NY 10036 (Attn: Arik Preis, Jason P. Rubin, Yochun Katie Lee) and Ashby & Geddes, P.A. 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899-1150 (Attn:  Karen B. Skomorucha Owens);

(f)    Counsel to the DIP Agent, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, MA, 02110-1726 (Attn: Julia Frost-Davies and Christopher L. Carter) and Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE, 19801, (Attn: Kurt F. Gwynne); and

(g)    The Office of the United States Trustee for the District of Delaware, 844 King St., Suite 2207, Wilmington, DE 19801.

**4.    Effect of Confirmation of the Plan**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

It is a condition to confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in a form and substance consistent with the form and substance required by any consents and approvals of the Restructuring Support Agreement.  Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

As more fully set forth in the Plan, and except as expressly provided otherwise therein or in the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in complete satisfaction, settlement, discharge and release of all Claims and Equity Interests or other rights of a Holder of a Claim or Equity Interest relating to any of the Debtors or the Reorganized Debtors or their respective Assets.  The Plan also contains certain other provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the mutual release by the Debtors and the Released Parties, (c) the release by Holders of Claims or Equity Interests, and each of their respective Related Persons, and (d) the exculpation of certain parties.

**G.    CONSUMMATION OF THE PLAN**

Following confirmation of the Plan, Consummation of the Plan shall occur on the Business Day as determined by the Debtors with the consent of the Required Consenting Creditors after they reasonably determine that certain conditions have been met or waived

pursuant to ARTICLE IX of the Plan, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court (the "Effective Date").

> ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## H.    RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS HAS BEEN URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN TITLED, "RISK FACTORS."**

## ARTICLE II.
## GENERAL BACKGROUND TO THE CHAPTER 11 CASES

### A.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

An organizational chart showing the Debtors is attached hereto as **Exhibit C**. The Debtors are five privately held, affiliated companies. TRLG Intermediate Holdings, LLC ("Holdings"), the direct or indirect parent of each of the other Debtors, is a Delaware limited liability company, and is a non-operating holding company. True Religion Apparel, Inc., a Delaware corporation, owns 100% of the interests of Guru Denim, Inc., a California corporation. Guru Denim, Inc. ("Guru"), in turn, owns 100% of the interests of True Religion Sales, LLC ("TR Sales"), a Delaware limited liability company, as well as 100% of the ownership interests in certain non-Debtor foreign affiliates of the Debtors. (Certain of the Debtors' foreign subsidiaries or Affiliates, in turn, own other foreign Affiliates.) True Religion Sales, LLC, which is the main operating company for the U.S. operations, owns 100% of the equity of TRLGGC Services, LLC, a Virginia limited liability company, which holds and manages the Debtors' gift card liability.

Prior to July 2013, shares of the Company were publicly listed. On July 30, 2013, the Company completed a going-private transaction with affiliates of TowerBrook Capital Partners L.P. ("TowerBrook Capital"). As of the Petition Date, Holdings is 100% owned by Equity Parent, which in turn is majority owned by TI Holdings, an affiliate of TowerBrook Capital.

The Debtors understand that, in January 2016, TI Holdings closed its purchase of a portion of the Prepetition First Lien Claims and, as of June 27, 2017, holds approximately 5.9% thereof.

### B.    OVERVIEW OF THE DEBTORS' BUSINESS

Founded by Jeff Lubell in 2002, the Company was at the forefront of the premium denim movement, turning jeans from a commodity into a fashion statement. The Company designs and retails trendsetting jeans with the iconic and trademarked horseshoe symbol. The True Religion brand offers a wide range of apparel, including jeans, pants, women and knit tops, and outerwear made from denim, fleece, jersey, and other fabrics. The Company is known for its unique fits, washes, and styling details.

The Company's denim products are manufactured in the United States and internationally, depending on the product. True Religion jeans are designed in house by the Company's dedicated team of designers. The Company's products are distributed through wholesale and retail channels in all 50 states across the country, the District of Columbia, and [six] different continents as described in detail below.

The Company leases its corporate headquarters, distribution facilities, and all of its retail stores. The Company's headquarters are located in Manhattan Beach, California. The Company has one distribution center in Fontana, California, as well as one showroom in the United States to display their apparel for buyers.

### 1. The Debtors' Business Operations

True Religion operates in four segments: (a) Direct to Consumer; (b) Americas Wholesale; (c) International; and (d) Core Services. Each segment is discussed below.

#### (a) Direct to Consumer

As of the Petition Date, the Company sells directly to consumers (DTC) in the United States and Canada through 128 retail stores, of which 73 are True Religion full-price retail stores, 53 are True Religion outlet stores, and 2 are Last Stitch retail stores. The U.S. retail locations are located in 33 states. The average full-price store is typically 1,700 square feet and showcases the full range of True Religion branded merchandise. The outlet stores are typically 2,500 square feet. The Company also retails its products on the internet through www.truereligion.com and www.last-stitch.com. The Company's retail business competes in the highly competitive fashion industry.

For fiscal year ended January 28, 2017, the Company's DTC business generated net sales totaling approximately $273 million, accounting for 73.9% of the Company's total net sales.

#### (b) Americas Wholesale

As of the Petition Date, in addition to the True Religion-branded retail stores, True Religion products are sold at nearly 500 locations not operated by the Company across the United States, Canada, Mexico, and South America. The Company has several valuable relationships with leading nationwide premium department stores, specialty retailers and boutiques, and off-price retailers through which its products are sold, including Nordstrom, Bloomingdales, Saks Fifth Avenue, Off 5th, and Nordstrom Rack, e-commerce sites, and others.

For fiscal year ended January 28, 2017, the Company's Americas Wholesale business generated net sales totaling approximately $54 million, accounting for approximately 14.6% of the Company's total net sales.

#### (c) International

Sales of the Debtors' products are made internationally through a variety of distribution channels, including Company-owned stores and distributor-owned stores. As of the Petition

Date, the international division consists of (i) 11 international stores outside of North America, of which 6 are international True Religion full-price retail stores and 5 are True Religion international outlet stores and (ii) wholesale operations. In 2010, the Company also formed a joint venture with UNIFA Premium GmbH (60% owned by True Religion and 40% owned by UNIFA) that distributes True Religion apparel in select European countries and operates certain of the internationalTrue Religion stores located in Germany and the Netherlands. The Company sells directly to wholesale accounts or has wholesale distribution agreements in various other countries and continents, including in Africa, Australia, Europe, the Middle East, and Asia.

For fiscal year ended January 28, 2017, the Company's International business generated net sales totaling approximately $40.8 million, accounting for approximately 11.1% of the Company's total net sales.

(d)    Core Services (Licensing Business)

The Core Services unit records all of the Company's corporate operations, including design, production, marketing, credit, customer services, information technology, accounting, executive, legal, and human services departments.

In addition, the Company selectively licenses to third parties the right to use its various trademarks in connection with the manufacture and sale of designated products. The licenses typically have three-year terms and the Debtors may grant the licensee conditional renewal options. For the fiscal year ended January 28, 2017, the Company recognized $1.7 million in royalty revenue.

## 2.    Intellectual Property Portfolio

The Company has invested heavily in developing and maintaining a large portfolio of copyright, patent, and trademark registrations in the United States and internationally. The Company owns registrations in the United States and certain foreign countries of the "True Religion" "True Religion Brand Jeans", "True Jeans," and the horseshoe trademark, among others. As of the Petition Date, the Company's intellectual property portfolio consists of 7 copyrights, 15 patents, and over 390 registered trademarks worldwide.

## 3.    Employees

As of the Petition Date, the Debtors employed approximately 1,705 employees, of which 621 are employed full-time and 1,084 are employed part-time. The Debtors are not party to any collective bargaining agreement and none of the employees are unionized.

## 4.    Intercompany Transactions

In the ordinary course of business, the Debtors transact business with their Debtor and non-Debtor affiliates. Guru provides corporate back-office support for all affiliates, including accounts receivable, customer service, legal, and IT support. Guru also provides the inventory for purchase by its subsidiary affiliates. These services are generally reflected as intercompany ledger entries between the Debtors and non-Debtors. Generally, the non-Debtor affiliates are independent operators and do not require funding from the Debtors, except with respect to the Hong Kong subsidiary, True Religion Brand Jeans Hong Kong Ltd., which is in the process of being wound down, and certain de minimis expenses that may be advanced on behalf of non-Debtor subsidiaries to maintain their corporate status. To the extent of any positive balances in the Debtors' favor, cash is generally upstreamed to the Debtors from their non-Debtor affiliates.

Guru has a 100% interest in non-Debtor True Religion Brand Jeans International S.a.r.l., a Luxemburg limited liability company ("Luxemburg"). Luxemburg, in turn, owns 100% of True Religion Brand Jeans EMEA Sagl, a Swiss limited liability company ("EMEA"). EMEA is in the process of being wound-down in accordance with applicable foreign law. Prepetition, EMEA owed Guru $18 million (the "Account Receivable"), which was booked between Guru and EMEA as an intercompany account receivable/payable. In order to comply with applicable Swiss law and continue the orderly wind down of EMEA, immediately prior to the Petition Date, the rights to receive the benefits of the Account Receivable were assigned by Guru to its subsidiary, Luxemburg, and replaced by a formal loan agreement whereby Luxemburg (EMEA's parent), as the borrower, agreed to repay Guru, as the lender, the same amount of the Account Receivable, effectively resulting in the debt being subordinated at only the EMEA level.

## C. DEBTORS' PREPETITION CAPITAL STRUCTURE

The Debtors are parties to certain financing arrangements, as summarized below:

### 1. Prepetition Revolver

As of the Petition Date, all of the Debtors, as borrowers or guarantors, were unconditionally indebted under that certain ABL Credit Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified, and together with its related agreements, the "Prepetition Revolver"), among, *inter alia*, True Religion, Guru and TR Sales, as borrowers, Deutsche Bank AG New York Branch, as administrative and collateral agent (the "Prepetition Revolver Agent"), the other arrangers and agents party thereto and the lenders party thereto from time to time (the "Prepetition Revolver Lenders"), in respect of loans in the aggregate outstanding principal amount of not less than $12,000,000 and outstanding letters of credit in the face amount of not less than $5,051,858, together with interest accrued thereon and other fees, costs, expenses, indemnities and other obligations owing under the Prepetition Revolver.

The Prepetition Revolver is secured by a first lien on, essentially, accounts receivable, inventory and cash (collectively, the "Prepetition Revolver Priority Collateral") and a third priority lien on the Term Loan Priority Collateral (as defined below), subject to the terms of the Intercreditor Agreement (as defined below).

As described further below, the Debtors used proceeds of their debtor-in-possession senior secured financing facility to pay in full all outstanding obligations owed under the Prepetition Revolver.

### 2. Prepetition First Lien Claims

As of the Petition Date, all of the Debtors, as borrowers or guarantors, were unconditionally indebted under that certain First Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified, and together with its related agreements, the "Prepetition First Lien Loan Agreement"), among, *inter alia*, True Religion, as borrower, Delaware Trust, as successor administrative and collateral agent (the "Prepetition First Lien Agent"), the other arrangers and agents party thereto and the lenders party thereto from time to time (the "Prepetition First Lien Lenders"), in respect of loans in the aggregate outstanding principal amount of not less than $386,000,000, together with interest accrued thereon and other fees, costs, expenses, indemnities and other obligations owing under the Prepetition First Lien Facility.

The Prepetition First Lien Loan Agreement is secured by a first priority lien on intellectual property, furniture, fixtures and equipment and certain other assets (collectively, the "Term Loan Priority Collateral") and a second priority lien on the Prepetition Revolver Priority Collateral, subject to the terms of the Intercreditor Agreement.

### 3. Prepetition Second Lien Claims

As of the Petition Date, all of the Debtors, as borrowers or guarantors, were unconditionally indebted under that certain Second Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified, and together with its related agreements, the "Prepetition Second Lien Loan Agreement"), among, *inter alia*, True Religion, as borrower, Wilmington Trust, as successor administrative and collateral agent (the "Prepetition Second Lien Agent"), the other arrangers and agents party thereto and the lenders party thereto from time to time (the "Prepetition Second Lien Lenders"), in respect of loans in the aggregate outstanding principal amount of not less than $85,000,000, together with interest accrued thereon and other fees, costs, expenses, indemnities and other obligations owing under the Prepetition Second Lien Loan Agreement.

The Prepetition Second Lien Loan Agreement is secured by a second priority lien on the Term Loan Priority Collateral and a third priority lien on the Prepetition Revolver Priority Collateral, subject to the terms of the Intercreditor Agreement.

### 4. Intercreditor Agreement

The Prepetition Revolver Agent, Prepetition First Lien Agent and Prepetition Second Lien Agent (collectively, the "Prepetition Agents") and each of the Debtors are, *inter alia*, parties to that certain Intercreditor Agreement, dated as of July 30, 2013 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"). The Intercreditor Agreement sets forth the relative priority of the respective prepetition liens and security interests of the Prepetition Agents in and to the Prepetition Revolver Priority Collateral and the Term Loan Priority Collateral (collectively, the "Prepetition Collateral") with: (i) the liens and security interests of the Prepetition Revolver Agent having priority over the liens and security interests of the Prepetition First Lien Agent and the Prepetition Second Lien Agent with respect to the Prepetition Revolver Priority Collateral; (ii) the liens and security interests of the Prepetition First Lien Agent having priority over the liens and security interests of the Prepetition Revolver Agent and the Prepetition Second Lien Agent with respect to the Term Loan Priority Collateral; (iii) the liens and security interests of the Prepetition First Lien Agent having priority over the liens and security interests of the Prepetition Second Lien Agent with respect to the Prepetition Revolver Priority Collateral and the Term Loan Priority Collateral; and (iv) the liens and security interests of the Prepetition Second Lien Agent having priority over the liens and security interests of the Prepetition Revolver Agent with respect to the Term Loan Priority Collateral.

### 5. Other Prepetition Obligations

As of the July 3, 2017, the Debtors had an estimated $8.6 million of aggregate outstanding accounts payable and also owe additional amounts, on an unsecured basis, to vendors, customers, service providers, and landlords.

# ARTICLE III.
## CHAPTER 11 CASES

## A.     EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

### 1.     Negative Shifts in Broader Retail Environment

From 2007 through 2012, the Debtors' business nearly tripled in size with net revenue at $490 million and EBITDA at $92 million in 2013. Beginning in 2013, the Debtors began experiencing declining sales caused by the general trend of consumers away from traditional retail to online shopping. The continuing fundamental shift in consumer behavior away from brick-and-mortar and mall shopping toward online retailing has decreased traffic and negatively impacted sales in the Company's physical locations, as well as the wholesale accounts to which the Company sells. The volume of retailers either going out of business, over-inventoried or closing a significant number of physical locations has created a highly competitive promotional environment wherein the Company must utilize significant promotional efforts to be competitive and attract its fair share of consumer traffic and drive sales.

At the same time, changing consumer preferences in the specialty retail segment, and in particular, premium denim, have compounded the broader retail industry-wide challenges. Denim entered a down cycle in 2013, caused in part by the growth of the "athleisure" trend. Competition has also increased from emerging and established fast fashion and low-priced apparel retailers, which has compressed pricing and put pressure on the Company's gross margin rates. In addition, the rapid rise and high profitability of the premium denim segment before 2013, led in part by the Company, attracted new companies and brands with focused style segmentation/specialization between clean and embellished product, further fragmenting the premium denim consumer base, particularly in the women's category. This increase in available consumer choice and volume of premium denim purveyors eroded overall market share of the Company in the premium denim segment.

In addition to broader industry shifts, the Company's financial performance was further adversely impacted by new product designs launched by the Company that failed to resonate with the consumer and investments in brand repositioning through new store concepts that performed below expectations.

### 2.     Internal Operational Restructuring Initiatives

In response to declining performance, the Company has made several concerted internal restructuring efforts. First, the Company changed senior leadership in 2015, hiring a new Chief Executive Officer, Chief Marketing Officer and Vice President of Sourcing. In order to reduce costs, the Company also accelerated the shift to offshore manufacturing. Moreover, the Company has undertaken a targeted and tenacious reduction in SG&A costs in areas such as reductions in force, modifying retail incentive plans, consolidating delivery, negotiating with vendors, and reducing travel, expense and sample spending, among other cost-cutting efforts.

Such measures showed promise as early results indicated that the business was stabilizing and the decline between current year and prior year EBITDA was shrinking. However, in early 2016, the Company saw further deterioration in customer traffic, top line business, gross margins and EBITDA. As a result, the Company addressed the decline in performance through a variety of additional initiatives, including but not limited to:

- evaluating and reducing the store fleet, including closing 20 unprofitable retail stores in 2016;

- focusing the product range to enhance brand perception and reinforce product messaging;

- redirecting resources in support of digital commerce to drive increased sales in this growth channel, enhance customer intelligence and significantly add customers to the Company's data base;

- increasing brand awareness through social media campaigns;

- streamlining the timeline between design and go-to-market;

- implementing a targeted reduction-in-force at corporate headquarters by approximately 25%; and

- hiring a new Chief Financial Officer in August 2016.

The Debtors have undertaken a critical and extensive evaluation of their lease portfolio, including engaging various real estate professional firms from time to time to assist them in their efforts. As a result, the Debtors have been engaged in landlord discussions either for re-negotiation of terms or a consensual termination of various leases and expect that these discussions will continue post-petition. In recent years, the Debtors have closed 30 underperforming locations worldwide and anticipate closing additional locations in 2017.

Although all these internal efforts have helped the bottom line, the Company could not change its trajectory quickly enough given the broader industry headwinds, looming debt maturity date, and high occupancy costs (even after taking into account the reduced store footprint). While the Company possessed ample liquidity, it realized its long-term prospects would be greatly enhanced by reducing outstanding debt. In March 2016, the Company retained a financial advisory firm, MAEVA Group, LLC ("MAEVA"), to assist and advise the Company in business strategy, financial forecasting, and devising and assessing potential restructuring proposals and any potential restructuring transaction.

### 3. Creditor Negotiations and Entry into Restructuring Support Agreement

Equity Parent and the Company realized that without a balance sheet restructuring, there would be limited ability for growth going forward. In order to address the Company's over-levered balance sheet and proactively address its 2019 and 2020 debt maturities under the Prepetition First Lien Loan Agreement and Prepetition Second Lien Loan Agreement, the Company, led by Equity Parent, and with the advice and support of MAEVA, reached out to its secured lenders. The Company and Equity Parent began discussions with certain Prepetition First Lien Lenders and Prepetition Second Lien Lenders in September 2016. Since November 2016, the Company and Equity Parent have been in active negotiations with an ad hoc group of Prepetition First Lien Lenders and Prepetition Second Lien Lenders (the "Ad Hoc Group").

The Debtors (with MAEVA), Equity Parent, and the Consenting Creditors, through their lead counsel (Akin Gump Strauss Hauer & Feld LLP) and their financial advisor (Moelis & Company, LLP) (collectively, the "Consenting Creditors' Professionals") attended several in-person meetings and exchanged several comprehensive restructuring proposals to right size the Debtors' balance sheet and enable the Debtors to be well-positioned going forward from an operational perspective.

In addition, in the months leading up to the commencement of these Chapter 11 Cases, the Company executed multiple forbearance agreements and limited waivers with the Prepetition Revolver Lenders, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders, providing the Company with interim covenant relief as the parties worked towards a consensual restructuring.

The negotiations between the Company, Equity Parent, and the Ad Hoc Group culminated in the entry into that certain Restructuring Support Agreement on July 4, 2017 between the Company, Equity Parent, and the Consenting Creditors (as amended, supplemented or otherwise modified in accordance with its terms from time to time, the "Restructuring Support Agreement").

The Restructuring Support Agreement outlines the terms of a plan of reorganization that will allow the Company to quickly emerge from Chapter 11 with a balance sheet that has $353.6 million less funded debt and other reduction in liabilities while simultaneously providing the Company an opportunity to execute on its operational restructuring strategies outlined above. With a significantly deleveraged balance sheet and support from the Consenting Creditors, the Company will be positioned for long-term growth and be in a position to continue to implement and execute its turnaround plan. Substantially all holders of the Debtors' Prepetition First Lien Claims have signed the Restructuring Support Agreement, even though the Plan contemplates distributions to other creditors and to equityholders, subject to the terms of the Plan.

The Restructuring Support Agreement obligates the Debtors to, among other things, take all necessary action reasonably required to propose and seek confirmation of the Plan in accordance with the following milestones:

(i)     (A) the date that is five (5) Business Days following the Petition Date, obtain entry of the Interim DIP Order and (B) the date that is thirty-nine (39) days following the Petition Date, obtain entry of the Final DIP Order;

(ii)     sixty-four (64) calendar days following the Petition Date (subject to modification), the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance reasonably acceptable to the Company and the Required Consenting Creditors;

(iii)     the date that is ninety nine (99) calendar days following the Petition Date (subject to modification), unless the Bankruptcy Court shall have entered a Confirmation Order in form and substance acceptable to the Company and the Required Consenting Creditors; and

(iv)     the date that is the earlier of one hundred and nineteen (119) calendar days following the Petition Date and October 29, 2017 (subject to modification), unless there shall have occurred a substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan.

In the event that any of these milestones are not satisfied, then the Required Consenting Creditors may seek to terminate the Restructuring Support Agreement in accordance with its terms and, with it, the Consenting Creditors' support of the Plan.

In connection with the Restructuring Support Agreement, the Debtors also obtained the Consenting Creditors' support of the Debtors' use of cash collateral and the Debtors' proposed debtor-in-possession financing facility, as further described below.

Consistent with the Restructuring Support Agreement, on July 5, 2017, the Debtors commenced these voluntary Chapter 11 Cases. The entities that filed for Chapter 11 are obligors

under each of the Debtors' funded debt facilities. The Debtors' foreign non-Debtor affiliates have not been filed as part of these Chapter 11 Cases.

Notwithstanding anything in the Plan or in this Disclosure Statement to the contrary, so long as the Restructuring Support Agreement has not been terminated in accordance with its terms, any and all consents and approval rights of the respective parties as set forth in the Restructuring Support Agreement with respect to (i) the form and substance of the Plan, (ii) the documents to be Filed as part of the Plan Supplement, (iii) the other Plan Documents, (iv) any other orders or documents referenced herein or otherwise to be executed in connection with the transactions contemplated hereunder, and/or (v) any other Restructuring Documents (as defined in the Restructuring Support Agreement), including, in each case, any amendments, restatements, supplements, or other modifications thereto, and any consents, waivers, or other deviations under or from any such documents, are expressly incorporated into the Plan by reference and fully enforceable as if stated in full therein. To the extent that there is any inconsistency between the Restructuring Support Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and the Restructuring Support Agreement has not been terminated, then the consents and the approval rights required in the Restructuring Support Agreement shall govern.

Further, notwithstanding any rights of approval that may exist pursuant to the Restructuring Support Agreement or otherwise as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, neither the Ad Hoc Group, nor their respective representatives, members, financial or legal advisors, or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained in the Plan or in this Disclosure Statement.

## B.   DEBTOR IN POSSESSION FINANCING

On the Petition Date, the Debtors sought Bankruptcy Court approval of a senior secured, superpriority debtor-in-possession financing facility (as amended, modified, or supplemented from time to time, the "DIP Facility") extended by Citizens Bank, N.A., a third party lender (the "DIP Lender"). The DIP Facility provides the Debtors access to a $60 million revolving credit facility (the "DIP Revolver"), which includes a $20 million sublimit for the issuance of letters of credit (the "Letters of Credit") issued by the DIP Lender.

On July [•], 2017, the Bankruptcy Court approved the DIP Facility on an interim basis (the "Interim DIP Order") on the terms set forth in the debtor-in-possession credit agreement (as amended, modified, or supplemented from time to time, the "DIP Credit Agreement").

Pursuant to the DIP Credit Agreement and the Interim DIP Order, the Debtors used proceeds of the DIP Facility to pay in full the outstanding obligations under the Prepetition Revolver Facility. The DIP Facility also provided the Company with liquidity to, among other things: (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs – all of which are necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Plan.

The DIP Credit Agreement obligates the Debtors to, among other things, take all necessary action reasonably required to propose and seek confirmation of the Plan in accordance with the following milestones:

- On the Petition Date, the Debtors shall file a motion seeking approval of the facility evidenced by the DIP Facility.

- On or before 5 business days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

- On or before 10 days after the Petition Date, the Debtors shall have filed a motion requesting, and within 35 days after the Petition Date shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days.

- On or before 40 days after the Petition Date, the Final Order authorizing and approving the DIP Facility on a final basis shall have been entered by the Bankruptcy Court.

- On the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement, which Plan shall be supported by committed financing and a plan support agreement from the lenders under the Prepetition First Lien Term Loan Agreement and shall provide, among other things, for payment in full in cash of the obligations under the DIP Facility.

- On or before 65 days after the Petition Date, the Debtors shall have obtained an order from the Bankruptcy Court approving the Disclosure Statement and voting and solicitation procedures for the Plan and the DIP Agent shall be satisfied that the Plan is reasonably anticipated to become effective on or prior to the 120th day after the Petition Date (an "Acceptable Plan").

- On or before 100 days after the Petition Date, the Debtors shall have obtained an order from the Bankruptcy Court confirming an Acceptable Plan.

- On or before the earlier of (a) 120 days after the Petition Date and (b) October 30, 2017, the effective date of the Acceptable Plan shall have occurred in accordance with its terms, and the Debtors shall have emerged from Chapter 11.

- On or before 65 days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court proposed bid procedures for a sale of the Debtors' assets consistent with the remedies provided in the DIP Agreement.

Concurrent with its commitment to enter into the DIP Facility, Citizens Bank, N.A. also committed to provide the exit financing required by the Debtors to consummate the Plan.

## C.     FIRST AND SECOND DAY RELIEF

Upon commencing the Chapter 11 Cases, the Debtors filed a number of motions (the "First Day Motions") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. A first day hearing was held on July [●], 2017. A second day hearing is scheduled for July [●], 2017, at which the Bankruptcy Court will consider approval of the First Day Motions on a final basis and certain additional relief requested by the Debtors.

1. **Procedural Motions**

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Debtors have filed certain "procedural" motions requesting orders for:

- joint administration of the Debtors' Chapter 11 Cases;

- preparing a list of creditors and filing a consolidated list of their thirty (30) largest unsecured creditors;

- filing a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor;

- enforcing the automatic stay and bankruptcy termination provisions of the Bankruptcy Code; and

- establishing procedures for interim compensation and reimbursement of expenses for Professionals and Committee members.

2. **Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- establish certain procedures for certain transfers with respect to Equity Interests;

- pay claims held by shippers/warehousemen who may be in possession of the Debtors' goods as of the Petition Date;

- maintain their existing cash management systems;

- remit and pay certain taxes and fees;

- pay administrative expense claims arising under Bankruptcy Code section 503(b)(9).

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business. Importantly, the Debtors had discretion to condition payments of these prepetition claims on the vendor's execution of a vendor agreement, which, among other things, provided the Debtors with the opportunity to obtain customary trade terms throughout the

pendency of these Chapter 11 Cases. The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

### 3. Retention of Chapter 11 Advisors

The Debtors are in the process of retaining these advisors to assist them in carrying out their duties and to represent their interests in the Chapter 11 Cases:

(a) Pachulski Stang Ziehl and Jones LLC, as restructuring counsel;

(b) MAEVA Group, LLC as financial advisor; and

(c) Prime Clerk LLC, as voting and solicitation agent.

## D. OTHER MATERIAL EVENTS IN THE CHAPTER 11 CASES

### 1. Claims Bar Date

On the Petition Date, the Debtors filed a motion (the "Bar Date Motion") seeking to establish September 15, 2017, as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Petition Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors in these Chapter 11 Cases (the "Claims Bar Date"). By the same motion, the Debtors also requested that the Court establish January 2, 2018, as the deadline by which all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "Government Bar Date"). The Bankruptcy Court is scheduled to hear the Bar Date Motion at the hearing on [_____], 2017.

### 2. Executory Contract and Unexpired Lease Rejection Procedures Motion

In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their global operations, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases and supply chain. The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or under-utilized or burdensome agreements and leases. As such, the Debtors are conducting a comprehensive analysis of their executory contracts and unexpired leases and have engaged, and intend to continue to engage, in extensive discussions with contract and lease counterparties regarding the contributions such parties are making to the restructuring process and can make to the post-emergence businesses.

In order to aid these efforts, on the Petition Date, the Debtors filed the *Debtors' Motion for an Order Establishing Procedures for(I) the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property and (II) the Abandonment of any Personal Property that Remains on the Leased Premises* (the "Rejection Procedures Motion") seeking to establish a streamlined set of procedures for the efficient rejection of executory contracts and unexpired leases.

For the executory contracts and unexpired leases that the Debtors have already determined to reject, the Debtors have filed the *Motion for the Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. § 554; and (C) Fix A Bar Date for Claims of Counterparties.*

3. **Appointment of the Creditors' Committee**

[On [_____], 2017, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. As of the date hereof, the Creditors' Committee consists of (a) [_____]; (b) [_____]; and (c) [_____].

The Creditors' Committee is in the process of retaining the following professionals: [_____]. [or] [No Creditors' Committee was formed in these Chapter 11 Cases.]

4. **Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code will be held on [_____], 2017. In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined by the United States Trustee and other attending parties in interest), one representative of the Debtors, as well as counsel to the Debtors, will attend the meeting and answer questions posed by the United States Trustee and other parties in interest present at the meeting.

<div align="center">

**ARTICLE IV.**
**SUMMARY OF THE PLAN**

</div>

> **THIS ARTICLE IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

A. **ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS**

1. **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim, subject to ARTICLE II.B and ARTICLE II.C of the Plan, will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

## 2. Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within seventy-five (75) days after the Effective Date, and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) ninety (90) days after the Effective Date and (b) thirty (30) days after the Filing of the applicable request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.

## 3. DIP Facility Claims

If there is a DIP Facility, unless otherwise agreed to by the DIP Lenders, all DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims. Except as otherwise expressly provided in the DIP Facility, upon indefeasible payment and satisfaction in full of all DIP Facility Claims, the DIP Facility Loan Agreement and all related loan documents, and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing. Notwithstanding the foregoing, the DIP Facility Loan Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' right to any contingent or indemnification obligations of the Debtors pursuant and subject to the terms of the DIP Facility Loan Agreement or DIP Orders.

## 4. Priority Tax Claims

On the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors, with the consent of the Required Consenting Creditors, or Reorganized Debtors: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by such Holder and the Debtors or Reorganized Debtors, as applicable, with the consent of the Required Consenting Creditors; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, with the consent of the Required Consenting Creditors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Petition Date,

pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; provided, however, that the Debtors, with the consent of the Required Consenting Creditors, or Reorganized Debtors, as applicable, may prepay any or all such Claims at any time, without premium or penalty.

## B. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1. Summary

All Claims and Equity Interests, except Administrative Expense Claims (including DIP Facility Claims and Professional Fee Claims) and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. Additionally, for voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Miscellaneous Secured Claim shall be deemed to be in its own subclass.

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Non-Tax Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Miscellaneous Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition First Lien Claims | Impaired | Entitled to Vote |
| 4 | Continuing Operations Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Holdings | Impaired | Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Deemed to Accept |

### 2. Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.  Voting; Presumptions; Solicitation in Good Faith

Holders of Allowed Claims in Class 3, Class 5, and Class 6 are entitled to vote to accept or reject the Plan. Holders of Claims in Classes 3, 5, and 6 will receive ballots containing detailed voting instructions. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If Equity Interests in an Impaired Class were to receive any consideration in exchange for the Equity Interests, then such Impaired Class of Equity Interests shall have accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

Claims in Class 1, Class 2 and Class 4 are Unimpaired, and the Holders of Class 1 Claims, Class 2 Claims and Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims, Class 2 Claims, and Class 4 Claims are not entitled to vote to accept or reject the Plan and will not receive Ballots.

The Debtors have, and upon the Effective Date the Reorganized Debtors shall be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Accordingly, the Debtors and the Reorganized Debtors and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no Claim or Equity Interest will become an Allowed Claim or Allowed Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim or Equity Interest. Notwithstanding anything to the contrary in the Plan, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim, except with respect to any Claim Allowed by order of the Bankruptcy Court.

### 4.  Cramdown

If any Class of Claims or Interests is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may, subject to the terms of the Restructuring Support Agreement, (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms thereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## C.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 1.  Class 1 – Non-Tax Priority Claims

*Classification*: Class 1 consists of the Non-Tax Priority Claims.

*Treatment*: Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim:

(a)  Cash equal to the amount of such Allowed Class 1 Claim on the later of (a) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, (b) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim or (c) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 1 Claim; or

(b)  At the election of the Debtors, in consultation with the Required Consenting Creditors, such other less favorable treatment as to which the Holder of such Allowed Class 1 Claim and the Debtors or Reorganized Debtors, as applicable, agree in writing.

*Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and may not receive Ballots.

2.  **Class 2 – Miscellaneous Secured Claims**

*Classification*: Class 2 consists of the Miscellaneous Secured Claims.

*Treatment*: Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:

(a)  Cash equal to the amount of such Allowed Class 2 Claim on the later of (a) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (b) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim; or

(b)  At the election of the Debtors, with the consent of the Required Consenting Creditors or Reorganized Debtors, as applicable, either:

    i.    Reinstatement (with the Holder, as applicable, retaining the Liens securing its Allowed Miscellaneous Secured Claim as of the Effective Date until full and final payment thereof);

    ii.    Return of the Collateral securing such Allowed Class 2 Claim by the Initial Distribution Date; or

    iii.    Such other less favorable treatment as to which the Holder of such Allowed Class 2 Claim and the Debtors or Reorganized Debtors, as applicable, will have agreed upon in writing.

*Impairment and Voting*: Class 2 is Unimpaired, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan and may not receive Ballots.

3.  **Class 3 – Prepetition First Lien Claims**

*Classification*: Class 3 consists of the Prepetition First Lien Claims.

*Allowance*: Notwithstanding any provisions of the Plan to the contrary, the Prepetition First Lien Claims will be deemed Allowed Claims in the aggregate amount of $386,000,000, plus accrued and unpaid interest, fees and expenses.

*Treatment*: On the Effective Date each Holder of an Allowed Prepetition First Lien Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Prepetition First Lien Claim, its Pro Rata share of:

(a)  Reorganized First Lien Term Loans in the aggregate principal amount of $110 million under the Reorganized First Lien Term Loan Facility; and;

(b)  (i) if each of Class 3, Class 5 and Class 6 vote to accept the Plan, the number of Exchange Common Shares equal to 90.0% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option, if applicable). To the extent any Holder of an Allowed General Unsecured Claim exercises the Class 5 Equity Cash Out Option, the percentage of New Common Shares received by Holders of Allowed Class 3 and Class 6 Claims will automatically adjust on a Pro Rata basis to reflect such exercise without the need to issue any additional New Common Shares; or (ii) if either of Class 5 or Class 6 votes to reject the Plan, the number of Exchange Common Shares equal to 94.5% of the Exchange Common Shares.

*Impairment and Voting*: Class 3 is Impaired, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan and will receive Ballots.

4.  **Class 4 – Continuing Operations Claims**

*Classification*: Class 4 consists of the Continuing Operations Claims.

*Treatment*: Each Continuing Operations Creditor will receive in full satisfaction, settlement, discharge and release of, and partially in exchange for, its Allowed Continuing Operations Claim:

(a)  Cash or such other consideration due under the applicable Allowed Class 4 Claim equal to the amount of such Allowed Class 4 Claim payable on the later of (a) the Initial Distribution Date if such Class 4 Claim is an Allowed Class 4 Claim on the Effective Date, (b) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, or (c) the

date such treatment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 4 Claim;

(b)  Such other less favorable treatment as to which the Debtors, with the consent of the Required Consenting Creditors (which consent may be obtained by the Debtors by providing reasonable negative notice of their determinations or the principles they will apply in making them), or Reorganized Debtors and the Holder of such Allowed Class 4 Claim will have agreed upon in writing; or

(c)  Reinstatement or such other treatment rendering such Claim Unimpaired.

*Impairment and Voting*:  Continuing Operations Creditors will not receive Ballots and will not be entitled to vote.  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Class 4 Claims are not entitled to vote to accept or reject the Plan.

5.  **Class 5 – General Unsecured Claims**

*Classification*:  Class 5 consists of the General Unsecured Claims.

*Allowance of Prepetition Second Lien Claims*.  Notwithstanding any provisions of the Plan to the contrary the Prepetition Second Lien Claims will be deemed Allowed General Unsecured Claims in the aggregate amount $85,000,000, plus accrued and unpaid interest, fees and expenses.

*Treatment*:  By the later of (x) fourteen (14) days after the Rejection Claim Bar Date and (y) the date from or after the Effective Date on which such General Unsecured Claim first is an Allowed General Unsecured Claim, or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim its Pro Rata share of the Class 5 Default Consideration, consisting of:

(a)  Reorganized First Lien Term Loans in the aggregate principal amount of $2.5 million under the Reorganized First Lien Term Loan Facility;

(b)  the number of Exchange Common Shares equal to 5.5% of the maximum number of Exchange Common Shares distributable under the Plan; and

(c)  Class A Warrants.

***Only if Class 5 votes to accept the Plan***, by the later of (x) fourteen (14) days after the Rejection Claim Bar Date and (y) the date from or after the Effective Date on which such General Unsecured Claim first is an Allowed General Unsecured Claim, or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim, in full satisfaction, settlement, discharge and release of, and in

exchange for, such Allowed General Unsecured Claims, also will receive the Class 5 Consensual Plan Consideration, consisting of:

(a) its Pro Rata share of $1,000,000 in Cash;

(b) its Pro Rata share of additional Reorganized First Lien Term Loans in the aggregate principal amount of $2.0 million under the Reorganized First Lien Term Loan Facility; provided, however, if any Holder of an Allowed General Unsecured Claim is a Class 5 Electing Holder, such Holder will receive the Class 5 Warrants for Debt Treatment with respect to its Class 5 Swapped Debt; and

(c) the Class 5 Equity Cash Out Option.

*Impairment and Voting*: Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan and will receive ballots.

6.     **Class 6 – Equity Interests in Holdings**

*Classification*: Class 6 consists of the Equity Interests in Holdings.

*Treatment*: On the Effective Date, and solely to the extent that each of Class 3, Class 5 and Class 6 vote to accept the Plan, each Holder of an Equity Interest in Holdings will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Equity Interest in Holdings, its Pro Rata share of:

(a) The number of Exchange Common Shares equal to 4.5% of the maximum number of Exchange Common Shares distributable under the Plan (prior to taking into account any exercise of the Class 5 Equity Cash Out Option, if applicable). To the extent any Holder of an Allowed General Unsecured Claim exercises the Class 5 Equity Cash Out Option, the percentage of New Common Shares received by Holders of Allowed Class 3 and Class 6 Claims will automatically adjust on a Pro Rata basis to reflect such exercise without the need to issue any additional New Common Shares;

(b) Class B Warrants; and

(c) Class C Warrants.

If any of Class 3, Class 5 or Class 6 votes to reject the Plan, Holders of Equity Interests in Holdings shall receive no recovery, and (x) the above-referenced 4.5% of the Exchange Common Shares shall be distributed Pro Rata to the Holders of Class 3 Prepetition First Lien Claims, as set forth in ARTICLE III.C.3 hereof and (y) the Class B Warrants and Class C Warrants shall not be issued.

*Impairment and Voting*: Class 6 is Impaired, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

7.     **Class 7 – Intercompany Interests**

*Classification*: Class 7 consists of the Intercompany Interests.

*Treatment*:  Each Allowed Intercompany Interest shall be Reinstated for purposes of the Subsidiary Structure Maintenance.

*Impairment and Voting*:  Class 7 is Unimpaired, and Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, the Holders of the Intercompany Interests are not entitled to vote to accept or reject the Plan and will not receive Ballots.

## D.  SPECIAL PROVISION GOVERNING CLAIMS RELATED TO ASSUMED EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND UNIMPAIRED CLAIMS

Obligations with respect to assumed Executory Contracts and Unexpired Leases are separately addressed in ARTICLE VI of the Plan.  Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, cure obligations as to any arrears or defaults that may exist with respect to contracts to be assumed under the Plan, or the performance of assumed obligations under such Executory Contracts or Unexpired Leases, including, without limitation, all rights in respect of legal and equitable defenses thereto, or setoffs or recoupments there against.

## E.  ACCEPTANCE OR REJECTION OF THE PLAN

### 1.  Presumed Acceptance of Plan

Classes 1, 2, and 4 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 2.  Voting Classes

Each Holder of an Allowed Claim or Allowed Equity Interest in Holdings as of the applicable Voting Record Date in the Voting Classes (Classes 3, 5, and 6) will be entitled to vote to accept or reject the Plan.

### 3.  Acceptance by Impaired Classes of Claims and Equity Interests

Except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if (x) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (y) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

### 4.  Cramdown; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

If any Class of Claims or Equity Interests is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may, subject to any consent that may be required in the Plan or under the Restructuring Support Agreement, (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan, or any Exhibit, Plan Schedule or Plan Document, in accordance with the terms hereof and the Bankruptcy Code, in order to satisfy the requirements of section 1129(b) of the

Bankruptcy Code, if necessary. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 5. Continuing Susceptibility to Claim Objection; Solicitation in Good Faith

The Debtors have, and upon the Effective Date the Reorganized Debtors shall be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Accordingly, the Debtors and the Reorganized Debtors and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no Claim or Equity Interest will become an Allowed Claim or Allowed Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim or Equity Interest. Notwithstanding anything to the contrary in the Plan, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim, except with respect to any Claim Allowed by order of the Bankruptcy Court.

## F. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith and integrated compromise and global settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### 2. Corporate Existence

The Debtors all will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization subject to the terms of the Plan and the Alternative Structures. The respective articles or certificate of incorporation and bylaws (or other applicable formation documents) in effect prior to the Effective Date for each Debtor shall continue to be in effect after the Effective Date, except (i) with respect to Reorganized Holdings, as to which there shall be new articles of incorporation and by-laws or other applicable organizational documents as set forth in the Amended Organization Documents Filed as an Exhibit with the Plan Supplement and (ii) other Debtor's articles or certificate of incorporation or bylaws (or other formation documents) may be amended pursuant to the Plan.

On or after the Confirmation Date or as soon thereafter as is reasonably practicable, the Debtors or Reorganized Debtors, as applicable, may undertake the Restructuring Transactions and, to the extent determined necessary or appropriate by the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable or their successors, may take all other actions to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan and that is consistent with the Restructuring Support Agreement, including, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition,

transfer, dissolution, name change, Chapter 11 Case closing, plans of reorganization, transfer or extinguishment of Intercompany Interests among the Reorganized Debtors or other successors to, or Affiliates of, the Debtors, or liquidation, containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree (the "Alternative Structures"); (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of formation or incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law in connection with such transactions.

### 3. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors or their successor, including under the Alternative Structures, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors or their successors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

### 4. New ABL Facility

The Debtors shall use their best efforts to enter into the New ABL Facility on or before the Effective Date. The DIP Lenders may become the New ABL Lenders and the DIP Facility Loan Agreement may be amended to become the New ABL Facility. Regardless, the New ABL Facility shall be in form and substance reasonably acceptable to the Required Consenting Creditors. The Confirmation Order shall be deemed approval of the New ABL Facility and the New ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New ABL Facility. If the Debtors enter into the New ABL Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

The New ABL Facility shall provide, as of the Effective Date, sufficient funding or deemed funding, together with the Debtors' Cash on hand, to satisfy any DIP Facility Claims and obligations to pay Cash on the Effective Date of the Plan in full.

## 5. Reorganized First Lien Term Loan Facility

As provided in the Plan's treatment of certain Allowed Claims, on the Effective Date, Reorganized Holdings shall issue to certain Holders of Allowed Claims in partial exchange for their Allowed Claims, the Reorganized First Lien Term Loans under the Reorganized First Lien Term Loan Facility. The Reorganized First Lien Term Loan Facility shall be governed by the Reorganized First Lien Term Loan Documents, which shall be consistent with, and subject to the approvals and consents as to form and substance set forth in the Restructuring Support Agreement. The obligations of the Reorganized Debtors under the Reorganized First Lien Term Loan Facility shall be secured by substantially all of their assets, whether now existing or hereinafter acquired, subject to certain exceptions. Such security interests and Liens shall be perfected and have a first priority, other than as to certain of the collateral for the New ABL Facility, as to which the security interests and Liens shall have a second priority.

## 6. Authorized Financing

On the Effective Date, the applicable Reorganized Debtors shall be and are authorized to execute and deliver the New ABL Facility Documents, the Reorganized First Lien Term Loan Documents and any related loan documents, and shall be and are authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, subject to any lien limitations set forth in the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the New ABL Facility and the Reorganized Debtors' Cash balances, including Cash from operations. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

## 7. Management Incentive Plan

On the Effective Date, 10% of the New Common Shares on a fully diluted basis shall be reserved for issuance as grants of stock, warrants, options, or other Equity Securities in connection with the Reorganized Debtors' Management Incentive Plan (such reserve, the "MIP Pool"), and issuances of the New Common Shares in respect thereof will dilute the Exchange Common Shares issued on the Effective Date. The remaining terms of the Management Incentive Plan shall be determined by the New Board.

## 8. Issuance of Reorganized First Lien Term Loans, New Common Shares, New Warrants and Related Documentation

From and after the Effective Date, Reorganized Holdings will be authorized to and will issue the Reorganized First Lien Term Loans, New Common Shares and New Warrants to the Holders of Claims and Equity Interests, as applicable, as set forth in the Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. On the Effective Date one-hundred percent (100%) of the Exchange Common Shares are to be distributed (or issuable under the Amended Organizational Documents), as provided in the Plan, to Holders of Allowed

Prepetition First Lien Claims and, if applicable, to Holders of Allowed General Unsecured Claims, to Holders of Allowed Equity Interests in Holdings, and on account of the Class 5 Reserve. The issuance of New Common Shares by Reorganized Holdings is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable. All of the shares of New Common Shares issued pursuant to the Plan shall be duly authorized and validly issued.

On the Effective Date, Reorganized Holdings and all the Holders of the Exchange Common Shares and New Warrants shall be deemed to be parties to the Amended Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder. The Amended Organizational Documents shall be binding on Reorganized Holdings and all parties receiving, and all holders of, New Common Shares and New Warrants; provided, that regardless of whether such parties execute the Amended Organizational Documents, such parties will be deemed to have signed the Amended Organizational Documents which shall be binding on such parties as if they had actually signed it.

As of the Petition Date, no class of Equity Securities of Holdings was registered under the Securities Exchange Act, and Holdings was not subject to any of the periodic reporting obligations of such Act. Except as otherwise provided under the Amended Organizational Documents, in each case consistent with the Restructuring Support Agreement, or unless otherwise determined by the New Board in accordance with applicable non-bankruptcy law, it is not intended that, from or after the Effective Date, Reorganized Holdings will have any class of its Equity Securities registered under or become subject to any of the periodic reporting obligations of such Act.

To the extent that any such instruments constitute "securities" under applicable securities laws, the offer and sale of Reorganized First Lien Term Loans, Exchange Common Shares, and New Warrants pursuant to the Plan, including any shares of New Common Shares issuable after the Effective Date thereof upon exercise of the New Warrants, shall be effected without registration under Section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon the exemption from such registration requirements afforded by section 1145 of the Bankruptcy Code.

The offer and sale of Equity Securities to officers and other key employees of the Reorganized Debtors pursuant to the Management Incentive Plan shall be effected without registration under Section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon available exemptions from such registration requirements afforded by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

The New Common Shares of Reorganized Holdings shall constitute a single class of Equity Security in Reorganized Holdings and, other than as contemplated through the New Warrants or under the Management Incentive Plan, there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Holdings. From and after the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Holdings will be that number of shares of New Common Shares as may be designated in the Amended Organizational Documents.

### 9. Substantive Consolidation for Plan Purposes

The Plan serves as a motion by the Debtors seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of

the Estates of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes only. Substantive consolidation will not (i) alter the state of incorporation of any Debtor for purposes of determining applicable law of any of the Causes of Action, Litigation Claim or Avoidance Action (ii) alter or impair the legal and equitable rights of the Debtors to enforce any of the Causes of Action, Litigation Claims or Avoidance Actions or (iii) otherwise impair, release, discharge, extinguish or affect any of the Causes of Action, Litigation Claims or Avoidance Actions, or issues raised as a part of any thereof.

If substantive consolidation is ordered, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated as though they were merged into a single estate solely for purposes of treatment of and distributions on Claims. All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors. All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

## 10. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

## 11. Amended Organizational Documents

The Amended Organizational Documents shall amend, amend and restate or succeed the limited liability company agreements, certificates or articles of incorporation, by-laws and other organizational documents of Holdings to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Shares in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate as determined by the Required Consenting Creditors, include restrictions on the Transfer of New Common Shares; (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan; and (v) be in form and substance acceptable to the Required Consenting Creditors in their sole discretion. After the Effective Date, the Reorganized Debtors may amend and restate their limited liability company agreements, certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law and their respective charters, by-laws and other organizational documents.

## 12. Directors and Officers of Reorganized Holdings

The New Board will be comprised initially of seven directors, who will consist of: (i) the Chief Executive Officer of Reorganized Holdings, (ii) a director selected by TI Holdings (with an initial term of one year, after which the members of the New Board will be appointed as provided in the Amended Organizational Documents), and (iii) five directors selected by the Consenting Creditors, in consultation with the Chief Executive Officer. Any directors designated pursuant to this section will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

In addition, TI Holdings, and each Person or Entity that holds more than 5% of the New Common Shares on a fully diluted basis as of the time of a meeting of the New Board as of the time of distribution of materials to the New Board in connection with such a meeting, as applicable, shall have the right to be represented by one non-voting observer at each such meeting of the New Board and receive all materials distributed to the New Board, subject to customary exceptions; provided that for this purpose, New Board meetings shall not include committee meetings.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date. Except as set forth in the Plan, any other directors or officers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, in a Plan Supplement or on the record at the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors. The existing board of directors of Holdings will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

## 13. Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan or to effectuate the Alternative Structures, including, without limitation, the distribution of the securities to be issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, and, in each case, except as expressly required pursuant to the Plan or the Restructuring Support Agreement, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors, as applicable, or by any other Person.

Other actions necessary to effect the Alternative Structures may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to

which the applicable Debtors or Reorganized Debtors may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Debtors or Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Alternative Structures. If and to the extent necessary, any controlling organization or formation documents or agreements for the Reorganized Debtors shall be deemed amended to authorize the foregoing.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person (except as expressly required pursuant to the Restructuring Support Agreement).

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtor, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtor, as applicable, or by any other Person (except as expressly required pursuant to the Restructuring Support Agreement). On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtor, as applicable, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtor, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person (except as expressly required pursuant to the Restructuring Support Agreement). The secretary and any assistant secretary or managing member of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

## 14. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest in Holdings and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, including any relating to the Equity Interests in Holdings. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or

authorization by any Person. Notwithstanding such cancellation and discharge, each of the Prepetition First Lien Loan Agreement and the Prepetition Second Lien Loan Agreement shall continue in effect to the extent necessary to: (1) allow Holders of Claims and Equity Interests to receive Plan Distributions; (2) allow the Reorganized Debtors to make distributions pursuant to the Plan; (3) allow the Prepetition First Lien Agent and Prepetition Second Lien Agent to receive distributions under the Plan on account of the Prepetition First Lien Claims and Prepetition Second Lien Claims, respectively, for further distribution in accordance with the Prepetition First Lien Loan Agreement and Prepetition Second Lien Loan Agreement, respectively; (4) allow the Prepetition First Lien Agent and the Prepetition Second Lien Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the Plan; and (5) preserve any rights of the Prepetition First Lien Agent and the Prepetition Second Lien Agent to payment of fees, expenses, and indemnification obligations as against any parties other than the Debtors or the Reorganized Debtors, and any money or property distributable to the beneficial holders under the relevant instrument, including any rights to priority of payment or to exercise charging liens. Except as provided pursuant to the Plan, each of the Prepetition First Lien Agent and the Prepetition Second Lien Agent, and their respective agents, successors, and assigns shall be discharged of all of their obligations associated with the Prepetition First Lien Loan Agreement and the Prepetition Second Lien Loan Agreement, respectively. The commitments and obligations (if any) of the Prepetition First Lien Lenders and Prepetition Second Lien Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Prepetition First Lien Loan Agreement and Prepetition Second Lien Loan Agreement, respectively, shall fully terminate and be of no further force or effect on the Effective Date.

### 15. Cancellation of Existing Instruments Governing Security Interests

Upon the full payment or other satisfaction of an Allowed Miscellaneous Secured Claim, or promptly thereafter, the Holder of such Allowed Miscellaneous Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Miscellaneous Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

On the Effective Date, any Lien in Collateral of any Debtor or Reorganized Debtor, as applicable, held for the DIP Facility Claims, the Prepetition First Lien Claims and the Prepetition Second Lien Claims shall be cancelled and of no further force or effect. Notwithstanding any other provision hereof, as a condition of any distribution for the benefit of Holders of DIP Facility Claims, Prepetition First Lien Claims and Prepetition Second Lien Claims, the respective collateral agents therefore shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor or Reorganized Debtor, as applicable, held for DIP Facility Claims, Prepetition First Lien Claims and Prepetition Second Lien Claims, together with any termination statements, instruments of satisfaction, or releases of all Liens that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 16. Intercompany Claims; Intercompany Interests; Corporate Reorganization

On the Effective Date, or as soon thereafter as is practicable, without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, and notwithstanding the provisions of the Plan in ARTICLE II and ARTICLE III (a) the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect (and shall be retained by the Holders thereof prior to the Effective Date), and (b) all Intercompany Claims and Intercompany

Interests will be reinstated in full or in part (collectively, the "Subsidiary Structure Maintenance") except, to the extent that the Debtors, Reorganized Debtors, their Affiliates or their successors, as applicable, as they determine necessary or appropriate with the consent of the Required Consenting Creditors, may effectuate Alternative Structures, which may include, without limitation, merger or dissolution of certain Debtors or Reorganized Debtors and the cancellation of certain Intercompany Interests, the transfer of Intercompany Interests among Reorganized Debtors, their successors or their Affiliates, or cancellation or discharge in full or in part of, or contribution, distribution or other transfer between and among the Debtors or their Affiliates in full or in part of Intercompany Claims.

### 17.    Restructuring Transactions

On or after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, may undertake the Restructuring Transactions and take all other actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, including effectuation of the Alternative Structures.

In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

### 18.    Restructuring Expenses

On the Effective Date, to the extent not previously paid pursuant to the DIP Orders, the Debtors or the Reorganized Debtors, as applicable, shall pay in full in Cash all outstanding Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date, in accordance with the terms of the applicable orders (including the DIP Orders), engagement letters, or other applicable contractual arrangements, but without regard to any notice or objection period as may be contained in such applicable orders, engagement letters, or other applicable contractual arrangements, subject to adjustment, if necessary, for the actual Restructuring Expenses incurred.

### 19.    Agent Fee Claims

On the Effective Date, to the extent not paid pursuant to the DIP Orders, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter 11 Cases, the reasonable and documented fees and expenses (including fees of counsel) of the Prepetition First Lien Agent and the Prepetition Second Lien Agent.

## G.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed by the applicable Reorganized Debtor in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been rejected by order of the Bankruptcy Court;

- are the subject of a motion to reject pending on the Effective Date;

- are identified in the Rejected Executory Contract/Unexpired Lease List; or

- are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption or assumption and assignment of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## 2. Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease to an Entity other than a Debtor or its successor, at least ten (10) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption and assignment that will: (a) list the applicable monetary cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court. Additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed monetary cure amounts, which list (including any proposed cure amounts set forth therein) shall be in form and substance reasonably satisfactory to the Required Consenting Creditors. Any applicable cure will be satisfied as set forth in ARTICLE VI.D of the Plan.

## 3. Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections identified in the Rejected Executory Contract/Unexpired Lease List and in the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after the date of entry of an order

of the Bankruptcy Court (including the Confirmation Order) approving such rejection or such other time as may be set by such order (the "Rejection Claim Bar Date"). The Debtors or Reorganized Debtors, as the case may be, will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim. The deadline for filing a Proof of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to a prior order of the Bankruptcy Court shall be as set forth in such order; provided, however if such order does not set such a deadline, the deadline shall be the Rejection Claim Bar Date. Each Claim arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in ARTICLE X.E.2 of the Plan.

Notwithstanding anything to the contrary in the Plan, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors, with the consent of the Required Consenting Creditors (which consent shall not be unreasonably withheld), or the Reorganized Debtors, as applicable, amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

### 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof, by payment of the default amount in Cash on the later of the Initial Distribution Date, or the date as and when such amount is due in the ordinary course, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree, subject to ARTICLE VI.E of the Plan. Following the Petition Date, the Debtors may serve a notice on parties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure (if any). If a counter party to any Executory Contract or Unexpired Lease, that the Debtors or Reorganized Debtors, as applicable, intend to assume, does not receive such a notice, the proposed cure for such Executory Contract or Unexpired Lease shall be deemed to be zero dollars ($0).

### 5. Objections to Assumption, Assignment or Cure of Executory Contracts or Unexpired Leases

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assignment or any related monetary cure amount must be Filed, served and actually received by the Debtors at least five (5) Business Days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption, assignment or cure amount will be deemed to have consented to such assumption or assumption and assignment, and to such cure, of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. In the event of a dispute

regarding assumption, assumption and assignment, or cure of any Executory Contract or Unexpired Lease, any applicable cure payments will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment, and cure. The Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease at any time in lieu of assuming or assuming and assigning it.

### 6. Assumption of Existing Senior Leadership Employment Agreements/Incentive Compensation

On the Effective Date, the Reorganized Debtors will assume all of the Existing Senior Leadership Employment Agreements pursuant to section 365(a) of the Bankruptcy Code, subject to the applicable employee agreeing to amendments thereto on terms that already have been negotiated between the Debtors and the Required Consenting Creditors. Nothing in the Plan shall prevent or prohibit the Debtors, with the consent of the Required Consenting Lenders, or the Reorganized Debtors from entering into new management employment agreements with their key management to be effective as of the Effective Date, covering, without limitation, base salary, incentives, and executive benefits.

### 7. Director and Officer Insurance Policies

Upon the Effective Date, the Reorganized Debtors will have similar insurance coverage to the D&O Liability Insurance Policies in effect upon the Petition Date. If, as of the Effective Date, the Debtors do not have a six (6) year discovery period (referred to as a "Tail Policy") in place under such D&O Liability Insurance Policies, the Reorganized Debtors shall acquire such six (6) year Tail Policy, which shall be in form and substance reasonably satisfactory to the Required Consenting Lenders, TI Holdings and the Debtors. If, as of the Effective Date, the Debtors have already acquired such a Tail Policy, such policy shall be deemed an assumed contract to the extent executory. For the avoidance of doubt, any new D&O Liability Insurance Policies that are to be purchased and effective as of the Effective Date shall be in form and substance reasonably satisfactory to the Required Consenting Creditors and the Debtors.

### 8. Indemnification Provisions

All indemnification provisions in place immediately prior to the Effective Date (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers and employees of the Debtors who served in such capacity with respect to the Debtors or Equity Parent, or based upon any act or omission taken or omitted in such capacities for or on behalf of the Debtors or Equity Parent, will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying contract or document as applicable; provided, further, that the Reorganized Debtors shall have no indemnification obligations for any losses, liabilities, or expenses arising out of conduct determined by a Final Order to have constituted actual fraud, gross negligence, bad faith, or willful misconduct.

### 9. Compensation and Benefit Programs

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Compensation and Benefit Programs. Except as otherwise provided in the Plan or in the Existing Senior Leadership Employment Agreements (as amended, if applicable), all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, vacation and paid time off programs, severance benefit plans, incentive

plans (other than equity incentive plans providing for the distribution of equity in the Reorganized Debtors, which will replaced by the Management Incentive Plan), life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, in each case to the extent listed on the Schedule of Assumed Compensation and Benefit Programs. Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

### 10. Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance. All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### 11. Insurance Policies

Other than the insurance policies otherwise discussed in the Plan, all other insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.

## H. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties and subject to the establishment of the Class 5 Reserve, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date.

### 2. Distributions on Account of Claims Allowed After the Effective Date

(a) Payments and Distributions on Disputed Claims.

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties and subject to the establishment of the Class 5 Reserve, if a Disputed Claim becomes an Allowed Claim after the Effective Date, distributions that would be past due under the Plan on account of such Disputed Claim if it had previously been an Allowed Claim shall be made within thirty (30) days after the Disputed Claim becomes an Allowed Claim, or as soon as practicable thereafter, without any interest to be paid on account of such Claim unless it is a Secured Clam and such payment is required under applicable bankruptcy law.

(b)   Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and such Claim has become an Allowed Claim. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims pursuant to ARTICLE IV.B.2(c) hereof.

(c)   The Class 5 Reserve.

On the Effective Date, pending resolution of Disputed General Unsecured Claims, the Reorganized Debtors or applicable Reorganized Debtor shall withhold from distributions as a reserve of the Class 5 Default Consideration and, if applicable, the Class 5 Consensual Plan Consideration, as set forth in this section of the Disclosure Statement (the "Class 5 Reserve"). For the benefit of Holders of Allowed General Unsecured Claims, and to enable the distribution of the Class 5 Default Consideration and the Class 5 Consensual Plan Consideration: (A) the Amended Organizational Documents shall provide for the issuance of (1) a number of shares of Exchange Common Shares equal to 5.5% of the maximum number thereof issuable under the Plan, provided that such number of shares shall be reduced by any reduction resulting if the Class 5 Equity Cash Out Option is available and elected by any eligible Holders and (2) the Class A Warrants; (B) the Reorganized First Lien Term Loan Agreement shall provide for the issuance of (1) $2.5 million of Reorganized First Lien Term Loans and (2) if Class 5 votes to accept the Plan, an additional $2.0 million of Reorganized First Lien Term Loans (less any Class 5 Swapped Debt); and (C) if Class 5 votes to accept the Plan, the Reorganized Debtors shall be obligated to pay $1,000,000 in Cash plus up to an additional $1,050,000 in Cash if the Class 5 Equity Cash Out Option is available and elected by any eligible Holders of Allowed General Unsecured Claims. Subject to the foregoing limits, the amount of Exchange Common Shares, Class A Warrants, Reorganized First Lien Term Loans and Cash to be withheld as a part of the Class 5 Reserve for the benefit of a Holder of a Disputed Claim in Class 5 shall be equal to the lesser of the amount set forth in the following clause (a) and the amount set forth in the following clause (b): (a) (i) if no estimation is made by the Bankruptcy Court pursuant to Article VIII.C.2. of the Plan, the number of shares of Exchange Common Shares and the amount of Class A Warrants, Reorganized First Lien Term Loans and Cash necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, with the consent of the Required Consenting Creditors (which consent shall not be unreasonably withheld) elect to withhold on account of such Claim in the Class 5 Reserve; or (ii) the number of shares of Exchange Common Shares and the amount of Class A Warrants, Reorganized First Lien Term Loans and Cash necessary to satisfy the distributions required to be made pursuant to the Plan for such Disputed Claim based on an amount as estimated by and set forth in an order of the Bankruptcy Court for purposes of allowance and distributions; and (b) the number of shares of Exchange Common Shares and the amount of Class A Warrants, Reorganized First Lien Term Loans and Cash necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtors, with the consent of the Required Consenting Creditors, which consent may not be unreasonably withheld. As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, Exchange Common Shares, Class A Warrants, Reorganized First Lien Term Loans and Cash to Holders of Allowed General Unsecured Claims, and the Class 5 Reserve shall be adjusted accordingly.

**3.** **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

    (a)    Record Date for Distributions

At the close of business on the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded security is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Equity Interests in Holdings shall be closed, and there shall be no further changes in the record holders of such Claims or Equity Interests.

The Reorganized Debtors, the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfers of Claims or Equity Interests not occurring timely in accordance herewith and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders on the Claims Register or transfer ledgers, as applicable, as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

    (b)    Delivery of Distributions in General

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that, permissively, Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be delivered to the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

All distributions to Holders of Prepetition First Lien Claims and Prepetition Second Lien Claims shall be deemed completed when made to such Holders. Notwithstanding any provisions in the Plan to the contrary, Prepetition First Lien Loan Agreement and Prepetition Second Lien Loan Agreement shall continue in effect to the extent necessary to allow the Debtors or Reorganized Debtors, as applicable, either directly or through the Distribution Agent to make Plan Distributions pursuant to the Plan on account of the Prepetition First Lien Claims and Prepetition Second Lien Claims.

    (c)    Distributions by Distribution Agents

Except as otherwise set forth in ARTICLE IV.B.2 of the Plan, all Plan Distributions shall be made by the Reorganized Debtors as Distribution Agent, or by such other Entity designated by the Debtors as a Distribution Agent on the Effective Date or thereafter, unless the Plan specifically provides otherwise. The Reorganized Debtors, or such other Entity designated by the Debtors to be the Distribution Agent, shall not be required to give any bond or surety or other

security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

    (d)    <u>Minimum Distributions</u>

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars, shares or warrants. Whenever any payment or distribution of a fraction of a dollar, fraction of a share of New Common Shares or fraction of a New Warrant under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, whole share of New Common Shares or whole New Warrant (up or down), with half dollars, half shares of New Common Shares and half New Warrants or less being rounded down.

    (e)    <u>Undeliverable Distributions</u>

        (i)    Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder within thirty (30) days following such notification or as soon as practicable thereafter. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to the following subsection hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind.

        (ii)    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable delivery and (iii) 180 days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, (i) any Exchange Common Shares, New Warrants, Reorganized First Lien Term Loans or Cash held for distribution on account of Allowed Claims in Class 3 or Class 5, as applicable, shall be redistributed to Holders of Allowed Claims in the applicable Class entitled to such form of consideration, and as may be limited by the Plan, within seventy-five days thereafter and (ii) any Cash held for distribution to any other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(iii)    Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### 4.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, and related liens and encumbrances. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Government Unit, including income, withholding and other tax obligations, on account of such distribution. The Reorganized Debtors have the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Reorganized Debtors for payment of any such tax obligations. The Reorganized Debtors may require, as a condition to the receipt of a distribution, that the Holder of an Allowed Claim complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If such Holder fails to comply with such request within one year, such distribution shall be deemed an unclaimed distribution.

In connection with the distribution of New Common Shares to current or former employees of the Debtors, Reorganized Holdings will take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, when applicable, withholding from distributions a portion of the New Common Shares, selling such securities or requiring Holders of such securities to contribute the Cash necessary to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes, and Reorganized Holdings shall pay such withheld taxes to the appropriate Governmental Unit.

To the extent that any Allowed Claim entitled to distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distributions shall, for all income tax purposes, be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

5.    **Timing and Calculation of Amounts to Be Distributed**

On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), or at such other time as may be specified in the Plan, each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class, provided that, in the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan hereof. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.    **Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim, other than the Allowed Claim of a Consenting Creditor, an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, other than the Allowed Claim of a Consenting Creditor, are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim, other than the Allowed Claim of a Consenting Creditor, and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.

7.    **Surrender of Canceled Instruments or Securities**

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Prepetition First Lien Claim or Prepetition Second Lien Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to Article V.N and Article V.O of the Plan, except to the extent otherwise provided in the Plan.

8.    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Holdings and other applicable Distribution Agent: (x)

evidence reasonably satisfactory to Reorganized Holdings and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Holdings and other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Holdings and other applicable Distribution Agents.

## I. PROCEDURES REGARDING DISPUTED CLAIMS AND EQUITY INTERESTS

### 1. Rights of Reorganized Debtors with Respect to Allowance of Claims and Equity Interests

Notwithstanding anything to the contrary in the Plan, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan (including the Prepetition First Lien Claims and Prepetition Second Lien Claims) or by orders of the Bankruptcy Court.

### 2. No Distributions to Holders of Disputed Claims or Equity Interests Pending Resolution of the Dispute

Under no circumstances will any distributions be made on account of any Claim or Equity Interest that is not an Allowed Claim or Equity Interest. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order and the DIP Orders), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest. No payment or other distribution or treatment shall be made on account of a Disputed Claim or Equity Interest, even if a portion of the Claim or Equity Interest is not disputed, unless and until such Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest and the amount of such Allowed Claim or Equity Interest is determined by a Final Order, provided, however, that the Reorganized Debtors and the subject Holder, may determine allowance of a Disputed Claim or Equity Interest after the Effective Date without further order of the Bankruptcy Court. Notwithstanding any other provision of the Plan, the Reorganized Debtors and any Distribution Agent shall have no obligation to make any distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

### 3. Resolving Disputed Claims and Equity Interests

All of the following objection, estimation and resolution procedures are cumulative and not exclusive of one another.

(a) Generally

The Debtors and Reorganized Debtors intend to attempt to resolve Disputed Claims and Equity Interests consensually or through judicial means outside the Bankruptcy Court. Nevertheless, from and after the Confirmation Date but before the Effective Date, the Debtors, and, after the Effective Date, the Reorganized Debtors, shall have the exclusive right to object to

Claims and Equity Interests and resolve such objections pending as of the Confirmation Date and, may, in their discretion, file with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto and prosecute all such pending objections, motions or adversary proceedings; provided, however, (i) the Debtors shall consult with the Required Consenting Lenders prior to filing any such objection, motion or adversary proceeding and (ii) the consent of the Required Consenting Lenders (which consent shall not be unreasonably withheld) shall be required with respect to the resolution of any objection that results in (x) and Allowed Administrative Expense Claim greater than or equal to $100,000 or (y) an Allowed General Unsecured Claim greater than or equal to $200,000. All such matters pending as of the Confirmation Date shall be litigated to Final Order, provided, however, that, except to the extent otherwise provided in the Confirmation Order, the Reorganized Debtors are authorized to settle, or withdraw any such matters with respect to any Disputed Claim or Equity Interest following the Effective Date without further notice or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan. The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(b)     Estimation

After the Confirmation Date but before the Effective Date, the Debtors, with the consent of the Required Consenting Creditors (which consent shall not be unreasonably withheld), and, after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

4.     **Distributions after Allowance of Disputed Claims or Equity Interests**

Following the date on which a Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Reorganized Debtors shall pay directly to the Holder of such Allowed Claim or Equity Interest the amount or consideration provided for under the Plan, as applicable, and in accordance therewith.

**J.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The failure to satisfy or waive a condition to Consummation may be asserted, as applicable, by the Debtors and the Required Consenting Creditors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

1.     **Conditions Precedent to Confirmation**

Consummation of the Plan shall occur on the Business Day as determined by the Debtors with the consent of the Required Consenting Creditors after they reasonably determine that the

following conditions have been met or waived pursuant to the provisions of ARTICLE IX of the Plan:

(a) The Bankruptcy Court has entered the Confirmation Order and it is a Final Order, and such order is in form and substance acceptable to the Debtors and the Required Consenting Creditors.

(b) The Confirmation Order provides that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents or Alternative Structures created in connection with or described in the Plan.

(c) All actions, documents, certificates and agreements necessary to implement the Plan have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

(d) The Plan Documents are consistent with, and in form and substance as required by the approvals and consents set forth in, the Restructuring Support Agreement; provided, however, for the avoidance of doubt, any Plan Documents regarding organizational and governance matters of the Reorganized Debtors, including, without limitation, the Amended Organizational Documents, shall be acceptable to the Required Consenting Creditors in their sole discretion.

(e) All documents and agreements necessary to implement the Plan, including, without limitation, the New ABL Facility Documents, the Reorganized First Lien Term Loan Documents, the Amended Organizational Documents and the New Warrants have (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery and/or (c) been effected or executed, as applicable.

(f) The Restructuring Support Agreement is in full force and effect.

(g) All Restructuring Expenses and all Agent Fee Claims have been paid in accordance with ARTICLE V.R and ARTICLE V.S of the Plan, respectively.

(h) The New Board and senior management shall have been selected as contemplated by the Plan.

(i) All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

(j) All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

## 2. Waiver of Conditions

The conditions to Consummation of the Plan set forth in the Plan, other than the condition that the Bankruptcy Court has entered a Confirmation Order in form and substance acceptable to the Debtors and the Required Consenting Creditors, may be waived, in whole or in part, by the Debtors with the consent of the Required Consenting Creditors, in each case without further notice, leave, hearing or order of the Bankruptcy Court or any formal action and, thereupon, Consummation may occur.

## 3. Notice of Effective Date

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in ARTICLE IX.A of the Plan have been satisfied or waived pursuant to ARTICLE IX.B of the Plan.

## 4. Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## K. EFFECT OF CONFIRMATION; AND RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1. General

For purposes of the following release and exculpation provisions:

(a) *"Released Party"* means, in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Prepetition First Lien Creditors; (d) the Prepetition Second Lien Creditors; (e) Equity Parent; (f) TowerBrook, (g) the Prepetition Revolver Agent; (h) each Prepetition Revolver Lender; (i) each other party to the Restructuring Support Agreement in all capacities; (j) the DIP Agent; (k) each DIP Lender; and (l) each Related Person of any of (a) through (k) of the foregoing; provided that, notwithstanding the foregoing, a person is not a "Released Party" if such Person is an Excluded Party.

(b) *"Releasing Party"* means, in its capacity as such: (a) each Holder of a Claim that votes to accept this Plan; (b) each Holder of a Claim that is Unimpaired under this Plan; (c) each Holder of a Claim that is solicited to vote to accept or reject this Plan but that does not vote either to accept or reject the Plan; (d) each Holder of a Claim that votes to reject this Plan and does not elect on their ballot to opt out of granting the releases set forth in Article X.C ; (e) the Prepetition First Lien Creditors; (f) the Prepetition Second Lien Creditors; (g) Equity Parent; (h) TowerBrook; (i) the Prepetition Revolver Agent; (j) each Prepetition Revolver Lender; (k) the DIP Agent; (l) each DIP Lender; and (m) each Related Person of each of (a) through (l) of the foregoing.

(c) "*Exculpated Party*" means, in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) any Committee; and (d) each Related Person of any of (a) through (c) of the foregoing.

## 2. Compromise and Settlement

Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Equity Interests or other rights of a holder of an Equity Security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed to have received a discharge under section 1141(d)(1)(A) of the Bankruptcy Code and release from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any Equity Security holder in any of the Debtors and all Equity Interests, subject to the Subsidiary Structure Maintenance or Alternative Structures.

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan.

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtors, their estates and all Holders of Claims, (ii) fair, equitable and reasonable, (iii) made in good faith and (iv) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist: (a) between the Debtors, Reorganized Debtors and Estates, on the one hand, and the Released Parties, on the other hand (to the extent set forth in the release contained in ARTICLE X.B of the Plan); and (b) as between the Releasing Parties and the Released Parties (to the extent set forth in the release contained in ARTICLE X.C of the Plan); and, as of the Effective Date, any and all such Causes of Action are settled, compromised and released pursuant to the Plan. The Confirmation Order shall approve the releases in the Plan of all contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant to the Plan.

Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates and the Reorganized Debtors any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a holder of an Equity Interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtors or terminated Equity Interest.

3.     **Mutual Release by the Debtors and Released Parties**

Except as otherwise provided in the Plan, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Debtors, Reorganized Debtors, and Estates, on the one hand, and the Released Parties, on the other hand, to the fullest extent permissible under applicable law, the Debtors, Reorganized Debtors, and Estates, on the one hand, and the Released Parties, on the other hand, shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge each other, their Related Persons, and their respective property from any and all Claims, Equity Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, on the one hand, and Released Parties, on the other hand, would have been legally entitled to assert against the other, their Related Persons or their property in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the Prepetition First Lien Loan Agreement, the Prepetition Second Lien Loan Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; provided, however, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Debtor, Reorganized Debtor or Estate, on the one hand, or Released Party, on the other hand, solely to the extent: (1) arising out of or relating to any act or omission of such purportedly released Entity that constitutes fraud, gross negligence, bad

faith, or willful misconduct as determined by Final Order of a court of competent jurisdiction; or (2) arising under the Plan or the Plan Documents.

### 4. Releases by Holders of Claims and Interests

Except as otherwise provided in the Plan, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party (and each such Released Party so discharged and released shall be deemed discharged and released by the Releasing Parties) and their respective property from any and all Claims, Equity Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the Prepetition First Lien Loan Agreement, the Prepetition Second Lien Loan Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; provided, however, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party, solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud, gross negligence, bad faith or willful misconduct as determined by Final Order of a court of competent jurisdiction or (2) arising under the Plan or the Plan Documents.

### 5. Exculpation

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any act on or after the Petition Date and on or before the Effective Date taken or omitted to be taken in connection with, or related to, the Chapter 11 Cases, the formulation, negotiation, solicitation, preparation, dissemination, confirmation, or implementation of the Plan, or consummation of the Plan, the Restructuring Support Agreement, the Disclosure Statement, the Plan Supplement, the Amended Organizational Documents, or other new corporate governance documents, any transactions contemplated by the Plan, the Management Incentive Plan, the New ABL Facility, the Reorganized First Lien Term Loan Facility, the issuance, distribution, and/or sale of any shares of the New Common Shares, the New Warrants (the issuance of New Common Shares in connection therewith), or any other Security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or Alternative Structures or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided, however, that each Exculpated Party

shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.

6. **Injunctions**

(a) Confirmation Date Injunction

ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

(b) Effective Date Injunctions

**Injunction Against All Entities**:

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONFIRMED ITS CONSENT TO THIS INJUNCTION.

**Injunction Against Holders of Released, Discharged or Exculpated Claims**:

Except as otherwise provided in the Plan or for obligations issued pursuant to the Plan, all Entities that have held, hold, or may hold Claims or Equity Interests that have been released pursuant to ARTICLE X.B or ARTICLE X.C of the Plan, discharged pursuant to ARTICLE X.A of the Plan, or are subject to exculpation pursuant to ARTICLE X.D of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff (except for setoffs asserted prior to the Petition Date), subrogation, or of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated, or settled pursuant to the Plan.

7. **Protection against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

8. **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim, and a Final Order has been entered determining such Claim as no longer contingent.

9. **Recoupment**

In no event shall any Holder of Claims or Equity Interests be entitled to recoup any Claim or Equity Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10. **Preservation of Rights of Action**

(a)    Maintenance of Causes of Action

Except as otherwise provided in ARTICLE X or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, and Avoidance Actions, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court. In accordance with the provisions of the Plan, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Litigation Claims.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action, Litigation Claim or Avoidance Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action, Litigation Claim or Avoidance Action for later adjudication by the Debtors, with the consent of the Required Consenting Creditors with respect to any Cause of Action, Litigation Claim or Avoidance Action

seeking in excess of $500,000 (which consent shall not be unreasonably withheld), or the Reorganized Debtors (including, without limitation, Causes of Action, Litigation Claims and Avoidance Actions not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action, Litigation Claims or Avoidance Actions have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in ARTICLE X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors, with the consent of the Required Consenting Creditors (which consent shall not be unreasonably withheld), and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

## L.  BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## M.  MODIFICATION OR REVOCATION OF THE PLAN

### 1.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in the Plan and in the Restructuring Support Agreement: (a) the Debtors reserve the right, with the consent of the Required Consenting Creditors and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may, and after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

### 2.  Revocation of Plan

Subject to the terms of the Restructuring Support Agreement, including the consent and approval rights contained therein, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or

withdraw the Plan, or if confirmation of the Plan or Consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE V.
## PLAN CONFIRMATION

### A. CONFIRMATION HEARING AND OBJECTIONS

A hearing to consider confirmation of the Plan will be held on [_____], **2017 at [____].m. (prevailing Eastern time)** before the Bankruptcy Court. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan or any Exhibit, Plan Schedule or Plan Document may be amended or modified, if necessary, in accordance with the terms therein, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest, in all cases, however, subject to any consent that may be required in the Plan or the Restructuring Support Agreement.

All objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and any other parties in accordance with the Disclosure Statement Order on or before [_____], **2017 at [____].m. (prevailing Eastern time)** (the "Confirmation Objection Deadline").

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by no later than the Confirmation Objection Deadline by the Notice Parties (as defined in Article I.C.12 herein).

<div style="border:1px solid black;padding:8px;text-align:center;">
CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.
</div>

### B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good

faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- The Debtors will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim against, or Equity Interest in, the Debtors will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111 (b)(2) of the Bankruptcy Code applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

1. **Best Interests of Creditors Test / Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class: (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated, as estimated in ARTICLE I.C.3 of the Disclosure Statement.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors prepared a Liquidation Analysis, a copy of which is attached hereto as **Exhibit D**, for comparison with the estimated Plan recoveries described in ARTICLE I.C.3.

The Liquidation Analysis presents "High" and "Low" estimates of Liquidation Proceeds, thus representing a range of the Debtors' assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof. The "High" and "Low" estimates of Liquidation Proceeds for the Chapter 11 Cases are $101.8 million and $78.2 million, respectively,[11] which are substantially less than the value to be realized by stakeholders under the Plan. For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as **Exhibit D**. It is assumed that the liquidation would occur over a period of 6 months. The projected date of conversion to a hypothetical chapter 7 liquidation (the "Assumed Effective Date") is September 30, 2017. In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Debtors' secured creditors to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

The Liquidation Analysis reflects that the Plan Distribution that each Holder of a Claim or Equity Interest is projected and estimated to receive or retain under the Plan as of the Assumed Effective Date is not less than the Liquidation Distribution that such Holder is projected and estimated to receive if the Chapter 11 Cases were converted to chapter 7 of the Bankruptcy Code as of the Assumed Effective Date.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS

---

[11] The Liquidation Proceeds are based on estimated high and low gross recoveries of $117.6 million and $95.4 million, and estimated high and low expenses (consisting of a carveout for chapter 11 Administrative Expense Claims, and wind-down expenses and other administrative claims arising after conversion of the cases to chapter 7) of $17.2 million and $15.8 million.

THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors developed a business plan and prepared financial projections for fiscal years 2017 through 2020 (the "Financial Projections"). The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the deleveraged capital structure provided under the Plan and the added funding availability under the New ABL Facility, the Reorganized Debtors should have sufficient Cash flow and Cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations. The Debtors believe that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE THE DEBTORS BELIEVE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the three-year period of the Financial Projections may vary from the projected results and the variations may be material. All Holders of Claims and Equity Interests that are entitled to vote to accept or reject

the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

### 3. Valuation

In connection with developing the Plan, MAEVA performed an analysis of the estimated value of Reorganized Debtors on a going-concern basis, attached hereto as **Exhibit F** (the "Valuation Analysis"). The Valuation Analysis is based on various valuation methodologies, including, but not limited to, the trading values approach, the discounted cash flow approach and the comparable transactions approach.

Specifically, in preparing the Valuation Analysis, MAEVA, among other things: (i) reviewed certain financial results of the Debtors; (ii) reviewed the Financial Projections; and (iii) discussed with certain senior executives the current operations and prospects of the Debtors, as well as key assumptions related to the Financial Projections. The material financial analyses performed by MAEVA consisted of (a) a selected publicly traded company analysis, (b) a discounted cash flow analysis, and (c) a selected transactions analysis.

THE VALUATION ANALYSIS SET FORTH IN EXHIBIT F IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION ANALYSIS WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATE SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

### 4. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to

demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan. (Section 1126(e) of the Bankruptcy Code permits the Bankruptcy Court to designate and not count the vote of an entity whose acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.)

Classes 1, 2, 4, and 7 are not Impaired under the Plan, and, as a result, the Holders of such Claims or Intercompany Interests are deemed to have accepted the Plan.

Claims in Classes 3, 5, and 6 are Impaired under the Plan, and as a result, the Holders of Claims in such Class are entitled to vote on the Plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in each Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein. As stated above, the Voting Classes (Classes 3, 5, and 6), will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

## 5. Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

(a)     No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)     Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the Plan; (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (c) such Holders of Secured Claims realize the indubitable equivalence of such Claims.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan, on account of such junior Claim or Equity Interest, any property.

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class (if any) may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtors reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## C.  CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

<div align="center">

### ARTICLE VI.
### RISK FACTORS

</div>

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.  RISKS RELATING TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.  Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

### 2.  The Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors, with any required approvals or consents as set forth in the Restructuring Support Agreement, and, after the Effective Date, the Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors.  Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 3.  The Debtors May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation

of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtors (subject to any consent that may be required under the Restructuring Support Agreement) reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 5. Non-Consensual Confirmation of the Plan May Be Necessary

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect

to the dissenting impaired classes. If there is an Accepting § 1129(a)(10) Class, the Debtors believe that the Plan satisfies these other requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 6. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to exchange their Prepetition First Lien Claims into a substantially reduced amount of the Reorganized First Lien Term Loans and Exchange Common Shares, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

### 7. The Restructuring Support Agreement May Terminate.

As set forth herein, the Restructuring Support Agreement may terminate if, among other things, the deadlines set forth in such agreement are not met or if the conditions precedent to the respective party's obligations to support the Plan or to confirm the Plan are not satisfied in accordance with the terms of such agreement. If the Restructuring Support Agreement terminates, the Debtors may not be able to obtain the support of the Holders of Claims required to confirm the Plan. If the Restructuring Support Agreement terminates and the Debtors lose the support of important creditor constituencies, the Debtors likely would not be able to consummate the Plan as currently proposed.

### 8. Risks of Not Obtaining the Funding Under the New ABL Facility

The Plan is predicated on, among other things, consummation of the New ABL Facility and the receipt of the funding contemplated under the New ABL Facility. Although the DIP Lenders have committed to providing the New ABL Facility upon the Debtors' emergence from chapter 11, there can be no assurance that the conditions precedent to consummation of the New ABL Facility will be met or otherwise waived.

### 9. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place. Although the Debtors believe that the Effective Date may occur within approximately [one month] after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

## B. RISKS RELATING TO THE CHAPTER 11 PROCESS

### 1. The Debtors' Exclusivity Period May Terminate

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 2. Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business

A prolonged continuation of these Chapter 11 Cases may adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases also may make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, so long as the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility or otherwise, in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing, it is unlikely the Debtors could successfully reorganize.

### 3. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

## C. RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1. The Recovery to Holders of Allowed Claims Can Not Be Stated With Absolute Certainty

The Claims estimates set forth herein are based on various assumptions and are estimates. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the

percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

### 2. The Value of New Common Shares Can Not Be Stated With Absolute Certainty

On the Effective Date, 100% of the New Common Shares will be issued (as Exchange Common Shares) to various creditors on account of their Claims, but will be subject to dilution by issuance of New Common Shares upon exercise of the New Warrants or pursuant to the Management Incentive Plan. Despite the Debtors' best efforts to value the New Common Shares, various uncertainties, including market conditions, the Debtors' inability to implement their business plan, and lack of a market for the New Common Shares may cause fluctuations or variations in value of the New Common Shares not fully accounted for herein.

In addition, the value of the New Common Shares may be impacted by changes to the Reorganized Debtors' post-emergence capital structure.

### 3. Holders of Equity Securities in Reorganized Holdings May Not Be Able to Recover in Future Cases of Bankruptcy, Liquidation or Reorganization

On the Effective Date or such other date as specified in the Plan, the Equity Securities will be distributed to the Holders of Allowed Claims in Class 3 and Class 5 and, if Classes 3, 5, and 6 vote to accept the Plan, to Holders of Allowed Equity interests in Class 6. Upon such Plan Distribution date, in its capacity as a Holder of an Equity Security, each Holder of such Equity Securities will become subordinated to all liabilities of the Reorganized Debtors. Therefore, the assets of the Reorganized Debtors would not be available for distribution to any holder of such Equity Securities, in respect of such Equity Securities, in any bankruptcy, liquidation or reorganization of the Reorganized Debtors unless and until all indebtedness of the Reorganized Debtors has been paid.

### 4. The Reorganized First Lien Term Loans, New Common Shares and New Warrants Will Be Illiquid

There is no organized trading market for the Reorganized First Lien Term Loans, New Common Shares or New Warrants and no such market is expected to emerge after the Effective Date. In the absence of any such market, the value of such securities may not be readily determinable and holders thereof must be prepared to bear the risk of their investment in such securities indefinitely. Resales of the Reorganized First Lien Term Loans, New Common Shares and New Warrants may be restricted under applicable federal and state securities laws, as discussed in Article VI of this Disclosure Statement. The New Common Shares, New Warrants, and shares of New Common Shares issuable upon exercise of New Warrants may be subject to material restrictions on transferability and other restrictions set forth in the Amended Organizational Documents.

5.   **There Is Not an Established Market for Equity Securities in Reorganized Holdings, and Holders of New Common Shares Will Be Subject to Restrictions on Resale and Transfer, Including Under the Amended Organizational Documents, Which Could Make Such Interests Illiquid**

No established market exists for the Equity Securities in Reorganized Holdings. Reorganized Holdings is not expected, in the near future, to cause Equity Securities of Reorganized Holdings to be listed on any national exchange or interdealer quotation system or to cooperate with any registered broker-dealer who may seek to initiate price quotations for the Equity Securities of Reorganized Holdings in the over the counter market. In addition, the Amended Organizational Documents governing the New Common Shares in Reorganized Holdings will contain restrictions on transfer by Holders, including transfers to certain prohibited transferees, prohibition on transfers that could result in Reorganized Holdings being required to file reports under the Exchange Act, and compliance with certain rights of first offer and, if applicable, tag-along and drag-along rights. Therefore, there cannot be any assurance that the Equity Securities in Reorganized Holdings will be a tradable, liquid security at any time after the Effective Date. If no public market for the Equity Securities of Reorganized Holdings develops, holders of such securities may have difficulty selling or obtaining timely and accurate valuation with respect to such securities.

Even if a market were to develop in the future, there cannot be any assurance as to the degree of price volatility in any market that develops for the Equity Securities in Reorganized Holdings. Some Holders who receive Equity Securities in Reorganized Holdings pursuant to the Plan may not elect to hold equity on a long-term basis. Sales by future equity holders of a substantial number of interests after the Effective Date could significantly reduce the market price of the Equity Securities in Reorganized Holdings. Moreover, the perception that these equity holders might sell significant amounts of the Equity Securities of Reorganized Holdings could depress the market price of such interests for a considerable period. Sales of the Equity Securities in Reorganized Holdings, and the possibility thereof, could make it more difficult for Reorganized Holdings to sell equity, or equity-related securities, in the future at a time and price that they consider appropriate.

The valuation of Equity Securities in Reorganized Holdings contained in this Disclosure Statement is not an estimate of the prices at which the Equity Securities in Reorganized Holdings may trade or be sold in the future, and the Debtors have not attempted to make any such estimate in connection with the development of the Plan. The value of the Equity Securities in Reorganized Holdings ultimately may be substantially higher or lower than reflected in the valuation assumptions provided in this Disclosure Statement.

Transfers of Equity Securities in Reorganized Holdings may be subject to customary restrictions consistent with the preservation of the net operating loss and other tax attributes of the Debtors. If Alternative Structures are determined to be utilized that cause Reorganized Holdings to be treated as a partnership for U.S. federal income tax purposes, transfers of Equity Securities in Reorganized Holdings will be subject to customary restrictions to avoid treatment as a "publicly traded partnership".

## D. RISK FACTORS RELATING TO THE DEBTORS' BUSINESS, INDUSTRY AND MARKET FACTORS

### 1. Continued Risk Upon Confirmation and Consummation

Even if the Plan is confirmed and Consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for premium denim. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 2. The Company's Industry Is Highly Competitive, Which May Force the Company to Lower Its Prices and May Have an Adverse Effect on Its Operating Results

The principal markets that the Company serves are highly competitive. Competition is based principally on price, service, quality, processing capabilities, inventory availability and timely delivery. The Company competes in a highly fragmented industry. Competition in the various markets in which the Company participates comes from other fashion retailers, some of which have greater financial resources than the Company does and some of which have more established brand names in the local markets that the Company serves. Increased competition could force the Company to lower its prices or to offer increased services at a higher cost to the Company, which could have an adverse effect on the Company's operating results.

### 3. The Company Operates in International Markets, Which Expose It to a Number of Risks

Although a majority of the Company's business activity takes place in the United States, it also serves and operates in certain international markets, which exposes the Company to political, economic and currency related risks, including the following:

- potential for adverse change in the local political or social climate or in government policies, laws and regulations;

- difficulty staffing and managing geographically diverse operations and the application of foreign labor regulations;

- restrictions on imports and exports or sources of supply;

- currency exchange rate risk; and

- changes in duties and taxes.

In addition to the United States, the Company operates in eleven foreign countries. An act of war or terrorism or major pandemic event could disrupt international shipping schedules, cause additional delays in importing or exporting products into or out of any of these countries, including the United States, or increase the costs required to do so. In addition, acts of crime or violence in these international markets could adversely affect the Company's operating results. Fluctuations in the value of the U.S. dollar versus foreign currencies could reduce the value of these assets as reported in the Company's financial statements, which could reduce its stockholders' equity.

### 4. The Company May Face Risks Associated with Current or Future Litigation and Claims

From time to time, the Company is involved in a variety of lawsuits, claims and other proceedings relating to the conduct of its business. These suits concern issues including contract disputes, employment actions, employee benefits, taxes, and personal injury matters. Due to the uncertainties of litigation, the Company can give no assurance that it will prevail on all claims made against it in the lawsuits that the Company currently faces or that additional claims will not be made against the Company in the future. While it is not feasible to predict the outcome of all pending lawsuits and claims, the Company does not believe that the disposition of any such pending matters is likely to have a materially adverse effect on its financial condition or liquidity, although the resolution in any reporting period of one or more of these matters could have an adverse effect on the Company's operating results for that period. Also, the Company can give no assurance that any other lawsuits or claims brought in the future will not have an adverse effect on its financial condition, liquidity or operating results.

### 5. The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations

The DIP Facility includes financial covenants that, among other things, require the Debtors to perform within a budget and meet certain milestones. If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants.

Furthermore, the DIP Facility contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Facility and are unable to obtain a waiver or amendment of such covenants, an event of default will occur thereunder. The DIP Facility contains other events of defaults customary for debtor-in-possession financings.

### 6. The Debtors May Fail in Their Lease Rationalization Efforts

The Debtors' efforts to renegotiate leases and close stores during the Chapter 11 Cases is an effort to cut costs and maintain profitability. The Debtors' forward-looking financial projections are based on a certain amount of savings and number of operating stores, which amount anticipates substantial concessions from various landlords. If the Debtors are unable to reach satisfactory terms with the quantity of landlords they anticipate, the Debtors may be forced to close additional stores, decreasing revenue. Further, the actual savings may be substantially greater than or less than the projected savings ranges.

7. **Large Holders of the Prepetition First Lien Claims May Control Reorganized Holdings**

Implementation of the Plan is anticipated to result in a small number of Holders of Prepetition First Lien Claims or their assignees owning a significant percentage of the shares of outstanding New Common Shares of Reorganized Holdings. These holders or their assignees could, among other things, exercise a controlling influence over the business and affairs of Reorganized Holdings and the other Reorganized Debtors.

8. **Tax Implications of the Plan**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and do not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there still would be significant tax uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the U.S. federal income tax treatment in the Plan, or that a court would not sustain such a challenge. *See* "Summary of Certain U.S. Federal Income Tax Consequences of the Plan," at Article IX herein. Each Holder of an Equity Interest or a Claim is urged to consult its own tax advisor for the U.S. federal, state, local, and non-U.S. income, estate and other tax consequences applicable under the Plan.

E. **RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS**

1. **The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed**

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2. **Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary**

This Disclosure Statement contains various projections concerning the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections. Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are

estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support; and (f) customer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

**F.      DISCLOSURE STATEMENT DISCLAIMER**

**1.      The Information Contained Herein Is for Soliciting Votes Only**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

**2.      This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

**3.      The Debtors Relied on Certain Exemptions From Registration Under the Securities Act**

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and does not necessarily conform to disclosure requirements of federal or state securities laws or other similar laws. The offer and issuance of the Reorganized First Lien Term Loans, New Common Shares and New Warrants under the Plan has not been registered under the Securities Act or Blue Sky Laws. To the maximum extent permissible by law, the offer and issuance of the Reorganized First Lien Term Loans, the New Common Shares, and the New Warrants under the Plan will be exempt from registration under the Securities Act and applicable Blue Sky Laws by virtue of section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act or Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act.

### 4. This Disclosure Statement Contains Forward-Looking Statements

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 5. No Legal or Tax Advice Is Provided to You by This Disclosure Statement

**This Disclosure Statement is not legal or tax advice to You**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

### 6. No Admissions Are Made by This Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors or the Consenting Creditors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, the Consenting Creditors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

Notwithstanding any rights of approval, pursuant to the Restructuring Support Agreement or otherwise, as to the form of substance of this Disclosure Statement, the Plan or any other document relating to the transactions contemplated thereunder, neither the Consenting Creditors nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

### 7. No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors, with any consent or approval required by the Restructuring Support Agreement, or the Reorganized Debtors may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

8. **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

9. **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. **No Representations Made Outside the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

## ARTICLE VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A. **LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such

trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

## B.  FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.

During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan. The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves the Debtors' business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases also will make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships. Further, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

<div align="center">

**ARTICLE VIII.**
**ISSUANCE AND RESALE OF REORGANIZED FIRST LIEN TERM LOANS, NEW COMMON SHARES, AND NEW WARRANTS UNDER THE PLAN**

</div>

## A.  EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND BLUE SKY LAWS

### 1.  Section 1145(a) of the Bankruptcy Code (Offer and Issuance of Reorganized First Lien Term Loans, Exchange Common Shares and New Warrants)

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act and applicable Blue Sky Laws to exempt the offer and issuance of Reorganized First Lien Term Loans, Exchange

Common Shares, and New Warrants to Holders of Prepetition First Lien Claims and Holders of Allowed General Unsecured Claims, respectively, on the Effective Date. Section 1145(a)(1) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

The Debtors are relying on the exemption provided by section 1145(a)(2) of the Bankruptcy Code from the registration requirements of the Securities Act and applicable Blue Sky Laws to exempt the offer and issuance of New Common Shares issuable after the Effective Date upon the exercise of New Warrants issued to Holders of Prepetition First Lien Claims and Holders of Allowed General Unsecured Claims, respectively, on the Effective Date. Section 1145(a)(2) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of any security through any warrant, option, right to subscribe, or conversion privilege that was sole in the manner specified in section 1145(a)(1) of the Bankruptcy Code, or the sale of a security upon the exercise of such a warrant, option, right or privilege.

> 2. **Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, and Rule 701 Under the Securities Act (Offer and Issuance of New Common Shares and Other Equity Securities Under Management Incentive Plan)**

The Debtors are relying on the exemptions provided by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act from the registration requirements of the Securities Act to exempt the offer and issuance of the New Common Shares and other Equity Securities to directors, officers and other key employees of the Debtors pursuant to the Management Incentive Plan (the "MIP Securities"). As stated in [Article VIII.A.1] above, Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that directors, officers and other key employees of the Debtors qualify as "accredited investors" within the meaning of U.S. securities laws.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation. Accordingly, the Debtors believe that the MIP Securities issued to directors, officers and other key employees of the Debtors will be exempt from registration under the Securities Act.

In reliance upon the exemptions provided by section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D under the Securities Act and/or Rule 701 promulgated under the Securities Act, as discussed in the preceding paragraphs, the Debtors believe that the offer and issuance of the Reorganized First Lien Term Loans, the New Common Shares, the MIP Securities and the New Warrants under the Plan, including the shares of New Common Shares issuable after the Effective Date upon exercise of New Warrants, will be exempt from registration under the Securities Act.

## B. RESALES OF REORGANIZED FIRST LIEN TERM LOANS, NEW COMMON SHARES, AND NEW WARRANTS

### 1. Resales of the Exchange Securities

As discussed in ARTICLE VIII.2, the offer and issuance of Reorganized First Lien Term Loans, Exchange Common Shares and New Warrants issued on the Effective Date, and New Common Shares issuable after the Effective Date upon exercise of New Warrants (collectively, the "Exchange Securities"), is anticipated to be exempt under section 1145(a)(1) of the Bankruptcy Code from registration under the Securities Act and applicable Blue Sky Laws. Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code ("Exempt 1145(a)(1) Securities") are deemed to have been issued pursuant to a public offering. Therefore, to the extent the offer and sale of any Exchange Securities are Exempt 1145(a)(1) Securities, they are not considered "restricted securities" and may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, Exchange Securities that are Exempt 1145(a)(1) Securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states (collectively, "Blue Sky Laws"). However, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities offered or sold under the plan for the holders of such securities, (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which (as described below) includes "control persons" of the issuer.

The term "issuer," as used in Section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the voting securities of a reorganized debtor may be presumed to be a "control person."

Notwithstanding the foregoing, "control person" underwriters may be able to sell securities without registration pursuant to the resale limitations for control securities under Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations and current

public information, notice and manner of sale requirements. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144 and other exemptions from registration under the Securities Act.

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF REORGANIZED FIRST LIEN TERM LOANS, NEW COMMON SHARES, OR NEW WARRANTS TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED HOLDINGS WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED HOLDINGS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SHARES OF REORGANIZED FIRST LIEN TERM LOANS, NEW COMMON SHARES OR NEW WARRANTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**The Debtors recommend that potential recipients of the Exchange Securities consult their own counsel concerning their ability to freely trade their Exchange Securities without registration under applicable federal securities laws and Blue Sky Laws.**

### 2.    Resales of the MIP Securities

The offer and issuance of the MIP Securities is covered by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act, and will not be exempt under section 1145 of the Bankruptcy Code. Therefore, such shares of New Common Shares will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be sold except pursuant to an effective registration statement or pursuant to an applicable exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act (as discussed below). The Debtors express no view as to whether any Person or Entity may freely resell the MIP Securities.

**The Debtors recommend that potential recipients of the MIP Securities consult their own counsel concerning their ability to freely trade the MIP Securities without registration under applicable federal securities laws and Blue Sky Laws and the availability of Rule 144 for exempt resales.**

**The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and Blue Sky Laws.**

## ARTICLE IX.
## SUMMARY OF CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**A.      GENERAL**

The following disclosure (the "Tax Disclosure") summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims and Equity Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not anticipate seeking a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims and Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, real estate investment trusts, employees, persons who received their Claims and Equity Interests as compensation, and persons holding Claims and Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction).  The following discussion assumes that Holders of Claims or Equity Interests (except in the case of Holders of General Unsecured Claims that were not based on holding Prepetition First Lien Term Loans or Prepetition Second Lien Term Loans) hold such Claims or Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  This summary assumes that the Prepetition First Lien Term Loans are property treated as debt for U.S. federal income tax purposes.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Claims or Equity Interests based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, estate, gift, foreign. or any other applicable tax law.

For purposes of this summary, a "U.S. Holder" means a Holder of a Claim or Equity Interest that is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.  A "Non-U.S. Holder" means a Holder of a Claims or Equity Interests that is not a U.S. Holder and is, for U.S.

federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity classified as a partnership for U.S. federal income tax purposes holds a Claims or Equity Interests, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIMS OR EQUITY INTERESTS. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S. AND ANY OTHER APPLICABLE TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## B. U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1. Cancellation of Debt Income

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of debt ("COD") income, that must be included in the debtor's income. The amount of the Debtors' COD income depends upon the value of the Plan consideration distributed on account of the Allowed Claims against the Debtors relative to the amount of such Allowed Claims (or adjusted issue price if different from the amount of the Allowed Claims), as well as the extent to which those Allowed Claims constitute debt for federal income tax purposes and to the extent the payment of such Allowed Claims would be deductible for tax purposes. However, COD income is excluded from taxable income by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the bankruptcy court or pursuant to a plan of reorganization approved by a bankruptcy court. The Plan, if approved, would enable the Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If debt of a Debtor is discharged in a reorganization case qualifying for the bankruptcy exclusion certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the COD income. Tax attributes subject to reduction include, in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate amount of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards. A debtor may elect instead to reduce the basis of depreciable property first.

In the case of affiliated corporations filing a consolidated return, such as the Debtors, that are taxed as corporations (the "True Religion Consolidated Group"), the attribute reduction rules apply first to the separate attributes of or attributable to the particular corporation whose debt is

being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a debtor would result first in the reduction of any NOLs and other attributes, including asset basis, of or attributable to such debtor, and then, potentially, of consolidated NOLs and/or basis of or attributable to other members of the consolidated group.. If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member. If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. Finally, if the attribute reduction is less than the amount of COD income and a member of the True Religion Consolidated Group has an excess loss account (an "ELA") (i.e., negative basis in the stock of another member of the consolidated group), the True Religion Consolidated Group will recognize taxable income to the extent of the lesser of such ELA or the amount of the COD income that was not offset by tax attribute reduction. NOL reduction does not occur until immediately after the close of the taxable year in which the debt discharge occurs, i.e., after use of any such NOLs and other attributes to determine the consolidated group's taxable income for the tax year in which the debt is discharged. Basis reduction applies to assets owned by a debtor at the beginning of the tax year following the discharge.

The Debtors expect to realize a significant amount of COD income in connection with the implementation of the Plan. The Reorganized Debtors have not yet determined whether to elect to reduce tax basis in their depreciable property or in their NOLs first. Regardless of whether the Reorganized Debtors make this election, the Reorganized Debtors do not expect to emerge with any significant NOL carryforwards remaining after reduction for COD income. The extent to which other tax attributes remain following the application of the attribute reduction rules will depend upon a number of factors, including the amount of COD income that is actually incurred, whether the Debtors elect to reduce their basis prior to utilizing their NOLs, the liabilities outstanding upon the Plan becoming effective, and whether certain subsidiary Debtors are liquidated or converted and deemed liquidated for U.S. federal income tax purposes. The Debtors and their advisors are continuing to explore the impact the implementation of the Plan will have upon Debtor tax attributes upon emergence and related permissible planning, such as tax elections, to better enable future utilization and/or preservation of tax attributes subsequent to the emergence.

### 2. Potential Limitations on NOL Carryforwards

The Debtors estimate that their U.S. federal income tax NOL carryforwards are approximately $5million as of January 28, 2017. The Debtors have not determined the magnitude of additional NOLs expected to be incurred since then through the Petition Date, the Effective Date, or the first fiscal year that will end following the effective date, all of which could be impacted by the implementation of the Plan. The Debtors do not believe that the NOLs are currently subject to any limitations.

### (a) Limitation on NOLs and Other Tax Attributes

Under Tax Code section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation. Similar rules apply to a corporation's capital loss carryforwards and tax credits.

The Reorganized Debtors' issuance of New Common Shares pursuant to the Plan is expected to result in an ownership change for purposes of Tax Code section 382. Accordingly, if the Debtors were to emerge with any NOLs or other pre-change losses following attribute reduction, and subject to the discussion below of certain special bankruptcy exceptions, the Reorganized Debtors' pre-change losses may be subject to an annual limitation. This limitation applies in addition to, and not in lieu of, any other similar limitation that may already or in the future be in effect and the attribute reduction that may result from COD. Although these limitations on NOL carryforwards and other pre-change losses are described in some detail, the Reorganized Debtors do not currently expect to emerge with significant NOL carryforwards remaining after reduction for COD income.

(b)     General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the loss corporation (or, in the case of a consolidated group, generally the stock of the common parent) immediately before the ownership change (with certain adjustments) and (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 2.04% for ownership changes occurring in July 2017). If a corporation (or a consolidated group) in bankruptcy undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change, after giving effect to the discharge of creditors' claims but subject to certain adjustments. In no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, unless the corporation qualifies for certain bankruptcy exceptions, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains, as described in "Built-in Gains or Losses". In addition, if a redemption or other corporate contraction occurs in connection with the ownership change of the loss corporation (or the consolidated group), or if the loss corporation (or the consolidated group) has substantial nonbusiness assets, the annual limitation is reduced to take the redemption, other corporate contraction or nonbusiness assets into account. Furthermore, if the corporation (or the consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never a greater) annual limitation with respect to any losses that existed at the time of the first ownership change.

(c)     Built-in Gains and Losses

A net unrealized built-in gain ("NUBIG") or net unrealized built-in loss ("NUBIL") is generally the difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily defined threshold amount. In certain cases, the NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules. If a loss corporation has a NUBIG immediately prior to the ownership change, the annual limitation may be increased as certain gains are recognized during the five-year period beginning on the date of the ownership change (the "Recognition Period"). If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of deductions, losses, and/or pre-change NOLs that could be used by the loss corporation during the Recognition Period.

If a loss corporation has a NUBIG immediately prior to an ownership change, any recognized built-in gain ("RBIG") will increase the annual limitation in the taxable year the RBIG is recognized. An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the ownership change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the ownership change. However, the aggregate amount of all RBIGs that are recognized during the Recognition Period may not exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an ownership change, any recognized built-in losses ("RBILs") will be subject to the annual limitation in the same manner as pre-change NOLs. An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the ownership change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the ownership change. However, the aggregate amount of all RBILs that are recognized during the Recognition Period may not exceed the NUBIL. RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed.

(d)     Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation under the jurisdiction of a court in a chapter 11 case receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed plan (the "Section 382(l)(5) Exception"). Under the Section 382(l)(5) Exception, a debtor's pre-change losses (including NUBILs, if any) are not limited on an annual basis, but instead NOL carryforwards will generally be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the Section 382(l)(5) Exception applies and a debtor undergoes another ownership change within two years after the effective date of the plan of reorganization, then the debtor's pre-change losses effectively are eliminated in their entirety. For purposes of the Section 382(l)(5) Exception, a "qualified creditor" generally consists of certain long-term creditors (who held the claims continuously for at least 18 months prior to the filing of the bankruptcy petition), and ordinary course creditors (e.g., trade creditors). In determining whether the Section 382(l)(5) Exception applies, certain Holders of claims that would own a de minimis amount of the debtor's stock pursuant to the debtor's plan are presumed to have held their claims since the origination of such claims. In general, this de minimis rule applies to Holders of claims who would own directly or indirectly less than 5% of the total fair market value of the debtor's stock pursuant to the plan. The application of this rule to the Reorganized Debtors is uncertain. If a debtor qualifies for the Section 382(l)(5) Exception, the exception applies unless the debtor affirmatively elects for it not to apply.

If the Section 382(l)(5) Exception applies, a subsequent ownership change with respect to the Reorganized Debtors occurring within two years after the Effective Date will result in the reduction of the annual limitation that would otherwise apply to the subsequent ownership change to zero. Thus, an ownership change within two years after the Effective Date would eliminate the ability of the Reorganized Debtors to use pre-ownership change NOLs or RBILs thereafter. If a change of ownership occurs after the two years following the Effective Date, then the Reorganized Debtors will become subject to limitation in the use of their NOLs based upon the value of the True Religion Consolidated Group at the time of that subsequent change.

Where the Section 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the

Section 382(l)(5) Exception), a second special rule will generally apply (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the ownership change. The annual limitation may be increased if the True Religion Consolidated Group has a NUBIG at the time of an ownership change. If, however, the True Religion Consolidated Group, or one or more Debtors, has a NUBIL at the time of an ownership change, the annual limitation may apply to such net unrealized built-in loss.

The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years of the Effective Date without triggering the elimination of its pre-change losses.

The Debtors have not yet determined whether the Reorganized Debtors are eligible for the Section 382(l)(5) Exception. Even if the Section 382(l)(5) Exception otherwise applies, the Reorganized Debtors may elect to not have the Section 382(l)(5) Exception apply, in which event the Section 382(l)(6) Exception would apply. The Reorganized Debtors will have until the due date of the tax return for the taxable year of the Effective Date to make such a determination. Transfers of Equity Securities in Reorganized Holdings may be subject to customary restrictions consistent with the preservation of the NOLs, NUBILs, and other tax attributes of the Debtors, including as necessary to avoid a second ownership change that would eliminate the benefits of the Section 382(l)(5) Exception.

### 3.  Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes). Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

If a corporation (or a consolidated group) undergoes an ownership change and is in a NUBIL position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

**C.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN**

The U.S. federal income tax consequences of the Plan to U.S. Holders of Claims (including the character, amount and timing of income, gain or loss recognized) generally will depend upon, among other factors: (i) the manner in which the U.S. Holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether a Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction in the current or prior years; (v) whether the U.S. Holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the U.S. Holder's method of tax accounting; and (vii) whether the Debtors reorganize as is expected. Therefore, U.S. Holders of Claims are urged to consult their tax advisors for information that may be relevant to their specific situation and circumstances and the particular tax consequences to such Holders as a result thereof.

The Debtors have not yet determined whether as part of the Restructuring Transactions the exchange of Claims for New Common Shares and Reorganized First Lien Term Loans will occur between Holders and True Religion Apparel or Holdings. Whether True Religion Apparel or Holdings exchanges consideration for Claims may impact the tax consequences for Holders of First Lien Claims and General Unsecured Claims as described below.

### 1.     Treatment of a Debt Instrument as a Security

As an initial matter, the U.S. federal income tax consequences to U.S. Holders of Claims may depend, in part, on whether the debt instrument underlying a Claim is a "security" of the Debtor that is issuing the consideration being received by a holder of such Claim, and whether any debt being received by such holder in exchange for such Claim constitutes a "security" under the reorganization provisions of the Tax Code. Whether an instrument constitutes a "security" for these purposes is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that such debt instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, without limitation: (1) the security for payment; (2) the creditworthiness of the obligor; (3) the subordination or lack thereof to other creditors; (4) the right to vote or otherwise participate in the management of the obligor; (5) convertibility of the instrument into an equity interest of the obligor; (6) whether payments of interest are fixed, variable or contingent; and (7) whether such payments are made on a current basis or accrued. The term of obligations under the Prepetition First Lien Term Loan Agreement was six years. The term of obligations under the Prepetition Second Lien Term Loan Agreement was six-and-a-half years. The term of obligations under the Reorganized First Lien Term Loans is five years. The Debtors have not determined whether any of the obligations under the Prepetition First Lien Term Loan Agreement, the Prepetition Second Lien Term Loan Agreement, or the Reorganized First Lien Term Loans were or will be considered securities for these purposes. Each U.S. Holder should consult with its tax advisor on whether it should treat the Prepetition First Lien Term Loan, the Prepetition Second Lien Term Loan, and the Reorganized First Lien Term Loan as a security for purposes of the reorganization provisions of the Tax Code.

The U.S. federal income tax consequences to Holders of such Allowed Claims will also depend in part on (i) whether such Allowed Claims are treated as "securities" of Holdings (as opposed to not being treated as "securities" or being treated as "securities" of Holdings' subsidiaries) for purposes of the reorganization provisions of the Tax Code and (ii) whether Holdings or True Religion Apparel will be the entity treated as exchanging New Common Shares, New Warrants, Reorganized First Lien Term Loans and Cash (if applicable) for the

Prepetition First Lien Claims and the General Unsecured Claims. The Debtors have taken the position that the obligations under the Prepetition First Lien Term Loan Agreement and the Prepetition Second Lien Term Loan Agreement constitute indebtedness of True Religion Apparel. Similarly, the Debtor intends to take the position that the Reorganized First Lien Term Loans constitute indebtedness of True Religion Apparel for U.S. federal income tax purposes.

## 2. Consequences to Holders of Allowed Prepetition First Lien Claims

In the Alternative Structures described below, the Debtors expect to take the position and assume that this treatment and ordering applies for US federal income tax purposes and the remaining discussion assumes this to be the case. The tax consequences could be materially different in the event this characterization is not respected for U.S. federal income tax purposes.

### (a) Exchange by True Religion Apparel

If (i) Holdings contributes the New Common Shares to True Religion Apparel; (ii) True Religion Apparel then exchanges a portion of New Common Shares and Reorganized First Lien Term Loans for Prepetition First Lien Claims; (iii) the Reorganized First Lien Term Loans are not treated as a security for tax purposes; and (iv) the form of the transaction is respected, a U.S. Holder will be treated as having exchanged its Allowed Prepetition First Lien Claims for New Common Shares and Reorganized First Lien Term Loans in a taxable transaction. As a result, a U.S. Holder of Allowed Prepetition First Lien Claims should recognize gain or loss equal to the difference between (1) the sum of (i) the fair market value of the New Common Shares received, and (ii) the issue price of the Reorganized First Lien Term Loans received; and (2) the U.S. Holder's tax basis in the applicable Claims exchanged by the U.S. Holder, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). Such gain or loss should be capital in nature (subject to the rules described in "Market Discount" below) and should be long-term capital gain or loss if the Prepetition First Lien Claims were held for more than one year by the U.S. Holder. The deductibility of any capital loss may be subject to limitations. Additionally, any loss will be treated as ordinary loss to the extent of a U.S. Holder's prior net inclusions of original issue discount. A U.S. Holder's tax basis in the New Common Shares and Reorganized First Lien Term Loans should equal their respective fair market values, as determined on the Effective Date. A U.S. Holder's holding period for the New Common Shares and Reorganized First Lien Term Loans should begin on the day following the Effective Date.

If the form of the transaction is not respected, it might be argued that the U.S. Holders receiving New Common Stock of Holdings in the reorganization were in reality the owners of the equity in True Religion Apparel and, in effect, surrendered their claims for the newly issued stock of True Religion Apparel, which was then exchanged for the New Common Stock of Holdings. In such a case, assuming the Reorganized First Lien Term Loan is not treated as a security under the reorganization provisions, gain, but not loss, could be recognized in an amount equal to the lesser of (x) (i) the fair market value of the New Common Shares and the issue price of the Reorganized First Lien Term Loans received in the exchange, over (ii) the U.S. Holder's basis in the Allowed Prepetition First Lien Claims, and (y) the issue price of the Reorganized First Lien Term Loan received in the exchange, provided that any portion of the consideration

received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest").

If, however, both the Allowed Prepetition First Lien Claims, and the Reorganized First Lien Term Loans are treated as securities for purposes of the reorganization provisions of the Tax Code and the form of the transaction is respected, a U.S. Holder should recognize gain, but not loss, on the transaction in an amount equal to the lesser of (x) the overall gain realized, as calculated in the preceding paragraph, and the fair market value of the New Common Shares received in the exchange, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). Such gain should be treated as capital gain (subject to the rules described in "Market Discount") and generally should be long-term capital gain if the Prepetition First Lien Claims were held for more than one year by the U.S. Holder. The U.S. Holder's basis in the New Common Shares will be equal to their respective fair market value, while its basis in the Reorganized First Lien Term Loans will be an amount equal to the U.S. Holder's basis in the Allowed Claims exchanged, decreased by the fair market value of the New Common Shares received, and increased by the amount of any gain recognized on the transaction. A U.S. Holder's holding period for the Reorganized First Lien Term Loans should carry over from the Allowed Prepetition First Lien Claims. The holding period for the New Common Shares should begin on the day following the Effective Date.

If both the Allowed Prepetition First Lien Claims, and the Reorganized First Lien Term Loans are treated as securities for purposes of the reorganization provisions of the Tax Code and the form of the transaction is not respected, it is possible that a U.S. Holder might not recognize gain or loss, except to the extent that any portion of the consideration received attributable to accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). In that case, a U.S. Holder's holding period and basis would carry over, with the basis apportioned between the New Common Stock and Reorganized First Lien Term Loans based on their relative fair market values.

(b)     Exchange by Holdings

If, rather than contributing the New Common Shares to True Religion Apparel, Holdings directly exchanges (or is treated as directly exchanging) New Common Shares and Reorganized First Lien Term Loans for the Allowed Prepetition First Lien Claims, the exchange of the Allowed Prepetition First Lien Claims for New Common Shares and Reorganized First Lien Term Loans is likely to be treated under the Tax Code as a tax-free capital contribution to a corporation controlled by the transferors. If the exchange were treated as a tax-free capital contribution, a U.S. Holder would realize gain equal to the excess of (i) the fair market value of the New Common Shares and the issue price of the Reorganized First Lien Term Loans received in the exchange, over (ii) the U.S. Holder's basis in the Allowed Prepetition First Lien Claims, of which, the lesser of (1) the amount of gain realized, and (2) the issue price of the Reorganized First Lien Term Loans received in the exchange would be recognized, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). However, a U.S. Holder would not recognize loss with respect to the exchange. Such gain should be treated as capital gain (subject to the rules described in "Market Discount") and should be long-term capital gain if the Prepetition First Lien Claims were held for more than one year by the U.S. Holder. A U.S. Holder's tax basis in the Reorganized First Lien Term Loans should equal their

issue price . A U.S. Holder's tax basis in the New Common Shares will be equal to basis in the Allowed Claims exchanged, decreased by the fair market value of the Reorganized First Lien Term Loans received, and increased by the amount of gain recognized on the transaction. The tax basis of any share of New Common Shares, or of the Reorganized First Lien Term Loans treated as received in satisfaction of accrued interest, should equal the amount of such accrued interest. A U.S. Holder's holding period for the New Common Shares should carry over from the Allowed Prepetition First Lien Claims. The holding period for the Reorganized First Lien Term Loans should begin on the day following the Effective Date.

### 3. Consequences to Holders of Allowed General Unsecured Claims

The U.S. federal income tax consequences to U.S. Holders of Allowed General Unsecured Claims will depend, in part, on (i) whether Class 5 votes to accept the Plan, (ii) whether such individual U.S. Holder of an Allowed General Unsecured Claim elects to participate in the Class 5 Equity Cash Out Option, and (iii) how the exchange is structured. Except as noted below, the following assumes that (i) Class 5 votes to accept the Plan and (ii) U.S. Holders of Allowed General Unsecured Claims do not elect to participate in the Class 5 Equity Cash Out Option.

#### (a)     Exchange by True Religion Apparel

If (i) Holdings contributes the New Common Shares and New Warrants to True Religion Apparel; (ii) True Religion Apparel then exchanges New Common Shares, New Warrants, Reorganized First Lien Term Loan, and Cash for Allowed General Unsecured Claims; (iii) the Reorganized First Lien Term Loans are not treated as a security for tax purposes; and (iv) the form of the transaction is respected, a U.S. Holder will be treated as having exchanged its Allowed General Unsecured Claims for the New Common Shares, New Warrants, Reorganized First Lien Term Loans, and Cash in a taxable transaction. A U.S. Holder should recognize gain or loss equal to the difference between (1) the sum of (i) the fair market value of the New Common Shares and Class A Warrants received, (ii) the issue price of the Reorganized First Lien Term Loans received, and (iii) the amount of Cash received; and (2) U.S. Holder's basis in the tax basis in the Allowed General Unsecured Claims exchanged, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). Such gain or loss generally should be capital in nature (subject to the rules described in "Market Discount") and should be long-term capital gain or loss if the Allowed General Unsecured Claims were held for more than one year by the U.S. Holder. The deductibility of any capital loss may be subject to limitations. Any loss will be treated as ordinary loss to the extent of a U.S. Holder's prior net inclusions of original issue discount. For certain General Unsecured Claims, any gain or loss might be treated as ordinary income or loss rather than capital, and holding periods might not carry over. U.S. Holders should discuss the tax character of their Claims with their tax advisors. A U.S. Holder's tax basis in the New Common Shares, New Warrants, and Reorganized First Lien Term Loans should equal its fair market value as determined on the Effective Date. The aggregate basis would be allocated among the New Common Shares, New Warrants, and Reorganized First Lien Term Loans in accordance with their relative fair market values, and to the Cash. A U.S. Holder's holding period for the New Common Shares, New Warrants, and Reorganized First Lien Term Loans should begin on the day following the Effective Date.

If and to the extent that an (1) Allowed General Unsecured Claim is a Prepetition Second Lien Claim, (2) the Prepetition Second Lien Claims and the Reorganized First Lien Term Loans are treated as securities for U.S. federal income tax purposes and (3) the form of the transaction is not respected, however, a U.S. Holder may recognize gain, but not loss, on the transaction in an amount equal to the lesser of (x) the overall gain realized, as calculated in the preceding paragraph, and (y) the sum of the fair market value of the New Common Shares, New Warrants, and Cash received in the exchange, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). If the surrendered Allowed General Unsecured Claim was a capital asset, such gain should be capital in nature (subject to the rules described in "Market Discount") and should be long-term capital gain if the Allowed General Unsecured Claims were held for more than one year by the U.S. Holder. The basis of the New Common Shares and New Warrants will be equal to their respective fair market values. The basis of the Reorganized First Lien Term Loans will be an amount equal to the U.S. Holder's basis in the Allowed Claims exchange, decreased by the fair market value of the New Common Shares and New Warrants received, and increased by the amount of gain recognized on the transaction. The holding period for the Allowed General Unsecured Claims treated as a security would carry over, while the holding period for the New Common Shares and New Warrants should begin on the day following the Effective Date.

As with the U.S. Holders of First Lien Claims, if the form of the transaction is not respected, it might be argued that the U.S. Holders receiving New Common Stock and New Warrants of Holdings in the reorganization were in reality the owners of the equity in True Religion Apparel and, in effect, surrendered their claims for the newly issued stock of True Religion Apparel, which was then exchanged for the New Common Stock and New Warrants of Holdings. In such a case, assuming the Reorganized First Lien Term Loan is not treated as a security under the reorganization provisions, gain, but not loss, could be recognized in an amount equal to the lesser of (i) the gain realized (as described in the second preceding paragraph) and (ii) the issue price of the Reorganized First Lien Term Loan and Cash received in the exchange.

If a U.S. Holder of Allowed General Unsecured Claim elects to participate in the Class 5 Equity Cash Out Option, such holder's tax consequences will be substantially the same as those described above, except that such electing U.S. Holder will not receive New Common Shares.

(b)     Exchange by Holdings

If, rather than contributing the New Common Shares to True Religion Apparel, Holdings directly exchanges (or is treated as directly exchanging) New Common Shares and Reorganized First Lien Term Loans for the Allowed General Unsecured Claims, the exchange of the Allowed General Unsecured Claims for New Common Shares and Reorganized First Lien Term Loans is likely to be treated under the Tax Code as a tax-free capital contribution to a corporation controlled by the transferors. If the exchange were treated as a tax-free capital contribution, a U.S. Holder would realize gain equal to the excess of (i) the sum of the fair market value of the New Common Shares, the fair market value of the New Warrants, the issue price of the Reorganized First Lien Term Loans, and the amount of Cash received in the exchange, over (ii) the U.S. Holder's basis in the Allowed General Unsecured Claims, of which the lesser of (1) the amount of gain realized, and (2) the sum of the fair market value of the New Warrants, issue

price of the Reorganized First Lien Term Loans, and the amount of Cash received in the exchange would be recognized, provided that any portion of the consideration received attributable to any accrued but untaxed interest should be taxed as ordinary income (as discussed in greater detail in "Accrued but Untaxed Interest"). However, a U.S. Holder would not recognize loss with respect to the exchange. Such gain should be treated as capital gain (subject to the rules described in "Market Discount") and should be long-term capital gain if the General Unsecured Claims were held for more than one year by the U.S. Holder. For certain General Unsecured Claims, any gain or loss might be treated as ordinary income or loss rather than capital, and holding periods might not carry over. U.S. Holders should discuss the tax character of their Claims with their tax advisors. A U.S. Holder's tax basis in the Reorganized First Lien Term Loans should equal their issue price (which should be their fair market value). The basis in the New Warrants should equal their fair market value. The basis of the New Common Shares received will be equal to basis in the Allowed Claims exchanged, decreased by the fair market value of the Reorganized First Lien Term Loans and New Warrants and the amount of Cash received, and increased by the amount of gain recognized on the transaction. A U.S. Holder's holding period for the New Common Shares should carry over from the Allowed General Unsecured Claims. The holding period for the Reorganized First Lien Term Loans and New Warrants should begin on the day following the Effective Date.

    (c)    <u>If Class 5 Does Not Vote for the Plan</u>

If Class 5 does not vote for the Plan, the tax treatment will be as described in (a) and (b) above except that a holder of an Allowed General Unsecured Claim will not receive Cash.

**4.    Equity Interests**

If Class 3, Class 5 and Class 6 vote to accept the Plan, a U.S. Holder will exchange its Equity Interests for New Common Shares and New Warrants. The exchange of Equity Interests for New Common Shares will be undertaken directly by Holdings. Assuming this exchange qualifies under the reorganization provisions of the Tax Code, the U.S. Holder should not recognize gain or loss on the transaction. The aggregate basis of the New Common Shares and New Warrants would be equal to the U.S. Holder's basis in the Equity Interests exchanged, and apportioned among the New Common Shares and New Warrants based on their relative fair market values. The holding period for the Equity Interests would carry over to the New Common Shares and the New Warrants. In the event that the exchange does not qualify under the reorganization provisions of the Tax Code, however, the issuance of the New Common Shares and New Warrants might be taxable, with a capital loss recognized for U.S. federal income tax purposes on the Equity Interests.

If Class 3, Class 5 and Class 6 do not vote to accept the Plan, Equity Interests will be deemed automatically cancelled, released, and extinguished and the obligations of the Debtors and the Reorganized Debtors thereunder will be discharged. In this case, U.S. Holders of Equity Interests should recognize a capital loss for U.S. federal income tax purposes in an amount equal to the Holder's adjusted tax basis of its Equity Interest. The utilization of capital losses may be subject to certain limitations.