### 5. New Warrants

The exercise of the New Warrants by U.S. Holders generally will not give rise to the realization of gain or loss upon the exercise of such New Warrants. A U.S. Holder's tax basis in the New Common Shares received upon exercise of a New Warrant will be equal to the sum of such Holder's tax basis in the New Warrant and the exercise price. The holding period for New Common Shares received on exercise of a New Warrant starts with the day after exercise.

If the terms of the New Warrants provide for any adjustment to the number of shares of New Common Shares for which the Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the U.S. Holder of the New Warrants. If no appropriate adjustment is made to the number of shares of New Common Shares for which the New Warrants may be exercised or to the exercise price of such New Warrants, a constructive distribution may result that could be taxable to the holders of New Common Shares.

If a New Warrant is sold or exchanged in a taxable transaction by a U.S. Holder, gain or loss will be recognized based on the difference between the amount received and the U.S. Holder's basis therein.

### 6. Accrued But Untaxed Interest

A portion of the consideration received by Holders of Claims may be attributable to Accrued but Untaxed Interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

The tax basis of any New Common Shares or Reorganized First Lien Term Loans received in satisfaction of accrued interest should equal the amount of such accrued interest. The holding period for such New Common Shares or Reorganized First Lien Term Loans should begin on the day following the Effective Date.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to Accrued but Untaxed Interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 7. Market Discount

U.S. Holders who exchange Allowed Claims for New Common Shares, New Warrants and Reorganized First Lien Term Loans may be affected by the "market discount" provisions of the Tax Code. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is

considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

### 8. Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses may be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income, though losses from the sale or exchange of capital assets may only be used to offset capital gains. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year. Non-corporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

### 9. Net Investment Income Tax

Certain U.S. Holders that are individuals, estates or trusts are required to pay an additional 3.8% Medicare tax on "unearned" net investment income (i.e., income received from, among other things, the sale or other disposition of certain capital assets). Congress is currently considering legislation that could repeal this tax. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 10. Information Reporting and Backup Withholding

All distributions to U.S. Holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends and other reportable payments may be, under certain circumstances, subject to "backup withholding" at the then-applicable withholding rate (currently 28%). Backup withholding generally applies if a Holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to

report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct TIN and that it is a U.S. person not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and if the appropriate information is supplied to the IRS. Certain U.S. Holders are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

## D. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS UNDER THE PLAN

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims or Equity Interests, and the ownership and disposition of the Reorganized First Lien Term Loans, New Common Shares, the New Warrants, and other consideration, as applicable.

### 1. Gain Recognition

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim or Equity Interest generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Plan Effective Date occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2. Interest**

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest and payments of interest on the Reorganized First Lien Term Loans generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person. Interest income, however, may be subject to U.S. withholding if:

        (i)     the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Reorganized Holdings shares entitled to vote;

        (ii)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Holdings (each, within the meaning of the Tax Code); or

        (iii)   the Non-U.S. Holder is a bank receiving interest described in Tax Code section 881(c)(3)(A).

A Non-U.S. Holder that does not qualify for the portfolio interest exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to such interest or accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

**3. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Shares or the New Warrants**

(a)    <u>Dividends on New Common Shares</u>

Any distributions made with respect to New Common Shares (including constructive distributions) will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Holdings' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy

certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)     Sale, Redemption, or Repurchase of New Common Shares or New Warrants

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Shares or the New Warrants, unless:

(i)     such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the U.S.;

(ii)     such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)     Reorganized Holdings is or has been a "United States real property holding corporation" for U.S. federal income tax purposes (a "USRPHC") at any time during the shorter of the Non-U.S. holder's holding period for the New Common Shares and the five-year period ending on the date of disposition.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Shares and/or the New Warrants. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder; and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. Any gain that is taxable because Reorganized Holdings is a USRPHC will generally be taxable in the same manner as gain that is effectively connected income (as described above), except that the branch profits tax will not apply. While there is no assurance that the IRS will agree with such position, the Debtors believe that based on current business plans and operations, Holdings is not and Reorganized Holdings should not become a USRPHC in the future.

The exercise of the New Warrants by Non- U.S. Holders generally will not give rise to the realization of gain or loss upon the exercise of such New Warrants.

If the terms of the New Warrants provide for any adjustment to the number of shares of New Common Shares for which the New Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the Non-U.S. Holder of the New Warrants. If no appropriate adjustment is made to the number of shares of New Common Shares for which the New Warrants may be exercised or to the exercise price of such New Warrants, a constructive distribution may result that could be taxable to the holders of New Common Shares.

4.    **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Shares), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Shares). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Shares, New Warrants, and Reorganized First Lien Term Loans.]

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

E.    **GENERAL DISCLAIMER**

THE FOREGOING U.S. FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF

ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN
APPLICABLE TAX LAWS.

## ARTICLE X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a greater distribution to the Holders of Allowed Claims and Equity Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that all Holders of Impaired Claims entitled to vote support confirmation of the Plan and vote to accept the Plan.

[Remainder of Page Intentionally Blank]

Dated: July 5, 2017

Respectfully submitted,

TRUE RELIGION APPAREL, INC.

By: _____
John Ermatinger
Its: CEO and President

Respectfully submitted,

TRLG INTERMEDIATE HOLDINGS, LLC

By: _____
John Ermatinger
Its: CEO and President

Respectfully submitted,

GURU DENIM INC.

By: _____
John Ermatinger
Its: CEO and President

Respectfully submitted,

TRUE RELIGION SALES, LLC

By: _____
John Ermatinger
Its: CEO and President

Respectfully submitted,

TRLGGC SERVICES, LLC

By: _____
John Ermatinger
Its: President and CEO

[Signature page to Disclosure Statement for
Debtors' Joint Chapter 11 Plan of Reorganization]

## EXHIBIT A

## PLAN OF REORGANIZATION

(Intentionally Omitted)

(Filed Plan To Be Attached To Service Copies Of Disclosure Statement)

**EXHIBIT B**

**RESTRUCTURING SUPPORT AGREEMENT**
**(with exhibits other than the Plan)**

## RESTRUCTURING SUPPORT AGREEMENT

This restructuring support agreement (together with all exhibits, annexes, and schedules hereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of July 4, 2017 (the "***Execution Date***"), is by and among: (i) TRLG Intermediate Holdings, LLC, a Delaware limited liability company ("***Holdings***"), (ii) True Religion Apparel, Inc., a Delaware corporation, on behalf of itself and each of its direct and indirect subsidiaries listed on **Exhibit A** hereto (collectively with Holdings, the "***Company***"), (iii) TRLG Holdings, LLC (the "***Sponsor***"), (iv) the undersigned holders of First Lien Claims (as defined below) and/or Second Lien Claims (as defined below) (each, in such capacity, the "***Initial Holders***"), and (v) each Joining Party (as defined below) (such Joining Parties, together with the Initial Holders, and in such capacity, the "***Holder Parties***"), in connection with (a) that certain First Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements, the "***First Lien Credit Agreement***"), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time (such lenders, the "***First Lien Lenders***"), and Deutsche Bank AG New York Branch, as administrative agent (it or its successors, in such capacity, the "***First Lien Agent***") and (b) that certain Second Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements, the "***Second Lien Credit Agreement***"), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time (such lenders, in their capacity as such, the "***Second Lien Lenders***"), and Deutsche Bank AG New York Branch, as administrative agent (it or its successors, in such capacity, the "***Second Lien Agent***"). Claims of the First Lien Lenders under the First Lien Credit Agreement are referred to herein collectively as the "***First Lien Claims***", and claims of the Second Lien Lenders under the Second Lien Credit Agreement are referred to herein collectively as the "***Second Lien Claims***." The Company, the Sponsor and each Holder Party are collectively referred to herein as the "***Parties***" and each individually as a "***Party***."

The Parties hereby agree as follows:

1.    Proposed Restructuring.

(a)    The Parties have agreed to implement a restructuring transaction for the Company, in accordance with and subject to the terms and conditions set forth in this Agreement (the "***Restructuring***"), which Restructuring requires pursuing consummation of a "pre-negotiated" chapter 11 plan of reorganization in the form attached as **Exhibit B** hereto (together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "***Plan***")[1]. In order to effectuate the Restructuring, the Company shall commence, in accordance with the terms of this Agreement, voluntary "pre-negotiated" cases (the "***Chapter 11 Cases***" and the date on which such Chapter 11 Cases are commenced, the "***Petition Date***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). The documents related to or otherwise utilized to implement or effectuate the Restructuring (collectively, the "***Restructuring Documents***") shall include, among others:

(i)    the Plan, a customary plan supplement (including any schedules of assumed and rejected leases and executory contracts), the related disclosure statement (such disclosure statement, together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise

---

[1] In the event of any inconsistency between the Plan and the remainder of this Agreement, the Plan shall control.

modified from time to time in accordance with the terms herein and therein, the "***Disclosure Statement***"), and any other documents and/or agreements relating to the Plan and/or the Disclosure Statement, including (A) a motion seeking approval of the Disclosure Statement, the procedures for the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, the forms of ballots and notices and related relief (such motion, together with all exhibits, appendices, supplements, and related documents, the "***Disclosure Statement Motion***"), (B) an order of the Bankruptcy Court approving the Disclosure Statement Motion (together with all exhibits, appendices, supplements and related documents, the "***Disclosure Statement Order***"), (C) the motion seeking confirmation of the Plan, and (D) a proposed order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code (together with all exhibits, appendices, supplements and related documents, the "***Confirmation Order***");

(ii)     any organizational and governance documents for the reorganized Company, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, identity of proposed members of the reorganized Company's board of directors, shareholders agreements and registration rights agreements, which documents shall in any event include the terms set forth in the corporate governance term sheet attached as **<u>Exhibit C</u>** hereto (collectively, the "***Governance Documents***");

(iii)     the agreements governing the newly issued warrants of the reorganized Company on the terms set forth in the term sheets attached as **<u>Exhibit D</u>** hereto;

(iv)     a 3-year business plan for the Company (the "***Business Plan***");

(v)     all such other definitive documentation relating to a recapitalization or restructuring of the Company as is necessary or desirable to consummate the Restructuring (including, without limitation, all documentation related to the Reorganized First Lien Term Loan Facility (as defined in the Plan), any exit financing or new credit facility);

(vi)     any documentation relating to a debtor-in-possession financing facility (the "***DIP Financing***"), including a motion seeking approval of a debtor-in-possession financing facility and consensual use of cash collateral and providing adequate protection to the First Lien Lenders consisting of, among other things, (A) adequate protection liens, superpriority administrative claims and payment of reasonable and documented fees and expenses of the First Lien Lenders and the First Lien Agent (and its counsel) and (B) payment of reasonable and documented fees and expenses of the Second Lien Agent (and its counsel) under the Second Lien Credit Agreement, and the interim order (the "***Interim DIP Order***") and the final order (the "***Final DIP Order***" and together with the Interim DIP Order, the "***DIP Orders***") approving such motion; and

(vii)     any other agreements, instruments, pleadings, orders and/or documents that are filed by debtors and debtors in possession in the Chapter 11 Cases (including any exhibits, amendments, modifications or supplements made from time to time thereto).

(b)     Each of the Restructuring Documents shall be consistent in all respects with, and shall contain, to the extent applicable, the terms and conditions set forth in this Agreement

(including the standards for acceptability to specified parties of the final form of certain Restructuring Documents). In addition:

(i)     the Plan, the Confirmation Order, the documentation concerning the DIP Financing, including the DIP Orders and the documentation related to the Reorganized First Lien Term Loan Facility, in each case shall be in form and substance acceptable to the Company and Holder Parties holding at least 50.1% of the aggregate First Lien Claims held by the Holder Parties as of a relevant date (the "*Majority Holders*");

(ii)    the Governance Documents shall be acceptable to, and need be acceptable only to, the Majority Holders;

(iii)   the definitive documentation concerning a $60 million senior secured asset-based revolving credit facility (the "*Exit Facility*") shall be on the terms set forth in the commitment letter, and related term sheet, attached as **Exhibit E** hereto, and shall otherwise be in form and substance reasonably acceptable to the Majority Holders and the Company;

(iv)    the definitive documentation concerning the Class B Warrants and Class C Warrants, including the applicable warrant agreement, shall otherwise be in form and substance reasonably acceptable to the Majority Holders and the Sponsor; and

(v)     the other Restructuring Documents shall otherwise be in form and substance reasonably acceptable to the Company and the Majority Holders.

2.      <u>Representations of the Parties</u>. Each of the Holder Parties, severally and not jointly, the Sponsor, and each of the entities comprising the Company, jointly and severally, hereby represents and warrants that, as of the Execution Date, the following statements are true, correct and complete:

(a)     It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or (B) its charter or bylaws (or other similar governing documents) or (ii) except, with respect to the Company, for customary bankruptcy, insolvency and reorganization type default and notice provisions, to the knowledge of such Party, conflict with, result in a breach of or constitute a default under (with or without notice or lapse of time or both) any contractual obligation to which it is a party or it or its assets are bound, in each case, other than any such violation, conflict, breach or default with respect to which a waiver has been obtained prior to the Execution Date and which waiver has not been subsequently revoked.

(c)     Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d)     The execution, delivery and performance by such Party of this Agreement does not, and shall not, require any authorization of, filing with, registration of or before, consent from, approval of or other action by or notice to any federal, state or other governmental authority or regulatory body, in each case, other than any such authorization, filing, registration, consent, approval, action or notice which has been obtained, provided, or otherwise satisfied prior to the Execution Date and which authorization, filing, registration, consent, approval, action, or notice has not been subsequently revoked (excluding, as to performance, applicable approvals of the Bankruptcy Court following the Petition Date).

(e)     If such Party is a Holder Party, such Holder Party (i) either (A) is the sole legal and beneficial owner of (1) the First Lien Claims, (2) the Second Lien Claims and/or (3) the claims (the "*ABL Claims*") under that certain ABL Credit Agreement, dated as of July 30, 2013, (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements, the "*ABL Credit Agreement*"), among Holdings, Borrower, the lenders party thereto from time to time (the "*ABL Lenders*"), and Deutsche Bank AG New York Branch (the "*ABL Administrative Agent*"), set forth below its name on the signature page hereof (or the Joinder (as defined below)), in each case, free and clear of any and all claims, liens and encumbrances (other than those imposed by securities laws applicable to unregistered securities), or (B) has sole investment and voting discretion with respect to such First Lien Claims, Second Lien Claims and/or ABL Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such First Lien Claims, Second Lien Claims and/or ABL Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such First Lien Claims, Second Lien Claims and/or ABL Claims in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, convert, assign and transfer such First Lien Claims, Second Lien Claims and/or ABL Claims (with respect to each Holder Party, all of such First Lien Claims, Second Lien Claims and/or ABL Claims under clauses (A) and (B) and any additional First Lien Claims, Second Lien Claims and/or ABL Claims it owns, has such control over from time to time, or acquires after the Execution Date, collectively, its "*Participating Claims*"). Further, such Holder Party has made no prior written assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other written agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Participating Claims that are subject to this Agreement, the terms of which written agreement are, as of the date hereof, inconsistent with the representations and warranties of such Holder Party herein or would render such Holder Party otherwise unable to comply with this Agreement and perform its obligations hereunder.

(f)     If such Party is a Holder Party or the Sponsor, such Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company, any other Party or any officer, employee, agent, or representative thereof, and based on such information as such Party has deemed appropriate, made their own analysis and decision to enter into this Agreement, except that such Party has relied upon the Company's express representations, warranties, and covenants in this Agreement, and such Party acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(g)     If such Party is a Holder Party or the Sponsor, such Party is either (i) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act of 1933, as amended (the "*Securities Act*"), (ii) an "accredited investor" as defined by Rule 501 of the Securities Act, (iii) a

non-U.S. person under Regulation S under the Securities Act, or (iv) the foreign equivalent of the foregoing subparts (i) or (ii).

3.     Agreements of the Holder Parties

(a)     From the Execution Date until the date that is the earlier of (i) the effective date of the Plan, and (ii) the termination of this Agreement pursuant to Section 6 (such date, the "**End Date**") and subject to the terms and conditions hereof and except as the Company and the Majority Holders may expressly release a Holder Party in writing from any of the following obligations, each Holder Party:

(i)     hereby agrees to timely vote (when solicited to do so after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so) its Participating Claims, and any other claims against or interests in the Company such Holder Party holds or acquires in favor of the Plan;

(ii)     shall not (A) object to, or vote any of such Participating Claims (or any other claims or interests held by it) to reject or impede the Disclosure Statement or the Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose, impede or to seek any modification of the Plan or any Restructuring Documents, or (B) support or prosecute, directly or indirectly, any alternative to the Restructuring and the Plan; and

(iii)     hereby agrees (A) to use commercially reasonable efforts to (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Restructuring Documents and (2) take any and all necessary and appropriate actions in furtherance of the Restructuring and the Restructuring Documents, and (B) not to take any actions inconsistent with this Agreement or the Restructuring Documents.

Notwithstanding the foregoing, nothing in this Section 3(a) shall require any Holder Party to incur any expenses or liabilities, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses or liabilities to any Holder Party; provided, however, that nothing herein shall serve to limit, alter or modify any Holder Party's express obligations under the terms of this Agreement.

(b)     The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing for, or credit support to, the Company, including as reorganized as contemplated herein.

(c)     Subject to Section 3(f), each Holder Party agrees that, from the Execution Date until the End Date, it shall not sell, assign, grant, transfer, convey, hypothecate or otherwise dispose of any Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Participating Claims, except to a person that (i) is a Holder Party; provided, however, that any such Participating Claims shall automatically be deemed to be subject to the terms of this Agreement, or (ii) executes and delivers a Joinder (as defined below and in the form attached hereto as **Exhibit F**) to Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") and the Company prior to the relevant sale, assignment, grant, transfer, conveyance, hypothecation or other disposition. With respect to any transfers effectuated in accordance with clause (ii) above, (A) such transferee shall be deemed to be a Holder Party for purposes of this Agreement, subject to Section 3(e), and (B) the Company shall be deemed to have acknowledged

such transfer. For the avoidance of doubt, (x) each transferee pursuant to clauses (i) or (ii) above, shall be deemed to have accepted the treatment accorded such acquired Participating Claim under the Plan and (y) each transferee that acquires an interest in a Participating Claim from a Holder Party that has agreed to elect to receive specified consideration under the Plan, by accepting such transfer, will be deemed to have made the same election as such transferring Holder Party, regardless of any other claims held by such transferee.

(d)     This Agreement shall in no way be construed to preclude any Holder Party from acquiring additional Participating Claims; provided, however, that any such additional Participating Claims shall automatically be deemed to be subject to all of the terms of this Agreement and each such Holder Party agrees that such additional Participating Claims shall be subject to this Agreement. Each Holder Party agrees to provide to Akin Gump and the Company notice of the acquisition of any additional Participating Claims within three (3) business days of the consummation of the transaction acquiring such additional Participating Claims.

(e)     Any person that receives or acquires a portion of the Participating Claims pursuant to a sale, assignment, grant, transfer, conveyance, hypothecation or other disposition of such Participating Claims by a Holder Party hereby agrees to be bound by all of the terms of this Agreement (as such terms may be amended from time to time in accordance with the terms hereof) (any such person, together with each holder of Participating Claims that becomes a Holder Party pursuant to Section 19, each a "**Joining Party**") by executing and delivering to Akin Gump a joinder in the form attached hereto as **Exhibit F** (the "**Joinder**"). The Joining Party shall thereafter be deemed to be a "Holder Party" and a Party for all purposes under this Agreement, and such Joining Party shall have the consent or approval rights of, and be deemed to be, a Holder Party for all purposes under this Agreement. Each Joining Party shall indicate, on the appropriate schedule annexed to its Joinder, the number and amount of First Lien Claims, Second Lien Claims and/or ABL Claims held by such Joining Party. With respect to the Participating Claims held by the Joining Party upon consummation of the sale, assignment, grant, transfer, conveyance, hypothecation or other disposition of such Participating Claims, the Joining Party hereby makes the representations and warranties of the Holder Parties set forth in Section 2 to the other Parties.

(f)     Notwithstanding anything herein to the contrary, (i) any Holder Party may transfer any of its Participating Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Holder Party; provided, however, that the Qualified Marketmaker subsequently transfers all right, title and interest in such Participating Claims to a transferee that is or becomes a Holder Party as provided above, and the transfer documentation between the transferring Holder Party and such Qualified Marketmaker shall contain a requirement that provides as such; and (ii) to the extent any Holder Party is acting in its capacity as a Qualified Marketmaker, it may transfer any Participating Claims that it acquires from a holder of such Participating Claims that is not a Holder Party without the requirement that the transferee be or become a Holder Party. Notwithstanding the foregoing, if, at the time of the proposed transfer of such Participating Claims to the Qualified Marketmaker, such Participating Claims (x) may be voted on (1) the Plan or (2) any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), recapitalization, restructuring or similar transaction involving the Company, other than the Plan (an "**Alternative Transaction**"), the proposed transferor Holder Party must first vote such Participating Claims in accordance with the requirements of Section 3(a)(i), or (y) have not yet been and may not yet be voted on the Plan or any Alternative Transaction and such Qualified Marketmaker does not transfer such Participating

Claims to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first business day immediately following the Qualified Marketmaker Joinder Date, become a Holder Party with respect to such Participating Claims in accordance with the terms hereof (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Holder Party with respect to such Participating Claims at such time that the transferee of such Participating Claims becomes a Holder Party with respect to such Participating Claims). For these purposes, "***Qualified Marketmaker***" means an entity that (X) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Participating Claims, or enter with customers into long and/or short positions in Participating Claims, in its capacity as a dealer or market maker in such Participating Claims, and (Y) is in fact regularly in the business of making a market in claims, interests and/or securities of issuers or borrowers.

4.     Agreements, Representations and Warranties of the Company

(a)     Subject to the terms and conditions hereof and except as the Majority Holders may expressly release the Company in writing from any of the following obligations (which release may be withheld, conditioned or delayed by the Majority Holders):

(i)     From the Execution Date until the End Date, the Company agrees (A) to prepare or cause to be prepared the Restructuring Documents (including, without limitation, all relevant motions, applications, orders, agreements and other documents), each of which, for the avoidance of doubt, shall contain terms and conditions consistent with this Agreement, including Section 1(b) above, (B) to provide draft copies of (i) all Restructuring Documents, pleadings and other documents the Company intends to file with the Bankruptcy Court, in each case, to Akin Gump as soon as reasonably practicable, but in no event less than two (2) days before such documents are to be filed with the Bankruptcy Court; provided that any such documents prepared following commencement of the Chapter 11 Cases may be provided less than two (2) days prior to filing if the provision of two (2) days prior notice is impractical under the circumstances (without waiver of any provision of this Agreement with respect to the required consent of the Majority Holders of any such Restructuring Document or other document); and (C) without limiting any approval rights set forth herein, consult in good faith with Akin Gump regarding the form and substance of any of the foregoing documents in advance of the filing, execution, distribution or use (as applicable) thereof.

(ii)     The Company agrees to (A) (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Restructuring Documents, (2) take any and all necessary and appropriate actions in furtherance of the Restructuring and the Restructuring Documents and (3) use commercially reasonable efforts to obtain any and all required governmental, regulatory, and/or third-party approvals (including, as applicable, Bankruptcy Court approvals) for the Restructuring, (B) use reasonable efforts to cause the milestones set forth in Section 6(g) to be satisfied so as to not allow a Support Termination Event to occur, and (C) not take any actions inconsistent with this Agreement or the Restructuring Documents or that are otherwise inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Restructuring.

(iii)    Subject to Section 24, the Company shall (A) cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to any Alternative Transaction, (B) not, directly or indirectly, seek, solicit, negotiate, support, engage, initiate or participate in discussions relating to, or enter into any agreements relating to, any Alternative Transaction, and (C) not solicit or direct any person or entity, including any of their representatives or members of the Company's board of directors (or equivalent) or any direct or indirect holders of existing equity securities of the Company, to undertake any of the foregoing.

(iv)    The Company agrees to timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases. For purposes of this Section 4(a), "*Person*" shall mean an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association.

(v)    The Company agrees to timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any Person with respect to the entry of the Interim DIP Order and/or the Final DIP Order.

(vi)    The Company agrees not to enter into any settlement, compromise or agreement with any authorized representative of retirees or employees or a retiree committee, unless such settlement, compromise or agreement is in form and substance acceptable to the Company and the Majority Holders.

(b)    Regardless of whether the Restructuring is consummated, the Company shall promptly pay in cash upon demand (i) all reasonable and documented out-of-pocket fees and expenses incurred by the Holder Parties in connection with this Agreement, the Restructuring and the Restructuring Documents, and the consummation of the transactions contemplated hereby and thereby, and (ii) all reasonable and documented fees and expenses of Akin Gump, as lead counsel, Ashby & Geddes ("*Ashby*"), as Delaware counsel, and Moelis & Company LLC, as financial advisor, to the Holder Parties ("*Moelis*" and together with Akin Gump and Ashby, the "*Holder Parties' Advisors*"). Simultaneously with the execution of this Agreement, the Company shall pay all such unpaid fees and expenses incurred at any time prior to the Execution Date, to the extent invoiced prior to the date hereof, and, prior to commencing the Chapter 11 Cases, the Company shall pay all such unpaid fees and expenses incurred prior to the Petition Date, to the extent invoiced prior to such date. In addition, the Company shall use commercially reasonable efforts to promptly assume all engagement letters for the Holder Parties' Advisors following the commencement of the Chapter 11 Cases in a manner acceptable to the Majority Holders.

(c)    From the Execution Date until the End Date, the Company shall (i) taking into account the effect of the Restructuring, operate the business of the Company and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent in all material respects with this Agreement, the Business Plan, past practices, and use commercially reasonable efforts to preserve intact the Company's business organization and relationships with third parties (including lessors, licensors, suppliers, distributors and customers) and employees (in each case subject to changes (A) resulting from or relating to the filing of the Chapter 11 Cases or (B) imposed by the Bankruptcy Court), (ii) keep the Holder Parties reasonably informed about the operations of the Company and its direct and indirect subsidiaries to the extent a Holder Party so

requests to be kept informed, (iii) provide the Holder Parties any information reasonably requested regarding the Company or any of its direct and indirect subsidiaries and provide, and direct the Company's employees, officers, advisors and other representatives to provide, to Akin Gump and Moelis, (x) reasonable access during normal business hours to the Company's books, records and facilities and (y) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, (iv) promptly notify the Holder Parties of any material governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) and (v) use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring (including the Bankruptcy Court's approval of the relevant Restructuring Documents).

5.  Agreements of the Sponsor

(a)  From the Execution Date until the date that is the earlier of the effective date of the Plan, and the End Date and subject to the terms and conditions hereof and except as the Company and the Majority Holders may expressly release the Sponsor in writing from any of the following obligations, the Sponsor:

(i)  hereby agrees to timely vote or cause its applicable controlled affiliates to timely vote (if solicited to do so after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so) its debt or equity interests in Holdings, including any First Lien Claims, Second Lien Claims and/or ABL Claims, if any (collectively, the "***Participating Claims/Interests***"), and any other claims against or interests in the Company the Sponsor or such affiliate holds or acquires in favor of the Plan;

(ii)  shall not (A) object to, or vote any of such Participating Claims/Interests (or any other claims or interests held by it) to reject or impede the Disclosure Statement or the Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose, impede or to seek any modification of the Plan or any Restructuring Documents, or (B) support or prosecute, directly or indirectly, any alternative to the Restructuring and the Plan; and

(iii)  hereby agrees (A) to use commercially reasonable efforts to (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Restructuring Documents and (2) take any and all necessary and appropriate actions in furtherance of the Restructuring and the Restructuring Documents, and (B) to not take any actions inconsistent with this Agreement or the Restructuring Documents.

Notwithstanding the foregoing, nothing in this Section 5(a) shall require the Sponsor to incur any expenses or liabilities, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses or liabilities to the Sponsor; provided, however, that nothing herein shall serve to limit, alter or modify the Sponsor's express obligations under the terms of this Agreement. For the avoidance of doubt, nothing in this Agreement or the Plan shall require the Company or any other Party (other than the Sponsor itself) to pay or be liable for any fees or expenses incurred by the Sponsor in connection with this Agreement or otherwise, except as may be explicitly set forth in the Plan.

(b)     Sponsor agrees that, from the Execution Date until the End Date, it shall not (nor shall it permit any of its controlled affiliates to) sell, assign, grant, transfer, convey, hypothecate or otherwise dispose of any Participating Claims/Interests, or any option thereon or any right or interest (voting or otherwise) in any or all of its Participating Claims/Interests, except to a person that is a controlled affiliate, or member or parent, of Sponsor; provided, however, that any such Participating Claims/Interests shall automatically be deemed to be subject to the terms of this Agreement.

6.     <u>Termination of Rights or Obligations</u>.  This Agreement may be terminated as follows and, except as otherwise provided herein, all obligations of the Parties shall immediately terminate and be of no further force and effect upon such termination (each such termination event, a "***Support Termination Event***"):

(a)     by the mutual written consent of the Company and the Majority Holders;

(b)     by the Majority Holders upon (i) a breach (other than an immaterial breach) by either the Company or the Sponsor of any of the undertakings, representations, warranties or covenants of the Company or the Sponsor, as applicable, set forth in this Agreement, including the Company's obligations under <u>Section 4</u> or the Sponsor's obligations under <u>Section 5</u>, or (ii) the failure by the Company or the Sponsor to act in a manner materially consistent with this Agreement, in each case which breach or failure remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Majority Holders;

(c)     by the Sponsor, solely to itself, upon a breach (other than an immaterial breach) by the Company or the Holder Parties of any of the undertakings, representations, warranties or covenants of the Company or the Holder Parties set forth in this Agreement, as applicable, or any amendment to the Plan that adversely affects the amount of consideration to which Sponsor is entitled under the Plan or otherwise materially and adversely affect Sponsor's rights under this Agreement, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Sponsor; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary herein, the right to terminate this Agreement as to Sponsor under this <u>Section 6(a)(iii)</u> shall not be available to the Sponsor if its failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a Support Termination Event;

(d)     by the Company upon a breach (other than an immaterial breach) by the Holder Parties of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Company;

(e)     by the Company if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the Company;

(f)     by the Company following the Company's determination that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties as described in <u>Section 24</u>;

(g)     by the Majority Holders or the Sponsor, solely as to itself, in the event a Fiduciary Action occurs (whether or not notice of such is provided);

(h)    by the Majority Holders upon the occurrence of any of the following events, unless such event is waived or the applicable deadline is extended by the Majority Holders in writing (which waiver or extension may be withheld, conditioned or delayed by the Majority Holders):

(i)    at 5:00 p.m. prevailing Eastern Time on (A) the date that is five (5) Business Days following the Petition Date if the Company fails to obtain entry of the Interim DIP Order or (B) the date that is thirty-nine (39) days following the Petition Date if the Company fails to obtain entry of the Final DIP Order (in each case, which DIP Orders, for the avoidance of doubt, shall be consistent with this Agreement and otherwise in form and substance acceptable to the Company and the Majority Holders, but may be subject to provisions (i) made at the request of, or in response to an objection by or stated position of, a party other than the Company or the Holder Parties, (ii) that are not material to the interests of the Holder Parties and (iii) that are otherwise reasonably acceptable to the Majority Holders);

(ii)    at 5:00 p.m. prevailing Eastern Time on the date that is sixty-four (64) calendar days following the Petition Date (subject to modification as set forth below), unless the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance reasonably acceptable to the Company and the Majority Holders

(iii)    at 5:00 p.m. prevailing Eastern Time on the date that is ninety nine (99) calendar days following the Petition Date (subject to modification as set forth below), unless the Bankruptcy Court shall have entered a Confirmation Order in form and substance acceptable to the Company and the Majority Holders;

(iv)    at 5:00 p.m. prevailing Eastern Time on the date that is the earlier of one hundred and nineteen (119) calendar days following the Petition Date and October 29, 2017 (subject to modification as set forth below), unless there shall have occurred a substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan;

(v)    upon the filing by the Company of any motion or other request for relief seeking to, or the granting by the Bankruptcy Court of any motion by any other person seeking to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases or (D) terminate exclusivity under section 1121 of the Bankruptcy Code;

(vi)    upon the entry of an order by the Bankruptcy Court (A) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company or (B) vacating, amending, terminating, extending or modifying the DIP Orders without the consent of the Majority Holders, other than amendments and modifications (i) made at the request of, or in response to an objection by or stated position of, a party other than the Company or the Holder Parties, (ii) that are not material to the interests of the Holder Parties and (iii) that are otherwise reasonably acceptable to the Majority Holders;

(vii)   the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Restructuring Documents (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(viii)   the withdrawal, waiver, amendment or modification, or the filing of a pleading by the Company seeking to withdraw, waive, amend or modify, any term or condition of any of the Restructuring Documents or any documents related thereto, including motions, notices, exhibits, appendices and orders, in a manner not consistent with the standards of acceptability set forth in Section 1(b), other than amendments and modifications (i) made at the request of, or in response to an objection by or stated position of, a party other than the Company or the Holder Parties, (ii) that are not material to the interests of the Holder Parties and (iii) that are otherwise reasonably acceptable to the Majority Holders;

(ix)   the Company files, proposes or otherwise supports any plan of liquidation, sale of all or substantially all of the Company's assets or plan of reorganization other than the Plan and the Restructuring (other than the filing of a motion to approve bidding procedures on a precautionary, contingent basis as is required by the DIP Financing);

(x)   an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any asset of the Company with a value, individually or in the aggregate, of $350,000 or more, or that would adversely affect the Company's ability to operate its businesses in the ordinary course;

(xi)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any ruling or order denying any requisite approval of, or delaying or impeding (which ruling or order would reasonably be expected to render confirmation or consummation of the Plan or any other portion of the Restructuring in accordance with this Agreement impossible), or enjoining the confirmation or consummation of the Plan or any other portion of the Restructuring;

(xii)   the Company experiences any circumstance, change, effect, event, occurrence, state of facts or development, after the date hereof, other than the filing and prosecution of the Chapter 11 Cases, that either alone or in combination has had or is reasonably likely to have a material adverse effect on the financial condition, business, assets or operations of the Company taken as a whole, or that causes a material adverse change to the Company's Business Plan, as disclosed to the Holder Parties prior to the execution of this Agreement.;

(xiii)   the failure by the Company to pay the fees and expenses set forth in Section 4(b) of this Agreement within ten (10) calendar days of receipt by the Company of an invoice related to such fees and expenses;

(xiv)   the filing by the Company (or, if any material relief adverse to the Holder Parties is granted by such filing, any other party in interest) of any motion, objection, application or adversary proceeding (x) challenging the validity enforceability, perfection or priority of, or seeking avoidance or subordination (other than pursuant to existing contractual arrangements with the ABL Administrative Agent and ABL Lenders) of the

First Lien Claims, Second Lien Claims, the liens securing the First Lien Claims and/or the liens securing the Second Lien Claims or (y) asserting any other claim or cause of action against and/or with respect to the First Lien Claims, the prepetition liens securing the First Lien Claims, any of the First Lien Lenders or the First Lien Agent, the Second Lien Claims, the prepetition liens securing the First Lien Claims, any of the Second Lien Lenders Party to this Agreement or the Second Lien Agent

(xv)     prior to the filing of the Chapter 11 Cases, any breach of, or any default under, the First Lien Credit Agreement that has not been waived;

(xvi)    prior to the filing of the Chapter 11 Cases, upon any "Limited Waiver Termination Event" as defined by and set forth in that certain Limited Waiver to First Lien Credit Agreement, dated as of May 8, 2017, by and among Holdings, True Religion Apparel, Inc., the subsidiaries of the Company party thereto and the lenders party thereto, as amended;

(xvii)   if an involuntary case against the Company is commenced or an involuntary petition is filed seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company or the Company's debts, or of a substantial part of the Company's assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, or if any court order grants the relief sought in such involuntary proceeding;

(xviii)  except in each case as expressly contemplated hereunder, (A) if the Company voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, (B) if the Company applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the Company's assets, (C) if the Company files an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) any general assignment or arrangement for the benefit of creditors of the Company or (E) if the Company takes any corporate action for the purpose of authorizing any of the foregoing; or

(xix)    a "Termination Date" under and as defined in the DIP Orders has occurred.

The milestones set forth in Section 6(h) above are set off the milestones under the DIP Financing and accordingly, if such milestone dates are modified or extended in, or pursuant to, the DIP Financing, the milestones set forth in Section 6(h) above will be automatically modified or extended in the same manner, unless the Majority Holders expressly agree otherwise in their sole discretion; provided that (i) the Majority Holders shall notify the Company of an objection to an extension of any milestone(s) within one business day of the Company's provision of notice of such extension to the Majority Holders' counsel and (ii) the Majority Holders shall not have any right of objection with respect to an extension of a milestone which is for ten (10) business days or less (up to an aggregate of twenty (20) days).

Upon the termination of this Agreement pursuant to this Section 6, this Agreement shall forthwith become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party; provided, however, that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 16; provided further, however, that notwithstanding anything to the contrary herein, (i) the right to terminate this Agreement under this Section 6 shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a Support Termination Event and (ii) any Support Termination Event may be waived only in accordance with this Agreement and the procedures established by Section 9, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in such waiver. Upon termination of this Agreement, any and all consents, agreements, undertakings, tenders, waivers, forbearances and votes delivered by a Holder Party prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Company or any other party. For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

7.      Good Faith Cooperation; Further Assurances. From the Execution Date until the End Date, the Parties shall cooperate with each other and negotiate the Restructuring Documents in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Further, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.

8.      Remedies. Subject to the proviso at the end of this sentence, all remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party, and all rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party; provided, however, that notwithstanding the foregoing, the Sponsor's sole remedy against any Holder Party under this Agreement is for specific performance hereunder, and the Sponsor expressly waives any and all rights to any other remedy that may be available to it at law or in equity, including, without limitation, any monetary damages.

9.      Amendments and Modifications; Waivers.

(a)      This Agreement may be amended or modified only upon written approval of both (i) the Company and (ii) the Majority Holders; provided, however, that (A) in no event shall this Agreement be so amended or modified with respect to any Holder Party in any manner that would adversely affect such Holder Party's legal rights under this Agreement in a disproportionate or discriminatory manner (as compared to all other Holder Parties), without such Holder Party's prior written consent, (B) in no event shall this Agreement be so amended or modified with respect to Sponsor in any manner that would adversely affect the amount of consideration to which it is entitled under the Plan or other otherwise materially and adversely affect its rights

under this Agreement, without the Sponsor's prior written consent, and (C) any amendments to this Section 9 shall (1) require the written consent of each Holder Party and (2) only as to amendments that may affect Sponsor's rights under clause (B) of this paragraph, require the written consent of Sponsor. Any amendment or modification of any condition, term or provision to this Agreement must be in writing. Any amendment or modification made in compliance with this Section 9 shall be binding on all of the Parties, regardless of whether a particular Party has executed or consented to such amendment or modification.

(b)     At any time prior to the End Date, the Company, on the one hand, and the Majority Holders, on the other, to the extent legally permitted, may (i) extend the time for the performance of any of the obligations of any other Party, (ii) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein. Any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

10.     Independent Analysis. Each of the Holder Parties, the Sponsor and the Company hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

11.     Representation by Counsel. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

12.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York. By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHTS SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF

THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.

      13.    Notices.  All notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally, (b) when sent by electronic mail ("*e-mail*") or facsimile, (c) one (1) business day after deposit with an overnight courier service or (d) three (3) business days after mailed by certified or registered mail, return receipt requested, with postage prepaid to the Parties at the following addresses, facsimile numbers or e-mail addresses (or at such other addresses, facsimile numbers or e-mail addresses for a Party as shall be specified by like notice):

**If to the Company:**

True Religion Apparel, Inc.
1888 Rosecrans Avenue
Manhattan Beach, CA 90266
Attention: Dalibor Snyder, Chief Financial Officer (dalibor@truereligion.com)

with a copy to (which shall not constitute notice):

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE. 19801
Attention: Laura Davis Jones (ljones@pszjlaw.com)

**If to the Sponsor:**

c/o Towerbrook Capital Partners, L.P.
65 East 55th Street
27th Floor
New York, NY 10022
Facsimile: (917) 591-4789
Attention:  Glenn F. Miller (glenn.miller@towerbrook.com)

**with a copy to (which shall not constitute notice):**

Wachtell, Lipton, Rosen & Katz
51 W. 52nd Street
New York, NY 10019
Attention:  Josh Feltman (jafeltman@wlrk.com)

**If to the Holder Parties**:  To each Holder Party at the addresses, facsimile numbers or e-mail addresses set forth below the Holder Party's signature page to this Agreement (or to the signature page to a Joiner in the case of any Holder that becomes a party hereto after the Execution Date).

with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Facsimile: (212) 872-1002
Attention: Arik Preis (apreis@akingump.com)
Allison Miller (amiller@akingump.com)
Jason Rubin (jrubin@akingump.com)

14.     Reservation of Rights. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict (a) the ability of any Party to protect and preserve its rights, remedies and interests, including the First Lien Claims and any other claims against the Company or other parties, or its full participation in any bankruptcy proceeding, including the rights of a Holder Party or the Sponsor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, in each case, so long as the exercise of any such right does not breach such Holder Party's or the Sponsor's obligations hereunder; (b) the ability of a Holder Party to purchase, sell or enter into any transactions in connection with the Participating Claims, subject to the terms hereof; (c) any right of any Holder Party (i) under the Debt Documents, or which constitutes a waiver or amendment of any provision of any Debt Document or (ii) under any other applicable agreement, instrument or document that gives rise to a Holder Party's Participating Claims, or which constitutes a waiver or amendment of any provision of any such agreement, instrument or document, subject to the terms of <u>Section 3(a)</u>; (d) the ability of a Holder Party to consult with its advisors (including the Holder Parties' Advisors), other Holder Parties or the Company; or (e) the ability of a Holder Party or the Sponsor (subject to the limitations set forth in <u>Section 8</u> hereof) to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents. Without limiting the foregoing sentence in any way, after the termination of this Agreement pursuant to <u>Section 6</u>, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests, subject to <u>Section 6</u>, in the case of any claim for breach of this Agreement. Further, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring Documents and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

15.     Rule of Interpretation. Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a plan of reorganization under the Bankruptcy Code. Time is of the essence in the performance of the obligations of each of the Parties. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to any Articles, Sections, Exhibits and Schedules are to such Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

16.     Survival. Notwithstanding (a) any sale of the Participating Claims in accordance with <u>Section 3</u> or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Sections 4(b)</u> (with respect to amounts accrued prior to the termination of this

Agreement), 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25, shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

17.     Successors and Assigns; Severability; Several Obligations.  Subject to Section 3, this Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.  The agreements, representations and obligations of the Holder Parties under this Agreement are, in all respects, several and not joint and several.

18.     Third-Party Beneficiaries.  This Agreement is intended for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

19.     Counterparts; Additional Holder Parties.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.  Any holder of First Lien Claims that is not already an existing Holder Party may execute the Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Holder Party" and a party for all purposes under this Agreement.

20.     Entire Agreement.  This Agreement and the Exhibits and Schedules attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations between and among the Company, the Sponsor and the Holder Parties (and their respective advisors) with respect to the subject matter hereof; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between any Parties hereto shall continue in full force and effect as provided therein.

21.     Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

22.     Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

23.     Publicity.  The Company shall not (a) use the name of any Holder Party in any communication (including a press release, pleading or other publicly available document) (other than a communication with the legal, accounting, financial and other advisors to, and employees, officers, directors, members, managers or shareholders of, the Company, in each case who are under obligations of confidentiality to the Company with respect to such communication, and whose compliance with such obligations the Company shall be responsible for) without such Holder Party's prior written consent or (b) disclose to any person, other than legal, accounting, financial and other advisors to the Company (who are under obligations of confidentiality to the Company with respect to such disclosure, and whose compliance with such obligations the Company shall be responsible for), the principal amount or

percentage of the Participating Claims held by any Holder Party or any of its respective subsidiaries; provided, however, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Participating Claims held by the Holder Parties as a group. Notwithstanding the foregoing, the Holder Parties hereby consent to the disclosure by the Company in the Restructuring Documents or as otherwise required by law, regulation or applicable court order, of the execution, terms and contents of this Agreement; provided, further, that (i) if the Company determines that it is required to attach a copy of this Agreement to any Restructuring Document or any other filing or similar document relating to the transactions contemplated hereby, it will redact any reference to a specific Holder Party and such Holder Party's holdings (unless required by law, regulation or applicable court order) and (ii) if disclosure is required by applicable law and their advisors with respect to its advance notice of the intent to disclose shall be given by the disclosing Party to each Holder Party (who shall have the right to seek a protective order prior to disclosure). Notwithstanding the foregoing, the Company will submit to Akin Gump all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company relating to this Agreement or the transactions contemplated hereby and any amendments thereof for prior approval by the Majority Holders. The Company will submit to the Holder Parties in advance, to the extent reasonably practicable, all material written communications with dealers, customers and employees relating to the transactions contemplated by this Agreement, will take the Holder Parties' views with respect to such communications into account and will otherwise consult with the Holder Parties and their advisors with respect to its general communications strategy in respect of the Restructuring. Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Holder Party, including the confidentiality and non-disclosure provisions contained in the Debt Documents.

24. <u>Fiduciary Duties; Relationship Among Holder Parties and the Company</u>. Notwithstanding anything to the contrary herein, the duties and obligations of the Holder Parties under this Agreement shall be several, not joint. Furthermore, notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company to take any action, or to refrain from taking any action (including termination of this Agreement), to the extent that the board of directors of Holdings (or other applicable Company party) determines, after consultation with the Company's relevant outside professional advisors, that taking such action or refraining from taking such action would not be consistent with the applicable directors' fiduciary obligations under applicable law (any such action, or refraining from action, to the extent that taking such action or refraining from taking such action absent this <u>Section 24</u> would, or would be reasonably expected to, result in a material breach of this Agreement or impede, in any material manner, consummation of the Restructuring on the terms contemplated hereby, being a "***Fiduciary Action***"); provided, however, that (i) the Company shall use commercially reasonable efforts to give the Holder Parties not less than three (3) business days prior written notice of, and in any event written notice substantially contemporaneously with, such anticipated action or anticipated refraining from taking such action, (ii) the Majority Holders may terminate this Agreement in accordance with, and subject to the terms of, <u>Section 6</u> and (iii) specific performance shall not be available as a remedy if this Agreement is terminated in accordance with this <u>Section 24</u>. None of the Holder Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any First Lien Lender, the Company, the Sponsor, or any of the Company's creditors or other stakeholders, including without limitation any holders of Second Lien Claims or ABL Claims, and there are no commitments among or between the Holder Parties, in each case except as expressly set forth in this Agreement. It is understood and agreed that any Holder Party may trade in any debt or equity securities of the Company without the consent of the Company, the Sponsor or any other Holder Party, subject to applicable securities laws and <u>Section 3(d)</u> of this Agreement. No prior history, pattern or practice of sharing confidences among or between any of the Holder Parties, the Sponsor and/or the Company shall in any way affect or negate this understanding and agreement.

25. <u>No Solicitation</u>. This Agreement and transactions contemplated herein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Company will not solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

HOLDINGS:

TRLG INTERMEDIATE HOLDINGS, LLC

By:
Name:
Its:


THE COMPANY:

TRUE RELIGION APPAREL, INC.,
on behalf of itself and each of its direct and indirect subsidiaries

By:
Name:
Its:

**SPONSOR**

Name of Institution: <u>TRLG HOLDINGS, LLC</u>

By: 
Name: <u>Glenn F. Miller</u>
Title: <u>Vice President</u>

Telephone: ██████████████
Facsimile: ██████████████

NOTICE ADDRESS:

████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████

**HOLDER PARTY**

**JFIN CLO 2012 LTD**
**JFIN CLO 2013 LTD**
**JFIN CLO 2014 LTD**
**JFIN MM CLO 2014 LTD**
**JFIN CLO 2014-11 LTD**
**JFIN CLO 2015 LTD**

By:  **APEX CREDIT PARTNERS LLC,**
     as Portfolio Manager



By:  _____

**Name:**     Stephen Goetschius

**Title:**    Managing Director

**Telephone:**  ████████████████████████

**Facsimile:**  ████████████████████████

**First Lien Claims:**   ███████████████████
**Second Lien Claims:**  ███████████████████
**ABL Claims:**          ███████████████████

**NOTICE ADDRESS:**

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

**HOLDER PARTY**

**FARMSTEAD MASTER FUND, LTD.**
**OC 530 OFFSHORE FUND, LTD.**

By: **FARMSTEAD CAPITAL MANAGEMENT, LLC,**
on behalf of its funds and accounts listed above



By:

Name: Michael Scott

Title: Managing Member

Telephone: ████████████████████

Facsimile: ████████████████████

First Lien Claims: ████████████████

Second Lien Claims:

ABL Claims:

**NOTICE ADDRESS:**

████████████████████████████

## HOLDER PARTY

Goldman Sachs Strategic Income Fund
Goldman Sachs High Yield Floating Rate Fund
Goldman Sachs High Yield Fund
Global Opportunities Offshore Ltd
Goldman Sachs Global Strategic Income Bond Portfolio
Goldman Sachs Income Builder Fund
High Yield Floating Rate Portfolio (LUX)
Floating Rate Loan Fund
Global Multi-Sector Credit Portfolio (Lux)
AST Goldman Sachs Strategic Income Portfolio
Global Opportunities LLC
Goldman Sachs Income Builder Fund-Canada
Factory Mutual Insurance Company_High Yield
Goldman Sachs Strategic Absolute Return Bond I Portfolio
Fire & Police Pension Association of Colorado
Lyondell Master Trust - High Yield
WestRock Company Master Retirement Trust_GSAM High Yield Fixed Income
Goldman Sachs Strategic Absolute Return Bond II Portfolio

By: **GOLDMAN SACHS ASSET MANAGEMENT, L.P.,**
on behalf of its funds and accounts listed above

By: _____

Name: Jean Joseph
Managing Director

Title: Managing Director

Telephone: 

Facsimile: _____

First Lien Claims:

Second Lien Claims:

ABL Claims:

NOTICE ADDRESS:

[Signature Page to Restructuring Support Agreement]

**HOLDER PARTY**

Global Opportunities Offshore Ltd
Global Opportunities LLC
Goldman Sachs Strategic Income Fund
Goldman Sachs High Yield Floating Rate Fund
Goldman Sachs High Yield Fund
High Yield Floating Rate Portfolio (LUX)
Floating Rate Loan Fund
Cal Regents High Yield
Factory Mutual Insurance Company_High Yield
Lyondell Master Trust - High Yield
WestRock Company Master Retirement Trust_GSAM High Yield Fixed Income

By: **GOLDMAN SACHS ASSET MANAGEMENT, L.P.**,
on behalf of its funds and accounts listed above



**By:** _____
Jean Joseph

**Name:** _____
Managing Director

**Title:** _____

**Telephone:** ████████████████████

**Facsimile:** _____

**First Lien Claims:** ████████████████

**Second Lien Claims:** ████████████████

**ABL Claims:** ████████████████

**NOTICE ADDRESS:**

████████████████████████

**HOLDER PARTY**

**JAMESTOWN CLO I LTD.**
**JAMESTOWN CLO II LTD.**
**JAMESTOWN CLO III LTD.**
**JAMESTOWN CLO IV LTD.**
**FRASERSULLIVAN CLO VII LTD.**
**COA SUMMIT CLO LTD.**

By: **INVESTCORP CREDIT MANAGEMENT US LLC, as Portfolio Manager**
on behalf of its funds and accounts listed above

By: _David Ell_

Name: _DAVID ENDLER_

Title: _PORTFOLIO MANAGER_

Telephone: ███████████████

Facsimile: ███████████████

First Lien Claims:
Second Lien Claims:
ABL Claims:

███████████████

**NOTICE ADDRESS:**

███████████████

<u>**HOLDER PARTY**</u>

**Palmer Square CLO 2013-1, Ltd**
**Palmer Square CLO 2013-2, Ltd**

By: **Palmer Square Capital Management LLC,**
on behalf of its funds and accounts listed above

By: 

Name: Matt Bloomfield

Title: Managing Director/Portfolio Manager

Telephone: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Facsimile: _____

**First Lien Claims:** ▓▓▓▓▓▓▓▓▓▓
**Second Lien Claims:** ▓▓▓▓▓▓▓▓▓▓
**ABL Claims:** ▓▓▓▓▓▓▓▓▓▓

**NOTICE ADDRESS:**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

<u>**HOLDER PARTY**</u>

**SOUTHPAW CREDIT OPPORTUNITY MASTER FUND L.P.**

By:     **SOUTHPAW ASSET MANAGEMENT LP,**
        on behalf of the fund listed above as its investment adviser

By: 

Name:       Kevin Wyman, Managing
            Member of General Partner -
Title:      Southpaw Holdings LLC

Telephone:  ███████████████

Facsimile:  ███████████████


First Lien Claims:      ██████████████
Second Lien Claims:     ██████████████
ABL Claims:             ██████████████


**NOTICE ADDRESS:**

████████████████████████

**HOLDER PARTY**

Ivy High Income Fund
Waddell & Reed Advisors High Income Fund
Ivy Variable Insurance Portfolio High Income
Ivy High Income Opportunities Fund
Ivy Global Investors High Income Fund
Ivy Apollo Multi-Asset Income Fund
Ivy Apollo Strategic Income Fund

By:  WADDELL & REED INVESTMENT
     MANAGEMENT COMPANY and IVY
     INVESTMENT MANAGEMENT COMPANY,
     on behalf of the funds and accounts listed above

By:     _____

Name:   Chad Gunther

Title:  Sr. Vice President

Telephone: ███████████████████

Facsimile: ████████████████████


First Lien Claims:   ████████████████

Second Lien Claims:  ████████████████

ABL Claims:          ████████████████


**NOTICE ADDRESS:**



## EXHIBIT A

COMPANY SUBSIDIARIES

1. Guru Denim Inc., a California corporation

2. True Religion Sales, LLC, a Delaware limited liability company

3. TRLGGC Services, LLC, a Virginia limited liability company

## EXHIBIT B

PLAN

**EXHIBIT C**

CORPORATE GOVERNANCE TERM SHEET

**GOVERNANCE TERM SHEET**
**FOR**
**REORGANIZED TRLG INTERMEDIATE HOLDINGS, LLC**

**July 4, 2017**

The following term sheet (the "**Term Sheet**") presents certain preliminary material terms in respect of the capital structure and corporate governance of Reorganized TRLG Intermediate Holdings, LLC, a Delaware limited liability company (the "**Company**") that would be reflected in the operating agreement(s) (the "**Organizational Documents**") of the Company to be entered into following the consummation of the Restructuring. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement to which this Term Sheet is attached.

*THIS TERM SHEET IS NOT LEGALLY BINDING OR AN EXHAUSTIVE LIST OF ALL THE TERMS AND CONDITIONS IN RESPECT OF THE STRUCTURE AND GOVERNANCE OF THE COMPANY NOR DOES IT CONSTITUTE AN OFFER TO SELL OR BUY, NOR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION SHALL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE LAWS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION.*

| | |
|---|---|
| **General:** | The Company will be a Delaware limited liability company managed by a board of managers (the "**Board**"), which will be responsible for overseeing the operation of the Company's business. The Company will be managed on a day-to-day basis by its Chief Executive Officer and other senior executive officers with oversight from the Board. |
| | It is intended that the Company will be treated as a corporation for U.S. federal income tax purposes. In the event that the Company elects to be taxed as a partnership for U.S. federal income tax purposes, additional provisions customary for such tax treatment will be included in the Organizational Documents, including, but not limited to, provisions relating to maintenance of capital accounts, tax allocations and appropriate information reporting (*e.g.*, delivery of annual K-1's). |
| **Common Shares:** | The Organizational Documents will provide that the equity interests of the Company be evidenced by one class of limited liability company membership interest (each of which, a "**Common Share**" and each holder of a Common Share, a "**Holder**" and each Holder together with its Affiliates that are Holders, a "**Holder Group**"). |
| | For all purposes hereunder (unless otherwise specified), references to any percentage of Common Shares will be calculated on the basis of the then-outstanding Common Shares, without giving any effect to any dilution under (i) the Management Incentive Plan or similar management compensation arrangement or equity issuances or (ii) the Warrants (unless such Warrants have been exercised, in which case the Common Shares issued upon exercise of the Warrants shall be considered in the calculations hereunder). |

**Board of Managers:**     The Board will be comprised of seven (7) managers. The initial managers as of the Effective Date shall be: [ ], [ ], [ ], [ ], [ ], [ ] and [ ][1]. The initial term of each manager will be through [ ], 2018[2] (the "**Initial Term**").

At each annual meeting that occurs following expiration of the Initial Term, managers will be elected as follows:

(i)     One (1) manager shall be the Chief Executive Officer of the Company, so long as such person is employed as Chief Executive Officer of the Company (the "**CEO Manager**");

(ii)    One (1) manager designated by funds or entities affiliated with Goldman Sachs Asset Management, L.P. ("**GSAM**") so long as GSAM holds, as of the date of such annual meeting, at least 50% of the Common Shares it held as of the Effective Date;

(iii)   One (1) manager designated by funds or entities affiliated with Waddell & Reed, Inc. ("**Waddell**") so long as Waddell holds, as of the date of such annual meeting, at least 50% of the Common Shares it held as of the Effective Date;

(iv)    One (1) manager designated by funds or entities affiliated with Farmstead Capital Management, LLC ("**Farmstead**") so long as Farmstead holds, as of the date of such annual meeting, at least 50% of the Common Shares it held as of the Effective Date;

(v)     Three (3) managers designated by Holders of a majority of the Common Shares, which managers shall have relevant industry experience.

In the event that the applicable Holder is no longer entitled to designate a manager pursuant to clauses (ii), (iii) or (iv) above, as applicable, at an annual meeting, the applicable Holder and the Secretary of the Company shall inform the Board and thereafter, at such annual meeting, such position(s) instead shall be filled by Holders of a majority of the then-outstanding Common Shares at such annual meeting.

If the Board appoints a new Chief Executive Officer of the Company, such person will become the CEO Manager (unless otherwise determined by unanimous vote of the Board).

Majority vote of the managers present at a meeting of the Board at

---

[1] **NTD**: 5 managers appointed by the Ad Hoc Group, in consultation with the Chief Executive Officer (each of GSAM, Waddell and Farmstead to have right to appoint 1 each); 1 manager who is the Chief Executive Officer, Mr. John Ermatinger; and 1 manager to be appointed by TI III TRLG Holdings, LLC (the "**Sponsor**"). The manager to be appointed by the Sponsor shall be an employee of TowerBrook Capital Partners L.P. or its affiliates; to the extent such manager resigns during the Initial Term, the Sponsor shall continue to be permitted to appoint one manager during the Initial Term, who shall either be (a) an employee of TowerBrook Capital Partners L.P. or its affiliates, or (b) if not an employee of TowerBrook Capital Partners L.P. or its affiliates, reasonably acceptable to the other managers.

[2] **NTD**: To be the date that is one year from the Effective Date.

which a quorum has been established shall be required for approval of Board actions/items.

**Board Replacement Rights:** Upon the resignation, removal, death or incapacity of a manager, the vacancy resulting from such resignation, removal, death or incapacity of a manager shall be filled by the Holder Group that originally designated such manager (unless no longer entitled to designate a manager pursuant hereto) or, if such manager was filled by majority vote of the Holders, by the Board, in each case to serve until the next annual meeting of the Holders (at which time the provisions set forth above shall apply). Notwithstanding the foregoing, in the case of the CEO Manager, such position will remain vacant until a new Chief Executive Officer is appointed.

For the avoidance of doubt, a manager may be removed (with or without cause) by the Holder Group that originally designated such manager (unless no longer entitled to designate a manager pursuant hereto) and, with respect to managers filled by majority vote of the Holders, by majority vote of the then-outstanding Common Shares.

**Chairman of the Board:** The Chairman of the Board will be determined by a majority vote of the Board; *provided*, that such Chairman will not also serve as the Chief Executive Officer.

**Board Committees:** The composition of any committee of the Board will be subject to agreement by majority vote of the Board.

**Board Observers:** Each of (i) the Sponsor and (ii) any Holder Group with 5% or more of the outstanding Common Shares (calculated together with its Affiliates) shall have the right to appoint a non-voting Board observer and shall be entitled to receive all materials distributed to the Board, subject to customary exceptions.

**Certain Transfer Related Provisions:** In addition to any other restrictions on Transfer of Common Shares set forth herein, the Organizational Documents will provide language to restrict any sale, exchange, assignment, pledge, encumbrance, or other transfer (each, a "**Transfer**") of Common Shares (a) that would result in any requirement to register any securities of the Company under any state or federal securities laws or regulations, (b) to a direct or indirect competitor of the Company (other than a Transfer pursuant to the drag-along rights described below) or (c) cause a loss of any accrued net operating loss tax benefits.

Common Shares shall be subject to dilution (i) as the result of awards made under a management incentive plan to be adopted by the Board in respect of the Company's management team and the Board (the "**Management Incentive Plan**"), (ii) pursuant to the issuance of Class A Warrants, Class B Warrants, Class C Warrants and Class D Warrants (collectively, the "**Warrants**") and (iii) other issuances of Common Shares not in contravention of the Organizational Documents. In any liquidation, dissolution or winding up of the Company, all available assets will be distributed to the Holders on a pro rata basis based on the

number of Common Shares held by such Holders in proportion to the aggregate number of outstanding Common Shares.

**ROFR/ROFO:**        No rights of first refusal/rights of first offer shall be provided to any Holder.

**Tag-Along Rights:**        If a Holder Group proposes to Transfer, to any purchaser, other than to an Affiliate of such Holder Group, in one or a series of related transactions, Common Shares representing 40% or more of the outstanding Common Shares, then the Transferring Holder Group will give written notice to the Company prior to the closing of such Transfer and each other Holder will have the right (but not the obligation) to include its Common Shares in the proposed Transfer on a pro rata basis (determined based on the relative ownership of Common Shares held by those Holders participating in the Transfer).

**Drag-Along Rights:**        Notwithstanding anything to the contrary contained herein, until an initial public offering of the Company, Holders of 40% or more of the outstanding Common Shares shall have the right to cause (a) the Company to consummate any Transfer to any un-Affiliated person of all or substantially all of the consolidated assets of the Company, (b) all Holders to consummate a Transfer to any un-Affiliated person of all of the outstanding Common Shares of the Company or (c) the Company to consummate a merger, combination or consolidation with or into any un-Affiliated person (any such transaction, a "**Company Sale**").

The provisions relating to a Company Sale are subject to the following limitations:

(i)      The Company Sale must be with a non-Affiliate of the Company and its Holders.

(ii)      The consideration for the Company Sale must be cash or marketable securities.

(iii)      There will be no requirement for the Holders to execute restricting agreements (for example, non-compete agreements).

(iv)      Any Holder liability for representations and warranties, indemnification or expense reimbursement in connection with the Company Sale shall be on a pro rata basis based on the number of Common Shares held by such Holders in proportion to the aggregate number of outstanding Common Shares and shall, as to any Holder, be capped at the amount of proceeds received by such Holder in the applicable transaction.

**Pre-Emptive Rights:**        Until a Qualified Public Offering occurs, if the Company issues any equity or equity-linked securities, except for Excluded Issuances, each Holder Group holding at least 5% of the outstanding Common Shares, will have a right of first refusal to purchase that amount of equity or equity-linked securities (on the same terms and conditions as the subject issuance) as would allow such Holder to maintain such Holder's

fully-diluted percentage ownership interests in the equity of the Company. In the event that a Holder does not subscribe for its pro rata share of such equity or equity-linked securities, the other subscribing Holders may subscribe for such shares on a pro rata basis based on their own subscriptions for such equity or equity-linked securities.

"**Excluded Issuances**" will include the issuance of equity or equity-linked securities (i) pursuant to or issued upon the exercise of awards granted under the Management Incentive Plan approved by the Board, (ii) issued upon the exercise of any Warrants, (iii) in consideration for certain merger, acquisition and related transactions, (iv) pursuant to conversion or exchange rights included in equity interests previously issued, (v) in connection with an equity interests split, division or dividend, (vi) as equity kickers to lenders, or (vii) pursuant to other customary or agreed upon excluded transactions, including emergency financings and public offerings.

In no event shall any Holder be required, without its consent, to participate in any issuance of debt, equity or equity-linked securities, or otherwise be subject to a mandatory capital call.

| | |
|---|---|
| **Information Rights:** | The Company to provide or make available to each Holder:[3] |

    (i)    Audited consolidated annual financial statements and financial information (including an income statement, balance sheet and statement of cash flows) within 120 days after the end of each fiscal year.

    (ii)    Unaudited consolidated quarterly financial statements and financial information (including an income statement, balance sheet and statement of cash flows) within 60 days after the end of each of the first three fiscal quarters.

In no event will any financial information required to be furnished pursuant to this Term Sheet be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section.

The information in clauses (i) and (ii) above will be initially posted to an Intralinks electronic dataroom accessible by all Holders and prospective transferees who agree to a click-through confidentiality agreement.

Holders will also be entitled to quarterly Q&A conference calls with management.

| | |
|---|---|
| **Registration Rights:** | The Organizational Documents will provide the following registration |

---

[3] **NTD**: Timing of delivery of financial statements to be consistent with exit financing documents.

rights:

- *Demand Registration.* At any time prior to or after a Qualified Public Offering, the Company will register all Registrable Securities requested to be registered by the Holders if the Company receives a written request from Holders holding at least 40% of the outstanding Common Shares. A "**Qualified Public Offering**" means an initial public offering of the Company's equity securities with net proceeds of $25 million or more. "**Registrable Securities**" means all Common Shares held by Holders, whether acquired on or after the date of the Organizational Documents and includes any equity securities issued by a corporation formed for the purpose of effecting the Qualified Public Offering. The demand rights will otherwise be subject to usual and customary limitations and cutbacks.

- *Piggyback Registration.* Each Holder Group that holds at least 5% of the outstanding Common Shares will have the right to include its Registrable Securities each time the Company proposes for any reason to register any of its Registrable Shares under the Securities Act. The rights to piggyback registration may be exercised an unlimited number of occasions. The rights to piggyback registration will be subject to usual and customary exceptions and limitations (including, without limitation, as to exceptions employee plan S-8 filings and acquisition transactions and as to limitations, selection of underwriters, priority and cutbacks).

- *S-3 Registration.* Following a Qualified Public Offering, any Holder Group that holds at least 10% of the outstanding Common Shares may request that the Company file a registration statement under the Securities Act on Form S-3 (or similar or successor form), covering Registrable Securities held by such Holder Group if (i) the Company is a registrant qualified to use Form S-3 to register the Registrable Shares and (ii) the plan of distribution of the Registrable Shares is other than pursuant to an underwritten public offering. Demands to register the Registrable Shares on Form S-3 will not be deemed to be demand requests (as described above) and such Holder Group will have the right to request an unlimited number of registrations on Form S-3.

- *Registration Procedures.* The registration rights provisions will also contain usual and customary provisions relating to the registration procedures to be followed by the Company, termination of registration rights, as well as indemnification obligations.

**Corporate Opportunities; Fiduciary Duties:**  The Organizational Documents will provide, to the maximum extent permissible under applicable law, for the renunciation of the Company's interest in business opportunities that are presented to managers or Holders and the disclaimer of fiduciary duties of the

managers and Holders, in each case, other than such managers or Holders that are employees, consultants or officers of the Company (other than any Chairman of the Board that is not otherwise an employee, consultant or officer of the Company).

**Affiliate Transactions:** The Company will not (subject to certain limited exceptions) be permitted to enter into or make or amend any transaction with, or for the benefit of, any Affiliate or Holder of the Company unless (i) approved by a majority of the disinterested managers of the Board and must be on an arm's-length basis or (ii) approved by Holders of at least 66 2/3% of the then-outstanding Common Shares (excluding any Common Shares held by the Affiliate or Holder of the Company for whom the Affiliate transaction is being proposed).

**Amendments:** The Organizational Documents will not be amended, modified or waived without the approval of the Holders of a majority of the outstanding Common Shares and any amendment, modification or waiver that adversely and disproportionately affects the rights or obligations of a Holder or group of Holders without similarly and proportionally affecting the rights or obligations of all other Holders, shall not be effective as to such Holder without such Holder's (or group of Holders') prior written consent. Any modification of a Holder's (or group of Holders') manager designation rights shall require the prior written consent of such Holder (or group of Holders).

**Other Terms:** The Organizational Documents will also provide for other customary terms, including, without limitation, the making of distributions in respect of Common Shares (which shall in any case be ratable), the time, place and manner of calling of regular and special meetings of Holders and managers, actions may be taken by the Board or the Holders without a meeting, the titles and duties of officers of the Company and the manner of appointment, removal and replacement thereof, and indemnification and exculpation of managers, officers and other appropriate persons.

For the avoidance of doubt, the Company will not be a public reporting company as of the Effective Date.

The Company shall retain a third party provider, such as Markit, to provide a daily valuation of the Common Shares, provided that such cost does not exceed $20,000 annually.

**Warrants:** The Warrants shall be restricted from transfer and sale in a manner similar to the restrictions on the transfer and sale of Common Shares. As a condition to the exercise of the Warrants, a holder must execute a joinder to the Organizational Documents to the extent such holder is not already a party thereto.

**Defined Terms:** "**Affiliate**" means any person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

"**control**" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

## EXHIBIT D

WARRANT TERM SHEETS

# EXHIBIT D

## WARRANT TERM SHEETS[1]

### CLASS A WARRANTS

| | |
|---|---|
| *Issuer* | Reorganized True Religion. |
| *Warrants* | Warrants to purchase a number of shares of New Common Shares equal to in the aggregate 2.5% of the New Common Shares outstanding on the Effective Date, calculated on a fully-diluted basis as of the Effective Date assuming full exercise of the Warrants. For the avoidance of doubt, the Warrants shall dilute the New Common Shares and the MIP. |
| *Term* | 5 years from the Effective Date. |
| *Exercise Price* | The exercise price for each share of New Common Shares underlying the Class A Warrants will be initially struck at a $116.5 million equity valuation.<br><br>The Class A Warrants may be exercised in cash or on a cashless basis in connection with, and at a price implied by, a sale of the Company for cash, securities or any combination thereof. No third party appraisal shall be required. |
| *Conditions to Exercise* | • Delivery of an exercise form.<br><br>• Payment of the exercise price, unless such exercise is on a cashless basis; and<br><br>• Execution of a Joinder to the Shareholders Agreement, to the extent not already a party thereto. |
| *Warrant Transfer Restrictions:* | All of the Class A Warrants will be restricted from transfer and sale in a similar manner as the shares of New Common Shares, in accordance with the Shareholders Agreement. |
| *Redemption* | The Class A Warrants will not be subject to redemption by Reorganized True Religion or any other person. |
| *Documentation* | All definitive documentation concerning the Class A Warrants, including the Class A Warrant Agreement, shall be in form and substance consistent with this term sheet and otherwise satisfactory to the Ad Hoc Group. |

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

# CLASS B WARRANTS

| | |
|---|---|
| *Issuer* | Reorganized True Religion. |
| *Warrants* | Warrants to purchase a number of shares of New Common Shares equal to in the aggregate 7.5% of the New Common Shares outstanding on the Effective Date, calculated on a fully-diluted basis as of the Effective Date assuming full exercise of the Warrants. For the avoidance of doubt, the Warrants shall dilute the New Common Shares and the MIP. |
| *Term* | 5 years from the Effective Date. |
| *Exercise Price* | The exercise price for each share of New Common Shares underlying the Class B Warrants will be initially struck at a $116.5 million equity valuation.<br><br>The Class B Warrants may be exercised in cash or on a cashless basis in connection with, and at a price implied by, a sale of the Company for cash, securities or any combination thereof. No third party appraisal shall be required. |
| *Catchup* | If at any time the aggregate realizations on New Common Shares by the holders thereof, whether in the form of dividends, distributions, stock repurchases, merger consideration or otherwise (other than by way of a sale to a person other than Reorganized True Religion) ("**Realizations**") reach $116.5 million, holders of the Class B Warrants shall thereafter be entitled to payment of their ratable share of the First Catchup Amount prior to any further Realizations by holders of the New Common Shares. "**First Catchup Amount**" shall mean up to approximately $9.3 million.<br><br>The entitlement to the "First Catchup Amount" set forth above shall only be available in the event of Realizations and not in any other circumstances, including, without limitation, any "valuation" performed by any party or advisor or bank. |
| *Conditions to Exercise* | <ul><li>Delivery of an exercise form.</li><li>Payment of the exercise price, unless such exercise is on a cashless basis; and</li><li>Execution of a Joinder to the Shareholders Agreement, to the extent not already a party thereto.</li></ul> |
| *Warrant Transfer Restrictions:* | All of the Class B Warrants will be restricted from transfer and sale in a similar manner as the shares of New Common Shares, in accordance with the Shareholders Agreement. |
| *Redemption* | The Class B Warrants will not be subject to redemption by Reorganized True Religion or any other person. |
| *Documentation* | All definitive documentation concerning the Class B Warrants, including the Class B Warrant Agreement, shall be consistent with this term sheet and otherwise in form and substance reasonably satisfactory to the Ad Hoc Group and the Sponsor. |

# CLASS C WARRANTS

| | |
|---|---|
| **Issuer** | Reorganized True Religion. |
| **Warrants** | Warrants to purchase a number of shares of New Common Shares equal to in the aggregate 10.0% of the New Common Shares outstanding on the Effective Date, calculated on a fully-diluted basis as of the Effective Date assuming full exercise of the Warrants. For the avoidance of doubt, the Warrants shall dilute the New Common Shares and the MIP. |
| **Term** | 5 years from the Effective Date. |
| **Exercise Price** | The exercise price for each share of New Common Shares underlying the Class C Warrants will be initially struck at a $216.5 million equity valuation.<br><br>The Class C Warrants may be exercised in cash or on a cashless basis in connection with, and at a price implied by, a sale of the Company for cash, securities or any combination thereof. No third party appraisal shall be required. |
| **Catchup** | If at any time the aggregate realizations on New Common Shares by the holders thereof, whether in the form of dividends, distributions, stock repurchases, merger consideration or otherwise (other than by way of sale to a person other than Reorganized True Religion) ("**Realizations**") reach $216.5 million, holders of the Class C Warrants shall thereafter be entitled to payment of their ratable share of the Second Catchup Amount prior to any further Realizations by holders of the New Common Shares. "**Second Catchup Amount**" shall mean up to approximately $24.1 million.<br><br>The entitlement to the "Second Catchup Amount" set forth above shall <u>only</u> be available in the event of Realizations and not in any other circumstances, including, without limitation, any "valuation" performed by any party or advisor or bank. |
| **Conditions to Exercise** | • Delivery of an exercise form.<br><br>• Payment of the exercise price, unless such exercise is on a cashless basis; and<br><br>• Execution of a Joinder to the Shareholders Agreement, to the extent not already a party thereto. |
| **Warrant Transfer Restrictions:** | All of the Class C Warrants will be restricted from transfer and sale in a similar manner as the shares of New Common Shares, in accordance with the Shareholders Agreement. |
| **Redemption** | The Class C Warrants will not be subject to redemption by Reorganized True Religion or any other person. |
| **Documentation** | All definitive documentation concerning the Class C Warrants, including the Class C Warrant Agreement, shall be consistent with this term sheet and otherwise in form and substance reasonably satisfactory to the Ad Hoc Group and the Sponsor. |

## CLASS D WARRANTS

| | |
|---|---|
| **Issuer** | Reorganized True Religion. |
| **Warrants** | Warrants to purchase a number of shares of New Common Shares equal to in the aggregate 1% of the New Common Shares for each $300,000 of Swapped Debt, calculated on a fully-diluted basis as of the Effective Date assuming full exercise of the Warrants. For the avoidance of doubt, the Warrants shall dilute the New Common Shares and the MIP. |
| **Term** | 5 years from the Effective Date. |
| **Exercise Price** | The exercise price for each share of New Common Shares underlying the Class A Warrants will be initially struck at a $330.0 million equity valuation.<br><br>The Class D Warrants may be exercised in cash or on a cashless basis in connection with, and at a price implied by, a sale of the Company for cash, securities or any combination thereof. No third party appraisal shall be required. |
| **Conditions to Exercise** | • Delivery of an exercise form.<br><br>• Payment of the exercise price, unless such exercise is on a cashless basis; and<br><br>• Execution of a Joinder to the Shareholders Agreement, to the extent not already a party thereto. |
| **Warrant Transfer Restrictions:** | All of the Class D Warrants will be restricted from transfer and sale in a similar manner as the shares of New Common Shares, in accordance with the Shareholders Agreement, which shall be in form and substance satisfactory to the Ad Hoc Group in its sole discretion. |
| **Redemption** | The Class D Warrants will not be subject to redemption by Reorganized True Religion or any other person. |
| **Documentation** | All definitive documentation concerning the Class D Warrants, including the Class D Warrant Agreement, shall be consistent with this term sheet and otherwise in form and substance satisfactory to the Ad Hoc Group. |

## EXHIBIT E

EXIT FACILITY

CITIZENS BANK, N.A.
28 State Street
Boston, MA 02109

July 4, 2017

True Religion Apparel, Inc.
1888 Rosecrans Avenue
Manhattan Beach, CA 90266
Attention: Dali Snyder, Chief Financial Officer

True Religion
Commitment Letter

Ladies and Gentlemen:

True Religion Apparel, Inc., a Delaware corporation (the "*Company*" or "*you*"), in connection with the Company's and certain of its affiliates' and subsidiaries' filing of petitions for relief (collectively, the "*Chapter 11 Cases*") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "*Bankruptcy Code*") have requested that Citizens Bank, N.A. ("*Citizens*", and collectively with the other Commitment Parties appointed as described below, the "*Commitment Parties*") provide the Company with a $60 million senior secured asset-based revolving credit facility (the "*Exit Facility*") in connection with the emergence of the Company and certain of its affiliates (the "*Debtors*", including, any entity formed to hold any newly issued equity in respect of the Company or any assets transferred from the Company upon its emergence from bankruptcy) from the Chapter 11 Cases, on the terms and conditions set forth herein and in the attached Summary of Indicative Terms and Conditions attached hereto as Exhibit A (the "*Exit Facility Term Sheet*"). The Debtors' emergence from bankruptcy will be pursuant to a plan of reorganization in form and substance satisfactory to Citizens to be approved by the United States Bankruptcy Court for the District of Delaware (the "*Court*") (the "*Approved Plan*"), which shall provide for, among other things, refinancing in full in cash of the $60,000,000 senior secured super priority debtor-in-possession asset-based revolving credit facility (the "*DIP Facility*"), dated as of on or about July 7, 2017. For the avoidance of doubt, (a) prior to the date of the Bankruptcy Court hearing with regard to the Debtors' assumption of this commitment letter, we will inform (the "*Approved Plan Citizens Confirmation*") the Debtors whether the plan of reorganization on file with the Bankruptcy Court at that time (as maybe amended, supplemented, or modified prior to that date) is an "Approved Plan" for purposes of this letter; if we fail to provide the Approved Plan Citizens Confirmation prior to such date, the Debtors shall not be required to seek approval of the assumption of this commitment letter; and (b) subject to final review of all documents, it is Citizens' current intention to provide the Approved Plan Citizens Confirmation prior to such date. The confirmation of the Approved Plan and the entering into, and funding of, the Exit Facility and all related transactions are referred to hereinafter, collectively, as the "*Exit Transaction*". The documentation related to the Exit Facility shall be referred to hereinafter as

the "***Exit Facility Documentation***". Capitalized terms used in this letter but not defined herein shall have the meanings given to them in the Exit Facility Term Sheet.

1.    Commitments.

In connection with the Chapter 11 Cases, Citizens is pleased to advise you of its commitment to provide 100% of the Exit Facility, upon the terms and conditions expressly set forth herein and in the Exit Facility Term Sheet and the Fee Letter (as defined below). The Exit Facility Term Sheet together with this letter, hereinafter are referred to as the "***Commitment Letter***").

2.    Titles and Roles.

It is agreed that:

(a)  Citizens will act as sole lead arranger (in such capacity, the "***Lead Arranger***") and as sole lead bookrunner for the Exit Facility; and

(b)  Citizens will act as sole administrative agent for the Exit Facility (in such capacity, the "***Administrative Agent***").

It is further agreed that Citizens will have "lead left" placement in any marketing materials or other documentation for the Exit Facility, and will hold the roles and responsibilities customarily understood to be associated with such name placement.

Citizens may, in its sole discretion (but at no additional cost to the Debtors), appoint additional agents, co-agents, arrangers, bookrunners or managers and award other titles to other lenders participating in the Exit Facility and you agree that, except as may be approved by Citizens, you shall not appoint any additional agents, co-agents, arrangers, bookrunners or managers or award other titles or pay any compensation (other than as expressly contemplated by this Commitment Letter and the related fee letter of even date herewith to be executed by you and us (the "***Fee Letter***")) to any lender in order to obtain its commitment in respect of the Exit Facility unless you and Citizens shall so agree.

3.    Information.

You hereby represent and warrant (with respect to such information relating to the Company and its subsidiaries prior to the closing date of the Exit Facility (the "***Exit Closing Date***"), to your knowledge) that (a) all written information other than financial estimates, forecasts and other forward-looking information (collectively, the "***Projections***") and other than information of a general economic or general industry nature, that has been or will be made available to any of the Commitment Parties by you or any of your or its respective representatives on your behalf in connection with the transactions contemplated hereby (the "***Information***"), taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the Projections that have been or will be made available to the Lead Arranger by you or any of your

2

or its respective representatives on your behalf in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time made; it being understood that any such Projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material. You agree that, if at any time prior to the Exit Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations and warranties were being made, at such time, then you will (prior to the Exit Facility Date with respect to Information and Projections relating to the Company and its subsidiaries) use commercially reasonable efforts to promptly supplement the Information and the Projections from time to time until the Exit Facility Date so that such representations and warranties will be correct in all material respects under those circumstances. In arranging and syndicating the Exit Facility, the Lead Arranger will be entitled to use and rely on the Information and the Projections without responsibility for independent verification thereof and does not assume responsibility for the accuracy or completeness of the Information or the Projections.

4.    Fees.

As consideration for the commitments of Citizens hereunder and the Administrative Agent's and the Lead Arranger's agreement to perform the services described herein, you agree to pay (or cause to be paid) the fees set forth in the Fee Letter on the terms and subject to the conditions (including as to timing and amount) set forth therein. Once paid, such fees shall not be refundable under any circumstances, except as otherwise contemplated herein or by the Fee Letter or as otherwise separately agreed to in writing by you and us.

5.    Conditions Precedent.

The commitment of Citizens hereunder and the undertaking of Citizens to provide the Exit Facility are subject to the satisfaction of the terms and conditions set forth in the Exit Facility Term Sheet and each of the following conditions precedent in a manner acceptable to Citizens: (a) the Administrative Agent's reasonable satisfaction with the approval by the Court of (i) the Exit Facility, the Exit Transaction and the transactions contemplated thereby and (ii) all actions to be taken, undertakings to be made and obligations to be incurred by the Borrower and Guarantors in connection with the Exit Facility, the Exit Transaction and the transactions contemplated thereby (all such approvals to be evidenced by the entry of one or more orders of the Court (not later than the date set forth in the final paragraph of this Commitment Letter) reasonably satisfactory in form and substance to the Administrative Agent and the Lead Arranger, which orders shall, among other things, approve and confirm (x) the payment by the Debtors of all of the fees that are provided for in this Commitment Letter and the Fee Letter and (y) the other terms of this Commitment Letter and the Fee Letter, and which order(s) shall, for the avoidance of any doubt, specifically provide that the right to receive all amounts due and owing to each of the Agent and the Lead Arranger, including indemnification obligations, the fees as set forth herein and in the Fee Letter and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and in the Fee Letter, shall be entitled to priority as administrative expense claims under Sections

3

503(b) and 507(a)(1) of the Bankruptcy Code, regardless of whether the Closing Date occurs); (b) the accuracy and completeness in all material respects of all representations that you and your affiliates make to Citizens and your compliance with the terms of this Commitment Letter and the Fee Letter (as hereinafter defined); (c) prior to and during the syndication of the Exit Facility there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf the Debtors or any of their respective subsidiaries (other than the Reorganized First Lien Term Loans (as defined in the Term Sheet)); (d) Citizens not having become aware of any information not previously disclosed to Citizens that Citizens reasonably believes to be materially and adversely inconsistent with the information regarding the business, condition (financial or otherwise), operations or assets of the Debtors provided to Citizens prior to the date hereof; and (e) the review and reasonable satisfaction by Citizens with (x) to the extent not specifically described in the Approved Plan or otherwise provided to Citizens prior to the date hereof, the terms of the restructuring of the Debtors and their affiliates (including, without limitation, changes to the current composition the persons acting in the capacities of chief executive officer, chief financial officer and chief operating officer of the Debtors and the capital and tax structure of the Company, the Guarantors and their subsidiaries) and (y) the terms and conditions of all other material transactions and documentation entered into in connection with the consummation of such Approved Plan, all as more specifically described in the Exit Facility Term Sheet.

6.    Indemnification; Expenses.

You agree (a) to indemnify and hold harmless each of the Commitment Parties, their respective affiliates and controlling persons and the respective officers, directors, members, partners, employees, advisors, agents and representatives of each of the foregoing and their successors and permitted assigns (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and out-of-pocket expenses, joint or several, to which any such Indemnified Person may become subject arising out of, resulting from or in connection with any actual or threatened claim, dispute, litigation, investigation or proceeding relating to this Commitment Letter, the Fee Letter, the Exit Facility or the use of proceeds thereof (any of the foregoing, an "*Action*"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Action is brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each such Indemnified Person within 30 days after receipt of a written request together with reasonably detailed backup documentation for any reasonable out-of-pocket legal and other reasonable out-of-pocket expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any of the foregoing; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses (i) to the extent resulting from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its Related Indemnified Persons (as defined below) (as determined by a court of competent jurisdiction in a final non-appealable judgment), (ii) to the extent resulting from any intentional material breach of such Indemnified Person's obligations under this Commitment Letter or (iii) to the extent arising from any dispute solely among Indemnified Persons other than any claims against any Commitment Party in its capacity or in fulfilling its role as an Administrative Agent or arranger or any similar role under any Facility and other than any claims arising out of any act or omission on the part of you or your affiliates (as determined by a court of competent jurisdiction in a final non-appealable judgment), and (b) to reimburse the

Commitment Parties and each of their respective affiliates from time to time, upon presentation of a summary statement for all reasonable and documented out-of-pocket expenses (including but not limited to out-of-pocket expenses of the Commitment Parties' due diligence investigation, field examinations and collateral appraisal expenses, travel expenses and reasonable fees, disbursements and other charges of one primary counsel to the Lead Arranger and the Agent (and any local or special counsel to the Lead Arranger and the Agent), in each case incurred in connection with the Exit Facility and the preparation of this Commitment Letter, the Fee Letter, the Exit Facility Documentation and any security arrangements in connection therewith (such expenses in this clause (b), collectively, the "**Expenses**"), in each case, whether or not the Exit Closing Date occurs.  Notwithstanding any other provision of this Commitment Letter, (i) no Indemnified Person or any other party hereto shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person, any Related Indemnified Person or such other party hereto, as applicable, and (ii) neither (x) any Indemnified Person or any of its Related Indemnified Persons, nor (y) you (or any of your subsidiaries or affiliates) or the Company (or any of its subsidiaries or affiliates) shall be liable for any indirect, special, punitive or consequential damages (with respect to you in the case of this clause (y), other than pursuant to the indemnification provisions of this Commitment Letter in respect of any such damages incurred or paid by an Indemnified Person to a third party) in connection with this Commitment Letter, the Fee Letter, the Exit Facility, or with respect to any activities related to the Exit Facility. You shall not, without the prior written consent of the affected Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned), effect any settlement of any pending or threatened Action against such Indemnified Person in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include any statement as to any admission.

For purposes hereof, a "**Related Indemnified Person**" of an Indemnified Person means (1) any affiliate or controlling person of such Indemnified Person, (2) the respective directors, officers, or employees of such Indemnified Person or any of its affiliates or controlling persons and (3) the respective agents or representatives of such Indemnified Person or any of its affiliates or controlling persons, in the case of this clause (3), acting on behalf of or at the instructions of such Indemnified Person, affiliate or controlling person.

7.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services (including without limitation investment banking and financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling) to other companies in respect of which you or the Company may have conflicting interests.  We will not furnish confidential information obtained from or on behalf of you or the Company by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you or the Company to other companies (except as contemplated below in Section 11).  You also acknowledge that we do not have any

obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you or the Company, confidential information obtained by us or any of our respective affiliates from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and your affiliates and the Commitment Parties and/or their affiliates is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties or their respective affiliates have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Parties or any of their affiliates and you waive, to the fullest extent permitted by law, any claims you may have against us for breach of fiduciary duty or alleged breach of fiduciary duty in connection with the Exit Facility and agree that we and our affiliates will have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including equity holders, employees or creditors, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties and their affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you or your affiliates, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and (f) each Commitment Party has been, is and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity. In addition, the Commitment Parties may employ the services of their respective affiliates in providing certain services hereunder and may exchange with such affiliates in connection therewith information concerning you and the Company, and such affiliates shall be entitled to the benefits afforded to, and be subject to the obligations of, the Commitment Parties under this Commitment Letter. You acknowledge and agree that we have not provided you with legal, tax or accounting advice and that you have obtained such independent advice from your own advisors, representatives and agents.

You further acknowledge that each Commitment Party and/or its affiliates is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each Commitment Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you, the Company and your and their respective subsidiaries and affiliates and other companies with which you, the Company and your and their respective subsidiaries may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Commitment Parties, their affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion and without any liability to you, the Company or any of your or their respective subsidiaries or affiliates.

6

8. Assignments; Amendments; Governing Law, Etc.

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons), is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons) and is not intended to create a fiduciary relationship among the parties hereto. Any and all services to be provided by the Commitment Parties hereunder may be performed by or through any of their respective affiliates or branches. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Commitment Parties and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or by ".pdf" or similar electronic transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. This Commitment Letter, together with the Fee Letter, supersedes all prior understandings, whether written or oral, among us with respect to the Exit Facility and sets forth the entire understanding of the parties hereto with respect thereto. THIS COMMITMENT LETTER, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

9. WAIVER OF JURY TRIAL.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

10. Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the Court, as to any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in the Court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby in the Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Court and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other

jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses set forth above shall be effective service of process against such party for any suit, action or proceeding brought in any such court.

11.    Confidentiality.

This Commitment Letter is delivered to you on the understanding that none of this Commitment Letter or the Fee Letter or their terms or substance shall be disclosed, directly or indirectly, to any other person or entity (including other lenders, underwriters, placement agents, advisors or any similar persons) except (a) to your respective officers, directors, employees, affiliates, members, partners, stockholders, existing secured creditors (and their agents, attorneys and advisors), attorneys, accountants, agents and advisors on a confidential and need-to-know basis, (b) if the Commitment Parties consent to such proposed disclosure, (c) this Commitment Letter (but not the Fee Letter) may be disclosed as may be required by the rules, regulations, schedules and forms of the Securities and Exchange Commission (the "*SEC*") in connection with any filings with the Court or the SEC in connection with the Exit Facility (in which case you agree to inform us promptly thereof to the extent lawfully permitted to do so) or (d) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law, regulation, compulsory legal process or as requested by a governmental authority (in which case you agree to inform us promptly thereof and to cooperate reasonably with us to prevent or limit such disclosure, in each case to the extent practicable and so long as you are lawfully permitted to do so); *provided* that (i) in connection with the Exit Facility, you may disclose this Commitment Letter and the contents thereof and, on a redacted basis in a manner reasonably acceptable to the Commitment Parties, the Fee Letter and the contents thereof to (x) the Company and its officers, directors, employees, attorneys, accountants, agents and advisors, on a confidential basis and (y) the direct or indirect equity holders of the Company and its respective officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, on a confidential basis, (ii) you may disclose the aggregate fee amounts (including upfront fees and original issue discount) payable under the Fee Letter as part of generic disclosure regarding sources and uses (but without disclosing any specific fees or other economic terms set forth therein) as part of a disclosure of overall transaction fees and expenses (not limited to fees associated with the Exit Facility) to the Company and its subsidiaries and their respective equity holders, existing secured creditors (and their agents, attorneys and advisors), officers, directors, employees, attorneys, accountants, agents and advisors, and (iii) you may disclose to the Company's auditors the Fee Letter and the contents thereof after the Exit Closing Date for customary accounting purposes, including accounting for deferred financing costs; *provided, further,* that the foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its fees and substance) on the date that is two years following the termination of this Commitment Letter in accordance with its terms.

Each Commitment Party, on behalf of itself and its affiliates, agrees that it shall treat confidentially all information provided to it or its affiliates by you or on your behalf hereunder and the terms and contents of this Commitment Letter, the Fee Letter and the Exit Facility Documentation and shall not publish, disclose or otherwise divulge such information; *provided* that nothing herein shall prevent a Commitment Party or its affiliates from disclosing any such

information (a) pursuant to the order of any court or administrative agency or otherwise as required by applicable law, regulation, compulsory legal process or as requested by a governmental authority (in which case such Commitment Party, to the extent practicable and so long as the same is permitted by law and except in connection with any order or request as part of a regulatory examination or audit, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or any of its affiliates (in which case such Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent practicable, unless such Commitment Party is prohibited by applicable law from so informing you, or except in connection with any request as part of a regulatory examination or audit), (c) to the extent that such information becomes publicly available other than by reason of disclosure by such Commitment Party or any of its affiliates in violation of this paragraph, (d) to the extent that such information is received by such Commitment Party from a third party that is not to such Commitment Party's knowledge in breach of related confidentiality obligations to you or the Company, (e) to the extent that such information is independently developed by such Commitment Party or its affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this provision, (f) to such Commitment Party's affiliates and its and their officers, directors, employees, legal counsel, independent auditors and other experts, professionals, advisors or agents (collectively, the "***Representatives***") who are informed of the confidential nature of such information, (g) to prospective Lenders, participants or assignees or any potential counterparty to any swap or derivative transaction relating to the Company or any of its subsidiaries or any of their respective obligations (in each case, other than a Disqualified Institution); *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, participant, assignee or counterparty, on behalf of itself and its Representatives, that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the Commitment Parties) in accordance with market standards for dissemination of such type of information which, in the case of any electronic access, shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (h) for purposes of establishing a "due diligence" defense, (i) to the members of the ad hoc group of unaffiliated Prepetition First Lien Lenders[1] and the Prepetition Second Lien Lenders[2] represented by Akin Gump Strauss Hauer & Feld LLP (the "***Ad Hoc Group***") and their agents, attorneys and advisors or (j) with your prior written consent. In addition, each Commitment Party may disclose the existence of the Exit Facility and the information about the Exit Facility to market data collectors, similar service providers to the lending industry and service providers to the Commitment Parties in connection with the administration and management of the Exit Facility. Each Commitment Party's obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive

---

[1] "***Prepetition First Lien Lenders***" means the lenders from time to time under that certain First Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time, and Deutsche Bank AG New York Branch, as administrative agent.

[2] "***Prepetition Second Lien Lenders***" means the lenders from time to time under that certain Second Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time, and Deutsche Bank AG New York Branch, as administrative agent.

documentation relating to the Exit Facility upon the execution and delivery of the definitive documentation therefor and in any event shall terminate two years from the date hereof.

12.    Surviving Provisions.

The provisions of this Section 12 and the indemnification, expenses, confidentiality, jurisdiction, service of process, venue, governing law, absence of advisory or fiduciary duty and waiver of jury trial, and information provisions contained herein, administrative fees and governing law provisions contained in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or Citizens' commitments hereunder and the Lead Arranger's agreements to provide the services described herein; *provided* that your obligations under this Commitment Letter, other than those relating to confidentiality, and information, shall automatically terminate and, to the extent covered thereby, be superseded by the definitive documentation relating to the Exit Facility upon the funding under such Facility, and you shall be released from all liability in connection therewith at such time. You may terminate this Commitment Letter at any time subject to the provisions of the preceding sentence. Nothing in this Agreement shall prevent the Company from taking or failing to take any action that it determines, based on the reasonable advice of its legal counsel, it is obligated to take in the performance of its statutory, contractual or fiduciary duties or as otherwise required by the Bankruptcy Code or applicable law; provided, however that it is agreed that Citizens may, at its option, terminate this Commitment Letter and the commitments and undertakings of Citizens hereunder as a result of any such actions (or inactions).

13.    Patriot Act Notification.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (as amended, the "*Patriot Act*"), each Commitment Party and each Lender is required to obtain, verify and record information that identifies the Company and each Guarantor, which information includes the name, address, tax identification number and other information regarding the Company and each such Guarantor that will allow such Commitment Party or such Lender to identify the Company and each such Guarantor in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Commitment Parties and each Lender.

14.    Acceptance and Termination.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letter by returning to the Lead Arranger executed counterparts hereof and of the Fee Letter, not later than 11:59 p.m., New York City time, on July 4, 2017. Each Commitment Party's respective commitments hereunder and agreements contained herein will be effective only upon execution and delivery hereof and of the Fee Letter by you and us in accordance with this paragraph, and will expire at such time in the event that the Lead Arranger have not received such executed counterparts in accordance with the immediately preceding sentence; provided, however, that this Commitment Letter and all commitments and undertakings of Citizens hereunder will automatically expire if this Commitment Letter and the Fee Letter have not been approved by a final order of the Court by

10

5:00 p.m. (New York City time) on August 4, 2017 (it being agreed that each party hereto shall use its reasonable best efforts to seek Court approval as soon as practicable prior thereto and shall not encourage or assist the submission or development of an alternative transaction whether relating to the sale or issuance of any debt or security or the acquisition, sale or lease or other disposition of the Debtors of any material assets or equity of the Debtors). Thereafter, this Commitment Letter and the commitments and undertakings of the Agent hereunder shall automatically terminate upon the earliest of (a) 5:00 p.m. (New York City time) on December 1, 2017, unless Citizens shall, in its discretion, agree to an extension hereof or the Exit Closing Date occurs on or prior thereto, (b) the consummation of the Approved Plan, (c) five (5) business days after the Petition Date in the event that the DIP Credit Facility is not closed and funded prior to such date, (d) a sale of all or a substantial portion of the assets of the Debtors, (e) a refinancing or all or any part of the DIP Credit Facility and (f) the consummation of a plan of reorganization without the use of the Exit Facility. In consideration of the time and resources that the Agent and the Lead Arranger will devote to the Exit Facility, but subject to the last sentence of paragraph 12 above, you agree that, until such expiration, you will not, and will cause the Debtors, the Borrower, the Guarantors or their affiliates not to, solicit, initiate, entertain or permit, or enter into any discussions in respect of, any offering, placement or arrangement of any competing senior credit facility or facilities for the Borrower and its subsidiaries with respect to the matters addressed in this Commitment Letter.

*[Remainder of this page intentionally left blank]*

We look forward to working with you on this important transaction.

Very truly yours,

CITIZENS BANK, N.A.

By _____
Name:
Title:

Accepted and agreed to as of
the date first above written:

TRUE RELIGION APPAREL, INC.

By _____
    Name:
    Title:

## Exhibit A

Exit Facility Term Sheet

**SUMMARY OF INDICATIVE TERMS AND CONDITIONS
("EXIT FACILITY TERM SHEET")
$60,000,000 SENIOR CREDIT FACILITY
(EXIT FACILITY)**

*Capitalized terms not otherwise defined herein have the same meanings as
specified therefor in the Commitment Letter to which this Exhibit A is attached.*

---

| | |
|---|---|
| **BORROWER:** | True Religion Apparel, Inc., a Delaware corporation (the "***Company***") and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from the Company upon its emergence from bankruptcy (the "***Borrower***"). |
| **GUARANTORS:** | The obligations of the Borrower and its subsidiaries and affiliates under the Senior Credit Facility (as defined below) and under any treasury management, bank products, interest protection or other hedging arrangements entered into with a Lender (or any affiliate thereof) will be guaranteed by TRLG Intermediate Holdings, LLC, a Delaware limited liability company that is the direct parent of the Borrower ("***Holdings***"), and each existing and future direct and indirect domestic subsidiary of the Borrower (collectively, the "***Guarantors***", and together with the Borrower, the "***Loan Parties***"). Notwithstanding the foregoing, the guaranty requirements will be subject to customary exceptions to be agreed. All guarantees will be guarantees of payment and not of collection. |
| **ADMINISTRATIVE AGENT:** | Citizens Bank, N.A. ("***Citizens***") will act as sole administrative agent (in such capacity, the "***Administrative Agent***"). |
| **LEAD ARRANGER AND BOOKRUNNER:** | Citizens will act as a lead arranger and bookrunner (in such capacities, the "***Lead Arranger***"). |
| **LENDERS:** | A group of lenders arranged by the Lead Arranger (collectively, the "***Lenders***"). |
| **SENIOR CREDIT FACILITY:** | Subject to the terms under the heading "Borrowing Base," a $60 million revolving credit facility (the "***Senior Credit Facility***") available from time to time until the fifth anniversary of the Exit Closing Date, which will include a $20 million sublimit for the issuance of letters of credit (the "***Letters of Credit***"). Letters of Credit will be issued by Citizens (in such capacity, the "***L/C Issuer***"). Each of the Lenders under the Senior Credit Facility will purchase an irrevocable and unconditional participation in each Letter of Credit. |
| **INCREASE OPTION:** | The Senior Credit Facility will include an accordion feature permitting the Borrower to request an increase in the Senior Credit Facility after the |

Exit Closing Date by an additional amount (for all such increases in the Senior Credit Facility) of up to $15,000,000 in the form of additional revolving loans or term loans; provided that any such request shall be in increments of $1,000,000 (collectively, the "Increase Option"). Such increases may be effected from time to time after the Exit Closing Date subject to customary terms and conditions (including, without limitation, delivery of customary documentation reflecting corporate action by the Borrower and the Guarantors approving of such increase) and provided that (i) no default or event of default shall exist at the time of any such increase or immediately after giving effect to such increase, and (ii) the Administrative Agent shall have received a certificate, in form and substance reasonably satisfactory to the Administrative Agent, of the Borrower setting forth calculations demonstrating that, after giving effect to any such increase (determined as if the entire amount of such increase is fully-funded), the Borrower and its subsidiaries shall be in compliance on a pro forma basis with its financial covenants under the definitive documentation for the Senior Credit Facility.

Any such increase in the Senior Credit Facility pursuant to an increase thereof in the form of revolving credit loans under the Senior Credit Facility (an "Incremental Facility"), shall be subject to terms and conditions approved by the Borrower, the Administrative Agent, the Lead Arranger and the lenders participating in such Incremental Facility; provided, that the Incremental Facility (a) will be made available as a separate facility established under the Loan Documents, and (b) all documentation in respect of the Incremental Facility (including any amendments to the Loan Documents) shall be in form and substance substantially the same as the Senior Credit Facility and shall be satisfactory to the Borrower, the Administrative Agent and the Lead Arranger and shall have been approved by the Administrative Agent and the Borrower.

**USE OF PROCEEDS:** The proceeds of the Senior Credit Facility shall be used solely for, in each case in a manner consistent with the terms and conditions herein, (a) repayment of the loans and all other obligations under the Senior Secured, Super Priority, Debtor-In-Possession Credit Agreement (the "*DIP Credit Agreement*"), among the Borrower, Holdings, the guarantors party thereto, the lenders party thereto from time to time, and the Administrative Agent, (b) payments described in the Approved Plan, (c) payment of costs and expenses incurred in connection with consummation of the Approved Plan, and (d) for working capital and other general corporate purposes of the Borrower.

**BORROWING BASE:** Advances under the Senior Credit Facility may be made to the Borrower on a revolving basis up to the full amount of the Senior Credit Facility and Letters of Credit may be issued up to the sublimit for Letters of Credit, in each case, subject to compliance with a borrowing base (the "*Borrowing Base*") equal to: (i) 90% of eligible credit card receivables of the Borrower and the Guarantors, plus (ii) 85% of eligible trade accounts receivables of the Borrower and the Guarantors, plus (iii) the lesser of (a) 90% of the appraised net orderly liquidation value of eligible

inventory and (b) 100% of the cost of eligible inventory, *minus* (iv) any applicable Reserves to be determined by the Administrative Agent in its Permitted Discretion.

The Borrowing Base will be computed by the Borrower monthly, and a certificate (the "***Borrowing Base Certificate***") presenting the Borrower's computation of the Borrowing Base will be delivered to the Administrative Agent promptly, but in no event later than the tenth day following the end of each calendar month; provided, however, that (a) during the continuance of an Event of Default or (b) if Excess Availability (as defined below) is less than the greater of (x) 20% of the lesser of (A) the aggregate commitments under the Senior Credit Facility at such time and (B) the Borrowing Base (such lesser amount, the "***Maximum Borrowing Amount***") and (y) $12,000,000, in each case, for three (3) consecutive Business Days, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis until the date on which, as applicable, in the case of clause (a), such Event of Default is cured or waived, or in the case of clause (b), Excess Availability has been greater than the greater of (x) 20% of the Maximum Borrowing Amount and (y) $12,000,000, in each case, for at least thirty consecutive days.

"***Permitted Discretion***" means a determination made by the Administrative Agent in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment. The Administrative Agent will inform the Borrower of, and explain to the Borrower, the establishment or increase of any Reserves.

"***Reserves***" means, on any date of determination, reserves established by the Administrative Agent from time to time against the Borrowing Base or any component thereof, in each case, in such amounts as the Administrative Agent may elect to impose from time to time in its Permitted Discretion upon not less than one (1) Business Day's prior written notice to the Borrower. The Administrative Agent shall not establish any Reserves to the extent such Reserves would be duplicative of any (x) specific item excluded as ineligible in the calculation of the Borrowing Base or any component thereof or (y) any other Reserves.

"***Excess Availability***" shall mean, at any time, (a) the Maximum Borrowing Amount, *minus* (b) the aggregate outstanding principal amount of all loans and Letter of Credit obligations at such time under the Senior Credit Facility.

RESERVES:

The Administrative Agent shall have the right to establish, modify or eliminate Reserves or to establish or adjust any eligibility criteria in its Permitted Discretion.

EXIT CLOSING DATE:

The "***Exit Closing Date***" shall occur as promptly as is practical after the order of the Court confirming the Approved Plan becomes a final order, but no later than December 1, 2017.

| | |
|---|---|
| **MATURITY:** | The Senior Credit Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full five years after the Exit Closing Date. |
| **MANDATORY PREPAYMENTS:** | In the event that the aggregate outstanding amount of loans and Letter of Credit obligations at such time under the Senior Credit Facility exceeds the then Maximum Borrowing Amount, the Borrower will immediately prepay an amount sufficient to result in Excess Availability being greater than $0. |
| **OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:** | The Senior Credit Facility may be prepaid in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings. The unutilized portion of the commitments under the Senior Credit Facility may be irrevocably reduced or terminated by the Borrower at any time without penalty. |
| **SECURITY:** | The Senior Credit Facility and the obligations of the Loan Parties thereunder will be secured by a fully perfected security interest in all property and assets of the Loan Parties (subject to customary exclusions to be agreed) including, but not limited to, as follows: |
| | A valid and perfected first priority lien and security interest in all of the property and assets of the Loan Parties set forth on <u>Schedule I</u> hereto (the "***Revolving Credit Primary Collateral***"). |
| | A valid and perfected second priority security interest in all of the property and assets of the Loan Parties set forth on <u>Schedule II</u> hereto (the "***Revolving Credit Secondary Collateral***" and, together with the Revolving Credit Primary Collateral, the "***Collateral***"). |
| | "***Intellectual Property***" shall mean the Borrower's and each Guarantor's intellectual property licenses, patents, copyrights, trademarks, the goodwill associated with such trademarks, trade secrets and customer lists and all rights to sue at law or in equity for any past, present or future infringement, misappropriation, violation, misuses or other impairment thereof, including the right to receive injunctive relief and all proceeds and damages therefrom. |
| | The Collateral shall secure the relevant party's obligations in respect of the Senior Credit Facility and any treasury management, bank products, interest protection or other hedging arrangements entered into with a Lender (or an affiliate thereof). |
| **CASH MANAGEMENT:** | The Loan Parties and their subsidiaries shall establish cash management procedures reasonably acceptable to the Administrative Agent. Subject to exceptions to be mutually agreed, all deposit accounts and securities accounts of the Loan Parties shall be subject to control agreements in favor of the applicable Administrative Agent (such accounts subject to |

the control of such Administrative Agent, collectively, the "***Blocked Accounts***"). Upon the occurrence and during the continuation of a Cash Dominion Period (as defined below), the Administrative Agent shall have control over all relevant Blocked Accounts and cause all amounts maintained in deposit accounts (that are Blocked Accounts) to be swept, on a daily basis, to a collection account of the Administrative Agent, to be applied to the outstanding obligations under the Senior Credit Facility. The Borrower, the Guarantors and their subsidiaries will maintain their primary cash management, controlled disbursement and ACH relationship with Administrative Agent and its affiliates.

"***Cash Dominion Period***" shall mean (a) commencing on the Exit Closing Date and continuing through the end of the first full quarter after the Exit Closing Date, (b) thereafter, each period beginning on the date that Excess Availability shall have been less than 15% of the Maximum Borrowing Amount for five (5) consecutive Business Days and ending on the date Excess Availability shall have been at least 15% of the Maximum Borrowing Amount for thirty (30) consecutive calendar days or (c) an event of default has occurred and is continuing.

**DOCUMENTATION:**

The credit agreement ("***Credit Agreement***") will contain customary representations and warranties, funding and yield protection provisions, conditions precedent, affirmative, negative and financial reporting covenants, indemnities, events of default and remedies and other provisions appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent, the Lenders and their counsel.

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Senior Credit Facility will be subject to satisfaction of customary closing conditions for transactions of this type, including, without limitation, the following conditions precedent, in each case, on or prior to December 1, 2017:

(i)     The negotiation, execution and delivery of a credit agreement, perfection certificates, collateral documents and other documents to be executed or delivered in connection therewith (collectively, with the Credit Agreement, the "***Senior Credit Facility Documentation***") reasonably satisfactory to the Administrative Agent and the Lenders.

(ii)     The Administrative Agent shall have received evidence of the perfection and priority of liens and security interests referred to above under the section entitled "***Security***" (including all filings, recordations and searches necessary or desirable in connection with (such liens and security interests)).   The Administrative Agent shall be reasonably satisfied that the Borrower maintains adequate insurance with respect to the Collateral, and the Lenders shall have received endorsements naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its

subsidiaries forming part of the Lenders' collateral described under the section entitled "*Security*" set forth above.

(iii) The Administrative Agent shall have received (A) customary and reasonably satisfactory legal opinions (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the Senior Credit Facility Documentation), corporate certificates and other usual and customary closing documentation for transactions of this type and (B) satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first priority (subject to certain exceptions to be set forth in the Senior Credit Facility Documentation) lien and security interest in the other collateral referred to under the section entitled "*Security*" set forth above.

(iv) The Administrative Agent shall have received customary evidence of organizational authority to enter into the Credit Agreement and the other Senior Credit Facility Documentation and the other transactions to be consummated on the Exit Closing Date, in each case, reasonably acceptable to the Administrative Agent.

(v) The Administrative Agent shall have received good standing certificates, or the equivalent, in the respective jurisdictions of organization of the Loan Parties.

(vi) There shall have been (a) since the date hereof, other than those customarily resulting from the commencement of the Debtors' bankruptcy case (the "*Case*") for bankruptcy protection and changes contemplated in the Borrower's business plan delivered to the Administrative Agent prior to the date hereof, no material adverse change, individually or in the aggregate, in the business, operations, property, assets, or financial condition of the Loan Parties or the Collateral taken as a whole, (b) no litigation commenced which could reasonably be expected to have a material adverse effect on the Loan Parties or their business taken as a whole, or their collective ability to perform any material obligation or repay the loans, (c) since the date hereof, no material increase in the liabilities, liquidated or contingent, of the Loan Parties as a whole, or material decrease in the assets of the Loan Parties, except in connection with the Borrower's previously disclosed store-closing plan and as contemplated by the Budget applicable during the Case, and (d) other than those resulting from the commencement of the Cases, since the filing date no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Senior Credit Facility Documentation and the obligations of the Borrower or the other Loan Parties thereunder.

(vii) A final non-appealable order of the Court in form and substance satisfactory to the Agent confirming the Approved Plan which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interests of the Agent, the Arranger or the Lenders (the "*Confirmation Order*") and authorizing Borrower, the Guarantors and

their subsidiaries to execute, deliver and perform under all documents contemplated hereunder and thereunder (including the payment of all fees with respect thereto) shall have been entered and shall have become a final order of the Bankruptcy Court and shall be in full force and effect. The Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective as of the Approved Plan shall have been (or concurrently with the occurrence of the Exit Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law, Court and regulatory approvals and the Approved Plan shall have become effective. The respective indebtedness and obligations of the Borrower and the Guarantors (including, without limitation, tax liabilities) and any liens securing same that are outstanding immediately after the consummation of the Approved Plan shall not exceed the amount contemplated by the Approved Plan.

(viii)    Receipt by the Administrative Agent, the Lead Arranger and the Lenders at least two (2) Business Days prior to the date of the initial Borrowing of all documentation and other information about the Borrower and the Guarantors as has been reasonably requested that they reasonably determine is required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(ix)    Excess Availability under the Senior Credit Facility as of the Exit Closing Date shall not be less than 30% of the Maximum Borrowing Amount, after giving effect to the Exit Transaction and all extensions of credit under the Senior Credit Facility on such date.

(x)    Receipt of all governmental, shareholder and third party consents and approvals necessary in connection with the Senior Credit Facility, the Exit Transaction and the related financings and other transactions contemplated hereby and by the Approved Plan and expiration of all applicable waiting periods without any action being taken by any authority that could restrain, prevent or impose any material adverse conditions on the Borrower and its subsidiaries or such other transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable which in the reasonable judgment of the Administrative Agent could have such effect.

(xi)    The Borrower's pre-petition term loan indebtedness shall have been restructured into a term loan in a principal amount of not more than $113,500,000, which shall be on terms and conditions satisfactory to the Administrative Agent (the "*Reorganized First Lien Term Loans*")

(xii)    The Exit Transaction shall have been consummated on terms consistent with those outlined in the Approved Plan and otherwise on terms and conditions, and pursuant to documentation in form and substance, reasonably satisfactory to the Administrative Agent and shall be in full force and effect. The Administrative Agent shall have received copies of each of the material documents (reasoanbly satisfactory to the

Administrative Agent) executed and or delivered in connection with the Exit Transaction, each of which shall be certified by a responsible officer of the Borrower as being true, complete, correct and in full force and effect.

(xiii)    The Administrative Agent shall have received a fully executed and effective Intercreditor Agreement with the holders of the Reorganized First Lien Term Loans (or an agent for such holders), in form, substance, and on terms, reasonably acceptable to the Administrative Agent (the "*Intercreditor Agreement*").

(xiv)    [Reserved].

(xv)    The Lenders shall have received pro forma consolidated financial statements as to the Company and its subsidiaries giving effect to all elements of the Exit Transaction, and forecasts prepared by management of the Company, each in form and substance reasonably satisfactory to the Administrative Agent, of balance sheets, income statements and cash flow statements on a monthly basis for the first year following the Exit Closing Date and on an annual basis for each year thereafter during the term of the Senior Credit Facility. The Administrative Agent shall have received and be satisfied with the business plan and shall be satisfied with the capital structure of the Borrower and the Guarantors.

(xvi)    The Lenders shall have received certification as to the financial condition and solvency of the Borrower and each Guarantor (after giving effect to the Exit Transaction and the incurrence of indebtedness related thereto) from the chief financial officer of the appropriate entities.

(xvii)    The Administrative Agent shall have received, in form and substance reasonably satisfactory to it, an updated asset appraisal, an updated field audit, flood certificates and flood insurance deliverables and such other reports, audits or certifications as it may reasonably request.

(xviii)    Receipt by the Administrative Agent, for the benefit of the Lenders and the Administrative Agent, of all reasonable and documented fees and expenses Lenders (including the reasonable and documented fees and expenses of one primary counsel (and any special or local counsel) for the Administrative Agent) due and payable in connection with the transactions contemplated hereby.

(xix)    All obligations under, or described in, the DIP Credit Agreement shall have been repaid in full in cash (or such other arrangements as are satisfactory to Citizens in its sole discretion).

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**    Each extension of credit under the Senior Credit Facility will be subject to satisfaction of the following conditions precedent:    (i) all of the

representations and warranties in the Senior Credit Facility Documentation shall be true and correct in all material respects as of the date of such extension of credit (except for representations and warranties that expressly relate to an earlier date); (ii) no default or event of default under the Senior Credit Facility shall have occurred and be continuing or would result from such extension of credit; (iii) the Administrative Agent shall have received a notice of borrowing from the Borrower; (iv) the aggregate principal amount of all loans outstanding and, if applicable, Letters of Credit outstanding on such date, after giving effect to the applicable borrowing or issuance or renewal of a Letter of Credit, shall not exceed the Maximum Borrowing Amount; and (v) the Borrower shall have paid the balance of all fees and expenses then due and payable as referenced herein. The request by the Borrower of, and the acceptance by the Borrower of, each extension of credit shall be deemed to be a representation and warranty by the Borrower that the foregoing conditions have been satisfied.

**REPRESENTATIONS AND WARRANTIES:**

Representations and warranties appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation and subject to customary qualifiers and exceptions, the following: (i) legal existence; qualification and power; (ii) due authorization and no contravention of law, contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect; (vi) no material litigation; (vii) no default; (viii) ownership of property; including disclosure of liens, properties, leases and investments; (ix) insurance matters; (x) environmental matters; (xi) tax matters; (xii) ERISA compliance; (xiii) identification of subsidiaries, equity interests and loan parties; (xiv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xv) status under Investment Company Act; (xvi) accuracy of disclosure; (xvii) compliance with laws; (xviii) intellectual property; (xix) solvency; (xx) no casualty; (xxi) labor matters; (xxii) collateral documents; (xxiii) none of Holdings, the Borrower or any Guarantor (collectively, the "***Loan Parties***") is an EEA Financial Institution.

**AFFIRMATIVE AND NEGATIVE COVENANTS:**

Affirmative, negative and financial covenants appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, the following (in each case, subject to baskets, qualifications, exceptions and thresholds to be agreed):

(a) <u>Affirmative Covenants</u> - (i) delivery of financial statements, budgets and forecasts; (ii) delivery of certificates and other information; (iii) delivery of notices (of any default, material adverse condition, ERISA event, material change in accounting or financial reporting

practices, disposition of property, sale of equity, incurrence of debt); (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) maintenance of insurance; (viii) compliance with laws; (ix) maintenance of books and records; (x) inspection rights; (xi) use of proceeds; (xii) covenant to guarantee obligations, give security; (xiii) compliance with environmental laws; (xiv) preparation of environmental reports; (xv) further assurances; (xvi) compliance with terms of leaseholds; (xvii) compliance with material contracts; and (xviii) designation as senior debt.

(b) <u>Negative Covenants</u> - Restrictions on (i) liens; (ii) indebtedness, (including (x) guarantees and other contingent obligations and (y) an amount [TBD] of junior secured indebtedness on terms and conditions acceptable to the Citizens (it being understood that such Indebtedness may be secured by junior Liens on Revolver Primary Collateral and/or senior Liens on Revolver Secondary Collateral on terms acceptable to Citizens and such Indebtedness and the liens on collateral securing such Indebtedness shall be subject to an intercreditor agreement acceptable to Citizens)); (iii) investments (including loans and advances); (iv) mergers and other fundamental changes; (v) sales and other dispositions of property or assets; (vi) payments of dividends and other distributions; (vii) changes in the nature of business; (viii) transactions with affiliates; (ix) burdensome agreements; (x) use of proceeds; (xi) capital expenditures; (xii) amendments of organizational documents; (xiii) changes in accounting policies or reporting practices; (xiv) prepayments and voluntarily redemption of other indebtedness; (xv) modification or termination of documents related to certain indebtedness; and (xvi) changes in activities of Holdings, in each case, with such exceptions as may be agreed and are reasonably acceptable to the Administrative Agent. The Borrower or any subsidiary shall be permitted to (w) make dividends, restricted payments and other distributions, (x) prepay and voluntarily redeem other indebtedness, (y) investments and (z) incur unsecured or subordinated debt, in each case, subject to the satisfaction of the Payment Conditions.

"*Payment Conditions*" shall mean, with respect to any applicable transaction, event, or payment, (a) no event of default shall exist before or immediately after giving effect to such transaction, event, or payment, and (b) the Borrower shall have demonstrated to the reasonable satisfaction of the Agent either (x) Excess Availability (on a pro forma basis after giving effect to such transaction, event or payment) will be greater than 25% of the Maximum Borrowing Amount immediately following such specified transaction, event, or payment and as projected on a pro-forma basis as of the end of each fiscal month for each of the twelve (12) fiscal months following such specified transaction, event, or payment or (y) both (i) Excess Availability (on a pro forma basis after giving effect to such transaction, event or payment) will be greater than 20% of the Maximum Borrowing Amount immediately following such

specified transaction, event, or payment and as projected on a pro-forma basis as of the end of each fiscal month for each of the twelve (12) fiscal months following such specified transaction, event, or payment, and (ii) the Fixed Charge Coverage Ratio for the period of for the trailing twelve month period most recently ended shall be greater than 1.10 to 1.00 (calculated both before giving effect to such transaction, event or payment and on a pro forma basis after giving effect to such transaction, event or payment). The Borrower shall certify in a certificate addressed to the Administrative Agent that the Payment Conditions are satisfied.

**FINANCIAL COVENANT:** Maintain, at all times, Excess Availability in an amount not less than the greater of (a) $5,000,000 and (b) ten percent (10%) of the Maximum Borrowing Amount.

**FIELD EXAMS AND APPRAISALS:** The Administrative Agent may conduct (a) two (2) field examinations and two (2) inventory appraisals (each at the expense of the Borrower) during the first twelve (12) month period after the Exit Closing Date; provided that (i) at any time after the date on which Excess Availability is less than 20% of the Maximum Borrowing Amount, field examinations and inventory appraisals may each be conducted (at the expense of the Borrower) three (3) times during the next twelve months, (b) one (1) field examination and one (1) inventory appraisal (each at the expense of the Borrower) during any twelve (12) consecutive month period after the first twelve (12) month period after the Exit Closing Date; provided that (i) at any time after the date on which Excess Availability is less than 20% of the Maximum Borrowing Amount, field examinations and inventory appraisals may each be conducted (at the expense of the Borrower) two (2) times during the next twelve months, and (ii) at any time during the continuation of an Event of Default, field examinations and inventory appraisals may be conducted (at the expense of the Borrower) as frequently as determined by the Administrative Agent in its reasonable discretion and (c) one (1) additional field examination and one (1) additional inventory appraisal during any twelve (12) consecutive month period at the expense of the Lenders.

**EVENTS OF DEFAULT:** Events of default appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, the following (subject, in certain cases, to grace periods and thresholds to be agreed): (i) nonpayment of principal, interest, fees or other amounts; (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (viii) customary ERISA defaults; (ix) actual or asserted invalidity or impairment of any loan documentation; (x) change of control; and (xi)

actual or asserted invalidity or impairment of any subordination provisions.

**ASSIGNMENTS AND PARTICIPATIONS:**

Assignments and participations appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, provided that the Loan Parties will not be permitted to list disqualified lenders except to the extent that a list of disqualified lenders (acceptable to Citizens) is provided to Citizens prior to the execution of the Commitment Letter.

*Consents*: The consent of the Borrower, not to be unreasonably withheld, will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the Senior Credit Facility). The consent of the Administrative Agent will be required for any assignment in respect of the Senior Credit Facility, to an entity that is not a Lender, an affiliate of such Lender or an Approved Fund in respect of such Lender. The consent of the Fronting Bank will be required for any assignment under the Senior Credit Facility.

*Assignments Generally*: An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion.

*Participations*: Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the Senior Credit Facility or all or substantially all of the value of the guaranty of the Borrower's obligations made by the Guarantors.

**WAIVERS AND AMENDMENTS:**

Waiver and amendments provisions appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders.

**INDEMNIFICATION:**

The Borrower will indemnify and hold harmless the Administrative Agent, the Lead Arranger, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Senior Credit Facility, any other aspect of the Exit Transaction, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable and documented out-of-pocket attorneys' fees (including the allocated cost of internal counsel) and settlement costs. This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**

State of New York.

**PRICING/FEES/EXPENSES:**

As set forth in Addendum I.

**COUNSEL TO THE ADMINISTRATIVE AGENT:** Morgan, Lewis & Bockius LLP.

**OTHER:** Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. The Loan Parties shall agree not to bring any suit or action in respect of or related to the Senior Credit Facility or any Senior Credit Facility Documentation therefor in any forum, other than in courts of the state of New York sitting in New York county and of the United States District Court of the Southern District of New York. The Senior Credit Facility Documentation will contain customary increased cost, withholding tax, capital adequacy and yield protection provisions and EU bail-in and defaulting lender language.

## PRICING, FEES AND EXPENSES

**INTEREST RATES:** The interest rates per annum applicable to the Senior Credit Facility will be LIBOR plus the Applicable Rate (as hereinafter defined) or, at the option of the Borrower, the Base Rate (to be defined as the highest of (a) the Federal Funds Rate plus ½ of 1%, (b) the Citizens prime rate and (c) LIBOR plus 1.00%) plus the Applicable Rate. "Applicable Rate" means a percentage per annum to be determined in accordance with the pricing grid set forth below. Notwithstanding anything to the contrary contained herein, to the extent that, at any time, LIBOR shall be less than zero, LIBOR shall be deemed to be zero for purposes of the Senior Credit Facility. The Applicable Rate for the period from the Exit Closing Date through the second full fiscal quarter of the Borrower after the Exit Closing Date shall be as set forth in Level III below.

The Borrower may select interest periods of one, two, three or six months for LIBOR loans, subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

During the continuance of any default under the Senior Credit Facility Documentation (as hereinafter defined), the Applicable Rate on obligations under the Senior Credit Facility Documentation shall increase by 2% per annum.

**COMMITMENT FEE:** Commencing on the Exit Closing Date, a commitment fee of (a) if utilization of the Senior Credit Facility is greater than or equal to 50%, 0.250% per annum and (b) if utilization of the Senior Credit Facility is less than 50%, 0.375% per annum, shall be payable on the actual daily unused portions of the Senior Credit Facility. Such fee shall be payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Exit Closing Date and the actual amount of such fee shall depend on Excess Availability thresholds to be mutually agreed upon.

**LETTER OF CREDIT FEES:** Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to the Applicable Rate from time to time applicable to Revolving Credit LIBOR loans. Such fees will be (a) payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Exit Closing Date, and (b) shared proportionately by the Lenders under the Senior Credit Facility. In addition, a fronting fee shall be payable to the Fronting Bank for its own account, in an amount to be mutually agreed.

| Level | Excess Availability | Applicable Rate for LIBOR Loans / Letter of Credit Fees | Applicable Rate for Base Rate Loans |
|-------|---------------------|--------------------------------------------------------|-------------------------------------|
| I | Greater than 66% | 1.50% | 0.50% |
| II | Less than or equal to 66%, but greater than 33% | 1.75% | 0.75% |
| III | Less than or equal to 33% | 2.00% | 1.00% |

**CALCULATION OF INTEREST AND FEES:**

Other than calculations in respect of interest at the Citizens prime rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD PROTECTION:**

Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**EXPENSES:**

The Borrower will pay all reasonable and documented out-of-pocket costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all Senior Credit Facility Documentation, including, without limitation, the reasonable and documented legal fees of one primary counsel to the Administrative Agent and the Lead Arranger (and any special or local counsel), regardless of whether or not the Senior Credit Facility is closed. The Borrower will also pay the reasonable and documented out-of-pocket expenses of the Administrative Agent and each Lender in connection with the work-out or enforcement of any of the Senior Credit Facility Documentation.

"Revolving Credit Primary Collateral" shall mean all interests of each Loan Party in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (1) all rights of each Loan Party to receive moneys due and to become due under or pursuant to the following, (2) all rights of each Loan Party to receive return of any premiums for or proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation proceeds with respect to the following, (3) all claims of each Loan Party for damages arising out of or for breach of or default under any of the following, and (4) all rights of each Loan Party to terminate, amend, supplement, modify or waive performance under any of the following to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

(i)     all Accounts and payment intangibles constituting credit card receivables, but for purposes of this clause (i) excluding rights to payment for any property which specifically constitutes Revolving Credit Secondary Collateral which has been or is to be sold, leased, licensed, assigned or otherwise disposed of; provided, however, that all rights to payment arising from any sale of Inventory shall constitute Revolving Credit Primary Collateral;

(ii)     all Chattel Paper;

(iii)     all Deposit Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained with any bank or other financial institution and all monies, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing (in each case, other than a deposit account holding only identifiable proceeds of any Revolving Credit Secondary Collateral);

(iv)     all Inventory;

(v)     all other cash and cash equivalents (other than identifiable proceeds of any Revolving Credit Secondary Collateral);

(vi)     to the extent evidencing or governing any of the items referred to in the preceding clauses (i) through (v), all General Intangibles, letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents; provided that to the extent of any of the foregoing also relates to Revolving Credit Secondary Collateral, only that portion related to the items referred to in the preceding clauses (i) through (v) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(vii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (vi), all insurance; provided that to the extent any of the foregoing also relates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding clauses (i) through (vi) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(viii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (vii), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding clauses (i) through (vii) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(ix)     to the extent relating to any of the items referred to in the preceding <u>clauses (i)</u> through (<u>viii</u>), all Commercial Tort Claims; <u>provided</u> that to the extent of any of the foregoing also rlates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding <u>clauses (i)</u> through (<u>viii</u>) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(x)     all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; and

(xi)     all cash proceeds and all non-cash proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (including all insurance proceeds) and all collateral security, guarantees and other Collateral Support given by any Person with respect to any of the foregoing.

"Revolving Credit Secondary Collateral" shall mean all interests of each Loan Party in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (1) all rights of each Loan Party to receive moneys due and to become due under or pursuant to the following, (2) all rights of each Loan Party to receive return of any premiums for or Proceeds of any Insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (3) all claims of each Loan Party for damages arising out of or for breach of or default under any of the following, and (4) all rights of each Loan Party to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

(i)     any deposit account holding only identifiable Proceeds of any Revolving Credit Secondary Collateral, and all cash, money, securities and other investments deposited therein;

(ii)     all Equipment;

(iii)     all Fixtures;

(iv)     all General Intangibles, including Contracts, together with all Contract Rights arising thereunder (in each case, other than General Intangibles constituting, evidencing, governing or otherwise relating to Revolving Credit Primary Collateral);

(v)     all letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights (to the extent perfected by the filing of a UCC financing statement as a Supporting Obligation), Instruments and Documents (except to the extent constituting, evidencing or governing or attached or related to (to the extent so attached or related to) Revolving Credit Primary Collateral);

(vi)     without duplication, all Investment related property, all Securities, all Securities Entitlements and all Securities Accounts (in each case, other than any Collateral constituting Revolving Credit Primary Collateral and other than any Supporting Obligations supporting Revolving Credit Primary Collateral);

(vii)     all Intellectual Property;

(viii)     except to the extent constituting, or relating to, Revolving Credit Primary Collateral, all Commercial Tort Claims;

(ix)     all real property (including, if any, leasehold interests) on which the Loan Parties are required to provide a lien to the lenders under the Reorganized First Lien Term Loans and any title insurance with respect to such real property (other than title insurance actually obtained by the Administrative Agent in respect of such real property) and the proceeds thereof; ·

(x)     except to the extent constituting, governing, evidencing or relating to, the Revolving Credit Primary Collateral, all other personal property (whether tangible or intangible) of such Loan Party;

(xi) to the extent constituting, or relating to, any of the items referred to in the preceding clauses (i) through (x), all insurance; provided that to the extent any of the foregoing also relates to

Revolving Credit Primary Collateral, only that portion related to the items referred to in the preceding clauses (i) through (x) as being included in the Revolving Credit Secondary Collateral shall be included in the Revolving Credit Secondary Collateral;

(xii)    to the extent relating to any of the items referred to in the preceding clauses (i) through (xi), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Revolving Credit Primary Collateral only that portion related to the items referred to in the preceding clauses (i) through (xi) as being included in the Revolving Facility Secondary Collateral shall be included in the Revolving Credit Secondary Collateral;

(xiii)    all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; provided that to the extent any of such material also relates to Revolving Credit Primary Collateral only that portion related to the items referred to in the preceding clauses (i) through (xii) as being included in the Revolving Credit Secondary Collateral shall be included in the Revolving Credit Secondary Collateral; and

(xiv)    all cash proceeds and, solely to the extent not constituting Revolving Credit Primary Collateral, non-cash proceeds, products, accessions, rents and profits of or in respect of any of the foregoing and all collateral security, guarantees and other Collateral Support given by any Person with respect to any of the foregoing.

## EXHIBIT F

### JOINDER

The undersigned ("*Transferee*") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of July 4, 2017 (the "*Agreement*"), by and among TRLG Intermediate Holdings, LLC, True Religion Apparel, Inc., on behalf of itself and certain of its wholly-owned direct and indirect subsidiaries (collectively, the "*Company*"), the Sponsor and the holders of First Lien Claims and Second Lien Claims against the Company, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Joining Party" and "Holder Party" under the terms of the Agreement. The Transferee hereby makes the representations, warranties and agreements of the Holder Parties set forth in Sections 2 and 3 of the Agreement to the other Parties thereto. This Joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. Capitalized terms not otherwise defined in this Joinder shall have the meanings assigned to such terms in the Agreement.

Date Executed: _____

**TRANSFEREE**

Name of Institution: _____

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

**First Lien Claims**

$ _____

**Second Lien Claims**

$ _____

**ABL Claims**

$ _____

NOTICE ADDRESS:

[_____]
[_____]
[_____]
Attention: [_____]
Facsimile: [_____]
E-mail: [_____]

**EXHIBIT C**

**ORGANIZATIONAL CHART OF THE DEBTORS**



**EXHIBIT D**

**LIQUIDATION ANALYSIS**

**True Religion Apparel, Inc., and Affiliated Debtors**
**Liquidation and Recovery Analysis**

General Assumptions

The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of September 30, 2017 (the "Conversion Date") and the net costs to execute the administration of the wind-down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a Chapter 7 liquidation on or about the Conversion Date under the supervision of a court-appointed Chapter 7 trustee. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining assets; a quick sale of their non-Debtor subsidiaries; and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date.

Summary Notes to Liquidation Analysis

1. Dependence on assumptions. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. Dependence on a forecasted balance sheet. This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3. Chapter 7 liquidation process. The liquidation of the Debtors' U.S. assets is assumed to be completed over a period of 6 months. During the first three months, the Debtors would complete going-out-of-business sales for all remaining U.S. store inventory, furniture, fixtures, and equipment, along with the sale of all intellectual property. During months 4–6, the Debtors would primarily focus on collecting other assets. The Debtors have assumed that the disruption to their operations occasioned by the conversion of the cases to Chapter 7, and in particular the Chapter 7 trustee's inability to provide design and procurement services to international licensees, will result in the termination of most of their international license agreements.

4. Claims Estimates. In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each indicated type of Claim based upon a review of the Debtors' estimated balance sheet. DIP Claims were estimated as of the Conversion Date. Additional Claims were estimated to include certain Chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

**True Religion Apparel, Inc., and Affiliated Debtors**
**Liquidation Analysis**

*($ in millions)*

<u>Projected Assets and Liquidation Proceeds</u>

| | Notes | 9/30/2017 Pro Forma Balance | % Realization | | Value Realization | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **DIP Collateral** | (1) | | | | | |
| Cash & Cash Equivalents | (2) | $5.8 | 100% | 100% | $5.8 | $5.8 |
| Accounts Receivable, Net | (3) | 13.2 | 75% | 85% | 9.9 | 11.2 |
| Inventory | (4) | 51.2 | 90% | 100% | 46.1 | 51.2 |
| Prepaid Expenses and Other Current Assets | (5) | 11.2 | 6% | 12% | 0.7 | 1.3 |
| 35% Equity in Foreign Subsidiaries | (6) | NA | NA | NA | 0.0 | 0.0 |
| Proceeds from Litigation | (7) | NA | NA | NA | 0.0 | 0.0 |
| Leaseholds | (8) | NA | NA | NA | 1.0 | 2.0 |
| **Subtotal Gross Recovery on DIP Collateral** | | **$81.3** | **78%** | **88%** | **$63.4** | **$71.5** |
| | | | | | | |
| **Prepetition First Lien Collateral** | (1) | | | | | |
| Property and Equipment, Net | (9) | 28.7 | 5% | 10% | 1.4 | 2.9 |
| Intangible Assets | (10) (11) | 48.0 | 64% | 90% | 30.6 | 43.3 |
| Other Assets | (12) | 2.0 | 0% | 0% | 0.0 | 0.0 |
| **Subtotal Gross Recovery on Prepetition First Lien Collateral** | | **$78.7** | **41%** | **59%** | **$32.0** | **$46.1** |
| | | | | | | |
| **Total Gross Asset Recovery** | | | | | **$95.4** | **$117.6** |
| | | | | | | |
| **Wind Down and Post-Conversion Admin Expenses** | | | | | | |
| Wind-Down | (13) | | | | ($7.0) | ($5.0) |
| Sales Taxes Payable | (14) | | | | (1.6) | (1.6) |
| Professional Fees | | | | | (3.0) | (3.0) |
| Trustee Fees | (15) | | | | (2.9) | (3.5) |
| Total | | | | | (14.5) | (13.1) |

<u>Estimated Recoveries</u>

| | Notes | 9/30/2017 Pro Forma Balance | % Realization | | Value Realization | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **Proceeds Available for DIP Facility Claims** | | | | | | |
| Gross Recovery on DIP Collateral | | | | | $63.4 | $71.5 |
| Pro Rata Share of Wind Down and Post-Conversion Admin Expenses | | | | | (9.6) | (8.0) |
| **Net Proceeds to DIP Claims** | | | | | **$53.8** | **$63.5** |
| DIP Carve Out for Professional Fees | (16) | | | | (2.7) | (2.7) |
| DIP Facility Claims Recovery | | 25.0 | 100% | 100% | 25.0 | 25.0 |
| | | | | | | |
| **Proceeds Available for Prepetition First Lien Claims** | | | | | | |
| Excess DIP Proceeds Available for Prepetition First Lien Claims | | | | | $25.1 | $33.8 |
| Gross Recovery on Prepetition First Lien Collateral | | | | | 32.0 | 46.1 |
| Pro Rata Share of Wind Down and Post-Conversion Admin Expenses | | | | | (4.7) | (4.9) |
| **Net Proceeds to Prepetition First Lien Claims** | | | | | **$52.4** | **$75.0** |
| Prepetition First Lien Claims Recovery | (17) | 392.0 | 13% | 19% | 52.4 | 75.0 |
| | | | | | | |
| **Proceeds Available for Admin & Priority Claims** | | | | | | |
| Excess Proceeds Available for Admin & Priority Claims | | | | | - | - |
| Net Proceeds from Assets Unencumbered under Prepetition First Lien Term Loan | (18) | | | | 1.0 | 2.0 |
| Pro Rata Share of Wind Down and Post-Conversion Admin Expenses | | | | | (0.2) | (0.2) |
| **Net Proceeds to Admin & Priority Claims** | | | | | **$0.8** | **$1.8** |
| Post-Petition Accounts Payable and Other Admin Claims Recovery | (19) | 10.9 | 8% | 16% | 0.8 | 1.8 |
| Priority Claims Recovery | (20) | 1.7 | NA | NA | - | - |
| | | | | | | |
| **Proceeds Available for Unsecured Claims** | | | | | | |
| Excess Proceeds Available for Unsecured Claims | | | | | - | - |
| Deficiency and Other Unsecured Claims Recovery | (21) | 466.0 | NA | NA | - | - |
| | | | | | | |
| **Total Recovery** | | | | | **$78.2** | **$101.8** |

(1) The allocation of collateral to the DIP Facility Claims and Prepetition First Lien Claims is made solely for the purpose of presenting this Liquidation Analysis and is without prejudice to the rights of the Debtors, any creditors or any party-in-interest. No attempt was made to estimate or include in the collateral any portion of assets that may otherwise be unencumbered based on a failure of adequate protection and diminution in the value of the collateral supporting the DIP Facility Claims or Prepetition First Lien Claims.

(2) This analysis assumes 100% recovery of cash and cash equivalents.

(3) Projected Accounts Receivable balance consists of wholesale receivables, and the analysis assumes recoveries of 75-85%. Under the Prepetition Revolver the U.S. receivables received an 85% advance rate.

(4) Projected Inventory balance includes finished goods, raw materials and work in progress. Inventory primarily consists of finished goods, and the analysis assumes inventory is sold through the company's existing stores. The assumed recoveries of 90-100% is supported by the company's recent inventory appraisal.

(5) Prepaid Expenses and Other Current Assets include credit card receivables, prepaid rent and deposits. The management team believes that the estimated recovery on these assets is very low.

(6) This analysis assumes no recovery value from equity in foreign subsidiaries. The International segment generates negative EBITDA.

(7) Due to the speculative nature of the value of litigation, the Debtors have not ascribed any value thereto for purposes of calculating projected recoveries.

(8) The Liquidation Analysis ascribes value to leaseholds as reflected in the Analysis. This value is predicated on an analysis prepared by a real estate consultant engaged by the Company comparing the Company's lease rents to current market rents for comparable properties. However, the Company believes that it is likely that no value would be realized on account of its leaseholds in the event of a liquidation considering: (i) the substantial costs which would need to be borne in maintaining, marketing and selling the Company's leases and (ii) the significant impediments which would be faced in realizing any value for leases in light of the time limitations prescribed by the Bankruptcy Code, difficulty in marketing the leases and potential opposition to any such sale by the relevant landlord(s).

(9) Property and Equipment includes computer equipment, furniture and fixtures, leasehold improvements, machinery and equipment, trade show booths and construction in progress. Due to the makeup consisting largely of retail fixtures and leasehold improvements, these assets are unlikely to generate a high return.

(10) This range is based on the Company's consideration of a recent independent appraisal of the domestic trademarks and an internal analysis of the international trademarks. Additionally, the Company considered the likely disruption to the retail business, e-commerce business and licensees' operations and relationships resulting from the commencement of the liquidation and the implications of those disruptions as to the value of the domestic and international trademarks under a forced liquidation scenario.

(11) Other Intangible Assets include license agreements, internal use software, customer and distributor relationships.

(12) Other Assets consist of utility deposits, security deposits and equipment deposits. The analysis assumes no recovery value from them.

(13) Wind-down costs consist of estimated funding needs for utilities, salaries, security personnel, occupancy, overhead and other limited operating expenses. It is assumed that a trustee would retain the necessary staff of the company to lead an aggressive collection effort to maximize asset recoveries for the estate.

(14) Sales tax accrued throughout the month is remitted during the following month. Under a liquidation scenario, 100% of the sales tax that has been collected but has not yet been remitted at the time of liquidation would be paid.

(15) The total fees for professionals are estimated at $3 million and for a trustee to be approximately 3% of the total proceeds available for distribution.

(16) The estimate of the DIP carve out for professional fees includes two months of projected accrued professional fees, a 20% holdback for prior fees, and the post-termination carve out of $500,000.

(17) The range of recovery amounts shown apply to the secured portion of these claims.

(18) Assets assumed to be unencumbered under Prepetition First Lien Term Loan include leaseholds (and, theoretically, unknown litigation proceeds estimated at zero, and the 35% of equity in foreign subsidiaries estimated to have no value).

(19) This amount consists of estimated accounts payable arising post-petition as of the conversion date and other admin claims. Other admin claims may be higher to the extent there are prepetition 503(b)(9) claims that are unpaid.

(20) Priority claims include vacation accrual as of the prepetition date.

(21) This figure represents estimated amounts, that may vary materially from actual amounts that would be owing as of the Conversion Date, for: (a) the remaining amount of the $392 million Prepetition First Lien Claims (this amount is determined by subtracting the midpoint of the estimated secured recoveries, $64 million, from the total Prepetition First Lien Claim); (b) the Prepetition Second Lien Claims; (c) the General Unsecured Claims; (d) Continuing Operations Claims; and (e) estimated rejection damage claims for additional real property leases that would have been assumed under the Plan. No estimate was made or included in this amount for, inter alia, (i) any possibly remaining Claims subject to section 503(b)(9) of the Bankruptcy Code, (ii) possible deficiencies Claims with respect to Miscellaneous Secured Claims, or (iii) additional rejection damage Claims resulting from the rejection of executory contracts or personal property leases. As such, in the event of a Chapter 7 liquidation, the aggregate amount of unsecured claims will likely increase significantly.

# EXHIBIT E

# FINANCIAL PROJECTIONS

**True Religion Apparel, Inc., and Affiliated Debtors**
**FINANCIAL PROJECTIONS**
**FISCAL YEARS 2017-2020**

The Company developed a set of financial projections for the purposes set forth below. The Financial Projections reflect the Company's estimate for results of operations after confirmation of the Debtors' Joint Plan of Reorganization of Pursuant to Chapter 11 of the Bankruptcy Code (the "**Plan**"), based upon the Company's assumptions and judgments as to future market and business conditions and expected future operating performance, all of which are subject to change. Actual operating results and values may vary.

## FINANCIAL PROJECTIONS

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Company. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Company's management has, through the development of the Financial Projections, analyzed its ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business subsequent to its emergence from these Chapter 11 Cases. The Financial Projections were prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

For the purpose of demonstrating Plan feasibility, the Company prepared the Financial Projections. The Financial Projections present, to the best of the Company's knowledge, potential operating results from 2017 through 2020 and reflect the Company's assumptions and judgments as of the time prepared.

These Financial Projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Company's independent accountants have neither examined nor compiled the accompanying projections and accordingly do not express an opinion or any other form of assurance with respect to the Financial Projections, assume no responsibility for the Financial Projections and disclaim any association with the Financial Projections.

The Company does not publish projections of its anticipated financial position or results of operations. Unless otherwise required by securities law, the Company will not furnish updated projections or make updated information concerning the Financial Projections publicly available.

The Company believes that the Financial Projections represent the most probable range of operating and financial results and that the estimates and assumptions underlying the projections are reasonable. The estimates and assumptions may not be realized, however, and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the Company's control. No representations can be or are made as to whether the actual results will be within the range set forth in the Financial Projections. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated, and therefore may affect financial results in a material and possibly adverse manner. See Article VI of the Disclosure Statement for a discussion of various factors that could affect the Company's financial condition, results of operations, business, prospects and securities.

*Scope of Financial Projections*

The Financial Projections are based on the assumption that the Effective Date will occur on or about September 30, 2017. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. It is also assumed that the reorganized Company will conduct operations substantially similar to its current business.

The Financial Projections do not fully reflect the application of fresh start accounting. Any formal fresh start reporting adjustments that may be required in accordance with Statement of Position 90-7 Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Company's reorganization value to the Company's assets in accordance with the procedures specified in Accounting Standards Codification 805, will be made after the Company emerges from bankruptcy. The Financial Projections include projected profit and loss of the reorganized Company.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to: the ability of the reorganized Company to operate its business consistent with its projections generally, including the ability to maintain or increase revenue and cash flow to satisfy its liquidity needs, service its indebtedness and finance the ongoing obligations of its business, and to manage its future operating expenses and make necessary capital expenditures; the ability of the reorganized Company to comply with the covenants and conditions under its credit facilities; the loss or material downtime of major suppliers; increases in production and payroll expenses; the reorganized Company's ability to attract and maintain key executives, managers and employees; and changes in general domestic and international political conditions.

## KEY ASSUMPTIONS TO FINANCIAL PROJECTIONS

*Methodology*

The Company's current business plan incorporates assumptions related to certain economic and business conditions for the projected period 2017-2020. These assumptions are based upon historic seasonality, management observations about existing trends, and management's industry experience.

The financial statements included herein reflect the projected core operating performance of the reorganized Company. The Financial Projections were developed on a bottoms-up basis through 2018 and at the business unit level through 2020. The Financial Projections incorporate multiple sources of information including general business and market conditions as well as industry and competitive trends.

*Net Sales*

The Company sells its products through the following channels:
- Direct to Consumer (North America Retail): The Company sells directly to consumers through 129 retail stores in the United States and Canada (76 full-price retail stores, 51 outlet stores, and 2 Last Stitch retail stores). The Direct to Consumer segment also includes online sales through the Company's proprietary websites. North America Retail accounted for 73.9% of total net sales in 2016.
- Americas Wholesale: The Company's products are sold at approximately 600 leading premium department stores, specialty retailers and boutiques, and off-price retailers, across the United

States, Canada, Mexico, Latin America and South America. Americas Wholesale accounted for 14.6% of total net sales in 2016.

- International: The International division consists of international retail and wholesale operations. Sales are made through a variety of distribution channels, including Company-owned stores and distributor-owned stores. In 2010, the Company formed a joint venture with UNIFA Premium GmbH, which is set to expire in January 2018 and that management plans to convert to a distribution and licensing agreement with UNIFA Premium GmbH. The Company sells directly to wholesale accounts or has wholesale distribution agreements in various other countries and continents, including in Africa, Australia, Europe, the Middle East, and Asia. The International business accounted for 11.1% of total net sales in 2016.

- Core Services (Licensing): The Core Services unit records all of the Company's corporate operations, including design, production, marketing, credit, customer services, information technology, accounting, executive, legal and human services departments. In addition, the Company selectively licenses to third parties the right to use its various trademarks in connection with the manufacture and sale of designated products, which generated $1.7 million in royalty revenue in 2016.

### *Gross Margin*

Projected gross margin is based on current inventory cost and historical experience, adjusted for sourcing-related gains, channel mix, modified promotional strategies, tighter inventory control and general operational improvement expected in future periods.

### *Selling, General and Administrative Expenses*

Selling, General and Administrative Expenses for the Company consists of store-related ("Direct SG&A") and other expenses ("Indirect SG&A"). Both categories of expenses include payroll, rent, marketing, professional fees and other expenses. The Financial Projections for SG&A are estimated based on historical spend, adjustments for known cost increases or decreases and management's view of improved operations going forward.

### *Adjusted EBITDA*

For purposes of the projections, Adjusted EBITDA is defined as earnings before interest expense, income tax provision, depreciation and amortization, non-recurring and restructuring related expenses (i.e., store shut-down costs, extraordinary severance, bankruptcy-related professional fees) and certain non-cash charges such as stock-based compensation and lease loss reserves.

### *Capital Expenditures*

Capital expenditures are assumed to be an annual amount of approximately $6 million during the projected period for maintenance and growth capital spending.

### *Taxes*

The Financial Projections assume a combined (federal and state) effective tax rate of 40%. Based on preliminary guidance from an independent tax advisor, they include an assumption that approximately $4.9 million of usable, post-transaction net operating loss carryforwards are available to offset taxable income in fiscal 2017.

*Depreciation and Amortization*

Book depreciation is projected based on straight line depreciation. The majority of Depreciation and Amortization is related to leasehold improvements, furniture and fixtures, and machinery and equipment in either stores, warehouse or corporate headquarters. The amortization of intangibles is mostly associated with software and computers.

*Interest Expense*

Post-reorganization interest expense reflects cash interest payments on the Collateralized Exchange Term Loan Facility, the New ABL Facility and any additional post-emergence debt obligations.

*Restructuring Costs*

The Financial Projections assume that the Company will use cash from operations, proceeds of the DIP Facility, the New ABL Facility and trade credit provided by suppliers to pay all expenses associated with the reorganization and to provide for working capital throughout the Projection Period. Certain of these expenses will be paid on or about the Effective Date, including success and completion fees, administrative claims, professional fees and expenses incurred or accrued during the Chapter 11 Cases.

*Working Capital*

Projections of changes in certain balance sheet accounts such as accounts receivable and accounts payable are based on historical ratios of such accounts to other accounts such as revenues and cost of goods sold, historical seasonal builds and de-builds between certain periods, and/or known and determinable increases or decreases.

True Religion Apparel, Inc., and Affiliated Debtors
Consolidated Income Statement

*($ in millions)*

| | Post Emergence | | | | |
| | Feb 2017-Sep 2017 | Oct 2017-Jan 2018 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| **Net Sales** | | | | | |
| North America Retail | 151.6 | 96.6 | 248.6 | 253.5 | 263.8 |
| Americas Wholesale | 36.5 | 17.0 | 54.0 | 54.3 | 55.4 |
| International | 21.7 | 16.8 | 31.5 | 32.6 | 33.3 |
| Licensing | 1.2 | 0.7 | 2.2 | 2.5 | 2.9 |
| **Total Net Sales** | **$210.9** | **$131.2** | **$336.3** | **$342.9** | **$355.3** |
| | | | | | |
| Total Cost of Goods Sold | 86.5 | 58.9 | 143.3 | 145.8 | 150.5 |
| **Gross Profit** | **$124.4** | **$72.3** | **$193.0** | **$197.1** | **$204.8** |
| | | | | | |
| **Gross Margin** | | | | | |
| North America Retail | *63.7%* | *58.5%* | *60.9%* | *60.8%* | *60.8%* |
| Americas Wholesale | *47.4%* | *43.2%* | *46.6%* | *47.2%* | *47.5%* |
| International | *43.1%* | *45.9%* | *44.9%* | *45.4%* | *45.7%* |
| Licensing | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| Total | *59.0%* | *55.1%* | *57.4%* | *57.5%* | *57.6%* |
| | | | | | |
| **SG&A** | | | | | |
| Direct SG&A | 55.2 | 24.5 | 73.6 | 74.3 | 76.5 |
| Indirect SG&A | 51.9 | 31.3 | 82.8 | 83.7 | 84.7 |
| Total SG&A | 107.1 | 55.7 | 156.3 | 158.1 | 161.2 |
| | | | | | |
| **EBITDA** | **$17.2** | **$16.6** | **$36.6** | **$39.0** | **$43.5** |
| | | | | | |
| Depreciation & Amortization | 7.4 | 3.6 | 11.7 | 10.9 | 10.4 |
| | | | | | |
| **Operating Profit** | **$9.9** | **$13.0** | **$25.0** | **$28.1** | **$33.1** |
| | | | | | |
| Interest (expense)/income | (24.0) | (3.8) | (11.4) | (11.4) | (11.3) |
| Foreign exchange gain (loss) | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Settlement of unsecured claims | (1.0) | 0.0 | 0.0 | 0.0 | 0.0 |
| Restructuring costs | (17.8) | (1.1) | 0.0 | 0.0 | 0.0 |
| Financing fee | (1.0) | (0.1) | 0.0 | 0.0 | 0.0 |
| | | | | | |
| **Pretax Income** | **($33.4)** | **$8.0** | **$13.6** | **$16.6** | **$21.8** |
| | | | | | |
| Income Tax | (0.1) | 0.0 | 5.4 | 6.6 | 8.7 |
| | | | | | |
| **Net Income** | **($33.2)** | **$8.0** | **$8.2** | **$10.0** | **$13.1** |

**True Religion Apparel, Inc., and Affiliated Debtors**
**Consolidated Balance Sheet**

*($ in millions)*

|  | October 1, 2017 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $4.5 | $5.0 | $9.4 | $18.5 | $32.8 |
| Accounts receivable, net of allowances | 13.2 | 15.2 | 15.0 | 15.3 | 15.6 |
| Inventories | 51.2 | 44.7 | 48.0 | 49.3 | 50.9 |
| Deferred tax assets | - | 8.4 | 11.8 | 11.8 | 15.5 |
| Prepaid income taxes | 8.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| Prepaid expenses and other current assets | 11.2 | 7.2 | 9.7 | 9.9 | 7.6 |
| Total current assets | $88.3 | $82.8 | $96.1 | $107.0 | $124.6 |
| Property and equipment, net | 28.7 | 27.8 | 22.2 | 17.0 | 12.8 |
| Deferred income tax assets | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Intangible assets | 48.0 | 47.7 | 47.7 | 47.9 | 47.7 |
| Goodwill | 36.3 | 36.3 | 36.3 | 36.3 | 36.3 |
| Other assets | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Total Assets** | **$204.2** | **$197.5** | **$205.2** | **$211.2** | **$224.3** |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current Liabilities: | | | | | |
| Accounts payable and accrued expenses | 17.7 | 16.2 | 26.4 | 27.0 | 28.0 |
| Projected accrued interest payable | 0.1 | 1.0 | 1.0 | 1.0 | 1.0 |
| Accrued salaries, wages and benefits | 7.6 | 8.7 | 9.8 | 10.1 | 10.4 |
| Income taxes payable | 0.7 | 4.3 | 3.8 | - | - |
| Total current liabilities | $26.1 | $30.2 | $41.0 | $38.1 | $39.4 |
| Long-term deferred rent | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 |
| Exit ABL facility | 25.0 | 10.1 | - | - | - |
| New term loan | 113.5 | 113.2 | 112.1 | 110.9 | 109.8 |
| Long-term deferred tax liabilities | 16.3 | 16.3 | 16.3 | 16.3 | 16.3 |
| Long-term income taxes payable | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Other liabilities | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 |
| Total long-term liabilities | $172.5 | $157.3 | $146.1 | $144.9 | $143.8 |
| **Total Liabilities** | **$198.6** | **$187.5** | **$187.0** | **$183.1** | **$183.1** |
| | | | | | |
| Redeemable Noncontrolling Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Total Stockholders' Equity** | **$5.5** | **$9.8** | **$17.9** | **$27.9** | **$41.0** |
| **Total Liabilities and Stockholders' Equity** | **$204.2** | **$197.5** | **$205.2** | **$211.2** | **$224.3** |

**True Religion Apparel, Inc., and Affiliated Debtors**
**Consolidated Statement of Cash Flows**

*($ in millions)*

| | Post Emergence Oct 2017-Jan 2018 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | |
| Net Income | $4.3 | $8.2 | $10.0 | $13.1 |
| Adjustments to reconcile net income to operating activities: | | | | |
| Depreciation & amortization | 3.6 | 11.7 | 10.9 | 10.4 |
| Deferred income taxes | (8.4) | (3.3) | (0.0) | (3.7) |
| Accounts receivable | (2.0) | 0.2 | (0.2) | (0.3) |
| Inventory | 6.5 | (3.2) | (1.4) | (1.6) |
| Prepaid expenses and other current assets | 4.0 | (2.5) | (0.2) | 2.3 |
| Accounts payable and accrued expenses | (1.5) | 10.2 | 0.6 | 0.9 |
| Projected accrued interest payable | 0.9 | (0.0) | - | - |
| Accrued salaries, wages and benefits | 1.1 | 1.1 | 0.3 | 0.3 |
| Prepaid income taxes and income taxes payable | 9.7 | (0.6) | (3.8) | - |
| Other Liabilities | - | - | - | - |
| **Net cash provided by operating activities** | **$18.2** | **$21.6** | **$16.2** | **$21.5** |
| | | | | |
| **Cash Flows from Investing Activities** | | | | |
| Purchases of property and equipment | (2.5) | (6.0) | (6.0) | (6.0) |
| **Net cash used in investing activities** | **($2.5)** | **($6.0)** | **($6.0)** | **($6.0)** |
| | | | | |
| **Cash Flows from Financing Activities** | | | | |
| Term loan amortization | (0.3) | (1.1) | (1.1) | (1.1) |
| Drawdown/(paydown) of ABL | (14.9) | (10.1) | - | - |
| **Net cash provided by financing activities** | **($15.2)** | **($11.3)** | **($1.1)** | **($1.1)** |
| | | | | |
| Effect of exchange rate changes in cash | - | - | - | - |
| | | | | |
| Net (decrease) increase in cash and cash equivalents | $0.5 | $4.4 | $9.1 | $14.3 |
| Cash and cash equivalents, beginning of period | 4.5 | 5.0 | 9.4 | 18.5 |
| Cash and cash equivalents, end of period | 5.0 | 9.4 | 18.5 | 32.8 |

**EXHIBIT F**

**VALUATION ANALYSIS**

**True Religion Apparel, Inc., and Affiliated Debtors**

## VALUATION ANALYSIS

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE REGARDING, AND MAEVA DOES NOT EXPRESS ANY VIEW OR OPINION AS TO, THE PRICE OR RANGE OF PRICES OF THE SECURITIES OF THE DEBTORS AT WHICH THEY WOULD BE SALEABLE OR OTHERWISE BE TRANSFERABLE AT ANY TIME, INCLUDING SUBSEQUENT TO CONSUMMATION OF THE PLAN. THE SUMMARY SET FORTH BELOW DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE INDICATIVE FINANCIAL ANALYSES PERFORMED BY MAEVA. THE PREPARATION OF SUCH ANALYSES INVOLVES VARIOUS COMPLEX DETERMINATIONS AND JUDGMENTS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSES DO NOT LEND THEMSELVES READILY TO SUMMARY DESCRIPTION.

MOREOVER, THE ESTIMATED ENTERPRISE VALUE AND ESTIMATED EQUITY VALUE (EACH AS DEFINED BELOW) OF AN OPERATING BUSINESS SUCH AS THAT OF THE DEBTORS ARE SUBJECT TO VARIOUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE, AT TIMES SUBSTANTIALLY, WITH CHANGES IN VARIOUS FACTORS AFFECTING THE FINANCIAL CONDITION, FINANCIAL PERFORMANCE AND FINANCIAL PROSPECTS OF SUCH A BUSINESS (INCLUDING, WITHOUT LIMITATION, GENERAL BUSINESS AND ECONOMIC CONDITIONS, CAPITAL MARKETS CONDITIONS AND INDUSTRY-SPECIFIC AND COMPANY SPECIFIC FACTORS, ALL OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND MAEVA). ACCORDINGLY, THE ESTIMATES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES (INCLUDING ANY ESTIMATE OF THE ENTERPRISE VALUE OR EQUITY VALUE SET FORTH HEREIN) ARE INHERENTLY SUBJECT TO SUCH UNCERTAINTIES AND CONTINGENCIES. NONE OF THE DEBTORS, MAEVA OR ANY OTHER PERSON ASSUMES ANY RESPONSIBILITY FOR THEIR ACCURACY OR ACHIEVABILITY.

THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER STAKEHOLDERS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

### Overview

MAEVA has performed an analysis of the estimated value of the Company on a going-concern basis as of June 30, 2017 (the "Valuation Date"). This Valuation Analysis should be read in conjunction with Article VI of the Disclosure Statement, entitled "Risk Factors."

In preparing its analysis, MAEVA has, among other things: (i) discussed with certain of the Debtors' senior executives the Debtors' current operations and prospects; (ii) reviewed certain of the Debtors' internal financial and operating data, including Financial Projections; (iii) discussed with certain of the

Debtors' senior executives key assumptions embedded in the Financial Projections and their implications; (iv) prepared discounted cash flow analyses based on the Financial Projections; (v) assessed the market value of certain publicly-traded companies in businesses reasonably comparable to the Debtors' operating businesses; (vi) analyzed certain comparable sale transactions; and (vii) conducted such other analyses as MAEVA deemed necessary under the circumstances. MAEVA also has considered a range of potential risk factors, including, but not limited to: (a) the Debtors' pro forma capital structure; (b) the secular and cyclical challenges facing the Debtors; and (c) their ability to meet projected growth and profitability targets included in the Financial Projections. MAEVA assumed, without independent verification, the accuracy and completeness of all of the financial and other information as provided to MAEVA by the Debtors or their representatives. MAEVA also assumed that the Financial Projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future financial and operating performance. MAEVA did not make any independent evaluation or appraisal of the Debtors' assets or liabilities, nor did MAEVA verify any of the information it reviewed. To the extent the valuation is dependent upon the Reorganized Debtors' achievement of the Financial Projections, the valuation must be considered speculative. MAEVA does not make any representation or warranty, and is not giving an opinion, as to the fairness of the terms of the Plan.

In addition to the foregoing, for purposes of its analyses MAEVA relied upon the following assumptions with respect to the valuation of the Debtors:

- The Debtors successfully reorganize with an assumed emergence date of September 30, 2017 (the "Effective Date").
- The Debtors are able to emerge from the restructuring process with a viable capital structure and adequate liquidity.
- The Debtors' pro forma debt levels as of the Effective Date will be approximately $138.5 million, including the $25 million under the New ABL Facility and approximately $113.5 million under the Reorganized First Lien Term Loan Facility.
- General financial and market conditions as of the Effective Date will not differ materially from those conditions prevailing as of the Valuation Date.

As a result of such analyses, review, discussions, considerations, and assumptions, MAEVA estimates the Debtors' total enterprise value ("Enterprise Value") at approximately $160 million to $200 million, with a midpoint valuation of $180 million. MAEVA reduced such Enterprise Value estimates by the Debtors' total estimated pro forma net debt upon emergence in order to calculate an implied distributable equity value. MAEVA estimates the implied distributable reorganized equity value (the "Equity Value") will have a midpoint of approximately $41.5 million, with a range of approximately $21.5 million to $61.5 million. This equity value is subject to dilution as a result of the potential issuance of any equity under any Management Equity Incentive Plan, to the extent applicable.

Any variance in actual results from the Financial Projections could have a material impact on the valuation achieved. These estimated ranges of values are based on a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. It should be understood that, although subsequent developments, before or after the Confirmation Hearing, may affect MAEVA's conclusions contained herein, MAEVA does not have any obligation to update, revise or reaffirm its estimate. The summary set forth herein does not purport to be a complete description of the analyses performed by MAEVA. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate does not readily lend itself to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of Enterprise Value set

forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of Enterprise Value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by MAEVA assume that the Reorganized Debtors will continue as the owner and operator of their businesses and those businesses are operated in accordance with the Financial Projections. Depending on the results of the Debtors' operations or changes in the financial markets, the Enterprise Value of the Reorganized Debtors as of the Effective Date may differ materially from that disclosed herein.

In addition, and as discussed in Article VI of the Disclosure Statement entitled "Risk Factors," the valuation of newly issued securities, such as the New Common Shares, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, market sentiment, specific valuation issues in the retail sector and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the Enterprise Value estimated by MAEVA does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. As noted in Article VI of the Disclosure Statement, the Debtors do not anticipate that there will be an established market for the New Common Shares, which may be subject to transfer restrictions preventing or limiting trading in such securities.

**Valuation Methodology**

The following is a brief summary of certain financial analyses performed by MAEVA to arrive at its range of estimated Enterprise Values. MAEVA's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to the Enterprise Value. The summary set forth below does not purport to be a complete description of the analyses performed by MAEVA. MAEVA performed these valuation analyses, resulting in a consolidated range of enterprise values generated by the (i) discounted cash flow analysis, (ii) comparable company analysis and (iii) the precedent transaction analysis.

    A.   Discounted Cash Flow Analysis

The discounted cash flow (the "DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its target capital structure. MAEVA calculated a Discount Rate based on a traditional cost of equity capital calculation using the Capital Asset Pricing Model. Based on this methodology, MAEVA used a range of discount rates reflecting a number of Company and market related considerations, which were calculated based on the cost of capital for companies that MAEVA deemed comparable. The Enterprise Value was determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Financial Projections, plus an estimate for the value of the Reorganized Debtors beyond the projection period known as the terminal value. The terminal value is estimated using a terminal multiple method derived using an exit multiple of Adjusted EBITDA based on a range selected to reflect the trading levels of the Peer Group (as defined below), discounted back to the assumed emergence date. Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. In applying the above

methodology, MAEVA utilized the Financial Projections to derive unlevered after-tax free cash flows of the Debtors. Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures, cash taxes, and changes in working capital. These cash flows, along with the terminal value, are discounted back to the assumed emergence date using a range of Discount Rates calculated in a manner described above to arrive at a range of enterprise values.

B. Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with publicly traded companies with similar operating and financial characteristics (the "Peer Group"). Under this methodology, the Enterprise Value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company and minority interests. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly EBITDA. In addition, each of the Peer Group's sales growth, operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples are calculated to apply to the Reorganized Debtors' projected financial performance.

A key factor in this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, targeted customer demographics, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of professional judgment, and subject to limitations due to sample size and the availability of meaningful market -based information. It should be noted that the selected companies are not identical to the Debtors.

MAEVA examined the selected Peer Groups' estimated EBITDA multiples to value the Debtors' business. In determining the applicable multiple and related ranges, MAEVA considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue growth, profitability, cost structure, size and similarity of business lines.

C. Comparable Sale Transaction Analysis

The comparable sale transaction analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating, business line and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, the enterprise value of each such target is determined by an analysis of the consideration paid and the net debt assumed in the merger or acquisition transaction. The enterprise value is then compared to a selected operating metric, in this case, EBITDA, in order to determine an enterprise value multiple. MAEVA analyzed various merger and acquisition transactions that have recently occurred in the apparel retail sector. In this analysis, the LTM enterprise value multiples were utilized to determine a range of implied enterprise value for the Reorganized Debtors.

Other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors: (a) circumstances surrounding a merger transaction may reflect competitive dynamics in the sale process; (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial

position of the company may have an impact on the resulting purchase price (i.e., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

## Valuation Considerations

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THE DEBTORS' PROJECTIONS ON WHICH THE VALUATION WAS BASED ARE UNAUDITED AND MAY NOT HAVE BEEN PREPARED IN COMPLIANCE WITH ACCOUNTING PRINCIPLES, INCLUDING GAAP.

THE ESTIMATED CALCULATION OF AN ENTERPRISE VALUE RANGE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL. THE FOREGOING VALUATION COULD BE MATERIALLY AFFECTED BY THE RISK FACTORS DISCUSSED IN ARTICLE VI OF THE DISCLOSURE STATEMENT.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE ENTERPRISE VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE FOR THE REORGANIZED DEBTORS. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED ENTERPRISE VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN BY MAEVA FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATIONS ARE ASSUMED TO REVISE THIS CALCULATION OF THE REORGANIZED DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE.