# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRUE RELIGION APPAREL, INC., et al.,[1] | ) | Case No. 17-11460 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## ORDER AUTHORIZING THE DEBTORS TO (I) ASSUME THE EXIT FACILITY COMMITMENT LETTER, (II) PAY AND REIMBURSE RELATED FEES AND EXPENSES, AND (III) INDEMNIFY THE PARTIES THERETO

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), authorizing the Debtors to (i) assume the Exit Facility Commitment Letter dated July 4, 2017 (including the Exit Facility Term Sheet (as defined therein), as amended, modified, waived, or supplemented from time to time in accordance with its terms, the "Exit Facility Commitment Letter") with Citizens Bank, N.A. ("Citizens") attached hereto as **Exhibit 1**, (ii) pay and reimburse related fees and expenses, and (iii) indemnify the parties thereto, pursuant to sections 105(a), 363(b), 365(a), 503(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"); and it appearing that the relief requested in the Motion is in the best interest of the Debtors' estates, their creditors and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and it appearing that this Court may enter a final order consistent with Article III of the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: TRLG Intermediate Holdings, LLC (3150); True Religion Apparel, Inc. (2633); Guru Denim Inc. (1785); True Religion Sales, LLC (3441); and TRLGGC Services, LLC (8453). The Debtors' headquarters is located at 1888 Rosecrans Avenue, Manhattan Beach, CA 90266.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

United States Constitution; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and adequate notice of the Motion having been given under the circumstances and no further notice need be given; and after due deliberation and cause appearing therefore; it is hereby:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

1.      This Court has core jurisdiction over these chapter 11 cases, the Motion, this Order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), 365(a), 503(b), and 507(a) of the Bankruptcy Code and Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      The notice given by the Debtors of the Motion and the hearing thereon constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and applicable local rules, and no other or further notice is necessary.

3.      The Debtors' decision to assume the Exit Facility Commitment Letter is a sound exercise of their business judgment and is based on good, sufficient and sound business purposes and justifications.

---

[3] This Order constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if stated as findings of fact.

4.     The terms and conditions of the Exit Facility Commitment Letter, including the fees and expenses set forth therein, are fair and reasonable and were negotiated at arm's length and in good faith.

5.     The indemnification provisions contained in the Exit Facility Commitment Letter, and the reimbursement provisions regarding the Citizens Expenses are integral components of the transaction, without which Citizens would not have entered into the Exit Facility Commitment Letter.

6.     The relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion is granted as set forth herein.

2.     The Debtors are authorized to (i) assume the Exit Facility Commitment Letter in its entirety, (ii) comply with the terms thereof, and (iii) take any and all actions necessary to implement the terms of the Exit Facility Commitment Letter.

3.     The Exit Facility Commitment Letter may be modified, amended, supplemented or waived by the parties thereto in accordance with the terms thereof, in each case without further order of the Court.

4.     The Debtors are authorized to pay the Citizens Expenses in accordance with the terms of the Exit Facility Commitment Letter.  To the extent that any Citizens Expenses were incurred prepetition and remain unpaid as of the date hereof, the Debtors are authorized to

pay such Citizens Expenses. Without limiting any other provision of this Order, the Court finds that the Citizens Expenses provided under the Exit Facility Commitment Letter: (i) are necessary to the preservation of the Debtors' estates and are approved and allowed as administrative expenses pursuant to sections 503(b) and 507(a) of the Bankruptcy Code, and (ii) shall be payable pursuant to the terms of the Exit Facility Commitment Letter. Under no circumstances shall the Citizens Expenses be subject to any otherwise applicable set-off, counterclaim, or recoupment. None of the Citizens Expenses shall be subject to further approval of the Court and no recipient of any Citizens Expenses shall be required to file any interim or final application with the Court as a condition precedent to the Debtors' obligation to pay such Citizens Expenses. None of the Citizens Expenses shall be subject to avoidance under sections 542, 547, or 548 of the Bankruptcy Code. The Debtors are authorized and directed to pay any Citizens Expenses regardless of whether the Exit Facility is consummated.

5. The indemnification in favor of the Indemnified Persons (including Citizens) contained in the Exit Facility Commitment Letter is hereby approved. The Debtors are authorized to indemnify each Indemnified Person in accordance with the terms of the Exit Facility Commitment Letter. Without limiting any other provision of this Order, the Court finds that the indemnification of the Indemnified Persons provided under the Exit Facility Commitment Letter is necessary to the preservation of the value of the estates and is approved and allowed as an administrative expense pursuant to sections 503(b) and 507(a) of the Bankruptcy Code in the event that such indemnification obligation arises. The automatic stay of section 362 is deemed modified to the extent necessary to enable the parties to the Exit Facility

Commitment Letter to perform thereunder, and to exercise any and all of their contractual rights thereunder, without seeking further relief from the automatic stay, and neither the Debtors nor any other party in interest may enforce the automatic stay against Citizens or any indemnified person under the indemnity obligations under the Exit Facility Commitment Letter with respect to such rights.

6.      The provisions and effect of this Order, any actions taken pursuant to this Order, and the respective rights, obligations, remedies and protections provided for herein shall survive the conversion, dismissal or closing of these chapter 11 cases or the appointment of a trustee herein, and the terms and provisions of this Order shall continue in full force and effect notwithstanding the entry of any such order.

7.      The Debtors are further authorized to take any and all actions necessary or appropriate to effectuate the relief granted pursuant to this Order.

8.      Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall take effect immediately upon its entry.

9.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Rule 6004(a) and the Local Rules are satisfied by such notice.

10.     The terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

11.     All objections to the Motion or relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

12.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____ 2017

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

**Exit Facility Commitment Letter**

CITIZENS BANK, N.A.
28 State Street
Boston, MA 02109

July 4, 2017

True Religion Apparel, Inc.
1888 Rosecrans Avenue
Manhattan Beach, CA 90266
Attention: Dali Snyder, Chief Financial Officer

<u>True Religion</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

      True Religion Apparel, Inc., a Delaware corporation (the "***Company***" or "***you***"), in connection with the Company's and certain of its affiliates' and subsidiaries' filing of petitions for relief (collectively, the "***Chapter 11 Cases***") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "***Bankruptcy Code***") have requested that Citizens Bank, N.A. ("***Citizens***", and collectively with the other Commitment Parties appointed as described below, the "***Commitment Parties***") provide the Company with a $60 million senior secured asset-based revolving credit facility (the "***Exit Facility***") in connection with the emergence of the Company and certain of its affiliates (the "***Debtors***", including, any entity formed to hold any newly issued equity in respect of the Company or any assets transferred from the Company upon its emergence from bankruptcy) from the Chapter 11 Cases, on the terms and conditions set forth herein and in the attached Summary of Indicative Terms and Conditions attached hereto as Exhibit A (the "***Exit Facility Term Sheet***"). The Debtors' emergence from bankruptcy will be pursuant to a plan of reorganization in form and substance satisfactory to Citizens to be approved by the United States Bankruptcy Court for the District of Delaware (the "***Court***") (the "***Approved Plan***"), which shall provide for, among other things, refinancing in full in cash of the $60,000,000 senior secured super priority debtor-in-possession asset-based revolving credit facility (the "***DIP Facility***"), dated as of on or about July 7, 2017. For the avoidance of doubt, (a) prior to the date of the Bankruptcy Court hearing with regard to the Debtors' assumption of this commitment letter, we will inform (the "***Approved Plan Citizens Confirmation***") the Debtors whether the plan of reorganization on file with the Bankruptcy Court at that time (as maybe amended, supplemented, or modified prior to that date) is an "Approved Plan" for purposes of this letter; if we fail to provide the Approved Plan Citizens Confirmation prior to such date, the Debtors shall not be required to seek approval of the assumption of this commitment letter; and (b) subject to final review of all documents, it is Citizens' current intention to provide the Approved Plan Citizens Confirmation prior to such date. The confirmation of the Approved Plan and the entering into, and funding of, the Exit Facility and all related transactions are referred to hereinafter, collectively, as the "***Exit Transaction***". The documentation related to the Exit Facility shall be referred to hereinafter as

the "**_Exit Facility Documentation_**". Capitalized terms used in this letter but not defined herein shall have the meanings given to them in the Exit Facility Term Sheet.

1.  Commitments.

In connection with the Chapter 11 Cases, Citizens is pleased to advise you of its commitment to provide 100% of the Exit Facility, upon the terms and conditions expressly set forth herein and in the Exit Facility Term Sheet and the Fee Letter (as defined below). The Exit Facility Term Sheet together with this letter, hereinafter are referred to as the "**_Commitment Letter_**").

2.  Titles and Roles.

It is agreed that:

(a) Citizens will act as sole lead arranger (in such capacity, the "**_Lead Arranger_**") and as sole lead bookrunner for the Exit Facility; and

(b) Citizens will act as sole administrative agent for the Exit Facility (in such capacity, the "**_Administrative Agent_**").

It is further agreed that Citizens will have "lead left" placement in any marketing materials or other documentation for the Exit Facility, and will hold the roles and responsibilities customarily understood to be associated with such name placement.

Citizens may, in its sole discretion (but at no additional cost to the Debtors), appoint additional agents, co-agents, arrangers, bookrunners or managers and award other titles to other lenders participating in the Exit Facility and you agree that, except as may be approved by Citizens, you shall not appoint any additional agents, co-agents, arrangers, bookrunners or managers or award other titles or pay any compensation (other than as expressly contemplated by this Commitment Letter and the related fee letter of even date herewith to be executed by you and us (the "**_Fee Letter_**")) to any lender in order to obtain its commitment in respect of the Exit Facility unless you and Citizens shall so agree.

3.  Information.

You hereby represent and warrant (with respect to such information relating to the Company and its subsidiaries prior to the closing date of the Exit Facility (the "**_Exit Closing Date_**"), to your knowledge) that (a) all written information other than financial estimates, forecasts and other forward-looking information (collectively, the "**_Projections_**") and other than information of a general economic or general industry nature, that has been or will be made available to any of the Commitment Parties by you or any of your or its respective representatives on your behalf in connection with the transactions contemplated hereby (the "**_Information_**"), taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the Projections that have been or will be made available to the Lead Arranger by you or any of your

DB1/ 92452234.9

or its respective representatives on your behalf in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time made; it being understood that any such Projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material. You agree that, if at any time prior to the Exit Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations and warranties were being made, at such time, then you will (prior to the Exit Facility Date with respect to Information and Projections relating to the Company and its subsidiaries) use commercially reasonable efforts to promptly supplement the Information and the Projections from time to time until the Exit Facility Date so that such representations and warranties will be correct in all material respects under those circumstances. In arranging and syndicating the Exit Facility, the Lead Arranger will be entitled to use and rely on the Information and the Projections without responsibility for independent verification thereof and does not assume responsibility for the accuracy or completeness of the Information or the Projections.

4.     Fees.

As consideration for the commitments of Citizens hereunder and the Administrative Agent's and the Lead Arranger's agreement to perform the services described herein, you agree to pay (or cause to be paid) the fees set forth in the Fee Letter on the terms and subject to the conditions (including as to timing and amount) set forth therein. Once paid, such fees shall not be refundable under any circumstances, except as otherwise contemplated herein or by the Fee Letter or as otherwise separately agreed to in writing by you and us.

5.     Conditions Precedent.

The commitment of Citizens hereunder and the undertaking of Citizens to provide the Exit Facility are subject to the satisfaction of the terms and conditions set forth in the Exit Facility Term Sheet and each of the following conditions precedent in a manner acceptable to Citizens:  (a) the Administrative Agent's reasonable satisfaction with the approval by the Court of (i) the Exit Facility, the Exit Transaction and the transactions contemplated thereby and (ii) all actions to be taken, undertakings to be made and obligations to be incurred by the Borrower and Guarantors in connection with the Exit Facility, the Exit Transaction and the transactions contemplated thereby (all such approvals to be evidenced by the entry of one or more orders of the Court (not later than the date set forth in the final paragraph of this Commitment Letter) reasonably satisfactory in form and substance to the Administrative Agent and the Lead Arranger, which orders shall, among other things, approve and confirm (x) the payment by the Debtors of all of the fees that are provided for in this Commitment Letter and the Fee Letter and (y) the other terms of this Commitment Letter and the Fee Letter, and which order(s) shall, for the avoidance of any doubt, specifically provide that the right to receive all amounts due and owing to each of the Agent and the Lead Arranger, including indemnification obligations, the fees as set forth herein and in the Fee Letter and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and in the Fee Letter, shall be entitled to priority as administrative expense claims under Sections

3

503(b) and 507(a)(1) of the Bankruptcy Code, regardless of whether the Closing Date occurs); (b) the accuracy and completeness in all material respects of all representations that you and your affiliates make to Citizens and your compliance with the terms of this Commitment Letter and the Fee Letter (as hereinafter defined); (c) prior to and during the syndication of the Exit Facility there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf the Debtors or any of their respective subsidiaries (other than the Reorganized First Lien Term Loans (as defined in the Term Sheet)); (d) Citizens not having become aware of any information not previously disclosed to Citizens that Citizens reasonably believes to be materially and adversely inconsistent with the information regarding the business, condition (financial or otherwise), operations or assets of the Debtors provided to Citizens prior to the date hereof; and (e) the review and reasonable satisfaction by Citizens with (x) to the extent not specifically described in the Approved Plan or otherwise provided to Citizens prior to the date hereof, the terms of the restructuring of the Debtors and their affiliates (including, without limitation, changes to the current composition the persons acting in the capacities of chief executive officer, chief financial officer and chief operating officer of the Debtors and the capital and tax structure of the Company, the Guarantors and their subsidiaries) and (y) the terms and conditions of all other material transactions and documentation entered into in connection with the consummation of such Approved Plan, all as more specifically described in the Exit Facility Term Sheet.

6.    Indemnification; Expenses.

You agree (a) to indemnify and hold harmless each of the Commitment Parties, their respective affiliates and controlling persons and the respective officers, directors, members, partners, employees, advisors, agents and representatives of each of the foregoing and their successors and permitted assigns (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and out-of-pocket expenses, joint or several, to which any such Indemnified Person may become subject arising out of, resulting from or in connection with any actual or threatened claim, dispute, litigation, investigation or proceeding relating to this Commitment Letter, the Fee Letter, the Exit Facility or the use of proceeds thereof (any of the foregoing, an "*Action*"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Action is brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each such Indemnified Person within 30 days after receipt of a written request together with reasonably detailed backup documentation for any reasonable out-of-pocket legal and other reasonable out-of-pocket expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any of the foregoing; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses (i) to the extent resulting from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its Related Indemnified Persons (as defined below) (as determined by a court of competent jurisdiction in a final non-appealable judgment), (ii) to the extent resulting from any intentional material breach of such Indemnified Person's obligations under this Commitment Letter or (iii) to the extent arising from any dispute solely among Indemnified Persons other than any claims against any Commitment Party in its capacity or in fulfilling its role as an Administrative Agent or arranger or any similar role under any Facility and other than any claims arising out of any act or omission on the part of you or your affiliates (as determined by a court of competent jurisdiction in a final non-appealable judgment), and (b) to reimburse the

Commitment Parties and each of their respective affiliates from time to time, upon presentation of a summary statement for all reasonable and documented out-of-pocket expenses (including but not limited to out-of-pocket expenses of the Commitment Parties' due diligence investigation, field examinations and collateral appraisal expenses, travel expenses and reasonable fees, disbursements and other charges of one primary counsel to the Lead Arranger and the Agent (and any local or special counsel to the Lead Arranger and the Agent), in each case incurred in connection with the Exit Facility and the preparation of this Commitment Letter, the Fee Letter, the Exit Facility Documentation and any security arrangements in connection therewith (such expenses in this clause (b), collectively, the "*Expenses*"), in each case, whether or not the Exit Closing Date occurs. Notwithstanding any other provision of this Commitment Letter, (i) no Indemnified Person or any other party hereto shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person, any Related Indemnified Person or such other party hereto, as applicable, and (ii) neither (x) any Indemnified Person or any of its Related Indemnified Persons, nor (y) you (or any of your subsidiaries or affiliates) or the Company (or any of its subsidiaries or affiliates) shall be liable for any indirect, special, punitive or consequential damages (with respect to you in the case of this clause (y), other than pursuant to the indemnification provisions of this Commitment Letter in respect of any such damages incurred or paid by an Indemnified Person to a third party) in connection with this Commitment Letter, the Fee Letter, the Exit Facility, or with respect to any activities related to the Exit Facility. You shall not, without the prior written consent of the affected Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned), effect any settlement of any pending or threatened Action against such Indemnified Person in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include any statement as to any admission.

For purposes hereof, a "*Related Indemnified Person*" of an Indemnified Person means (1) any affiliate or controlling person of such Indemnified Person, (2) the respective directors, officers, or employees of such Indemnified Person or any of its affiliates or controlling persons and (3) the respective agents or representatives of such Indemnified Person or any of its affiliates or controlling persons, in the case of this clause (3), acting on behalf of or at the instructions of such Indemnified Person, affiliate or controlling person.

7.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services (including without limitation investment banking and financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling) to other companies in respect of which you or the Company may have conflicting interests. We will not furnish confidential information obtained from or on behalf of you or the Company by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you or the Company to other companies (except as contemplated below in Section 11). You also acknowledge that we do not have any

obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you or the Company, confidential information obtained by us or any of our respective affiliates from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and your affiliates and the Commitment Parties and/or their affiliates is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties or their respective affiliates have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Parties or any of their affiliates and you waive, to the fullest extent permitted by law, any claims you may have against us for breach of fiduciary duty or alleged breach of fiduciary duty in connection with the Exit Facility and agree that we and our affiliates will have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including equity holders, employees or creditors, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties and their affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you or your affiliates, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and (f) each Commitment Party has been, is and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity. In addition, the Commitment Parties may employ the services of their respective affiliates in providing certain services hereunder and may exchange with such affiliates in connection therewith information concerning you and the Company, and such affiliates shall be entitled to the benefits afforded to, and be subject to the obligations of, the Commitment Parties under this Commitment Letter. You acknowledge and agree that we have not provided you with legal, tax or accounting advice and that you have obtained such independent advice from your own advisors, representatives and agents.

You further acknowledge that each Commitment Party and/or its affiliates is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each Commitment Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you, the Company and your and their respective subsidiaries and affiliates and other companies with which you, the Company and your and their respective subsidiaries may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Commitment Parties, their affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion and without any liability to you, the Company or any of your or their respective subsidiaries or affiliates.

DB1/ 92452234.9

8.      Assignments; Amendments; Governing Law, Etc.

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons), is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons) and is not intended to create a fiduciary relationship among the parties hereto. Any and all services to be provided by the Commitment Parties hereunder may be performed by or through any of their respective affiliates or branches. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Commitment Parties and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or by ".pdf" or similar electronic transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. This Commitment Letter, together with the Fee Letter, supersedes all prior understandings, whether written or oral, among us with respect to the Exit Facility and sets forth the entire understanding of the parties hereto with respect thereto. THIS COMMITMENT LETTER, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

9.      WAIVER OF JURY TRIAL.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

10.     Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the Court, as to any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in the Court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby in the Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Court and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other

jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses set forth above shall be effective service of process against such party for any suit, action or proceeding brought in any such court.

11.  Confidentiality.

This Commitment Letter is delivered to you on the understanding that none of this Commitment Letter or the Fee Letter or their terms or substance shall be disclosed, directly or indirectly, to any other person or entity (including other lenders, underwriters, placement agents, advisors or any similar persons) except (a) to your respective officers, directors, employees, affiliates, members, partners, stockholders, existing secured creditors (and their agents, attorneys and advisors), attorneys, accountants, agents and advisors on a confidential and need-to-know basis, (b) if the Commitment Parties consent to such proposed disclosure, (c) this Commitment Letter (but not the Fee Letter) may be disclosed as may be required by the rules, regulations, schedules and forms of the Securities and Exchange Commission (the *"SEC"*) in connection with any filings with the Court or the SEC in connection with the Exit Facility (in which case you agree to inform us promptly thereof to the extent lawfully permitted to do so) or (d) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law, regulation, compulsory legal process or as requested by a governmental authority (in which case you agree to inform us promptly thereof and to cooperate reasonably with us to prevent or limit such disclosure, in each case to the extent practicable and so long as you are lawfully permitted to do so); *provided* that (i) in connection with the Exit Facility, you may disclose this Commitment Letter and the contents thereof and, on a redacted basis in a manner reasonably acceptable to the Commitment Parties, the Fee Letter and the contents thereof to (x) the Company and its officers, directors, employees, attorneys, accountants, agents and advisors, on a confidential basis and (y) the direct or indirect equity holders of the Company and its respective officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, on a confidential basis, (ii) you may disclose the aggregate fee amounts (including upfront fees and original issue discount) payable under the Fee Letter as part of generic disclosure regarding sources and uses (but without disclosing any specific fees or other economic terms set forth therein) as part of a disclosure of overall transaction fees and expenses (not limited to fees associated with the Exit Facility) to the Company and its subsidiaries and their respective equity holders, existing secured creditors (and their agents, attorneys and advisors), officers, directors, employees, attorneys, accountants, agents and advisors, and (iii) you may disclose to the Company's auditors the Fee Letter and the contents thereof after the Exit Closing Date for customary accounting purposes, including accounting for deferred financing costs; *provided, further*, that the foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its fees and substance) on the date that is two years following the termination of this Commitment Letter in accordance with its terms.

Each Commitment Party, on behalf of itself and its affiliates, agrees that it shall treat confidentially all information provided to it or its affiliates by you or on your behalf hereunder and the terms and contents of this Commitment Letter, the Fee Letter and the Exit Facility Documentation and shall not publish, disclose or otherwise divulge such information; *provided* that nothing herein shall prevent a Commitment Party or its affiliates from disclosing any such

information (a) pursuant to the order of any court or administrative agency or otherwise as required by applicable law, regulation, compulsory legal process or as requested by a governmental authority (in which case such Commitment Party, to the extent practicable and so long as the same is permitted by law and except in connection with any order or request as part of a regulatory examination or audit, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or any of its affiliates (in which case such Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent practicable, unless such Commitment Party is prohibited by applicable law from so informing you, or except in connection with any request as part of a regulatory examination or audit), (c) to the extent that such information becomes publicly available other than by reason of disclosure by such Commitment Party or any of its affiliates in violation of this paragraph, (d) to the extent that such information is received by such Commitment Party from a third party that is not to such Commitment Party's knowledge in breach of related confidentiality obligations to you or the Company, (e) to the extent that such information is independently developed by such Commitment Party or its affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this provision, (f) to such Commitment Party's affiliates and its and their officers, directors, employees, legal counsel, independent auditors and other experts, professionals, advisors or agents (collectively, the "**_Representatives_**") who are informed of the confidential nature of such information, (g) to prospective Lenders, participants or assignees or any potential counterparty to any swap or derivative transaction relating to the Company or any of its subsidiaries or any of their respective obligations (in each case, other than a Disqualified Institution); _provided_ that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, participant, assignee or counterparty, on behalf of itself and its Representatives, that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the Commitment Parties) in accordance with market standards for dissemination of such type of information which, in the case of any electronic access, shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (h) for purposes of establishing a "due diligence" defense, (i) to the members of the ad hoc group of unaffiliated Prepetition First Lien Lenders[1] and the Prepetition Second Lien Lenders[2] represented by Akin Gump Strauss Hauer & Feld LLP (the "**_Ad Hoc Group_**") and their agents, attorneys and advisors or (j) with your prior written consent. In addition, each Commitment Party may disclose the existence of the Exit Facility and the information about the Exit Facility to market data collectors, similar service providers to the lending industry and service providers to the Commitment Parties in connection with the administration and management of the Exit Facility. Each Commitment Party's obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive

---

[1] "**_Prepetition First Lien Lenders_**" means the lenders from time to time under that certain First Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time, and Deutsche Bank AG New York Branch, as administrative agent.

[2] "**_Prepetition Second Lien Lenders_**" means the lenders from time to time under that certain Second Lien Credit Agreement, dated as of July 30, 2013 (as amended, restated, supplemented or otherwise modified heretofore), among Holdings, True Religion Apparel, Inc., the lenders party thereto from time to time, and Deutsche Bank AG New York Branch, as administrative agent.

DB1/ 92452234.9

documentation relating to the Exit Facility upon the execution and delivery of the definitive documentation therefor and in any event shall terminate two years from the date hereof.

12.    Surviving Provisions.

The provisions of this Section 12 and the indemnification, expenses, confidentiality, jurisdiction, service of process, venue, governing law, absence of advisory or fiduciary duty and waiver of jury trial, and information provisions contained herein, administrative fees and governing law provisions contained in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or Citizens' commitments hereunder and the Lead Arranger's agreements to provide the services described herein; *provided* that your obligations under this Commitment Letter, other than those relating to confidentiality, and information, shall automatically terminate and, to the extent covered thereby, be superseded by the definitive documentation relating to the Exit Facility upon the funding under such Facility, and you shall be released from all liability in connection therewith at such time. You may terminate this Commitment Letter at any time subject to the provisions of the preceding sentence. Nothing in this Agreement shall prevent the Company from taking or failing to take any action that it determines, based on the reasonable advice of its legal counsel, it is obligated to take in the performance of its statutory, contractual or fiduciary duties or as otherwise required by the Bankruptcy Code or applicable law; provided, however that it is agreed that Citizens may, at its option, terminate this Commitment Letter and the commitments and undertakings of Citizens hereunder as a result of any such actions (or inactions).

13.    Patriot Act Notification.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (as amended, the "*Patriot Act*"), each Commitment Party and each Lender is required to obtain, verify and record information that identifies the Company and each Guarantor, which information includes the name, address, tax identification number and other information regarding the Company and each such Guarantor that will allow such Commitment Party or such Lender to identify the Company and each such Guarantor in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Commitment Parties and each Lender.

14.    Acceptance and Termination.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letter by returning to the Lead Arranger executed counterparts hereof and of the Fee Letter, not later than 11:59 p.m., New York City time, on July 4, 2017. Each Commitment Party's respective commitments hereunder and agreements contained herein will be effective only upon execution and delivery hereof and of the Fee Letter by you and us in accordance with this paragraph, and will expire at such time in the event that the Lead Arranger have not received such executed counterparts in accordance with the immediately preceding sentence; provided, however, that this Commitment Letter and all commitments and undertakings of Citizens hereunder will automatically expire if this Commitment Letter and the Fee Letter have not been approved by a final order of the Court by

5:00 p.m. (New York City time) on August 4, 2017 (it being agreed that each party hereto shall use its reasonable best efforts to seek Court approval as soon as practicable prior thereto and shall not encourage or assist the submission or development of an alternative transaction whether relating to the sale or issuance of any debt or security or the acquisition, sale or lease or other disposition of the Debtors of any material assets or equity of the Debtors).  Thereafter, this Commitment Letter and the commitments and undertakings of the Agent hereunder shall automatically terminate upon the earliest of (a) 5:00 p.m. (New York City time) on December 1, 2017, unless Citizens shall, in its discretion, agree to an extension hereof or the Exit Closing Date occurs on or prior thereto, (b) the consummation of the Approved Plan, (c) five (5) business days after the Petition Date in the event that the DIP Credit Facility is not closed and funded prior to such date, (d) a sale of all or a substantial portion of the assets of the Debtors, (e) a refinancing or all or any part of the DIP Credit Facility and (f) the consummation of a plan of reorganization without the use of the Exit Facility.  In consideration of the time and resources that the Agent and the Lead Arranger will devote to the Exit Facility, but subject to the last sentence of paragraph 12 above, you agree that, until such expiration, you will not, and will cause the Debtors, the Borrower, the Guarantors or their affiliates not to, solicit, initiate, entertain or permit, or enter into any discussions in respect of, any offering, placement or arrangement of any competing senior credit facility or facilities for the Borrower and its subsidiaries with respect to the matters addressed in this Commitment Letter.

*[Remainder of this page intentionally left blank]*

DB1/ 92452234.9

We look forward to working with you on this important transaction.

Very truly yours,

CITIZENS BANK, N.A.

By _____
Name:
Title:

Accepted and agreed to as of
the date first above written:

TRUE RELIGION APPAREL, INC.

By _____
      Name:
      Title:

## Exhibit A

Exit Facility Term Sheet

## SUMMARY OF INDICATIVE TERMS AND CONDITIONS
## ("EXIT FACILITY TERM SHEET")
## $60,000,000 SENIOR CREDIT FACILITY
## (EXIT FACILITY)

*Capitalized terms not otherwise defined herein have the same meanings as*
*specified therefor in the Commitment Letter to which this Exhibit A is attached.*

| | |
|---|---|
| **BORROWER:** | True Religion Apparel, Inc., a Delaware corporation (the "***Company***") and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from the Company upon its emergence from bankruptcy (the "***Borrower***"). |
| **GUARANTORS:** | The obligations of the Borrower and its subsidiaries and affiliates under the Senior Credit Facility (as defined below) and under any treasury management, bank products, interest protection or other hedging arrangements entered into with a Lender (or any affiliate thereof) will be guaranteed by TRLG Intermediate Holdings, LLC, a Delaware limited liability company that is the direct parent of the Borrower ("***Holdings***"), and each existing and future direct and indirect domestic subsidiary of the Borrower (collectively, the "***Guarantors***", and together with the Borrower, the "***Loan Parties***"). Notwithstanding the foregoing, the guaranty requirements will be subject to customary exceptions to be agreed. All guarantees will be guarantees of payment and not of collection. |
| **ADMINISTRATIVE AGENT:** | Citizens Bank, N.A. ("***Citizens***") will act as sole administrative agent (in such capacity, the "***Administrative Agent***"). |
| **LEAD ARRANGER AND BOOKRUNNER:** | Citizens will act as a lead arranger and bookrunner (in such capacities, the "***Lead Arranger***"). |
| **LENDERS:** | A group of lenders arranged by the Lead Arranger (collectively, the "***Lenders***"). |
| **SENIOR CREDIT FACILITY:** | Subject to the terms under the heading "Borrowing Base," a $60 million revolving credit facility (the "***Senior Credit Facility***") available from time to time until the fifth anniversary of the Exit Closing Date, which will include a $20 million sublimit for the issuance of letters of credit (the "***Letters of Credit***"). Letters of Credit will be issued by Citizens (in such capacity, the "***L/C Issuer***"). Each of the Lenders under the Senior Credit Facility will purchase an irrevocable and unconditional participation in each Letter of Credit. |
| **INCREASE OPTION:** | The Senior Credit Facility will include an accordion feature permitting the Borrower to request an increase in the Senior Credit Facility after the |

Exit Closing Date by an additional amount (for all such increases in the Senior Credit Facility) of up to $15,000,000 in the form of additional revolving loans or term loans; <u>provided</u> that any such request shall be in increments of $1,000,000 (collectively, the "Increase Option"). Such increases may be effected from time to time after the Exit Closing Date subject to customary terms and conditions (including, without limitation, delivery of customary documentation reflecting corporate action by the Borrower and the Guarantors approving of such increase) and provided that (i) no default or event of default shall exist at the time of any such increase or immediately after giving effect to such increase, and (ii) the Administrative Agent shall have received a certificate, in form and substance reasonably satisfactory to the Administrative Agent, of the Borrower setting forth calculations demonstrating that, after giving effect to any such increase (determined as if the entire amount of such increase is fully-funded), the Borrower and its subsidiaries shall be in compliance on a pro forma basis with its financial covenants under the definitive documentation for the Senior Credit Facility.

Any such increase in the Senior Credit Facility pursuant to an increase thereof in the form of revolving credit loans under the Senior Credit Facility (an "Incremental Facility"), shall be subject to terms and conditions approved by the Borrower, the Administrative Agent, the Lead Arranger and the lenders participating in such Incremental Facility; provided, that the Incremental Facility (a) will be made available as a separate facility established under the Loan Documents, and (b) all documentation in respect of the Incremental Facility (including any amendments to the Loan Documents) shall be in form and substance substantially the same as the Senior Credit Facility and shall be satisfactory to the Borrower, the Administrative Agent and the Lead Arranger and shall have been approved by the Administrative Agent and the Borrower.

**USE OF PROCEEDS:** The proceeds of the Senior Credit Facility shall be used solely for, in each case in a manner consistent with the terms and conditions herein, (a) repayment of the loans and all other obligations under the Senior Secured, Super Priority, Debtor-In-Possession Credit Agreement (the "*DIP Credit Agreement*"), among the Borrower, Holdings, the guarantors party thereto, the lenders party thereto from time to time, and the Administrative Agent, (b) payments described in the Approved Plan, (c) payment of costs and expenses incurred in connection with consummation of the Approved Plan, and (d) for working capital and other general corporate purposes of the Borrower.

**BORROWING BASE:** Advances under the Senior Credit Facility may be made to the Borrower on a revolving basis up to the full amount of the Senior Credit Facility and Letters of Credit may be issued up to the sublimit for Letters of Credit, in each case, subject to compliance with a borrowing base (the "*Borrowing Base*") equal to: (i) 90% of eligible credit card receivables of the Borrower and the Guarantors, plus (ii) 85% of eligible trade accounts receivables of the Borrower and the Guarantors, plus (iii) the lesser of (a) 90% of the appraised net orderly liquidation value of eligible

inventory and (b) 100% of the cost of eligible inventory, minus (iv) any applicable Reserves to be determined by the Administrative Agent in its Permitted Discretion.

The Borrowing Base will be computed by the Borrower monthly, and a certificate (the "*Borrowing Base Certificate*") presenting the Borrower's computation of the Borrowing Base will be delivered to the Administrative Agent promptly, but in no event later than the tenth day following the end of each calendar month; provided, however, that (a) during the continuance of an Event of Default or (b) if Excess Availability (as defined below) is less than the greater of (x) 20% of the lesser of (A) the aggregate commitments under the Senior Credit Facility at such time and (B) the Borrowing Base (such lesser amount, the "*Maximum Borrowing Amount*") and (y) $12,000,000, in each case, for three (3) consecutive Business Days, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis until the date on which, as applicable, in the case of clause (a), such Event of Default is cured or waived, or in the case of clause (b), Excess Availability has been greater than the greater of (x) 20% of the Maximum Borrowing Amount and (y) $12,000,000, in each case, for at least thirty consecutive days.

"*Permitted Discretion*" means a determination made by the Administrative Agent in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment. The Administrative Agent will inform the Borrower of, and explain to the Borrower, the establishment or increase of any Reserves.

"*Reserves*" means, on any date of determination, reserves established by the Administrative Agent from time to time against the Borrowing Base or any component thereof, in each case, in such amounts as the Administrative Agent may elect to impose from time to time in its Permitted Discretion upon not less than one (1) Business Day's prior written notice to the Borrower. The Administrative Agent shall not establish any Reserves to the extent such Reserves would be duplicative of any (x) specific item excluded as ineligible in the calculation of the Borrowing Base or any component thereof or (y) any other Reserves.

"*Excess Availability*" shall mean, at any time, (a) the Maximum Borrowing Amount, *minus* (b) the aggregate outstanding principal amount of all loans and Letter of Credit obligations at such time under the Senior Credit Facility.

| RESERVES: | The Administrative Agent shall have the right to establish, modify or eliminate Reserves or to establish or adjust any eligibility criteria in its Permitted Discretion. |

| EXIT CLOSING DATE: | The "*Exit Closing Date*" shall occur as promptly as is practical after the order of the Court confirming the Approved Plan becomes a final order, but no later than December 1, 2017. |

**MATURITY:** The Senior Credit Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full five years after the Exit Closing Date.

**MANDATORY PREPAYMENTS:** In the event that the aggregate outstanding amount of loans and Letter of Credit obligations at such time under the Senior Credit Facility exceeds the then Maximum Borrowing Amount, the Borrower will immediately prepay an amount sufficient to result in Excess Availability being greater than $0.

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:** The Senior Credit Facility may be prepaid in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings. The unutilized portion of the commitments under the Senior Credit Facility may be irrevocably reduced or terminated by the Borrower at any time without penalty.

**SECURITY:** The Senior Credit Facility and the obligations of the Loan Parties thereunder will be secured by a fully perfected security interest in all property and assets of the Loan Parties (subject to customary exclusions to be agreed) including, but not limited to, as follows:

A valid and perfected first priority lien and security interest in all of the property and assets of the Loan Parties set forth on <u>Schedule I</u> hereto (the "*Revolving Credit Primary Collateral*").

A valid and perfected second priority security interest in all of the property and assets of the Loan Parties set forth on <u>Schedule II</u> hereto (the "*Revolving Credit Secondary Collateral*" and, together with the Revolving Credit Primary Collateral, the "*Collateral*").

"*Intellectual Property*" shall mean the Borrower's and each Guarantor's intellectual property licenses, patents, copyrights, trademarks, the goodwill associated with such trademarks, trade secrets and customer lists and all rights to sue at law or in equity for any past, present or future infringement, misappropriation, violation, misuses or other impairment thereof, including the right to receive injunctive relief and all proceeds and damages therefrom.

The Collateral shall secure the relevant party's obligations in respect of the Senior Credit Facility and any treasury management, bank products, interest protection or other hedging arrangements entered into with a Lender (or an affiliate thereof).

**CASH MANAGEMENT:** The Loan Parties and their subsidiaries shall establish cash management procedures reasonably acceptable to the Administrative Agent. Subject to exceptions to be mutually agreed, all deposit accounts and securities accounts of the Loan Parties shall be subject to control agreements in favor of the applicable Administrative Agent (such accounts subject to

the control of such Administrative Agent, collectively, the "**Blocked Accounts**"). Upon the occurrence and during the continuation of a Cash Dominion Period (as defined below), the Administrative Agent shall have control over all relevant Blocked Accounts and cause all amounts maintained in deposit accounts (that are Blocked Accounts) to be swept, on a daily basis, to a collection account of the Administrative Agent, to be applied to the outstanding obligations under the Senior Credit Facility. The Borrower, the Guarantors and their subsidiaries will maintain their primary cash management, controlled disbursement and ACH relationship with Administrative Agent and its affiliates.

"**Cash Dominion Period**" shall mean (a) commencing on the Exit Closing Date and continuing through the end of the first full quarter after the Exit Closing Date, (b) thereafter, each period beginning on the date that Excess Availability shall have been less than 15% of the Maximum Borrowing Amount for five (5) consecutive Business Days and ending on the date Excess Availability shall have been at least 15% of the Maximum Borrowing Amount for thirty (30) consecutive calendar days or (c) an event of default has occurred and is continuing.

**DOCUMENTATION:**

The credit agreement ("**Credit Agreement**") will contain customary representations and warranties, funding and yield protection provisions, conditions precedent, affirmative, negative and financial reporting covenants, indemnities, events of default and remedies and other provisions appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent, the Lenders and their counsel.

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Senior Credit Facility will be subject to satisfaction of customary closing conditions for transactions of this type, including, without limitation, the following conditions precedent, in each case, on or prior to December 1, 2017:

(i)     The negotiation, execution and delivery of a credit agreement, perfection certificates, collateral documents and other documents to be executed or delivered in connection therewith (collectively, with the Credit Agreement, the "**Senior Credit Facility Documentation**") reasonably satisfactory to the Administrative Agent and the Lenders.

(ii)     The Administrative Agent shall have received evidence of the perfection and priority of liens and security interests referred to above under the section entitled "**Security**" (including all filings, recordations and searches necessary or desirable in connection with (such liens and security interests)). The Administrative Agent shall be reasonably satisfied that the Borrower maintains adequate insurance with respect to the Collateral, and the Lenders shall have received endorsements naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its

subsidiaries forming part of the Lenders' collateral described under the section entitled "*Security*" set forth above.

(iii)     The Administrative Agent shall have received (A) customary and reasonably satisfactory legal opinions (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the Senior Credit Facility Documentation), corporate certificates and other usual and customary closing documentation for transactions of this type and (B) satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first priority (subject to certain exceptions to be set forth in the Senior Credit Facility Documentation) lien and security interest in the other collateral referred to under the section entitled "*Security*" set forth above.

(iv)     The Administrative Agent shall have received customary evidence of organizational authority to enter into the Credit Agreement and the other Senior Credit Facility Documentation and the other transactions to be consummated on the Exit Closing Date, in each case, reasonably acceptable to the Administrative Agent.

(v)     The Administrative Agent shall have received good standing certificates, or the equivalent, in the respective jurisdictions of organization of the Loan Parties.

(vi)     There shall have been (a) since the date hereof, other than those customarily resulting from the commencement of the Debtors' bankruptcy case (the "*Case*") for bankruptcy protection and changes contemplated in the Borrower's business plan delivered to the Administrative Agent prior to the date hereof, no material adverse change, individually or in the aggregate, in the business, operations, property, assets, or financial condition of the Loan Parties or the Collateral taken as a whole, (b) no litigation commenced which could reasonably be expected to have a material adverse effect on the Loan Parties or their business taken as a whole, or their collective ability to perform any material obligation or repay the loans, (c) since the date hereof, no material increase in the liabilities, liquidated or contingent, of the Loan Parties as a whole, or material decrease in the assets of the Loan Parties, except in connection with the Borrower's previously disclosed store-closing plan and as contemplated by the Budget applicable during the Case, and (d) other than those resulting from the commencement of the Cases, since the filing date no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Senior Credit Facility Documentation and the obligations of the Borrower or the other Loan Parties thereunder.

(vii)     A final non-appealable order of the Court in form and substance satisfactory to the Agent confirming the Approved Plan which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interests of the Agent, the Arranger or the Lenders (the "*Confirmation Order*") and authorizing Borrower, the Guarantors and

their subsidiaries to execute, deliver and perform under all documents contemplated hereunder and thereunder (including the payment of all fees with respect thereto) shall have been entered and shall have become a final order of the Bankruptcy Court and shall be in full force and effect. The Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective as of the Approved Plan shall have been (or concurrently with the occurrence of the Exit Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law, Court and regulatory approvals and the Approved Plan shall have become effective. The respective indebtedness and obligations of the Borrower and the Guarantors (including, without limitation, tax liabilities) and any liens securing same that are outstanding immediately after the consummation of the Approved Plan shall not exceed the amount contemplated by the Approved Plan.

(viii)   Receipt by the Administrative Agent, the Lead Arranger and the Lenders at least two (2) Business Days prior to the date of the initial Borrowing of all documentation and other information about the Borrower and the Guarantors as has been reasonably requested that they reasonably determine is required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(ix)   Excess Availability under the Senior Credit Facility as of the Exit Closing Date shall not be less than 30% of the Maximum Borrowing Amount, after giving effect to the Exit Transaction and all extensions of credit under the Senior Credit Facility on such date.

(x)   Receipt of all governmental, shareholder and third party consents and approvals necessary in connection with the Senior Credit Facility, the Exit Transaction and the related financings and other transactions contemplated hereby and by the Approved Plan and expiration of all applicable waiting periods without any action being taken by any authority that could restrain, prevent or impose any material adverse conditions on the Borrower and its subsidiaries or such other transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable which in the reasonable judgment of the Administrative Agent could have such effect.

(xi)   The Borrower's pre-petition term loan indebtedness shall have been restructured into a term loan in a principal amount of not more than $113,500,000, which shall be on terms and conditions satisfactory to the Administrative Agent (the "*Reorganized First Lien Term Loans*")

(xii)   The Exit Transaction shall have been consummated on terms consistent with those outlined in the Approved Plan and otherwise on terms and conditions, and pursuant to documentation in form and substance, reasonably satisfactory to the Administrative Agent and shall be in full force and effect. The Administrative Agent shall have received copies of each of the material documents (reasoanbly satisfactory to the

Administrative Agent) executed and or delivered in connection with the Exit Transaction, each of which shall be certified by a responsible officer of the Borrower as being true, complete, correct and in full force and effect.

(xiii)     The Administrative Agent shall have received a fully executed and effective Intercreditor Agreement with the holders of the Reorganized First Lien Term Loans (or an agent for such holders), in form, substance, and on terms, reasonably acceptable to the Administrative Agent (the "***Intercreditor Agreement***").

(xiv)     [Reserved].

(xv)     The Lenders shall have received pro forma consolidated financial statements as to the Company and its subsidiaries giving effect to all elements of the Exit Transaction, and forecasts prepared by management of the Company, each in form and substance reasonably satisfactory to the Administrative Agent, of balance sheets, income statements and cash flow statements on a monthly basis for the first year following the Exit Closing Date and on an annual basis for each year thereafter during the term of the Senior Credit Facility. The Administrative Agent shall have received and be satisfied with the business plan and shall be satisfied with the capital structure of the Borrower and the Guarantors.

(xvi)     The Lenders shall have received certification as to the financial condition and solvency of the Borrower and each Guarantor (after giving effect to the Exit Transaction and the incurrence of indebtedness related thereto) from the chief financial officer of the appropriate entities.

(xvii)     The Administrative Agent shall have received, in form and substance reasonably satisfactory to it, an updated asset appraisal, an updated field audit, flood certificates and flood insurance deliverables and such other reports, audits or certifications as it may reasonably request.

(xviii)     Receipt by the Administrative Agent, for the benefit of the Lenders and the Administrative Agent, of all reasonable and documented fees and expenses Lenders (including the reasonable and documented fees and expenses of one primary counsel (and any special or local counsel) for the Administrative Agent) due and payable in connection with the transactions contemplated hereby.

(xix)     All obligations under, or described in, the DIP Credit Agreement shall have been repaid in full in cash (or such other arrangements as are satisfactory to Citizens in its sole discretion).

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**     Each extension of credit under the Senior Credit Facility will be subject to satisfaction of the following conditions precedent:  (i) all of the

representations and warranties in the Senior Credit Facility Documentation shall be true and correct in all material respects as of the date of such extension of credit (except for representations and warranties that expressly relate to an earlier date); (ii) no default or event of default under the Senior Credit Facility shall have occurred and be continuing or would result from such extension of credit; (iii) the Administrative Agent shall have received a notice of borrowing from the Borrower; (iv) the aggregate principal amount of all loans outstanding and, if applicable, Letters of Credit outstanding on such date, after giving effect to the applicable borrowing or issuance or renewal of a Letter of Credit, shall not exceed the Maximum Borrowing Amount; and (v) the Borrower shall have paid the balance of all fees and expenses then due and payable as referenced herein. The request by the Borrower of, and the acceptance by the Borrower of, each extension of credit shall be deemed to be a representation and warranty by the Borrower that the foregoing conditions have been satisfied.

**REPRESENTATIONS AND WARRANTIES:**

Representations and warranties appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation and subject to customary qualifiers and exceptions, the following: (i) legal existence; qualification and power; (ii) due authorization and no contravention of law, contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect; (vi) no material litigation; (vii) no default; (viii) ownership of property; including disclosure of liens, properties, leases and investments; (ix) insurance matters; (x) environmental matters; (xi) tax matters; (xii) ERISA compliance; (xiii) identification of subsidiaries, equity interests and loan parties; (xiv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xv) status under Investment Company Act; (xvi) accuracy of disclosure; (xvii) compliance with laws; (xviii) intellectual property; (xix) solvency; (xx) no casualty; (xxi) labor matters; (xxii) collateral documents; (xxiii) none of Holdings, the Borrower or any Guarantor (collectively, the "*Loan Parties*") is an EEA Financial Institution.

**AFFIRMATIVE AND NEGATIVE COVENANTS:**

Affirmative, negative and financial covenants appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, the following (in each case, subject to baskets, qualifications, exceptions and thresholds to be agreed):

(a) Affirmative Covenants - (i) delivery of financial statements, budgets and forecasts; (ii) delivery of certificates and other information; (iii) delivery of notices (of any default, material adverse condition, ERISA event, material change in accounting or financial reporting

practices, disposition of property, sale of equity, incurrence of debt); (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) maintenance of insurance; (viii) compliance with laws; (ix) maintenance of books and records; (x) inspection rights; (xi) use of proceeds; (xii) covenant to guarantee obligations, give security; (xiii) compliance with environmental laws; (xiv) preparation of environmental reports; (xv) further assurances; (xvi) compliance with terms of leaseholds; (xvii) compliance with material contracts; and (xviii) designation as senior debt.

(b) <u>Negative Covenants</u> - Restrictions on (i) liens; (ii) indebtedness, (including (x) guarantees and other contingent obligations and (y) an amount [TBD] of junior secured indebtedness on terms and conditions acceptable to the Citizens (it being understood that such Indebtedness may be secured by junior Liens on Revolver Primary Collateral and/or senior Liens on Revolver Secondary Collateral on terms acceptable to Citizens and such Indebtedness and the liens on collateral securing such Indebtedness shall be subject to an intercreditor agreement acceptable to Citizens)); (iii) investments (including loans and advances); (iv) mergers and other fundamental changes; (v) sales and other dispositions of property or assets; (vi) payments of dividends and other distributions; (vii) changes in the nature of business; (viii) transactions with affiliates; (ix) burdensome agreements; (x) use of proceeds; (xi) capital expenditures; (xii) amendments of organizational documents; (xiii) changes in accounting policies or reporting practices; (xiv) prepayments and voluntarily redemption of other indebtedness; (xv) modification or termination of documents related to certain indebtedness; and (xvi) changes in activities of Holdings, in each case, with such exceptions as may be agreed and are reasonably acceptable to the Administrative Agent. The Borrower or any subsidiary shall be permitted to (w) make dividends, restricted payments and other distributions, (x) prepay and voluntarily redeem other indebtedness, (y) investments and (z) incur unsecured or subordinated debt, in each case, subject to the satisfaction of the Payment Conditions.

"*Payment Conditions*" shall mean, with respect to any applicable transaction, event, or payment, (a) no event of default shall exist before or immediately after giving effect to such transaction, event, or payment, and (b) the Borrower shall have demonstrated to the reasonable satisfaction of the Agent either (x) Excess Availability (on a pro forma basis after giving effect to such transaction, event or payment) will be greater than 25% of the Maximum Borrowing Amount immediately following such specified transaction, event, or payment and as projected on a pro-forma basis as of the end of each fiscal month for each of the twelve (12) fiscal months following such specified transaction, event, or payment or (y) both (i) Excess Availability (on a pro forma basis after giving effect to such transaction, event or payment) will be greater than 20% of the Maximum Borrowing Amount immediately following such

specified transaction, event, or payment and as projected on a pro-forma basis as of the end of each fiscal month for each of the twelve (12) fiscal months following such specified transaction, event, or payment, and (ii) the Fixed Charge Coverage Ratio for the period of for the trailing twelve month period most recently ended shall be greater than 1.10 to 1.00 (calculated both before giving effect to such transaction, event or payment and on a pro forma basis after giving effect to such transaction, event or payment). The Borrower shall certify in a certificate addressed to the Administrative Agent that the Payment Conditions are satisfied.

**FINANCIAL COVENANT:** Maintain, at all times, Excess Availability in an amount not less than the greater of (a) $5,000,000 and (b) ten percent (10%) of the Maximum Borrowing Amount.

**FIELD EXAMS AND APPRAISALS:** The Administrative Agent may conduct (a) two (2) field examinations and two (2) inventory appraisals (each at the expense of the Borrower) during the first twelve (12) month period after the Exit Closing Date; provided that (i) at any time after the date on which Excess Availability is less than 20% of the Maximum Borrowing Amount, field examinations and inventory appraisals may each be conducted (at the expense of the Borrower) three (3) times during the next twelve months, (b) one (1) field examination and one (1) inventory appraisal (each at the expense of the Borrower) during any twelve (12) consecutive month period after the first twelve (12) month period after the Exit Closing Date; provided that (i) at any time after the date on which Excess Availability is less than 20% of the Maximum Borrowing Amount, field examinations and inventory appraisals may each be conducted (at the expense of the Borrower) two (2) times during the next twelve months, and (ii) at any time during the continuation of an Event of Default, field examinations and inventory appraisals may be conducted (at the expense of the Borrower) as frequently as determined by the Administrative Agent in its reasonable discretion and (c) one (1) additional field examination and one (1) additional inventory appraisal during any twelve (12) consecutive month period at the expense of the Lenders.

**EVENTS OF DEFAULT:** Events of default appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, the following (subject, in certain cases, to grace periods and thresholds to be agreed): (i) nonpayment of principal, interest, fees or other amounts; (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (viii) customary ERISA defaults; (ix) actual or asserted invalidity or impairment of any loan documentation; (x) change of control; and (xi)

actual or asserted invalidity or impairment of any subordination provisions.

**ASSIGNMENTS AND PARTICIPATIONS:**

Assignments and participations appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, provided that the Loan Parties will not be permitted to list disqualified lenders except to the extent that a list of disqualified lenders (acceptable to Citizens) is provided to Citizens prior to the execution of the Commitment Letter.

*Consents*: The consent of the Borrower, not to be unreasonably withheld, will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the Senior Credit Facility). The consent of the Administrative Agent will be required for any assignment in respect of the Senior Credit Facility, to an entity that is not a Lender, an affiliate of such Lender or an Approved Fund in respect of such Lender. The consent of the Fronting Bank will be required for any assignment under the Senior Credit Facility.

*Assignments Generally*: An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion.

*Participations*: Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the Senior Credit Facility or all or substantially all of the value of the guaranty of the Borrower's obligations made by the Guarantors.

**WAIVERS AND AMENDMENTS:**

Waiver and amendments provisions appropriate for transactions of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders.

**INDEMNIFICATION:**

The Borrower will indemnify and hold harmless the Administrative Agent, the Lead Arranger, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Senior Credit Facility, any other aspect of the Exit Transaction, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable and documented out-of-pocket attorneys' fees (including the allocated cost of internal counsel) and settlement costs. This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**

State of New York.

**PRICING/FEES/EXPENSES:**

As set forth in Addendum 1.

**COUNSEL TO THE ADMINISTRATIVE AGENT:** Morgan, Lewis & Bockius LLP.

**OTHER:** Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. The Loan Parties shall agree not to bring any suit or action in respect of or related to the Senior Credit Facility or any Senior Credit Facility Documentation therefor in any forum, other than in courts of the state of New York sitting in New York county and of the United States District Court of the Southern District of New York. The Senior Credit Facility Documentation will contain customary increased cost, withholding tax, capital adequacy and yield protection provisions and EU bail-in and defaulting lender language.

**PRICING, FEES AND EXPENSES**

**INTEREST RATES:** The interest rates per annum applicable to the Senior Credit Facility will be LIBOR plus the Applicable Rate (as hereinafter defined) or, at the option of the Borrower, the Base Rate (to be defined as the highest of (a) the Federal Funds Rate plus ½ of 1%, (b) the Citizens prime rate and (c) LIBOR plus 1.00%) plus the Applicable Rate. "Applicable Rate" means a percentage per annum to be determined in accordance with the pricing grid set forth below. Notwithstanding anything to the contrary contained herein, to the extent that, at any time, LIBOR shall be less than zero, LIBOR shall be deemed to be zero for purposes of the Senior Credit Facility. The Applicable Rate for the period from the Exit Closing Date through the second full fiscal quarter of the Borrower after the Exit Closing Date shall be as set forth in Level III below.

The Borrower may select interest periods of one, two, three or six months for LIBOR loans, subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

During the continuance of any default under the Senior Credit Facility Documentation (as hereinafter defined), the Applicable Rate on obligations under the Senior Credit Facility Documentation shall increase by 2% per annum.

**COMMITMENT FEE:** Commencing on the Exit Closing Date, a commitment fee of (a) if utilization of the Senior Credit Facility is greater than or equal to 50%, 0.250% per annum and (b) if utilization of the Senior Credit Facility is less than 50%, 0.375% per annum, shall be payable on the actual daily unused portions of the Senior Credit Facility. Such fee shall be payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Exit Closing Date and the actual amount of such fee shall depend on Excess Availability thresholds to be mutually agreed upon.

**LETTER OF CREDIT FEES:** Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to the Applicable Rate from time to time applicable to Revolving Credit LIBOR loans. Such fees will be (a) payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Exit Closing Date, and (b) shared proportionately by the Lenders under the Senior Credit Facility. In addition, a fronting fee shall be payable to the Fronting Bank for its own account, in an amount to be mutually agreed.

| Level | Excess Availability | Applicable Rate for LIBOR Loans / Letter of Credit Fees | Applicable Rate for Base Rate Loans |
|-------|---------------------|---------------------------------------------------------|-------------------------------------|
| I | Greater than 66% | 1.50% | 0.50% |
| II | Less than or equal to 66%, but greater than 33% | 1.75% | 0.75% |
| III | Less than or equal to 33% | 2.00% | 1.00% |

**CALCULATION OF INTEREST AND FEES:**

Other than calculations in respect of interest at the Citizens prime rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD PROTECTION:**

Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**EXPENSES:**

The Borrower will pay all reasonable and documented out-of-pocket costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all Senior Credit Facility Documentation, including, without limitation, the reasonable and documented legal fees of one primary counsel to the Administrative Agent and the Lead Arranger (and any special or local counsel), regardless of whether or not the Senior Credit Facility is closed. The Borrower will also pay the reasonable and documented out-of-pocket expenses of the Administrative Agent and each Lender in connection with the work-out or enforcement of any of the Senior Credit Facility Documentation.

"Revolving Credit Primary Collateral" shall mean all interests of each Loan Party in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (1) all rights of each Loan Party to receive moneys due and to become due under or pursuant to the following, (2) all rights of each Loan Party to receive return of any premiums for or proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation proceeds with respect to the following, (3) all claims of each Loan Party for damages arising out of or for breach of or default under any of the following, and (4) all rights of each Loan Party to terminate, amend, supplement, modify or waive performance under any of the following to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

(i)     all Accounts and payment intangibles constituting credit card receivables, but for purposes of this clause (i) excluding rights to payment for any property which specifically constitutes Revolving Credit Secondary Collateral which has been or is to be sold, leased, licensed, assigned or otherwise disposed of; provided, however, that all rights to payment arising from any sale of Inventory shall constitute Revolving Credit Primary Collateral;

(ii)     all Chattel Paper;

(iii)     all Deposit Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained with any bank or other financial institution and all monies, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing (in each case, other than a deposit account holding only identifiable proceeds of any Revolving Credit Secondary Collateral);

(iv)     all Inventory;

(v)     all other cash and cash equivalents (other than identifiable proceeds of any Revolving Credit Secondary Collateral);

(vi)     to the extent evidencing or governing any of the items referred to in the preceding clauses (i) through (v), all General Intangibles, letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents; provided that to the extent of any of the foregoing also relates to Revolving Credit Secondary Collateral, only that portion related to the items referred to in the preceding clauses (i) through (v) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(vii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (vi), all insurance; provided that to the extent any of the foregoing also relates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding clauses (i) through (vi) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(viii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (vii), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding clauses (i) through (vii) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(ix)　　to the extent relating to any of the items referred to in the preceding <u>clauses (i)</u> through (<u>viii</u>), all Commercial Tort Claims; <u>provided</u> that to the extent of any of the foregoing also rlates to Revolving Credit Secondary Collateral only that portion related to the items referred to in the preceding <u>clauses (i)</u> through (<u>viii</u>) as being included in the Revolving Credit Primary Collateral shall be included in the Revolving Credit Primary Collateral;

(x)　　all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; and

(xi)　　all cash proceeds and all non-cash proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (including all insurance proceeds) and all collateral security, guarantees and other Collateral Support given by any Person with respect to any of the foregoing.

"Revolving Credit Secondary Collateral" shall mean all interests of each Loan Party in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (1) all rights of each Loan Party to receive moneys due and to become due under or pursuant to the following, (2) all rights of each Loan Party to receive return of any premiums for or Proceeds of any Insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (3) all claims of each Loan Party for damages arising out of or for breach of or default under any of the following, and (4) all rights of each Loan Party to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

(i)     any deposit account holding only identifiable Proceeds of any Revolving Credit Secondary Collateral, and all cash, money, securities and other investments deposited therein;

(ii)     all Equipment;

(iii)     all Fixtures;

(iv)     all General Intangibles, including Contracts, together with all Contract Rights arising thereunder (in each case, other than General Intangibles constituting, evidencing, governing or otherwise relating to Revolving Credit Primary Collateral);

(v)     all letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights (to the extent perfected by the filing of a UCC financing statement as a Supporting Obligation), Instruments and Documents (except to the extent constituting, evidencing or governing or attached or related to (to the extent so attached or related to) Revolving Credit Primary Collateral);

(vi)     without duplication, all Investment related property, all Securities, all Securities Entitlements and all Securities Accounts (in each case, other than any Collateral constituting Revolving Credit Primary Collateral and other than any Supporting Obligations supporting Revolving Credit Primary Collateral);

(vii)     all Intellectual Property;

(viii)     except to the extent constituting, or relating to, Revolving Credit Primary Collateral, all Commercial Tort Claims;

(ix)     all real property (including, if any, leasehold interests) on which the Loan Parties are required to provide a lien to the lenders under the Reorganized First Lien Term Loans and any title insurance with respect to such real property (other than title insurance actually obtained by the Administrative Agent in respect of such real property) and the proceeds thereof;

(x)     except to the extent constituting, governing, evidencing or relating to, the Revolving Credit Primary Collateral, all other personal property (whether tangible or intangible) of such Loan Party;

(xi) to the extent constituting, or relating to, any of the items referred to in the preceding clauses (i) through (x), all insurance; provided that to the extent any of the foregoing also relates to

Revolving Credit Primary Collateral, only that portion related to the items referred to in the preceding clauses (i) through (x) as being included in the Revolving Credit Secondary Collateral shall be included in the Revolving Credit Secondary Collateral;

(xii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (xi), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Revolving Credit Primary Collateral only that portion related to the items referred to in the preceding clauses (i) through (xi) as being included in the Revolving Facility Secondary Collateral shall be included in the Revolving Credit Secondary Collateral;

(xiii)    all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; provided that to the extent any of such material also relates to Revolving Credit Primary Collateral only that portion related to the items referred to in the preceding clauses (i) through (xii) as being included in the Revolving Credit Secondary Collateral shall be included in the Revolving Credit Secondary Collateral; and

(xiv)    all cash proceeds and, solely to the extent not constituting Revolving Credit Primary Collateral, non-cash proceeds, products, accessions, rents and profits of or in respect of any of the foregoing and all collateral security, guarantees and other Collateral Support given by any Person with respect to any of the foregoing.